IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREGORY T. ANGELO, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-1878 RDM |
| | ) | |
| DISTRICT OF COLUMBIA, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR PRELIMINARY INJUNCTION**

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  July 11, 2022

# TABLE OF CONTENTS

Table of Authorities …………………………………………………………………... ii

I.      Plaintiffs have standing to bring this action ……………………………………… 1

II.     Plaintiffs are entitled to a preliminary injunction …………………...………………… 2

      A.      Plaintiffs are likely to prevail on the merits ……………………………..……… 3

            1.  The Second Amendment ……………………………………...................... 3

            2.  The statutory scheme ………………………………...…………………... 5

            3.  Public transportation vehicles and  stations are unlike any of the other
                so-called sensitive areas where DC prohibits handgun carry ……..…..…… 9

            4.  The challenged regulation is a substantial burden on Plaintiffs'
                Second Amendment rights …………………………………………… 22

            5.  No analogue exists to justify the challenged ban as consistent
                with the nation's historic tradition of firearms regulation …………..…. 24

      B.      Plaintiffs will continue to suffer irreparably harm in the absence
          of preliminary relief …………………………………………………….… 34

      C.  The balance of equities tips overwhelmingly in Plaintiffs' favor ……………..…… 36

      D.  An injunction is in the public interest …………………………………………… 36

III.    The Court should waive the bond requirement or set a nominal bond because
      Defendants will suffer no harm from a preliminary injunction …………………..……37

IV.     The Court should enter final judgment for Plaintiffs …………………………..…… 39

V.      Conclusion ………………………………………………………………..… 40

Exhibit 1, Declaration of Gregory T. Angelo

Exhibit 2, Declaration of Tyler Yzaguirre

Exhibit 3, Declaration of Robert M. Miller

Exhibit 4, Declaration of Cameron M. Erickson

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*,
　　742 F.3d 1023 (D.C. Cir. 2014) ……………………………………..…………..…….. 3

*Adderly v. Florida*,
　　385 U.S. 39 (1966) …………………………………………………………………… 12

*Andrews v. State*,
　　50 Tenn. (3 Heiskel) 165 (1871) ………………………………………...……… 28

*Ark. Best Corp. v. Carolina Freight Corp.*,
　　60 F.Supp.2d 517 (W.D.N.C. 1999) ………………………………………………… 38

*Berg v. Glen Cove City School District*,
　　853 F.Supp. 651 (E.D.N.Y. 1994) ………………………………………………… 35

*Bliss* v. *Commonwealth*,
　　12 Ky. 90 (1822) ……………………………………………………………...…… 27

*Bonidy v. U.S. Postal Serv.*,
　　790 F.3d 1121 (10th Cir. 2015) …………………………………………………… 12

*Burson v. Freeman*,
　　504 U.S. 191 (1992) …………………………………………………….…………… 16

*Caetano v. Massachusetts*,
　　577 U.S. 411 (2016) ……………………………………………………………....... 3, 4

*Chaplaincy of Full Gospel Churches v. England*,
　　454 F.3d 290 (D.C. Cir. 2006) …………………………………………….……… 34, 36

*Curtis 1000, Inc. v. Suess*,
　　24 F.3d 941 (7th Cir. 1994) …………………………………….…………………… 39

*Davis v. District of Columbia*,
　　158 F.3d 1342 (D.C. Cir. 1998) …………………………………………………… 35

*Digiacinto v. The Rector and Board of Visitors of George Mason University*,
　　281 Va. 127 (2011) …………………………………………………….……….... 14

*District of Columbia v. Heller*,
　　554 U.S. 570 (2008) …………………………………………………….……….. passim

*Denotes principal cases relied upon

*Doe v. Shenandoah County School Board,*
    737 F.Supp. 913 (W.D.Va. 1990) ……………………………………….………… 35

*Elrod v. Burns,*
    427 U.S. 347 (1976) ……………………………………………………………… 35

*Ezell v. Chicago,*
    651 F.3d 684 (7th Cir. 2011) ………………………………….……………… 35, 36

*Fife v. State,*
    31 Ark. 455 (1876) ……………………………………………………..……… 28

*GeorgiaCarry.Org, Inc. v. Georgia,*
    764 F. Supp. 2d 1306 (M.D. Ga. 2011, *aff'd,*
    687 F.3d 1244 (11th Cir. 2012) …………………………………………….….. 10

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) …………………………………………….… 35, 37

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ……………………..……………………… 5, 10, 11

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) ……………………………………..…………….. 4

*Hill v. State,*
    53 Ga. 473 (1874) ……………………………………………………………… 29

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,*
    174 F.3d 411 (4th Cir. 1999) ……………………..………………………..………… 37

*Jeanette Rankin Brigade v. Chief of the Capitol Police,*
    421 F.2d 1090 (D.C. Cir. 1969) ……………………………………..…………….. 12

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ………………………………………………………..… 18

*Joynes v. Lancaster,*
    553 F.Supp. 809 (M.D.N.C. 1982) …………………………………..……… 35

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
    710 F.3d 99 (3d Cir. 2013) ……………………………………………………… 37

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) …………………………………………………...……………… 1

*McDonald v. Chicago,*
        561 U.S. 742 (2010) ……………………………………………………………… 3

*Minnesota Majority v. Mansky,*
        849 F.3d 749 (8th Cir. 2017) …………………………………………...……….. 1

*Moore v. Madigan,*
        702 F.3d 933 (7th Cir. 2012) *reh'g en banc denied,*
        708 F.3d 901 (7th Cir. 2013)……………………………………………… 24, 40

*Morris v. U.S. Army Corps of Engineers,*
        60 F.Supp.3d 1120 (D. Idaho 2014) ……………………………………………. 13

*Morris v. District of Columbia,*
        38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………………... 39

*New York State Rifle & Pistol Association v. Bruen,*
        Case No. 20-843, *slip op.* (June 23, 2022) ……………………………… passim

*Nunn v. State,*
        1 Ga. 243, 251 (1846) …………………………………………...……… 27

*Palmer v. District of Columbia,*
        59 F.Supp.3d 173 (D.D.C. 2014) …………………………………….... 3, 4, 5

*Papachristou v. City of Jacksonville,*
        405 U.S. 156 (1972) ……………………………………………………… 18

*Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.,*
        50 F.3d 1168 (2d Cir. 1995) …………………………………………….. 38

*SEC v. Dowdell,*
        Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 (W.D. Va., Oct. 11 , 2002) ….. 37

*State v. Chandler,*
        5 La. Ann. 489, 490 (1850) ………………………………………...……… 27

*State v. Duke,*
        42 Tex. 455 (1874) …………………………………………..………… 29, 30

*State v. Reid,*
        1 Ala. 612 (1840) ……………………………………………………….. 27

*Temple Univ. v. White,*
        941 F.2d 201 (3d Cir. 1991), *cert. denied,*
        502 U.S. 1032 (1992) ………………………………………………...……… 38

*The Truth About Obama v. Federal Election Commission,*
575 F.3d 342 (4th Cir. 2009), *remanded other grounds,*
130 S.Ct. 237 (2010) ………………………………………………………………………… 3

*U.S. v. Class,*
930 F.3d 460, 463 (D.C. Cir. 2019) ………………………… 9, 10, 11, 12, 13, 19, 22

*United States v. Dorosan*,
350 F. App'x 874 (5th Cir. 2009) …………………………………………………….. 13

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
249 F. Supp.2d 98, 128 (D. Mass. 2003) ……………………………………… 38, 39

*Wilson v. State,*
33 Ark. 557 (1878) ……………………………………………………………...…… 28

*Winter v. National Resources Defense Fund,*
555 U.S. 7 (2008) ……………………………………………………...……… 2, 34

*Wrenn v. District of Columbia,*
864 F.3d 650 (D.C. Cir. 2017) ……………………...………………… 3, 4, 6, 24, 27, 39

## Statutes and Rules

18 U.S.C. § 922(q) ……………………………………………………...…………… 13

430 Ill Comp. Stat. §66/65 ………………………………………………………… 30

1859 Wash. Sess. Laws 489 ………………………………………………………… 29

1870 La. Acts 61 …………………………………………………………….……… 29

1870 Tex. Gen. Laws 63 ……………………………………………………...…… 29

1878 Va. Acts 37 ……………………………………………………………...…… 29

DC Code Section 7-2501.01(12) ………………………………………...……………. 5

DC Code Section 7-2501.01(18) ………………………………………………………... 23

DC Code Section 7-2502.03(a)(2) ………………………………………………..... 23

DC Code Section 7-2509.02 ……………………………………………………...…… 6

DC Code Section 7-2509.07(a) …………………………………………………… 7, 8, 9, 10

v

DC Code Section 7-2509.07(a)(1) ……………..…………………………………………………... 10

DC Code Section 7-2509.07(a)(2) …………………..…………………………………………... 13

DC Code Section 7-2509.07(a)(3) ………………..…………………………………………... 15

DC Code Section 7-2509.07(a)(4) …………………..…………………………………………... 16

DC Code Section 7-2509.07(a)(5) …………………..…………………………………………... 16

DC Code Section 7-2509.07(a)(6) …..……………………………………………………....... passim

DC Code Section 7-2509.07(a)(7) ……………..…………………………………………….... 17

DC Code Section 7-2509.07(a)(8) ………………..…………………………………………... 17

DC Code Section 7-2509.07(a)(9) …………..…………………………………………………... 18

D.C. Code Section 7-2509.07(a)(10) ………………………………………………………... 19

DC Code Section 7-2509.07(a)(11) …..…………………………………………………………... 19

DC Code Section 7-2509.07(a)(12) ………..…………………………………………………... 19

DC Code Section 7-2509.07(a)(13) …………..…………………………………………………... 19

DC Code Section 7-2509.07(a)(14) …………..…………………………………………………... 18

DC Code Section 7-2509.07(a)(15) ….…………………………………………………………... 20

DC Code Section 7-2509.07(b)(1) ……………………………………………………………….... 9, 20

DC Code Section 7-2509.07(b)(2) ……………………………………………………………….... 9, 20

DC Code Section 7-2509.07(b)(3) ……………………………………………………………..…... 9, 20

DC Code Section 7-2509.07(e) ……………………………………………………..……... 18, 23

DC Code Section 7-2707.06(a) ………………………………………………………..……… 23

DC Code Section 22-3571.01(b)(4) ………………………………………………………..…... 23

DC Code Section 22–4504(a) ………………………..…………………………..…………………... 5, 6

DC Code Section 22-4504.02 ……………………………………………………………………... 22, 23

DC Code Section 22.4506(a) ……………………………………………………………… 5, 6

DCMR 24-2344 ………………………………………………………………...…….. 18

DCMR 24-2346.1 ……………………………………………………………….…...…… 9

DCMR 24-2346.2 …………………………………………………………………...…….. 9

Fed. R. Civ. P. 65(a)(2) …………………………………………………………………… 39

Fed. R. Civ. P. 65(c) …………………………………………………………………….… 37

Fed. R. Evid. 301 …………………………………………………………………….…… 10

FL. Stat. 790.06(12)(a)(12) …………………………………………………….……...… 17

Mont. Code Ann. Section 87-5-401 ……………………………………………………… 30

New York Penal Code Section 265.01-e(2)(N) …………………………………………… 30

NM Stat. Ann. Section 30-7-13 ……………………………………………………...…… 30

RSMO Section 70.441(11) ……………………………………………………………...… 30

RSMO Section 577.030(4) …………………………………………………...……...…… 30

S.C. Code Ann. Section 58-23-1830 ………………………………………………..……… 30

Utah Code Section 76-10-505.5 …………………………………………………………....… 13

## Other authorities

1 A New and Complete Law Dictionary (1771) …………………………………………..…… 3

1 Dictionary of the English Language 107 (4th ed.) ……………………………………….………3

*Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfurt: Gerald & Berry 1813) ……………………………….……… 28

*A List of States that Allow Concealed Guns on Campus,* Campus Safety (August 30, 2017), available at *https://www.campussafetymagazine.com/university/list-of-states-that-allow-concealed-carry-guns-on-campus/* …………………………………………………………...…… 14

Ayoob, 10 Cases Where An Armed Citizen Took Down An Active Shooter, *Personal Defense World* (March 11, 2015), available at https://www.personaldefenseworld.com/2015/03/10-cases-where-an-armed-citizen-took-down-an-active-shooter/ …………………………………..…… 15

Ayoob, *The Case for Arming Teachers and the Reality of How it Works,* Personal Defense World (August 21, 2018), available at https://www.personaldefenseworld.com/2018/08/hard-targets-arming-teachers/ …………………………………………………………………………..…… 13

Barlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: Crawford Greene and Brother, 1856) …………………..…… 25

Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports* ….. 15

Cornell, *The Right to Carry Firearms Outside the Home: Separating Historical Myths and Historical Realities,* 39 Fordham L. Urb. L. J. 1695 (2012) ………………………..…… 26, 29, 30

Cramer, Concealed Weapons Laws of the Early Republic (Praeger:  Westport, Conn. 1999) …. 28

Cramer, *Gun Control in the Middle & Southern Colonies*, citing Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* (New York: R & W & G. Bartow, 1832) ……... 25

Crime Prevention Research Center, *Updated: Mass Public Shootings Keep Occurring in Gun-Free Zones: 94% of Attacks Since 1950* (June 15, 2018) …………………………………..…… 21

Farnam, Unnecessary Gun Handling, *Ammoland Shooting Sports News* (July 27, 2015), available at https://www.ammoland.com/2015/07/unnecessary-gun-handling/#axzz5mywSQ2FR …….. 23

Hoadly, ed. *Records of the Colony and Plantation of New Haven, From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857) ……………………………………………………… 25

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ct-gun-laws/#loc_res …... 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/nj-gun-laws/#loc_res …... 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ri-gun-laws/#loc_res …... 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ma-gun-laws/#loc_res …. 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ny-gun-laws/#loc_res ….. 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ ………………………… 31

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/md-gun-laws/#loc_res …. 32

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ca-gun-laws/#loc_res ….. 32

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/hi-gun-laws/#loc_res ...... 32

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/de-gun-laws/#loc_res ..... 32

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/tx-gun-laws/#loc_res ..... 33
.
https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/fl-gun-laws/#loc_res ...... 33

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ut-gun-laws/#loc_res ...... 33

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/va-gun-laws/#loc_res ..... 33

https://www.wmata.com/about/transit-police/upload/MTPD-2020-Year-End-Summary.pdf ..... 21

https://www.wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm ........................ 21

Kopel & Greenlee, *The Sensitive Places Doctrine,* 13 Charleston L. Rev. 203 (2018) ...…... 11, 26

*Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly*
(Jeffersonville:  Isaac Cox, 1820) ……………………………………………………………… 28

Michalowski, Avoiding a Negligent Discharge, available at
https://www.usconcealedcarry.com/blog/avoiding-negligent-discharge/ ………………...…… 23

MPD Response to FOIA Request, 2019-FOIA-05038 ………………………………………... 6

Op. *Atty*. Gen. Va. 05-078 (January 4, 2006) …………………………………………...…… 14

Ramirez, *DC residents trying to obtain concealed carry permits seeing lengthy delays*
(October 1, 2021), available at https://www.fox5dc.com/news/dc-residents-trying-to-obtain-
concealed-carry-permits-seeing-lengthy-delays ........................................................................... 6

*Revised Laws of Indiana in Which Are Comprised All Such Acts of a General Nature as
Are in Force in Said State; Adopted and Enacted by the General Assembly at Their
Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831) …………………………...… 28

*Revised Statutes of the State of Arkansas, Adopted at the October Session of the
General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan & Co. 1838) ……….…… 28

*Room for Debate, Should Guns Be Allowed on College Campuses,* The New York Times
(May 31, 2016), available at https://www.nytimes.com/roomfordebate/2016/05/31/should-guns-
be-permitted-on-college-campuses ………………………………………………….……… 14

Shurleff, *Records of the Governor and Company of the Massachusetts Bay
in New England* (Boston:  William White, 1853) ………………………………………….. 24

Trumbell, *The Public Records of the Colony of Connecticut, Prior to the Union
with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1950), 1:95, 96.,
*Records of the Colony and Plantation of New Haven From 1638 to 1649*
(Hartford, Conn.: Case, Tiffany, 1857) ……………………………………………….... 24

Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner & Sons,
1907; reprinted New York: Barnes & Noble, 1959) ……………………………………..… 25

*Whitaker v. District of Columbia Concealed Pistol License Review Board,*
Case No. 21-1545, Petition for Writ of Certiorari (June 7, 2022) …………………….……… 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GREGORY T. ANGELO, ET AL.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-1878 RDM |
| | ) | |
| **DISTRICT OF COLUMBIA, ET AL.** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF APPLICATION FOR PRELIMINARY INJUNCTION**

Plaintiffs, Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson, submit their memorandum of points and authorities in support of their application for preliminary injunction, and show the following:

**I.      *Plaintiffs have standing to bring this action.***

To show standing, Plaintiffs must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be both fairly traceable to the challenged action of the defendants and redressable by the court. *Id*. at 560-61. Individual Plaintiffs plainly meet this standard.

Plaintiffs here are suffering an immediate and continuing injury because the Defendants by enforcement of DC Code Section 7-2509.07(a)(6) prohibit them from carrying their registered personal protection handguns in non-sensitive areas, i.e., public transportation vehicles and stations in violation of their Second Amendment right to carry a handgun for personal protection in public. *See New York State Rifle & Pistol Association v. Bruen,* 597 U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*").

Plaintiffs have been issued licenses to carry handguns in public in the District pursuant to District law. *See* Exhibit 1 (Declaration of Gregory T. Angelo); Exhibit 2 (Declaration of Tyler Yzaguirre); Exhibit 3 (Declaration of Robert M. Miller); and Exhibit 4 (Declaration of Cameron M. Erickson). Each of the Plaintiffs is a regular rider of the DC Metro system, a public transportation system covering the DC, Maryland and Virginia area, specifically delineated in DC Code Section 7-2509.07(a)(6). However, D.C. Code 7-2509.07(a)(6) prohibits their carrying on public transportation vehicles and stations within the District, including the Metro system. This limitation restricts the ability of Plaintiffs to exercise their Second Amendment right to carry a firearm for personal protection in a way that is not consistent with the nation's historical tradition of firearms regulation. It is therefore invalid under the test the Supreme Court announced in *Bruen*, slip op. at 15-17 & 20.[1]

A decision by this court invalidating the District regulation in question and granting the relief Plaintiffs request in their Complaint, including issuing a preliminary injunction enjoining enforcement of DC Code Section 7-2509.07(a)(6), will redress Plaintiffs' injury as it will allow Plaintiffs to carry their handguns on public transportation vehicles and in public transportation stations for their self-defense. Therefore, Plaintiffs have standing to bring this action.

## II.      *Plaintiffs are entitled to a preliminary injunction.*

A plaintiff seeking a preliminary injunction must establish four factors: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief;  (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. National Resources Defense Fund,* 555 U.S. 7 (2008); *Aamer v.*

---

[1] Page references to *Bruen* are to the majority opinion as set forth on the Supreme Court's website at https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf.

*Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). *See also The Truth About Obama v. Federal Election Commission,* 575 F.3d 342 (4th Cir. 2009), remanded other grounds, 130 S.Ct. 237 (2010) (subsequent history omitted). Each of these factors supports granting Plaintiffs' application for a preliminary injunction.

> ### A.      *Plaintiffs are likely to prevail on the merits.*

As we show below, Plaintiffs are likely to prevail on the merits of their claims because DC Code Section 7-2509.07(a)(6) violates their Second Amendment rights.

> #### 1.      *The Second Amendment.*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Bruen,* slip op.; *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (*per curium*) (hereinafter *"Caetano")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C. 2014) (hereinafter *"Palmer"*).

Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581. The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

*Heller,* 554 U.S. at 582; *Caetano*, 577 U.S. at 411. Pursuant to the Supreme Court's decision in *Bruen, supra,* and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to carry a handgun in public for self-protection.

Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate consistent with the nation's historical tradition of firearms regulation the manner of carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, and prohibit the carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen,* slip op. at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n.5. When such regulations impinge on the ability of law-abiding persons to protect themselves and their loved ones, such laws are invalid unless supported by the text of the Second Amendment or by historical analogues existing at the time of the founding. *Bruen*, slip op. at 13-15 & 20.

Given the decisions in *Bruen* and *Heller*, The District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen,* slip op. at 13-15 & 20. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection. Moreover, to the extent any continuing validity exists of the interest balancing

test adopted by the D.C. Circuit in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) – and we suggest there is not – the regulation at issue herein is not justified by an articulated compelling or substantial governmental interest, and lacks sufficient tailoring to achieve whatever governmental interest, if any, might exist to otherwise support it, without unreasonably intruding on Second Amendment liberties.

### 2. *The statutory scheme.*

Following the issuance of *Palmer*, the District of Columbia enacted a detailed scheme that restricted the public carrying of handguns to persons who are issued licenses to carry concealed pistols.[2] *See* DC Code Section 22-4504(a) ("No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon."). The MPD Chief was given discretion to issue handgun carry licenses to persons who could show good cause and otherwise meet detailed eligibility requirements. *See* DC Code Section 22-4506(a), which provided:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her

---

[2] DC Code Section 7-2501.01(12) defines the term "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Generally, in usage, the term "pistol" refers to a handgun having one chamber integral with the barrel, making pistols distinct from the other main type of handgun, the revolver, which has a revolving cylinder containing multiple chambers. Most handgun experts and dictionaries make a technical distinction that views pistols as a subset of handguns. Contrary to general usage, the District uses the term pistol to refer to all handguns, however. For the sake of clarity, this complaint will use the term "handgun" to refer to both pistols, revolvers and other weapons coming within the term "pistols" as defined by District law.

person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

Under this provision, some 123 carry licenses were issued between the date of enactment of Section 22-4506(a), and the decision of the Court of Appeals in *Wrenn.* Pursuant to *Wrenn*, the District became what is known as a shall issue jurisdiction, meaning that upon an applicant meeting objective qualifications, the MPD Chief was required to issue a license to carry a handgun to the applicant unless the Chief had information indicating that the applicant was otherwise not suitable to carry a handgun, for example, that he presented a danger to himself or others.[3] Such objective criteria include meeting the requirement to take 16 hours of classroom training and two hours of range training from an MPD licensed concealed carry instructor, passing a 50 round shooting test administered by the instructor, passing a background check, and not being a person prohibited from possessing firearms and ammunition under federal or District law. *See* DC Code Section 7-2509.02. The training requirement is one of the more rigorous in the nation, rivaling the training requirements of California and Illinois.

Based upon MPD's response to a Freedom of Information Act request, as of August 29, 2019, the District had issued 3,339 carry licenses. *See* Response to FOIA Request, 2019-FOIA-05038. An October 2021 media report indicated MPD has granted close to 9,000 carry licenses. *See* Ramirez, *DC residents trying to obtain concealed carry permits seeing lengthy delays* (October 1, 2021), available at https://www.fox5dc.com/news/dc-residents-trying-to-obtain-concealed-carry-permits-seeing-lengthy-delays.

---

[3] This discretion afforded the MPD Chief by this provision has been subject to abuse. *See Whitaker v. District of Columbia Concealed Pistol License Review Board,* Case No. 21-1545, Petition for Writ of Certiorari (June 7, 2022).

The District has adopted strict regulations on the carrying of handguns. For example, District law substantially limits where handguns may be carried. *See* DC Code 7-2509.07(a). Quoting from Code Section 7-2509.07(a), handguns may not be carried in the following places or in the following circumstances:

(**1**) A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

(**2**) The building and grounds, including any adjacent parking lot, of a childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

(**3**) A hospital, or an office where medical or mental health services are the primary services provided;

(**4**) A penal institution, secure juvenile residential facility, or halfway house;

(**5**) A polling place while voting is occurring;

(**6**) A public transportation vehicle, including the Metrorail transit system and its stations;

(**7**) Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to § 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

(**8**) A stadium or arena;

(**9**) A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

(**A**) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

(**B**) The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

**(10)** The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

**(11)** The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

**(12)** The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

**(13)(A)** When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

> **(i)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

> **(ii)** The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

> **(iii)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

**(B)** For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

**(14)** When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a

perimeter, or other means to make the designated area of the demonstration obvious;

**(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

**(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; …

**(15)** Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

In addition, DC Code Section 7-2509.07(b)(1) provides that carrying a handgun into the residence of another is presumed prohibited unless authorized in advance by the owner or person in control of the property. A similar provision presumes that carrying a handgun into a place of worship is prohibited unless signage allows it, or the licensee is provided permission personally in advance. DC Code Section 7-2509.07(b)(2). Under DC Code Section 7-2509.07(b)(3), it is presumed that a licensee has permission to carry in and on other non-residential property unless conspicuous signage prohibits handgun carry or the licensee has been personally told not to carry on the property.[4]

> ### 3.   *Public transportation vehicles and stations are unlike any of the other so-called sensitive places where DC prohibits handgun carry.*

In dicta, *Heller* designated schools and government building as presumptively sensitive areas where carriage of firearms could be restricted. *Heller,* 554 U.S. at 626. In *U.S. v. Class,* 930

---

[4]  DCMR 24-2346.1 specifies that "Signs stating that the carrying of firearms is prohibited on any private property shall be clearly and conspicuously posted at any entrance, open to the public, of a building, premises, or real property."  DCMR 24-2346.2, in turn, provides that "A sign shall be considered conspicuous if it is at least eight (8) inches by ten (10) inches in size and contains writing in contrasting ink using not less than thirty-six (36) point type."

F.3d 460, 463 (D.C. Cir. 2019) the D.C. Circuit noted that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia],* 670 F.3d [1244,] 1253 [D.C. Cir. 2011]."  The court in *Class* further explained that the question of what is a sensitive area turns on "the people found there" or the "activities that take place there."  *Class,* 930 F.3d at 465, quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011, *aff'd,* 687 F.3d 1244 (11th Cir. 2012). *Bruen,* however, indicates that an historical analysis is required in determining whether a place is "sensitive." *Bruen*, slip op. at 21-22.

DC Code Section 7-2509.07(a) goes far beyond *Heller* in restricting handgun carry in a variety of locations other than the schools and government buildings *Heller* discussed as presumptively valid. Although it is questionable whether many of the areas set forth in the statute are truly sensitive areas, one area stands far apart from the others in terms of the lack of any basis for its designation as such: that is the prohibition of carrying personal protection firearms on public transportation vehicles such as Metro buses and trains. *See* DC Code Section 7-2509.07(a)(6). Discussion of each of the prohibited locations set forth in DC Code Section 7-2509.07(a) makes this abundantly clear.

As noted immediately above, under *Heller* government buildings (*see* DC Code Section 7-2509.07(a)(1) are presumptively[5] considered sensitive areas. 554 U.S. at 626. The logic behind

---

[5] We emphasize the word presumptive. Presumptions are just that, presumptions. Presumptions can be overcome with evidence. *See* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.") Thus, we would not concede that all government buildings in all circumstances are sensitive areas. Consider, for example, a government store selling maps and navigational aids. Such a store is indistinguishable from any other commercial establishment. Or consider a bathroom structure in a national park. As discussed above, the D.C. Circuit in *Class*, 930 F.3d at 463, stated that "A challenger may rebut this

this is not difficult to fathom. Government buildings house government officials and often sensitive information and activities. The buildings themselves have been the subject of terrorist attacks and government officials represent potential prime targets to terrorists, deranged persons, or persons who have some perceived grudge against some governmental action. As Professor Kopel has put it in discussing the sensitive places doctrine, "misuse of arms may prevent the operation of courts and other institutions of a free government."  Kopel & Greenlee, *The Sensitive Places Doctrine,* 13 Charleston L. Rev. 203, 209 (2018) (hereinafter "Kopel")[6]

Moreover, one generally enters a government building at his own volition. Significantly, the vast majority of government buildings in the District of Columbia employ security measures such as armed security guards (designated special police officers in the District), and metal detectors at entrances. Thus, although a person gives up personal security by not being able to carry a firearm in a government building, he does so under the circumstances generally where the prohibited place provides an added layer of security not present in other public places.[7] Thus, the burden presented to his or her personal security and his or her need for self-defense is substantially

---

presumption only by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia]*, 670 F.3d at 1253."

[6] The court in *Bruen* cites Kopel in its discussion of the sensitive places doctrine. *See Bruen,* slip op. at 21.

[7] The court in *Class* declined to hold the presence of security as a definitive factor in the determination of whether a location qualified as "sensitive" under *Heller.* 970 F.3d at 465. *See also Bruen, slip op.* at 22. Nonetheless, the presence of armed security and the scanning of persons entering a location bear on the degree to which a person entering such a location runs a risk of criminal attack and thus bears directly on the degree of burden on the person's right to bear arms for personal protection. It stands to reason there is less need for an individual to be armed for his or her self-protection if there is the presence of adequate armed security, including screening of persons entering a location, and thus the burden on his or her Second Amendment right to be armed in the event of a violent confrontation is substantially diminished.

lessened by the security measures employed. Finally, traditionally the government has more

authority to control its own property than to control other properties.[8]

---

[8]  In addressing the issue of firearm carry on the grounds under the jurisdiction of the U.S. Capitol, the court in *Class,* explained,

> With respect to the Capitol itself, there are few, if any, government buildings more "sensitive" than the "national legislature at the very seat of its operations." *Jeanette Rankin Brigade v. Chief of the Capitol Police*, 421 F.2d 1090, 1093 n.3 (D.C. Cir. 1969). And tragically, gunmen have targeted the Capitol before. [Citation omitted.] … [W]e have little trouble concluding that the same security interests which permit regulation of firearms "in" government buildings permit regulation of firearms on the property surrounding those buildings as well….

> As for the Maryland Avenue parking lot, although it is not a government building, we conclude that it is sufficiently integrated with the Capitol for Heller's sensitive places exception to apply….

> First, though it is open to the public, the Maryland Avenue parking lot may be used during working hours only by Capitol employees with a permit. This makes the area a potential stalking ground for anyone wishing to attack congressional staff and disrupt the operations of Congress….

> Second, the lot is close to the Capitol and legislative office buildings. Class possessed a firearm less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building. Although there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, Congress has not exceeded it here.

> Finally, as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property. *See Adderly v. Florida*, 385 U.S. 39, 47 (1966) (observing in the free-speech context that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *cf. Bonidy v. U.S. Postal Serv*., 790 F.3d 1121, 1126 (10th Cir. 2015) (observing that when the U.S. Postal Service acts "as a proprietor rather than as a sovereign, [it] has broad discretion to govern its business operations according to the rules it deems appropriate").

> In sum, because the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a "sensitive" place where firearms prohibitions

Schools are also a location presumptively sensitive under *Heller,* 554 U.S. at 626. *See* DC Code Section 7-2509.07(a)(2). Schools are populated by large numbers of persons under the age of 21, the age limit most states have adopted for issuance of firearm carry permits to citizens, and thus unable to defend themselves with firearms due to age.

In addition, schools generally have some degree of enhanced security compared to most public areas. For example, schools generally have locked doors, the presence of armed school resource officers, and in some schools students are required to pass through metal detectors. To be sure, schools have been a target of active killers, perhaps emboldened by the prospect of the lack of any effective armed resistance, resulting in calls to allow teachers and other school employees to possess arms to defend against such attacks. *See, e.g.,* Ayoob, *The Case for Arming Teachers and the Reality of How it Works,* Personal Defense World (August 21, 2018), available at https://www.personaldefenseworld.com/2018/08/hard-targets-arming-teachers/. However, these calls do not generally extend to proposing to allow visitors to elementary and secondary schools to carry on school premises without permission of school authorities.[9] Most states prohibit the carrying of firearms in K-12 schools by non-school personnel even with carry licenses or permits.[10]

---

are presumptively lawful. *Accord id.* at 1125-28 (finding that a post office parking lot is "sensitive" for Second Amendment purposes); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (same).

930 F.3d at 463-64. *But see Morris v. U.S. Army Corps of Engineers,* 60 F.Supp.3d 1120 (D. Idaho 2014) (invalidating regulation prohibiting firearms on Army Corps of Engineers lands).

[9] The Federal Gun Free School Zones Act, 18 U.S.C. Section 922(q), passed pre-*Heller*, prohibits firearm carry on and around elementary and secondary school property, but exempts persons holding a carry permit or license issued by the state wherein the school is located. *Cf. United States v. Lopez,* 514 U.S. 549 (1995) (invalidating the previous iteration of this law on commerce clause grounds).

[10] A notable exception is the State of Utah. *See* Utah Code Section 76-10-505.5 which allows Utah concealed weapons permit holders to carry in schools.

The District goes beyond the Supreme Court's *Heller* dicta on schools to prohibit licensed carry also at colleges and universities. Plainly the justification for finding such institutions to be sensitive locations is weaker than for elementary and secondary schools, though such institutions also have substantial numbers of persons under the age of 21 who would lack the legal ability to carry a handgun for personal protection. There has been robust public debate over allowing licensed firearm carriers to carry personal protection firearms on college campuses. Some states, allow carrying on college campuses while prohibiting carrying firearms on elementary and secondary school grounds. Some persons have noted that gun free zones are the preferred choice of active killers, while others have suggested that the presence of firearms may limit academic freedom and free classroom discussion. *See Room for Debate, Should Guns Be Allowed on College Campuses,* The New York Times (May 31, 2016), available at https://www.nytimes.com/roomfordebate/2016/05/31/should-guns-be-permitted-on-college-campuses.[11] *See also Digiacinto v. The Rector and Board of Visitors of George Mason University,* 281 Va. 127 (2011) (finding portions of George Mason University to be a sensitive place under *Heller*).[12]

---

[11] According to *Campus Safety Magazine*, 12 states allow carry on college campuses, while 16 states prohibit the practice as of August 2017.  22 states leave the decision to the individual colleges and universities. *See A List of States that Allow Concealed Guns on Campus,* Campus Safety (August 30, 2017), available at *https://www.campussafetymagazine.com/university/list-of-states-that-allow-concealed-carry-guns-on-campus/.*

[12] The court in *Digiacinto* found that the regulation in question was not a total ban on carrying firearms but was "tailored, restricting weapons only in those places where people congregate and are most vulnerable – inside campus buildings and at campus events. Individuals may still carry or possess weapons on the open grounds of GMU, and in other places on campus not enumerated in the regulation." 281 Va. at 136. *Cf. Op. Atty.* Gen. Va. 05-078 (January 4, 2006) (opining that licensed individuals may not be prohibited from carrying firearms in open areas of public universities.)

Hospitals share with schools the fact that substantial numbers of persons present may be incapable of effectively using a firearm for self-defense due to physical infirmities or illness. *See* DC Code Section 7-2509.07(a)(3). And although hospitals generally lack the tight security of government buildings, e.g., use of metal detectors to screen for weapons, hospitals generally will have a security staff present to provide somewhat of an enhanced degree of security for patients and staff.

Mental health facilities present an additional factor in determining whether such a location is a "sensitive" area. Approximately two-thirds of firearm deaths are the result of suicide. *See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*. Thus, at least a plausible basis exists to limit the carrying of firearms at facilities providing mental health treatment. On the other hand, it is questionable whether a compelling basis exists for restricting hospital or medical staff from having the means to protect themselves and their patients from a deadly criminal attack. In one well known incident,

> an enraged man entered a psychiatric clinic and shot a caseworker dead and wounded one of the doctors before the latter drew a small-caliber pistol and shot the man down, limiting the death toll to one. The doctor recovered and, declared a hero by local police, suffered no consequences for being armed in a "gun-free" zone.

Ayoob, 10 Cases Where An Armed Citizen Took Down An Active Shooter, *Personal Defense World* (March 11, 2015), available at https://www.personaldefenseworld.com/2015/03/10-cases-where-an-armed-citizen-took-down-an-active-shooter/.[13] The District's prohibition on its face

---

[13] Undersigned counsel is aware of an incident where a psychiatrist employed at a university hospital in the District took a patient off a scheduled prescription drug because the patient was abusing the drug with alcohol, thus creating a danger to himself. The patient became enraged and showed up at the hospital threatening to kill the doctor. Under the then "may issue" regime, MPD granted the doctor a carry license finding she had a legitimate need for self-protection distinct from

extends to both staff and to patients and visitors.  DC also extends its prohibition to medical offices in general. There would appear a much weaker basis for upholding such a prohibition based on "sensitive" areas for medical offices in general as opposed to hospitals and locations where mental health treatment is being provided.

DC prohibits licensed gun carry in a penal institution or in a secure juvenile residential facility or halfway house. DC Code Section 7-2509.07(a)(4). If any location would appear to meet the requirements for "sensitive" it would be these locations. Persons incarcerated for crimes plainly have no right to deadly weapons. Penal facilities generally have armed security and the risk of a dangerous person taking a gun away from a firearm carrier is not insubstantial.

DC prohibits carrying a firearm in a polling place. DC Code Section 7-2509.07(a)(5). Traditionally, governments have had substantial latitude to regulate the conduct of elections. *Burson v. Freeman*, 504 U.S. 191 (1992). It is a common restriction to limit the first amendment right to engage in political speech inside a polling place. *See Minnesota Majority v. Mansky*, 849 F.3d 749 (8th Cir. 2017). There is also a governmental interest in preventing intimidation of voters. The argument could be made that preventing firearms aids in effectuating that latter governmental interest. *Bruen,* slip op. at 21, further indicates that restrictions on carriage at polling places is historically supported by 18th and 19th Century regulations. On the other hand, most polling places do not have police protection and could be a prime candidate for some type of election day terrorist or active killer incident.

---

the population in general, but she was prohibited from carrying her firearm to work – the most likely place where her patient might try to carry out his threat – because of the various DC prohibitions against carrying a firearm in a medical facility, carrying where mental health treatment was provided, carrying in a hospital, or on college or university grounds. For her, these restrictions resulted in a more than de minimis infringement on her Second Amendment rights.

DC prohibits carrying firearms at taverns and nightclubs, while allowing it at other establishments licensed to sell alcohol, subject to licensees not consuming alcohol. DC Code Section 7-2509.07(a)(7). This type of prohibition is not unusual among the various states. *See, e.g.* FL. Stat. 790.06(12)(a)(12) (Florida concealed carry license does not authorize carry of a firearm into the bar area of a restaurant). It is well known that consumption of alcohol impairs judgment, inhibitions, and coordination. Consumption of alcohol increases the risk of firearm accidents and inhibits the ability of an individual to properly evaluate whether use of deadly force in self-defense is legally justified. Under DC law, a licensee is free to go to a restaurant for dinner and carry his firearm as long as he does not consume alcohol. The limitation on carrying into a night club or tavern can be supported by the fact that such establishments in the District are not required to serve food and thus service of alcohol is a primary activity occurring at such an establishment. On the other hand, the flat prohibition on consuming alcohol versus consuming to the point of impairment could indicate that the alcohol prohibition is overbroad.

The District bans the carrying of firearms at stadia and arenas. DC Code Section 7-2509.07(a)(8). Stadia and arenas are characterized by the presence of large numbers of persons who are concentrated at a sporting event. They are likely not situationally aware. Moreover, alcohol is often served at such events, and persons often are very emotional over their teams, perhaps taking offense at persons cheering for the opposing team. Fights have been known to break out at such locations. Moreover, such events at least in the District have a substantial police and private security presence, including in many cases metal detector screening. Thus, there is some support for the view these venues could be considered sensitive and the burden on self-defense and Second Amendment rights diminished.

DC prohibits the carrying of a handgun at a "gathering or event open to the public." DC Code Section 7-2509.07(a)(9). Quite frankly, this prohibition, without more, likely suffers from the fatal flaw of vagueness. *See, e.g., Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952). The District, however, substantially ameliorates this problem by providing that a person cannot be prosecuted for carrying a firearm at such an event unless there has been advance notice that carrying firearms is prohibited at the event and by posted signage at the event, or unless the licensed carrier is ordered by law enforcement to leave and does not leave. Thus, the degree of interference with the right to carry by this prohibition is substantially less than a regulation that outright prohibits carrying at such events. And the likelihood of a justiciable case being presented with respect to this prohibition is limited. DC law provides that licensees must fully conceal their carried handguns, so it is unlikely that a law enforcement official would even notice that a licensed carrier was attending such an event.[14]

DC's treatment of demonstrations in a public place is similar to its treatment of "public events." *See* DC Code Section 7-2509.07(a)(14). Demonstrations have the potential for confrontations between persons of differing views. Some might argue that this would be just such a location where possession of effective self-defense tools would be appropriate due to the potential of a violent attack. However, demonstrations in the District almost always are marked by

---

[14] DC Code Section 7-2509.07(e). *See also* DCMR 24-2344:

> Pistol Carry Methods. 2344.1 A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public. 2344.2 A licensee shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol.

substantial police presence to prevent violence from breaking out. The prohibition on carrying at

demonstrations also contains a safe harbor provision that violators cannot be prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;
>
> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or
>
> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order;

DC prohibits carry in the public memorials on the Mall and around the Tidal Basin and

areas where carrying a firearm is prohibited by federal law, including the Capitol Grounds. DC

Code Section 7-2509.07(a)(10). Areas prohibited by federal law needs no further discussion. The

memorials are plainly a possible target of a terrorist or active killer given their status as landmarks

and symbols of the country. To that extent one could argue that these locations could be considered

sensitive; but these facts might also suggest a heightened need for persons to be able to defend

themselves. They are also, however, areas that generally have a high degree of police presence to

provide added security. The Capital Grounds have already been discussed. *See U.S. v. Class, supra.*

The District prohibits carrying a firearm around the perimeter of the White House grounds

and Lafayette Park and the Vice President's residence. DC Code Section 7-2509.07(a)(11)-(12).

In light of the *Class* decision discussed above, there cannot be any serious debate over whether

these qualify as sensitive areas with the possible exception of Lafayette Park.

The District requires licensed carriers to stay 1,000 feet away from a motorcade (moving

or stopped for an event) carrying domestic or foreign dignitaries under police escort. DC Code

Section 7-2509.07(a)(13). The provision contains a safe harbor, however, providing that a licensee

cannot be prosecuted for violating this provision unless advanced notice has been given of the prohibited route – which is almost never done – or the area of protection is obvious as a result of a police perimeter, or the licensee is told to leave and refuses to do so. This prohibition is relatively meaningless since law enforcement is not in the habit of providing advance notice of motorcade routes and licensees carrying fully concealed firearms would likely go undetected; hence, their presence near a motorcade route is unlikely to come to the attention of law enforcement unless the licensee attempts to violate a security perimeter. Thus, the degree of burden of this regulation to the average DC concealed carrier is minimal.

DC law essentially allows houses of worship and private property owners to determine if they will allow firearm carry. *See* DC Code Sections 7-209.07(B)(1)-(3). At houses of worship and on residential property of others the law presumes that carrying of firearms is prohibited unless the owner or persons in charge allow it by signs or direct communication. Other private property is presumed to allow carrying of firearms unless there are signs or direct communication that firearms are prohibited. Thus, the law does not outright ban carrying firearms on private property. Few would argue that there is or should be an unlimited right to conduct oneself as one pleases on the private property of another. One could certainly argue there should be no presumption that carrying is prohibited on residential property of others or houses of worship, however.

There is no need to discuss Code Section 7-2509.07(a)(15), allowing the Chief to designate other sensitive areas, as the Chief has to Plaintiffs' knowledge not done so.

Public transportation vehicles and stations, essentially the DC Metro, share few, if any, of the characteristics supporting the designation of other locations as sensitive areas. They are not substantially populated with persons lacking the physical ability to defend themselves with a firearm or other tool. They are not populated with individuals who would be high value targets to

a terrorist or active killer. They are not the workplace of government officials or the location of sensitive information and activities. They are not the venue for sports competitors and their rival fans. They are not landmarks or symbols of our nation which would be inviting to terrorists or active killers.[15] The Metro system does not screen persons entering its stations or embarking on a Metro bus or train. The Metro is not an area of intellectual debate, voting, or where demonstrations regularly take place. The Metro is essentially a commercial enterprise providing an essential transportation service to an area with highly congested routes of travel. And although Metro has its own police force, the overwhelming number of trains and buses lack any police presence. In fact, according to WMATA, in 2019, the last full calendar year prior to Covid pandemic, average daily entries to their rail system was 626,000.[16] Yet, the Metro Transit Police Department must also protect the bus system and commuter parking lots spread over Maryland and Northern Virginia besides the District. Consequently, the Metro system has a significant level of crime against individual riders. According to Metro Transit Police, in 2019, the last year of typical use of Metro trains and buses prior to the pandemic, there were 1591 crimes against persons, including aggravated assault, kidnapping, and sex offenses.[17] Additionally, as discussed in more detail below, there is not a tradition or history of prohibitions of carrying firearms on public transportation vehicles. In short there is no basis to label the Metro as a sensitive area.

---

[15] Of course, the evidence strongly indicates that active killers seek out gun free zones to accomplish their nefarious plans. Thus, a location that might not otherwise be a target could be endangered by giving it the status of a "gun free zone." *See* Crime Prevention Research Center, *Updated: Mass Public Shootings Keep Occurring in Gun-Free Zones: 94% of Attacks Since 1950* (June 15, 2018).

[16] https://www.wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm.

[17] https://www.wmata.com/about/transit-police/upload/MTPD-2020-Year-End-Summary.pdf.

Some might argue that mass transit systems are soft targets of terrorists, and the hijacking of planes might be used to support such an argument; however, soft targets are "soft" because they lack security to harden them from attack. Aircraft are also subject to catastrophic crashes causing a loss of life unlike ground-based transportation. Further, in the case of the terrorist attacks on 9/11, the airliners and their passengers were not targets in and of themselves. Instead, they were used as weapons of mass destruction to attack national symbols. The response to that threat was to intensify airport security and to deploy a large cadre of air marshals. The Metro system lacks such security measures. Rather, DC's prohibition on carrying arms in the Metro system is what would make Metro a soft target.

### 4. The challenged regulation is a substantial burden on Plaintiffs' Second Amendment rights.

Even if the public transportation vehicles could somehow be considered "sensitive areas," the prohibition on licensed carry on such vehicle is a substantial infringement on licensees' Second Amendment rights. This is especially the case as to persons of limited means lacking access to alternative transportation. It is certainly more than a de minimis burden on persons such as the Plaintiffs here who regularly use the Metro system in their day-to-day activities, and thus no presumption of constitutionality would accrue to this prohibition. *See Class,* 930 F.3d at 463. The practical effect is that persons who need to travel around the District via the Metro are disarmed for the entirety of their journey. This is true despite that it is technically possible to transport a handgun on the Metro.

Currently, to lawfully transport a handgun on the Metro, the firearm must be unloaded, stored in a locked container with the ammunition stored separately. DC Code Section 22-4504.02. Thus, a woman with a DC concealed pistol license could theoretically holster her gun for the walk through her crime ridden neighborhood as she heads out for shopping, but before she could enter

the Metro station or get on a Metro bus or train, she would have to unholster her firearm, unload it, open a lockable container, place the gun in the lockable container, lock it, and store the ammunition separately. *See* DC Code Section 22-4504.02. All of this would be done in public and in violation of the requirement of DC Code Section 7-2509.07(e) that the gun has to be fully concealed.[18] And once getting off the Metro, to continue to her ultimate destination while exercising her constitutional right to be armed in the event of a violent confrontation, she would have to unlock the locked container, remove her firearm from the container, load it, holster it, and conceal it, again all in public. The likelihood of creating a public disturbance with a dangerous police response and likely arrest is substantial.

Moreover, notwithstanding that DC Code Section 7-2509.07(e) makes it well-nigh impossible to comply with the transport code section, unnecessary handling of a firearm creates the risk of an accidental or negligent discharge. *See* Farnam, Unnecessary Gun Handling, *Ammoland Shooting Sports News* (July 27, 2015), available at https://www.ammoland.com/2015/07/unnecessary-gun-handling/#axzz5mywSQ2FR; Michalowski, Avoiding a Negligent Discharge, available at https://www.usconcealedcarry.com/blog/avoiding-negligent-discharge/.

---

[18] The penalties for violating the requirement that the firearm must be fully concealed are enormous. The District of Columbia Code provides for a potential jail term of up to six months and a fine of up to $1000 for such violation. *See* DC Code Sections 7-2707.06(a) and 22-3571.01(b)(4). Moreover conviction "in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device" is defined as a "weapons offense." DC Code Section 7-2501.01(18). Conviction of a weapons offense – with very minor exceptions not pertinent hereto – by a DC resident renders that person ineligible for life to register or carry a firearm, thus stripping him of his firearms rights in DC. *See* DC Code Section 7-2502.03(a)(2). Under such circumstances no DC carrier is likely to intentionally expose his firearm and risk losing his firearms rights in the District. We note that MPD actively enforces this provision.

### 5.    *No analogue exists to justify the challenged regulation as consistent with the nation's historic tradition of firearms regulation.*

As mentioned, *Bruen, Heller* and *Wrenn* teach us that firearm prohibitions are to be evaluated in light of the text, history and tradition of the Second Amendment. *Bruen,* slip op. at 13-15 & 20. *Heller,* 554 U.S. at 576-628*; Wrenn,* 864 F.3d at 657-61*; See also Moore v. Madigan,* 702 F.3d 933, 935-37 (7ᵗʰ Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013). Nothing in the text, history or tradition of the Second Amendment supports upholding a ban on arms carry on public transportation.

Public transportation systems did not exist as they do today at the founding of the nation. However, there was plainly a tradition of firearms carry when citizens traveled from their homes. In modern parlance, Americans carried arms to prevent their gatherings from becoming soft targets. For example, a March 9, 1636, ordinance provided that every person above 18 years of age (except magistrates and elders of the churches) were ordered to "come to public assemblies with their muskets, or other pieces fit for service, furnished with match, powder, & bullets, upon paine of 12*d* for every default … And no person shall travel above one mile from his dwelling house, except in places wheare other houses are nearby together, without some armes, upon paine of 12*d* for every default."  Shurleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston:  William White, 1853), 1:190, 1:210.

Connecticut in 1643 ordered that at least one person in every house "shall bring a musket, pistol or some piece, with powder and shot" to every church meeting. Trumbell, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1950), 1:95, 96., *Records of the Colony and Plantation of New Haven From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), at 131-32. It is reported that several persons were fined for neglecting to bring their arms to meetings. *Id.* at 486.

In the New Haven Colony, militia members were required to arrive at Church with their guns charged. Hoadly, ed. *Records of the Colony and Plantation of New Haven, From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), 131.

Rhode Island ordered "that no man shall go two miles from the Towne unarmed, either with Gun or Sword, and that none shall come to any public Meeting without his weapon." Barlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: Crawford Greene and Brother, 1856), 1:94.

The requirement to carry arms when traveling from home and while attending gatherings was not just a New England requirement. A 1619 statute in Virginia commanded those churchgoers who "bear arms shall bring their pieces, swords, powder and shot" to carry those arms to worship services with violators subject to fine. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner & Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273. Virginia reissued the law in 1632 and again in 1738. Cramer, *Gun Control in the Middle & Southern Colonies*, citing Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* (New York: R & W & G. Bartow, 1832), 1:198 & 5:19.

A 1743 South Carolina law required church attendees on pain of fine "with minor exceptions to come to church armed." Cramer, Gun Control in the Middle & Southern Colonies at 6.

In *Heller*, the court cited "the most important early American edition of Blackstone's Commentaries," 554 U.S. at 594, by St. George Tucker. Speaking in 1803 of the right to bear arms Tucker noted that in "many parts of the United States, a man no more thinks, of going out of his

house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Id.*

The limitation of carrying arms in sensitive places at least reaches as far back as the 14th century. Professor Kopel reports that a 1313 statute provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably.' In other words, Parliament and similar assemblies should be conducted without arms present at the deliberations." Kopel at 209-10 & n. 22.

In 1328, the Statute of Northampton was propounded which in pertinent part prohibited carrying arms around the king's officials: "no man great nor small . . . be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace. . ." Kopel at 212. Professor Kopel explains that the "prohibition served several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort." *Id.* Additional provisions of the statute on its face purported to prohibit riding "armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere. . ." *Id.* Various reiterations of the statute were propounded through the 17th century. *See Id.* at 216-17.

Various commentators have noted that even at the founding or shortly thereafter, it was not uncommon for the states or localities to enact laws regulating firearms, such as regulations for the storage of powder, prohibiting discharge in public, surety laws designed to keep the peace and state variances of the English Statute of Northhampton. *See, e.g.,* Cornell, *The Right to Carry Firearms Outside the Home: Separating Historical Myths and Historical Realities,* 39 Fordham L. Urb. L. J. 1695, 1707-17 & 1719-20 (2012) (hereinafter cited as "Cornell").

The D.C. Circuit in *Wrenn*, acknowledged the existence of these laws but noted that considering *Heller's* analysis, the Statute of Northhampton did not support a prohibition on handgun carry outside the home for law-abiding citizens. *Wrenn*, 864 F.3d 660 ("[T]he history showcased in *Heller* contradicts the main scholar whose work the District cites for the idea that Northhampton banned all carrying in crowded areas (as opposed to carrying dangerous arms or carrying so as to terrify."). And *Wrenn* further explained that "surety laws did not deny a responsible person carrying rights … [t]hey only burdened someone reasonably accused of posing a threat." *Id.* 864 F.3d at 661. *Bruen* extensively discussed the Statute of Northampton. *See* slip op. at 34-39 & nn. 10-11, 41-43 & nn. 14-15, explaining that the statute prohibited the carrying of dangerous or unusual weapons or carrying weapons in a manner so as to terrorize the people.

In the antebellum era, several states enacted laws prohibiting the carrying of concealed pistols and Bowie knives. The Court in *Heller* noted that state Court decisions on these laws are instructive in understanding the scope of the Second Amendment. *State v. Reid,* 1 Ala. 612 (1840), for example, cited at 554 U.S. at 688, held it was within the legislature's power to prohibit the carrying of a *concealed* firearm where the legislature had left open the option to carry the weapon *openly*. By contrast, *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822), cited at 554 U.S. 585 n. 9, invalidated a Kentucky statute that criminalized the carry of concealed weapons. *Heller* explained that in *Nunn v. State,* 1 Ga. 243, 251 (1846), "the Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defense' and therefore struck down a ban on carrying pistols openly." *Heller,* 554 U.S. at 612.

*Heller* further cited *State v. Chandler,* 5 La. Ann. 489, 490 (1850), in which the Louisiana Supreme Court held that citizens had a right to carry arms openly: "'This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble

defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.'" *Heller,* 554 U.S. at 613. *See also Wilson v. State,* 33 Ark. 557 (1878)[19]

It is noteworthy that the laws at issue in those cases that prohibited the concealed carry of pistols, generally made an exception for travelers. *See* Cramer, Concealed Weapons Laws of the Early Republic (Praeger:  Westport, Conn. 1999), Appendix A, p. 143-52. Illustrative is Kentucky's 1813 statute that criminalized "any person in this commonwealth, who shall wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined in any sum, not less than one hundred dollars[.]" *Id,* at 143.[20] Indiana enacted a similar exception in its 1820 statute and its 1831 reenactment. *Id.* at 145.[21] Arkansas also had an exception for travelers carrying concealed weapons in its 1838 statute. *Id.* at 150.[22]

---

[19] Citing *Fife v. State,* 31 Ark. 455 (1876) the court said the legislature might constitutionally prohibit the carrying of such pistols and other arms easily concealed about the person, as are used in quarrels, brawls and fights between maddened individuals, but that the Constitution guaranteed to the citizens the right to keep and bear arms for defense, etc." Remarking on what we would now call sensitive areas, the court stated that the state could in time of peace ban "wearing war arms [army pistols] to places of public worship or elections" (citing *Andrews v. State,* 50 Tenn. (3 Heiskel) 165 (1871)), [b]ut to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage … is an unwarranted restriction upon his constitutional right to keep and bear arms." 33 Ark. at 559-60.

[20] Citing *Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfurt: Gerald & Berry 1813), 100-01.

[21] Citing *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville:  Isaac Cox, 1820), 39, and *Revised Laws of Indiana in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

[22] Citing *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan & Co. 1838), Div. VIII, Art. I § 13, p. 280.

Cornell, who has written extensively in support of restrictions on firearm carry, cites (at 1719 n. 132) several post Reconstruction state laws regulating the carriage of firearms in sensitive places, including: 1870 La. Acts 61 (prohibited weapons carrying "on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration"); 1870 Tex. Gen. Laws 63 (prohibiting carry at a church or religious assembly, school or other place where persons are assembled for educational, literary or scientific purposes, ballroom, social party or other social gathering, election precinct on the day or days of any election, place where people may be assembled to perform any other public duty, or other public assembly); 1878 Va. Acts 37 ("place of worship while a meeting for religious purposes is being held without good and sufficient cause therefor, and on Sundays); and 1859 Wash. Sess. Laws 489 (penitentiary, jail or house of correction). *See also Hill v. State,* 53 Ga. 473 (1874) (upheld a statute prohibiting carrying weapons at sensitive locations such as courts of justice and religious gatherings). These statutes share a consistency with modern day sensitive place restrictions. Significantly, Cornell fails to point to any historical restriction on firearm carry on public conveyances.

Although much has been written purporting to discuss the history of public carriage of firearms in the 19th century following the adoption of the Second Amendment, we have been unable to find any authority to support a tradition of prohibiting the carriage of weapons on public conveyances of the time such as riverboats, ferries, trains or stagecoaches. Indeed, the statute at issue in *State v. Duke,* 42 Tex. 455 (1874), which generally prohibited pistol carry outside ones

home or place of business except in case of apprehended danger, like the antebellum laws discussed above, also excepted travelers within the state. 42 Tex. at 457.[23]

Given the foregoing discussion, it cannot be said that history supports treating public transportation vehicles as sensitive for firearm carry. Nor does there appear to be a widespread practice or tradition of treating public transportation facilities as sensitive even today.

Currently among the various states, firearm carry restrictions on public transportation are rare. A survey of available data for state restrictions shows that although restrictions vary considerably from state to state, restrictions on public transportation are outliers. Other than the District of Columbia, only Illinois, Missouri, New Mexico, and South Carolina prohibit carry on public transportation as of the filing of this action. *See* 430 Ill Comp. Stat. §66/65; RSMO §§70.441(11) & 577.030(4); NM Stat. Ann. §30-7-13; S.C. Code Ann. §58-23-1830. Montana also prohibits carrying firearms on trains, but not on other public transportation. *See* Mont. Code Ann. §87-5-401. None of these restrictive statutes can be said to be longstanding. The oldest appears to be Missouri's restriction on carry on buses, but it dates back only to 1982. *See* RSMO §577.030(4).[24]

None of the other more restrictive states appear to prohibit carry on public transportation. Connecticut, which is technically a may issue jurisdiction but is liberal in granting carry permits, prohibits carrying firearms in schools, state parks, wilderness management areas, by non-owner employees of a business, on posted property, legislative buildings, and in the town owned property

---

[23] Cornell erroneously claims the Texas law was a comprehensive ban on traveling when armed. *See* Cornell at 1721.

[24] As part of its massive resistance to *Bruen,* New York has adopted New York Penal Code Section 265.01-e(2)(N), criminalizing carry on public transportation vehicles, despite never having previously prohibited carry on such vehicles. Plainly, an act adopted days ago fails as evidence of the nation's historic tradition of firearms regulation.

of Woodbridge. *See* https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ct-gun-laws/#loc_res (providing citations to Connecticut authorities).[25]

New Jersey prohibits carrying firearms in schools and universities, state parks and on ferry cruises to the national landmarks of Ellis Island and the Statue of Liberty. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/nj-gun-laws/#loc_res. New Jersey has no general prohibition on carrying on public transportation.

Rhode Island prohibits the carrying of firearms in state parks and wilderness management areas, secured areas in airports, and detention facilities. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ri-gun-laws/#loc_res.

Massachusetts prohibits carry in schools and universities, courthouses, airports, and when using off-highway vehicles. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ma-gun-laws/#loc_res.

Prior to *Bruen,* New York had numerous restricted areas: schools and universities, childcare facilities, public campgrounds, courthouses, mental health facilities, government buildings, airports, and certain parks, and recreation areas. New York also had a narrow public transportation ban prohibiting the carrying of firearms on Ellis Island and Liberty Island cruises and at the Statue of Liberty, but the state did not ban the carrying of firearms on subways, buses or ferries. Upstate permits are not valid for New York City, however, without the New York City police commissioner's signoff. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ny-gun-laws/#loc_res.

---

[25] The United States Concealed Carry Association maintains an up-to-date web site listing state by state restrictions on the carry of firearms, including citation to the specific state statutes. *See* https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/. To review carry restrictions in any state, one simply clicks on the state, scrolls down to "location restrictions" and click on that link.

Maryland restricts firearms carry in public schools, most childcare centers, state parks, state and national forests, Chesapeake forest lands, state highway rest areas, commercial aircraft, lodging establishments if the innkeeper so requires, dredge boats, community rehabilitation centers, state buildings and grounds, legislative buildings, and at demonstrations. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/md-gun-laws/#loc_res.

California also has a long list of restricted locations: schools and universities, courtrooms, gun shows (if in possession of ammunition for the gun), state capitol and legislative buildings and the residences of state officers and legislators, state parks, wildlife management areas, polling places, labor demonstrations (picketing), bars, the Cal Expo Center, and San Francisco City property.          https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ca-gun-laws/#loc_res.

Hawaii prohibits the carrying firearms in the secured area of an airport, in state and national parks, national forests and wildlife management areas, and in rest stop buildings. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/hi-gun-laws/#loc_res.

Delaware prohibits carrying firearms in schools and universities, vehicles owned or operated by a school, public recreational buildings, sports stadia and fields, prisons, and detention facilities.          https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/de-gun-laws/#loc_res.

With respect to those states with substantial numbers of carry licenses outstanding, while limitations again vary considerably, public transportation limitations do not exist. Where the appropriate warning sign is posted, Texas prohibits the carrying of firearms at schools and private colleges and universities, hospitals and nursing homes, churches, and government meetings. Texas also prohibits carrying firearms in establishments deriving 51 or more percent of their income from

alcohol sales, as well as courthouses, correctional institutions, places of execution, certain posted private property, polling places, racetracks, and the secured area of an airport. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/tx-gun-laws/#loc_res.

Florida prohibits carry in schools and universities including vocational technical centers, school and professional athletic events, police stations, detention facilities, court houses, polling places, legislative meetings, hospitals providing mental health services, bar portions of establishments serving alcohol, The Seaport, Savannas State Reserve, and airport passenger terminals. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/fl-gun-laws/#loc_res.

Utah prohibits carrying firearms in any secure area in a correctional, law enforcement, courthouse, airport, mental health facility, and houses of worship and private residences that have given notice that firearms are prohibited. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ut-gun-laws/#loc_res.

Neighboring Virginia prohibits carry on school grounds, school buses, and areas open to the public and exclusively used for school-sponsored functions or extracurricular activities while such functions or activities are taking place. Most public colleges and universities have promulgated regulations prohibiting carry in buildings and at events. Carrying firearms is also banned in courthouses, airports, and detention facilities. Carrying is also banned in the Capitol Square in Richmond, in state executive branch offices, on certain Tennessee Valley Authority lands, the portion of Hog Island Wildlife Management Area bordering on the James River north of the Surry Nuclear Power Plant (except while hunting), on Buggs Island, and a portion of the Gaston Reservoir (Roanoke River). https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/va-gun-laws/#loc_res.

In sum, in line with *Heller,* the broad consensus of states regulate schools, court houses, and most government buildings as sensitive locations. Hospitals, polling stations, colleges and universities, sports stadia and events, and certain outdoor recreational locations are often treated as sensitive locations as well. But there is not a tradition to treat public transportation facilities as sensitive. Moreover, in those few jurisdictions which do so, the restrictions in questions are not longstanding. Even in New York, which generally has the most restrictive laws on firearms, prior to *Bruen,* the 153-year-old New York subway, one of the world's largest underground transit systems, did not ban the carrying of firearms.

Thus, an analysis of text, history and tradition requires a conclusion that DC's prohibition of carrying firearms on public transportation facilities and vehicles is not grounded in the nation's historic tradition of firearms regulation, and therefore cannot be restricted as sensitive areas under *Heller*. Accordingly, DC's prohibition on carrying defensive firearms within public transportation vehicles and stations violates Plaintiffs' Second Amendment right to bear arms for self-defense and Plaintiffs are likely to prevail on the merits of their claim.

### B. Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. at 22. The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). Plainly here Plaintiffs are suffering irreparable injury.

Where the defendants' actions violate the plaintiffs' constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and

injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (hereinafter *"Gordon"*) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346). *See also Berg v. Glen Cove City School District,* 853 F.Supp. 651 (E.D.N.Y. 1994); *Doe v. Shenandoah County School Board,* 737 F.Supp. 913 (W.D.Va. 1990); *Joynes v. Lancaster,* 553 F.Supp. 809 (M.D.N.C. 1982).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of a Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id*. Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id*. Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id*.

For these reasons, law-abiding citizens like Plaintiffs suffer irreparable harm each day they are subjected to the restrictions of DC Code 7-2509.07(a)(6). The allegation of the violation,

without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that the Defendants' public transportation carry ban will "chill" their exercise of constitutionally protected conduct, *see Chaplaincy of Full Gospel*, 454 F.3d at 299, they have satisfied this requirement by declaring that, but for the challenged regulations, they would carry their handguns on the Metro system. *See* Exhibits 1-4.

Each day that the unconstitutional regulation continues in force, Plaintiffs risk physical injury because they are unable to fully exercise their Second Amendment right to self-defense on public transportation. Of course, that injury cannot be compensated adequately through money damages. *See Ezell*, 651 F.3d at 699. For example, each day DC Code Section 7-2509.07(a)(6) remains in effect, Plaintiffs lack the security of knowing they have available an effective self-defense tool if attacked while riding public transportation.

### C.    *The balance of equities tips overwhelmingly in Plaintiffs' favor.*

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. Any interest the District may have in enforcing this regulation against Plaintiffs is entirely speculative. Plaintiffs have passed extensive background checks and undergone extensive training. The District is free to prosecute persons carrying illegal guns on public transportation. Moreover, the Second Amendment itself is the product of interest balancing by the People and leaves no room for the third branch of government to determine whether the rights it protects are "*really* worth insisting upon." *Heller,* 554 U.S. at 634 (emphasis in original).

### D.   *An injunction is in the public interest.*

For similar reasons, an injunction is also in the public interest. The courts have acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary

to the public interest." *Gordon*, 721 F.3d at 653; *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of DC Code Section 7-209.07(a)(6) is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity effectively to defend themselves from attack, not by perpetuating an unconstitutional restriction on that right.

III.   *The Court should waive the bond requirement or set a nominal bond because Defendants will suffer no harm from a preliminary injunction.*

Plaintiffs request the court to set the bond amount at zero. Federal Rule of Civil Procedure 65(c) provides in relevant part:

> Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court has the discretion to set the bond amount "in such sum as the court deems proper." Fed. R. Civ. P. 65(c). Consequently, the district court may set the bond amount at zero or a nominal amount "[w]here [it] determines that the risk of harm is remote, or that the circumstances otherwise warrant it. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421, n.3 (4th Cir. 1999) (remanding case to district court for determination of appropriate bond amount).

Courts have set a nominal bond or waived the requirement altogether where, for example:

(l) the risk of harm to the defendant is remote or nonexistent, *SEC v. Dowdell*, Civil No. 3:01-cv-00116, 2002 U.S. Dist. LEXIS 19980 (W.D. Va., Oct. 11, 2002)

(setting nominal $100.00 bond after concluding that the risk of harm to the defendants was minimal);

(2)      the plaintiff has made a strong showing of likelihood of success on the merits, *Ark. Best Corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 518 (W.D.N.C. 1999) (requiring nominal $100.00 security bond where plaintiffs made a strong showing of likelihood of success on the merits);

(3)      the balance of hardships weighs overwhelmingly in favor of the plaintiff, *Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991), *cert. denied*, 502 U.S. 1032 (1992) (requiring no bond in non-commercial case where the balance of hardships that each party would suffer as the result of a preliminary injunction weighs overwhelmingly in favor of the party seeking the injunction); and

(4)      the case involves enforcement of a public interest, *Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.*, 50 F.3d 1 168, 1 174 (2d Cir. 1995) (concluding that "an exception to the bond requirement has been crafted for cases involving the enforcement of public interests arising out of 'comprehensive federal health and welfare statutes'"); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp.2d 98, 128, 129 (D. Mass. 2003) (waiving bond requirement where plaintiffs submitted affidavits indicating their financial inability to post a security bond and where plaintiffs were seeking to preserve their rights to free expression and free exercise of religion).

Plaintiffs request the court set the bond requirement at zero because Defendants cannot demonstrate they will suffer any harm from grant of a preliminary injunction. This is a civil rights case, not commercial litigation. Even if Defendants were ultimately to prevail here, they would

suffer no monetary damage. Indeed, by not enforcing the ordinances at issue, Defendants would avoid otherwise necessary public expenditure. In fact, however, Plaintiffs have demonstrated they will suffer irreparable harm if preliminary relief is not granted. The bond requirement should be waived because Plaintiffs' enforcement of important constitutional rights serves the public interest. *See Westfield High Sch. L.I. F. E. Club,* 249 F.Supp.2d at 129 (waiving bond requirement after concluding that plaintiffs' suit to enforce their right to freedom of expression and free exercise of religion served the public interest). For these reasons, Plaintiffs respectfully request the court set the bond amount at zero.

## IV.     *The Court should enter final judgment for Plaintiffs.*

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia,* 38 F.Supp.3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)). The D.C. Circuit employed this procedure in *Wrenn. See* 864 F.3d at 667.

Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support the provision at issue *and* that the regulation is supported by the nation's historical tradition of firearms regulation, a permanent injunction is appropriate now. In that regard, the court should require the District to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, final outcome of this case will not depend on any facts presented at trial, and no "genuine uncertainty [exists] at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945.

Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore v. Madigan,* "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting Illinois's motion to dismiss. *See Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's unconstitutional restriction on the carrying of handguns for personal protection.

## V.    *Conclusion.*

Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from DC Code Section 7-2509.07(a)(6). They have shown the balance of equities weighs in their favor. They have shown that the public interest favors grant of an injunction. And they have shown that they are entitled to a permanent injunction now. For the foregoing reasons, the court should preliminarily and permanently enjoin the defendants from enforcing DC Code Section 7-2509.07(a)(6).

Respectfully submitted,

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys PLLC
1929 Biltmore Street NW
Washington, DC 20009
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  July 11, 2022

### *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing

document on all counsel of record for Defendants through the court's ECF system, this 11th day of

July, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678