**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GREGORY T. ANGELO**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-01878-RDM** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR**
**PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 2

    I.   Legal and Historical Background ........................................................................................ 2

        A.    The Second Amendment Framework ........................................................................ 2

        B.    The District of Columbia's Tradition of Gun Regulation ........................................ 4

        C.    The Metro Law ......................................................................................................... 5

        D.    Public Transportation in the District of Columbia ................................................... 6

    II.   Factual and Procedural Background ................................................................................... 11

LEGAL STANDARD .................................................................................................................. 12

    I.   Preliminary Injunctive Relief ........................................................................................... 12

    II.   Federal Rule of Civil Procedure 65 .................................................................................. 13

    III.  Federal Rule of Civil Procedure 56 .................................................................................. 13

ARGUMENT ............................................................................................................................... 14

    I.   Plaintiffs Lack Standing Because They Have Failed to Allege an Injury-in-Fact. ........... 14

    II.   Plaintiffs Are Unlikely to Succeed on the Merits Because the Metro Law Governs
    "Sensitive Places." ........................................................................................................... 15

        A.    Laws Regulating "Sensitive Places" Do Not Infringe Second Amendment Rights... 15

        B.    The Metro Law Governs Sensitive Places That Fall Outside the Second
        Amendment's Scope. ............................................................................................... 23

    III.  Plaintiffs Will Not Suffer Imminent, Irreparable Harm Absent Relief. ............................ 32

    IV.  The Balance of the Equities and Public Interest Weigh Against an Injunction. ................ 33

    V.   Plaintiffs Are Not Entitled to Summary Judgment or a Trial on the Merits. ..................... 34

CONCLUSION ............................................................................................................................ 37

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. State*, 11 S.W. 628 (Tex. Ct. App. 1889) ............................................................... 20

*Am. Freedom Def. Initiative v. WMATA*, 898 F. Supp. 2d 73 (D.D.C. 2012) ....................... 24, 25

*Archdiocese of Washington v. WMATA*, 897 F.3d 314 (D.C. Cir. 2018) ............................... 7, 32

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) .................................................... 17

*Bsharah v. United States*, 646 A.2d 993 (D.C. 1994) ................................................................. 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 13

*Chaplaincy of Full Gospel Churches*, 454 F.3d 290 (D.C. Cir. 2006) ....................................... 33

*Convertino v. DOJ*, 684 F.3d 93 (D.C. Cir. 2012) ................................................... 13, 34, 35, 36

*DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365 (Va. 2011) ............... 21

*District of Columbia v. Heller* (*Heller I*), 554 U.S. 570 (2008). ................................. 3, 15, 16, 20

*Easlick v. United States*, 104 S.W. 941 (Indian Terr. 1907) ...................................................... 29

*Ellington v. Denning*, 138 S.W. 453(Ark. 1911) ...................................................................... 30

*Eslava v. State*, 49 Ala. 355 (1873) ......................................................................................... 29

*George v. George Washington Univ.*, No. 22-896, 2022 WL 1719002 (D.D.C. May 27, 2022). 13

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348 (N.D. Ga. 2016) . 19

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318 (11th Cir. 2015) ........... 19

*Gholson v. State*, 53 Ala. 519 (Ala. 1875) ................................................................................ 29

*Hathcote v. State*, 17 S.W. 721 (Ark. 1891) ............................................................................. 29

*Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ................................. 3

*Heller v. District of Columbia* (*Heller III*), 801 F.3d 264 (D.C. Cir. 2015) ................................. 5

*Hill v. State*, 53 Ga. 472 (1824) ............................................................................................... 18

*Int'l & G.N.R. Co. v. Folliard*, 1 S.W. 624 (Tex. 1886) ............................................................. 36

*Jeffries v. Barr*, 965 F.3d 843 (D.C. Cir. 2020) ....................................................................... 14

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) .................................................................. 32

*McGuirk v. State*, 1 So. 103 (Miss. 1887) ................................................................................ 29

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ................................................................... 3

*Moore v. Madigan*, 708 F.3d 901 (7th Cir. 2013) ..................................................................... 18

*Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014) ............................................ 13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ................................. passim

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 (2020) ............. 16

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 12

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ................................................................. 18, 32

*NRDC v. Peña*, 147 F.3d 1012 (D.C. Cir. 1998) ................................................................. 13, 34

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ........................................ 14, 15

*Rosaman v. City of Okolona*, 37 So. 641 (Miss. 1905)............................................................ 29

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005)...................................................... 14, 15

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................................................ 12

*State v. Wilforth*, 74 Mo. 528 (1881) ..................................................................................... 21

*Stilly v. State*, 11 S.W. 458 (Tex. Ct. App. 1889) .................................................................. 29

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) .................................................... passim

*United States v. Davis*, 304 F. App'x 473 (9th Cir. 2008)...................................................... 18

*United States v. Hartzog*, 983 F.2d 604 (4th Cir. 1993) ........................................................ 26

*United States v. Krug*, 20 F. App'x 271 (6th Cir. 2001)......................................................... 26

*United States v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009) .............................. 19, 21

*United States v. Walters*, Civil Action No. 08-0031, 2008 WL 2740398 (D.V.I. July 15, 2008) 20

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .......................................................... 13, 34

*Voisine v. United States*, 579 U.S. 686 (2016)............................................................... 1, 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................... 12, 32

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). .......................................... 3, 27

**Statutes**

1637 Md. Laws 216, § 6 ........................................................................................................ 17

1686 N.J. Laws, ch. 9, in *The Grants, Concessions, and Original Constitution of the Province of New Jersey* (2d ed. 1881) .................................................................................................. 28

1787 N.Y. Laws 345, ch. 1 .................................................................................................... 17

18 U.S.C. § 922(e) ................................................................................................................ 26

1813 Ky. Law, ch. 89, *reprinted in Acts Passed at the First Session of the Twenty-First General Assembly for the Commonwealth of Kentucky* (1813) ......................................................... 28

1820 N.H. Laws 322, § 49 ..................................................................................................... 19

1843 Rhode Island Sess. Laws 13, § 38................................................................................. 19

1859 Wash. Sess. Laws 489 ............................................................................................ 19

1870 La. Acts 160, § 73 ................................................................................................. 17

1870 Tex. Gen. Laws 63 ...................................................................................... 17, 19, 21

1876 Iowa Acts 142, ch. 148, § 1 ................................................................................... 19

1877 Va. Acts 305, pt. 21 .............................................................................................. 17

1878 Miss. Laws 176, § 4 .............................................................................................. 21

1879 Mo. Laws § 1274 ....................................................................................... 17, 19, 21

1887 Terr. of N.M. Laws, § 9, *reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session*  (1887) .................................................................. 29

49 U.S.C. § 46505 ......................................................................................................... 26

Act of July 13, 1892, ch. 159, 27 Stat. 116 ..................................................................... 4

Act of the Corporation of the City of Washington of Nov. 4, 1857 .................................... 4

D.C. Code § 50-921.01 ................................................................................................... 7

D.C. Code § 7-2501.01 ................................................................................................... 6

D.C. Code § 7-2509.07 ................................................................................................... 5

Firearms Control Regulations Act of 1975, Law 1-185, 23 D.C. Reg. 2464 (Sept. 24, 1976) ....... 5

N.Y. Penal Law § 265.01-a ............................................................................................ 27

Pub. L. No. 89-774, 80 Stat. 1324 (1966) ......................................................................... 7

Town of Georgetown Ordinance of Oct. 24, 1801 ............................................................... 4

**Constitutional Provisions**

Delaware Const. art. XXVIII (1776) ............................................................................... 17

U.S. Const. amend. II .................................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 56 ................................................................................ 13

Federal Rule of Civil Procedure 65(a)(2) ........................................................................ 13

**Regulations**

24 DCMR § 24-2344.2 ..................................................................................................... 6

49 C.F.R. § 1540.111 ..................................................................................................... 26

49 C.F.R. § 1540.5 ........................................................................................................ 26

**Other Authorities**

1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W. Blackstone* (1826) . 20

1 Richard Burn, *The Justice of the Peace and Parish Officer* (7th ed. 1762) ............................. 20

1 William Hawkins & Thomas Leach, *Treatise of the Pleas of the Crown* (7th ed. 1795) .......... 20

Benjamin Vaughan Abbott, *Judge and Jury* (1880) ..................................................... 20

Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp. I.-60 (2022) ......................................... 19

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459 (2019)............................................................................................................ 17

David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine*, 13 Charleston L. Rev. 205 (2018)............................................................................................... 16, 18

Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America*, Oxford Research Encyclopedias, Mar. 2, 2015 .................................................................. 31

Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* § 788*a* (2d ed. 1883) ....... 29

Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* (2018)...................... 22

*Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis, in 1774, 1775, & 1776* (1836).......................................................................... 17

*Revitalizing WMATA: Getting To A Culture Of Excellence: Hearing Before the House Committee on Oversight and Reform*, 117th Cong. (2022)....................................................... 7, 8

William Waller Hening, *The Virginia Justice* (4th ed. 1825)..................................... 20

## INTRODUCTION

Plaintiffs' case rests on the remarkable assertion that the Second Amendment affirmatively compels the District of Columbia to allow handguns on the same public-transit system that carries children to school and federal employees to work. That claim is as sweeping as it is unprecedented. No sound reason exists for this Court to break new ground as the first in history to declare that the Second Amendment bars the regulation of guns on government property dedicated to public transportation. And that is particularly true at this early stage of the case. Such a ruling would not only abruptly destabilize the District's ability to securely operate its public-transit system, but it also would lack any principled limit and jeopardize countless other common-sense laws banning guns in airports, on school buses, on Amtrak trains, on commuter ferries, and more.

This Court should thus reject Plaintiffs' demand for the extraordinary remedy of a preliminary injunction and avoid prematurely resolving the merits of this case. For one thing, Plaintiffs cannot show a likelihood of success because the District's public-transit vehicles and facilities are "sensitive places" outside the scope of the Second Amendment. As the Supreme Court recently reiterated, "sensitive places" are "in effect exempt" "from the Second Amendment," whether they are "schools and government buildings" or "*new* and analogous sensitive places." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133–34 (2022) (emphasis in original). This case involves just such a sensitive place: The Metro is a crowded, fast-moving public-transit system that carries children to and from school, and that transports federal workers to and from the government buildings in which they serve. By any reasonable measure, that is a place "where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133; *see Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J.,

dissenting) (recognizing that laws "prohibiting the carrying of weapons . . . in sensitive locations, such as government buildings" "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms").

Yet even were this case a closer call on the merits, Plaintiffs would still lose.  They have failed not only to show that a preliminary injunction is necessary to save them from imminent, irreparable injury, but also to show that the balance of equities and public interest favor immediate relief.  If anything, those factors weigh strongly *against* issuing an injunction at this early stage, since Defendants have only begun the fact-intensive historical research suggested by the Supreme Court in *Bruen*.  142 S. Ct. at 2131–33.

Not content to settle for an extraordinary preliminary remedy, however, Plaintiffs also urge the Court to take the additional step of awarding them final judgment on the merits and a permanent injunction through summary judgment or a consolidated merits trial—all without allowing Defendants to complete discovery or undertake a fulsome historical inquiry.  This Court should decline Plaintiffs' premature invitation.  On top of significantly prejudicing Defendants, the hasty and truncated process Plaintiffs propose is no way to decide *any* novel constitutional issue, much less Second Amendment claims requiring time-intensive historical research.  The Court should instead deny Plaintiffs' requests across the board and allow Defendants to conduct the discovery and research necessary for this Court to properly resolve the issues in this case.

## BACKGROUND

### I.   Legal and Historical Background

#### A.  The Second Amendment Framework

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S.

Const. amend. II.  This provision codified the right of "ordinary, law-abiding," and "responsible" citizens to own and carry common firearms for self-defense and other lawful purposes.  *See Bruen*, 142 S. Ct. at 2122, 2131, 2135, 2156.  It does not entitle citizens "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *District of Columbia v. Heller* (*Heller I*), 554 U.S. 570, 626 (2008).

Prior to *Bruen*, Courts had analyzed Second Amendment claims under a two-step framework.  The first step asked whether a challenged law regulated conduct outside the scope of the Amendment, as defined by its "text" and "historical limitations."  *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1252–53 (D.C. Cir. 2011).  Many Second Amendment challenges have failed at this threshold step because the regulations were "self-evidently de minimis," *id.* at 1254–55 (basic registration requirements), or because they governed "sensitive places," *United States v. Class*, 930 F.3d 460, 463 (D.C. Cir. 2019) (Capitol Grounds), or because the challengers fell outside "the category of 'law-abiding and responsible' citizens," *Medina v. Whitaker*, 913 F.3d 152, 157–60 (D.C. Cir. 2019) (convicted felons).  For those claims that survived, however, courts typically applied some form of means-end scrutiny at step two, the severity of which depended on how onerously the challenged law burdened a "core" Second Amendment right.  *See Wrenn v. District of Columbia*, 864 F.3d 650, 664–68 (D.C. Cir. 2017).

The Supreme Court's decision in *Bruen* altered the Second Amendment analysis.  While rejecting means-end scrutiny, *Bruen* endorsed the first step of the above framework as appropriately "rooted in the Second Amendment's text" and "history."  142 S. Ct. at 2125–27. The Court reasoned that, to satisfy their initial burden, challengers must show that their claim is covered by "the Second Amendment's plain text," "as informed by history."  *Id.* at 2126–27. Reiterating that "the right secured by the Second Amendment is not unlimited," the Court

indicated that the challengers' initial burden would entail both a textual and historical showing, given that "the historical understanding of the Amendment" serves "to demark the limits on the exercise of that right." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).

Even when challengers fit their claim within the Second Amendment's text, however, the government can still prevail by showing that its law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. To satisfy this standard, the challenged regulation need not be "a dead-ringer for historical precursors," and that is especially true for laws addressing "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132–33. As *Bruen* explained, "a distinctly modern firearm regulation" passes "constitutional muster" when it is "relevantly similar" to "a historical regulation" in terms of "how and why the regulations burden a law-abiding citizen's right." *Id.* Because this standard requires only "a well-established and representative historical *analogue*, not a historical *twin*," the government need only show that the "modern and historical regulations impose a comparable burden on the right" and that the "burden is comparably justified." *Id.* at 2133.

## B.  The District of Columbia's Tradition of Gun Regulation

The District has regulated firearms since the Founding Era. In 1801, for example, the then-Town of Georgetown prohibited firing guns in its "inhabited parts." Town of Georgetown Ordinance of Oct. 24, 1801. In 1857, the city made it unlawful to carry "deadly or dangerous weapons, such as . . . pistol[s]." Act of the Corporation of the City of Washington of Nov. 4, 1857; *see also* Act of Nov. 18, 1858 (same). In 1892, Congress similarly barred persons in the District from having such weapons "concealed about their person" outside of their "place of business, dwelling house, or premises." Act of July 13, 1892, ch. 159, 27 Stat. 116. And the District continued to regulate firearms after Congress granted it limited self-government. *See,*

*e.g.*, Firearms Control Regulations Act of 1975, Law 1-185, 23 D.C. Reg. 2464 (Sept. 24, 1976), *invalidated in part by Heller I*, 544 U.S. 570; *Heller II*, 670 F.3d at 1247–48, 1260–64 (upholding ban on assault weapons and large-capacity magazines); *Heller v. District of Columbia* (*Heller III*), 801 F.3d 264, 269–70, 280–81 (D.C. Cir. 2015) (upholding registration requirement for long guns, fingerprint and photo requirements, registration fees, and training requirements).

### C.  The Metro Law

In 2015, the District passed the License to Carry a Pistol Amendment Act of 2014 (License Act), D.C. Law No. 20-279, eff. June 30, 2015, 62 D.C. Reg. 1944 (Feb. 13, 2015), *codified as amended at* D.C. Code §§ 7-2501.01 *et seq.* (2022 Supp.).  Among other things, the License Act codified a list of circumstances in or at which individuals cannot carry a pistol, including government buildings, schools, hospitals, jails, polling places, places where alcohol is served, stadia or arenas, memorials along the National Mall, the White House area, and public demonstrations.  D.C. Code § 7-2509.07(a); *see id.* § 7-2509.07(b) (clarifying that property owners can ban guns on their property).

Most notably, the License Act reaffirmed the rule that pistols are not permitted on the District's public-transit systems.  *Id.* § 7-2509.07(a)(6); *see Bsharah v. United States*, 646 A.2d 993, 994–1001 & n.5–7, 12 (D.C. 1994) (upholding convictions for carrying "a handgun on a crowded subway train").  This provision (the "Metro Law") states that "[n]o person holding a license shall carry a pistol" in "[a] public transportation vehicle, including the Metrorail transit system and its stations."  D.C. Code § 7-2509.07(a)(6); *see id.* § 7-2509.07(g)(3) ("'Public transportation vehicle' means any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train.").  The

term "'[p]istol'" essentially means a handgun—*i.e.*, "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length," *id.* § 7-2501.01(12)—and to "[c]arry" means to have the "pistol in a holster on [one's] person," 24 DCMR § 24-2344.2.

The legislative history of the Metro Law reveals the care with which the D.C. Council crafted this provision.  As the committee reports explained, "crowding in confined spaces such as a Metro rail car or bus can lead to jostling and pickpocketing, and people sometimes get frustrated or angry and small spats will break out."  D.C. Council, Committee of the Whole Report on Bill 20-0930, at 3 (Dec. 2, 2014).[1]  As a result, because "public transportation in the District is particularly crowded," any "use of a weapon in such a confined space would most certainly result in injury to innocent bystanders."  D.C. Council, Committee on the Judiciary and Public Safety Report on Bill 20-0930, at 13 (Nov. 25, 2014) (noting that the list of sensitive places included "confined spaces such as buses and sports arenas"); *see* Committee of the Whole Report on Bill 20-0930, at 2–3 (Dec. 2, 2014) (explaining that these provisions were essential to law enforcement and to ensure that property owners, including WMATA, could restrict firearms on their property).

### D.  Public Transportation in the District of Columbia

Public transit in the District is operated by two agencies: the District Department of Transportation (DDOT) and the Washington Metropolitan Area Transit Authority (WMATA).

---

[1]     An excerpt of the Committee Report is attached as Exhibit I for the Court's convenience. Defendants are aware of the Court's requirement to file complete copies of documents.  The Committee Report, and all other excerpts, are excerpted from voluminous documents that are publicly available in full online, at the citations referenced.  If the Court would like complete copies of any of these documents, Defendants are prepared to file the full documents or deliver paper copies to the Court.

DDOT is a part of the District's Executive Branch.  D.C. Code § 50-921.01.  It oversees the DC Circulator—a bus system that operates six routes throughout the District including a route around the National Mall—and the DC Streetcar, a single route streetcar service. Declaration of Carla Longshore (Longshore Decl.) at 2–3, ¶¶ 3, 4, 10 (attached as Ex. F).[2]

WMATA is a governmental unit created by a congressionally approved compact between Maryland, Virginia, and the District "to provide safe and reliable transportation services." *Archdiocese of Washington v. WMATA*, 897 F.3d 314, 318 (D.C. Cir. 2018) (citing Pub. L. No. 89-774, 80 Stat. 1324 (1966)); *see* 80 Stat. at 1324 (deeming WMATA "essential" to "the effective performance of the functions of the United States Government").  WMATA operates three services: Metrorail, Metrobus, and MetroAccess.  Defs.' Statement of Undisputed Material Facts (Defs.' SOF) at 4, ¶ 1.  Metrorail is a heavy transit rail system with 91 stations, more than half of which provide access to federal facilities.  *Id.* at 4, ¶¶ 2, 3; Ex. H (map of downtown D.C.).  The Metrobus system has 11,500 bus stops throughout the District, Maryland, and Virginia.  Defs.' SOF at 5, ¶ 5.  MetroAccess is a shared ride service for individuals with qualifying disabilities traveling within WMATA's service area.  *Id.* at 5, ¶ 10.  Before the pandemic, WMATA provided approximately one million trips on average each weekday, *id.* at 6, ¶ 23, a considerable number of which were federal employees going to and from work, *see Revitalizing WMATA: Getting To A Culture Of Excellence: Hearing Before the House Committee on Oversight and Reform*, 117th Cong. 32 (2022) (statement of Rep. Shontel M. Brown, Ohio) (recognizing that the Metro remains "essential to keeping our Federal Government

---

[2]     Citations are to the .pdf pagination of the exhibit, not the native page numbers.

working, with Federal employees representing approximately 40 percent of Metrorail's peak period customer base").[3]

DDOT's and WMATA's public-transit services are also crucial to getting children in the District to and from school.  The District does not operate dedicated school buses, and almost a third of public-school students in the District travel three or more miles to school.  Defs.' SOF at 5–6, ¶¶ 16–17.  DDOT's Kids' Ride Free Program enables students to make their daily school commutes for free using Metrobus, Metrorail, and the DC Circulator.  *Id.* at 6, ¶ 18.  In the 2021–2022 school year, 33,608 students participated in the Kids Ride Free Program.  Longshore Decl. at 3, ¶ 12.  In the 2019–2020 school year, 50,012 students participated in the Program.  *Id.* Overall, nearly 1 in 4 students in the District use public transit to get to and from public school every day.  Defs.' SOF at 6, ¶ 21.

Citizens from across the region and the Nation also rely on public transit in the District to attend cultural and political events, including annual Fourth of July celebrations, Presidential Inaugurations, and public demonstrations.  Defs.' SOF at 6, ¶ 22.  In January 2009, for example, Metrorail alone had over one million rides taken on Inauguration Day.  Declaration of Heather Allison Davis (Davis Decl.) at 3, ¶ 12 (attached as Ex. B).  On July 4, 2022, 253,000 people rode the Metrorail in the hour before the fireworks and nearly 4,500 of them exited at the Smithsonian Metro station.  *Id.* at 4, ¶ 13.  After a hockey game on May 13, 2022, 2,300 people entered the Gallery Place Metro station over the course of a single hour.  *Id.*  And, during the Cherry

---

[3]     *Revitalizing WMATA: Getting To A Culture Of Excellence: Hearing Before the House Committee on Oversight and Reform*, 117th Cong. 32, at 4 (2022) (statement of Rep. Gerald E. Connolly, Virginia) ("[D]uring normal operations prepandemic, Federal employees represent 40 percent of Metrorail's peak period ridership."); *id.* at 6–7 (Rep. Jody B. Hice, Georgia) ("Metro was built to transport Federal workers to and from agencies each and every day.").

Blossom Festival on March 26, 2022, 7,500 people entered or exited the Smithsonian Metro

station in just one hour.  *Id.*

On a normal day, Metrorail cars are expected to hold approximately 100 seated and

standing passengers each, resulting in dense ridership, as depicted in Figure A, below.



**100 Passengers Per Car**

**Seated Load**

● 1 passenger

Figure A, Metrorail Service Standards[4]

But during the peak times of a daily commute, or during a service interruption, Metrorail

stations and Metrorail trains can become even more crowded, as shown in Figure B.

---

[4]     WMATA, *Metrorail Service Standards* 5 (updated 2022), https://tinyurl.com/4wjnskyx.
During peak service, 80 to 100 passengers per Metrorail car is considered optimal.  *Id.*  A car is
"crowded" under WMATA service standards if it contains 101 to 120 passengers and a car is
"very crowded" if it contains 121 or more passengers.  *Id.*  A crowded train would have
approximately 1,000 people on it.  Davis Decl. at 3, ¶ 8.



Figure B, Metrorail Photograph[5]

As anyone who has taken the Metro at busy times knows, the density of ridership and the impatience of riders often results in jostling.  Defs.' SOF at 5, ¶¶ 8, 9.  Passengers often run on the escalators or push through packed crowds on platforms to board trains.  *Id.*  Riding the train might mean standing so close to other riders that their breath can be felt on one's neck, or their coat might rest on one's head.  *Id.*  Because Metro doors cannot effectively be held open once they begin to close, passengers riding in the middle of a packed train car often must ramrod through other riders to disembark before the doors close.  *Id.*  Passengers riding late at night, or after sporting or special events, may be drunken and rambunctious.  Defs.' SOF at 6, ¶ 25.

Metrobus passengers are also regularly packed shoulder to shoulder.  WMATA operates 40-foot buses and 60-foot articulated buses.  The 40-foot buses have a seated capacity of 40 passengers and a maximum capacity close to 50 passengers, while the 60-foot buses have a seated capacity of 60 passengers and a maximum capacity of over 70 passengers.  Davis Decl. at

---

[5]      Mike Murillo, "Metro Rider Endure Insufferable Crowding Thursday," *WTOP News*, June 24, 2016, https://tinyurl.com/3d42hy7n; *see* Defs.' SOF at 4, ¶ 8.

3, ¶ 18.  WMATA tries to fill every seat on buses scheduled more than 20 minutes apart, and for buses scheduled less than 20 minutes apart, it strives for 120% seated capacity.  *Id.* at 3, ¶ 17.

WMATA has its own police force, the Metro Transit Police Department (MTPD), with 400 patrolling officers and jurisdiction over crimes that occur in or against WMATA facilities. *Id.* at 4, ¶¶ 24–25.[6]  As a result of MTPD's enforcement efforts, there were fewer than 8 crimes per million passengers in 2021.  Defs.' SOF at 5, ¶ 12.

## II.   __Factual and Procedural Background__

Plaintiffs are residents of the Washington, D.C.-metropolitan area who have licenses to carry concealed handguns and who want to carry handguns on public transportation in the District.  Pls.' Statement of Undisputed Material Fact [16] (Pls.' SOF) at 2–3, ¶¶ 6, 7, 9–11, 13–15, 17–19, 21.  Plaintiffs Cameron Erickson and Tyler Yzaquirre use public transit in the District to commute to work.  Pls.' Answer to Defs.' Interrog. No. 1 at 5–6 (copy attached to Ex. A). Erickson is a federal employee who works for a member of the House of Representatives; Yzaquirre works for a non-profit.  *Id.*  Plaintiff Gregory Angelo does not commute, *id.*, but estimates he uses public transit in the District at least a few times a month, and up to a few dozen times per month.  Pls.' Answer to Defs.' Interrog. No. 3 at 7–8.  Plaintiff Robert Miller alleges that he "regularly" uses public transit in the District, Compl. [1] at 2, ¶ 3, but he cannot estimate how many times he has used it monthly since 2019, Pls.' Answer to Defs.' Interrog. No. 3 at 7. Plaintiffs do not carry concealed handguns on public transit but would like to do so.  Pls.' SOF at 2–3, ¶¶ 9, 13, 17, 21.

---

[6]      *See About the Metro Transit Police Department*, WMATA, https://tinyurl.com/2p9xds2j; *Milestones and History*, WMATA, https://tinyurl.com/3sumyubc.  Unless otherwise noted, all cited electronic materials were last accessed on September 16, 2022.

Plaintiffs filed this lawsuit on June 30, 2022, challenging the Metro Law, D.C. Code § 7-2509.07(a)(6).  Compl. at 10, ¶ 23.  In Count I, Plaintiffs allege that the Metro Law, "facially and as applied," violates the Second Amendment.  *Id.* at 33–34, ¶¶ 81–82.  In Count II, they allege that the Metro Law "violates the [D]ue [P]rocess [C]lause of the Fifth Amendment[.]"  *Id*. at 34, ¶ 83.

On July 11, 2022, Plaintiffs filed their Application for a Preliminary Injunction [6] (the Motion), seeking to enjoin enforcement of the Metro Law.  *See* Pls.' Mem. of Points and Authorities in Supp. of Appl. for Prelim. Inj. [6-1] (Pls.' Mem.) at 12, 51.  Plaintiffs also requested that the Court consolidate consideration of the Motion with a trial on the merits and grant permanent relief under Rule 65(a)(2).  *Id.* at 50–51.  In response to Plaintiffs' request for a permanent injunction, the Court instructed that Plaintiffs should "demonstrate that they are entitled to summary judgment" and invited them to supplement the Motion to satisfy the requirements of Rule 56.  Minute Order of July 15, 2022.  Plaintiffs complied on July 22, 2022.  *See* Pls.' SOF.

## LEGAL STANDARD

### I.   <u>Preliminary Injunctive Relief</u>

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Plaintiffs have the burden to prove that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm," that "the balance of equities" favors such extraordinary relief, and "that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the last two factors merge when the government opposes an

injection).  Because the goal of a preliminary injunction is to preserve the status quo, plaintiffs

seeking to alter the status quo "'face an additional hurdle when proving their entitlement to

relief' and courts 'exercise extreme caution in assessing' such motions."  *George v. George*

*Washington Univ.*, No. 22-896, 2022 WL 1719002, \*5 (D.D.C. May 27, 2022) (quoting

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54,

56–57 (D.D.C. 2012)).

## II.   <u>Federal Rule of Civil Procedure 65</u>

Under Rule 65(a)(2), upon hearing a motion for preliminary injunction, "the [C]ourt may

advance the trial on the merits and consolidate it with the hearing."  Consolidation is appropriate

only when "the relevant facts are undisputed, exigent circumstances exist, and granting

preliminary relief will effectively give a party all of the relief it would obtain after trial on the

merits."  *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 63 (D.D.C. 2014) (citations omitted).

The practice is disfavored:  "[I]t is generally inappropriate for a federal court at the preliminary-

injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S.

390, 395 (1981); *see NRDC v. Peña*, 147 F.3d 1012, 1023 (D.C. Cir. 1998) (holding that

requiring the parties "to fully make their case at the preliminary injunction hearing" is "at odds

with both the Federal Rules" and the "nature of preliminary injunctive relief").

## III.   <u>Federal Rule of Civil Procedure 56</u>

Summary judgment is unavailable unless the movant "show[s] that there is no genuine

issue as to any material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R.

Civ. P. 56(c).  And "summary judgment is premature unless all parties have 'had a full

opportunity to conduct discovery.'"  *Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).  "Rule 56(d) provides an

avenue for relief for nonmovants who can show, by affidavit or declaration, that 'for specified reasons' they 'cannot present facts essential to justify' their opposition to summary judgment." *Jeffries v. Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) (quoting Rule).  "To obtain relief, a Rule 56(d) movant must: (1) 'outline the particular facts the party defending against summary judgment intends to discover and describe why those facts are necessary to the litigation'; (2) explain why the party could not produce those facts in opposition to the pending summary-judgment motion; and (3) 'show that the information is in fact discoverable.'" *Id.* (quoting *Convertino*, 684 F.3d at 99–100) (cleaned up).  The Court can look to the testimony required by Rule 56(d) and to the parties' briefing.  *Id.*

## ARGUMENT

### I.  <u>Plaintiffs Lack Standing Because They Have Failed to Allege an Injury-in-Fact.</u>

The Court should deny Plaintiffs' Motion at the outset because they have not satisfied the requirements of Article III standing, and this Court therefore lacks jurisdiction to reach the merits.  To establish standing to bring a pre-enforcement Second Amendment challenge, Plaintiffs must show (1) a concrete, imminent injury-in-fact (2) caused by the challenged law (3) that would be redressed by judicial relief.  *Parker v. District of Columbia*, 478 F.3d 370, 374–76 (D.C. Cir. 2007).  An "imminent" injury requires proof that Plaintiffs face a "credible threat of imminent prosecution under the District's gun laws."  *Seegars v. Gonzales*, 396 F.3d 1248, 1254 (D.C. Cir. 2005).  It is not enough for them to point to a "background expectation that the government will enforce the law," or even to show that the District "enforces its gun laws, prosecuting all violators of the statute under normal prosecutorial standards."  *Id.* at 1253, 1255 (internal quotation marks omitted).  Plaintiffs must instead show that *they* have "been personally threatened with prosecution," *id.* at 1255, in the sense of being "singled out or uniquely targeted

14

by the D.C. government for prosecution," *Parker*, 478 F.3d at 374–75.  "[F]eared injury" is

"insufficiently imminent."  *Id.* (holding that "a general threat of prosecution" does not suffice).

Plaintiffs here have not even tried to pass this threshold jurisdictional test.  Nor could

they.  The most Plaintiffs can say about any threat of enforcement is that they want to carry

handguns on public transit, but do not, because it is against District law.  Pls.' SOF at 2–3, ¶¶ 9,

13, 17, 21.  But nowhere do Plaintiffs allege—much less show—that the District has threatened

them personally with prosecution or targeted them for enforcement, or that they otherwise have

characteristics that make enforcement against *them* an "especially high" probability.  *Parker*, 478

F.3d at 374–76; *see Seegars*, 396 F.3d at 1255 (holding that plaintiffs lack standing absent "prior

threats against them or any characteristics indicating an especially high probability of

enforcement against them").  In the absence of that showing, Plaintiffs lack standing to bring this

pre-enforcement challenge.

## II.   Plaintiffs Are Unlikely to Succeed on the Merits Because the Metro Law Governs "Sensitive Places."

Plaintiffs cannot prevail on the merits because the Metro Law governs "sensitive places"

where firearms can be barred consistent with the Second Amendment.  As a result, Plaintiffs'

claim fails, whether that is because they cannot fit their proposed conduct within the Second

Amendment's "plain test" when it is properly interpreted in light of its historical limitations, or

because the District's law is "consistent with this Nation's historical tradition of firearm

regulation.  *Bruen*, 142 S. Ct. at 2126–28, 2133–34, 2156.  Either way, the Court should deny the

request for a preliminary injunction.

### A.   Laws Regulating "Sensitive Places" Do Not Infringe Second Amendment Rights.

Laws regulating guns in "sensitive places" do not infringe the Second Amendment.  *See*

*Heller I*, 554 U.S. at 626–27.  As noted, the term "sensitive places" refers to locations that are

"in effect exempt" "from the Second Amendment," such as schools, government buildings, legislative assemblies, polling places, and other "*new* and analogous" areas. *Bruen*, 142 S. Ct. at 2133–34. Because citizens "can preserve an undiminished right of self-defense by not entering those places" or by "taking an alternate route," *Class*, 930 F.3d at 463–65, laws restricting guns "in sensitive locations" "neither prohibit nor broadly frustrate any individual from generally exercising his right to bear arms," *Voisine*, 579 U.S. at 714 (Thomas, J., dissenting); *see* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine*, 13 Charleston L. Rev. 205, 215 (2018) ("[T]he sensitive places doctrine is an exception to the general right to bear arms.").[7]

### 1. "Sensitive Places" Are Principally Defined by the Nature of the Property at Issue, the Activities Performed There, and the People Present.

While historically rooted, the category of "sensitive places" was not frozen in time at the founding. *See Bruen*, 142 S. Ct. at 2133–34; *Heller I*, 554 U.S. at 627 n.26. Such places are principally characterized by the nature of the property, the activities that take place there, or the people found there. *See*, *e.g.*, *Class*, 930 F.3d at 463–66. Any one of those characteristics, moreover, suffices to make a place "sensitive" for purposes of the Second Amendment.

#### a. Nature of the Property

Places that are "sensitive" by *nature* include many forms of government property in addition to locations dedicated to the exercise of constitutional rights. Under this framework, courts have recognized that courthouses, polling places, churches, and post offices qualify as sensitive places. *See Bruen*, 142 S. Ct. at 2133 (listing "legislative assemblies, polling places, and courthouses"); *Heller I*, 554 U.S. at 626–27 (same, "government buildings"); *Bonidy v. U.S.*

---

[7]        *See also, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., dissenting) (recognizing "the constitutionality of . . . laws banning firearms from certain sensitive locations"); *id.* at 1527 (Kavanaugh, J., concurring) (agreeing "with Justice Alito's general analysis").

*Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (same, "post offices").  This category has deep historical roots in early American laws prohibiting the carrying of arms in places of election, worship, and legislative assembly.  *See* Delaware Const. art. XXVIII (1776) ("To prevent any violence or force being used at the said elections, no person shall come armed to any of them."); 1637 Md. Laws 216, § 6 ("[N]o one shall come into the house of Assembly (whilst the house is set) with any weapon upon peril of such fine or censure as the house shall think fit.").[8]

Such laws were intended to prevent the carrying of firearms from hindering the government's operation or chilling the exercise of other constitutional rights.  *See, e.g.,* Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019) (explaining that some "places are sensitive because they are the locus of the production of

---

[8]      *See also, e.g.*, 1787 N.Y. Laws 345, ch. 1 ("[A]ll elections shall be free and that no person by force of arms nor by malice or menacing or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment and treble damages to the party grieved."); *Proceedings of the Conventions of the Province of Maryland, Held at the City of Annapolis, in 1774, 1775, & 1776* 185 (1836) ("And to prevent any violence or force being used at the said elections, no person shall come armed to any of them, and that no muster of the militia be made on the day on which any of the said elections shall be held ... nor shall any soldiers in the pay of this province be suffered to collect at the time and place of holding any of the said elections, so as in any manner to impede the freely and convenient carrying on such elections."); 1870 La. Acts 160, § 73 ("It shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration within a distance of one-half mile of any place of registration or revision of registration."); 1870 Tex. Gen. Laws 63 (prohibiting guns at "any church or religious assembly," "any election precinct," and "any other place where people may be assembled to muster or to perform any other public duty"); 1877 Va. Acts 305, pt. 21 ("If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars."); 1879 Mo. Laws § 1274 (banning "concealed" carry of "firearms" in "any church or place where people have assembled for religious worship," and "any courtroom during the sitting of court").

other kinds of public goods protected by other kinds of constitutional rights").  As one 19th-century court put it, "the temple of justice" must not be "turned into a barracks."  *Hill v. State*, 53 Ga. 472, 477–78 (1824) (upholding conviction for carrying pistol in court).  "The right to bear arms," the court reasoned, "is in no fair senses a guarantee that the owners of these arms may bear them at concerts, and prayer-meetings, and elections.  At such places, the bearing of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majority of the laws, and a marked breach of good manners."  *Id.* at 476; *see id.* at 481 ("[T]he legislature may prescribe the manner of bearing arms, including in this manner the mode in which they shall be carried upon the person, and the time, place and circumstances in which they may be borne.").[9]

### b.  Activities Taking Place

Likewise, many types of *activities* may make a place "sensitive."  This includes uniquely intense activities involving dense, distracted crowds (*e.g.*, stadiums, airports, public conveyances), as well as activities of a governmental nature (*e.g.*, motorcades, prisoner rehabilitation).  *See, e.g.*, *United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008) (affirming conviction for carrying concealed gun on airplane); *Moore v. Madigan*, 708 F.3d 901, 904 (7th Cir. 2013) (Hamilton, J., dissenting from the denial of rehearing en banc) (writing for Judges Rovner, Wood, and Williams in suggesting that "public transportation facilities and vehicles" may be "'sensitive' places'").  This is why guns can be lawfully prohibited in certain recreational areas and other "gathering places where high numbers of people might congregate." *Nordyke v. King*, 563 F.3d 439, 459–60 (9th Cir. 2009), *vacated on other grounds*, 575 F.3d 890

---

[9]     *See* Kopel & Greenlee*, supra*, at 246–47 (describing *Hill v. State* as "consistent with the origins of the sensitive places laws in medieval England, which were greatly concerned about violent intimidation of the courts of justice").

(9th Cir. 2009);[10] *see GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1320, 1325–26 (11th Cir. 2015) (denying preliminary injunction against gun ban in "area designed for recreation"); *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1362–67 (N.D. Ga. 2016) (rejecting same challenge on the merits).  This category of sensitive places is closely tethered to early American laws prohibiting the carrying of arms near parades and on trains.  *See* 1820 N.H. Laws 322, § 49 ("If any non-commissioned officer or private shall come on to any parade with his musket, rifle, or pistol loaded with powder and ball, slugs or shot, he shall for such offence forfeit not less than two nor more than ten dollars."); 1876 Iowa Acts 142, ch. 148, § 1 (making it a crime to "present or discharge any gun, pistol, or other fire arm at any railroad train, car or locomotive engine").[11]

The purpose of such laws was, among other things, to preserve order in crowded locations, improve the safety of travelers, and diminish the risk of panic in confined spaces.  *See, e.g.,* Carina Bentata Gryting & Mark Frassetto, NYRSPA v. Bruen *and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) (explaining that [t]he number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place").  Indeed, the longstanding

---

[10]     Despite having been vacated, "the panel opinion in *Nordyke* is persuasive with respect to its 'sensitive places' analysis," *United States v. Masciandaro*, 648 F. Supp. 2d 779, 791 n.18 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111.

[11]     *See also, e.g.*, 1843 Rhode Island Sess. Laws 13, § 38 ("No noncommissioned officer or private, shall unnecessarily, or without orders from his superior officer, come on to any place of parade, with his musket, rifle, or pistol loaded with balls, slugs, shot, or other dangerous substance, or shall so load the same while on parade."); 1859 Wash. Sess. Laws 489 (prohibiting carry in a penitentiary, jail, or house of correction); 1870 Tex. Gen. Laws 63 (banning guns in any "ball room, social party or other social gathering composed of ladies and gentlemen"); 1879 Mo. Laws § 1274 (prohibiting "concealed" carry of "firearms" in "any other public assemblage of persons met for any lawful purpose other than for militia drill").

prohibition on "going armed" under "such circumstances as are apt to terrify the people"

including the carrying of arms in "places" where it was not "customary to make use of them."

William Waller Hening, *The Virginia Justice* 50 (4th ed. 1825); *see* 1 William Hawkins &

Thomas Leach, *Treatise of the Pleas of the Crown* 21–22 (7th ed. 1795) (same); 1 Richard Burn,

*The Justice of the Peace and Parish Officer* 15–16 (7th ed. 1762) (same).  And in early America,

it was not entirely common for civilians to carry arms in certain crowded gatherings, such as

while "attending [public] meetings," 1 Joseph Chitty, *Commentaries on the Laws of England by

the Late Sir W. Blackstone* 142–43 n.18 (1826), or in "a place where persons were assembled for

amusement," *Alexander v. State*, 11 S.W. 628, 629 (Tex. Ct. App. 1889); *see* Benjamin Vaughan

Abbott, *Judge and Jury* 333 (1880) (admonishing those who "toy[] with" pistols "at picnics, on

board steamers, and in saloons").  The carrying of arms in such places therefore in many ways

constituted "circumstances as are apt to terrify the people," Hening, *Virginia Justice* 50, and the

sensitive-place laws in this category were aimed at preventing the predictable consequences of

such terror in crowded, intensive environments, *see Alexander*, 11 S.W. at 629 (upholding

conviction for carrying pistol in schoolhouse holding evening entertainment).

### c.   People Found There

A place may also be sensitive because of the *people* found there, including places like

schools and hospitals that house particularly vulnerable groups such as children and those

suffering from illness.  *See Heller I*, 554 U.S. at 626–27; *United States v. Walters*, Civil Action

No. 08-0031, 2008 WL 2740398, at *1 & n.1 (D.V.I. July 15, 2008) (upholding conviction for

possession of gun within 1,000 feet of school (citing *Heller I*, 554 U.S. at 527 n.26)).  Indeed,

both federal and state courts have recognized that the frequent presence of children in a

particular location strongly indicates that the area should be deemed sensitive for Second

Amendment purposes, whether dealing with a public university or specific portions of a national

park.  *See, e.g., DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370

(Va. 2011) (holding that "GMU is a 'sensitive place'" because it "is a school" with many

students "under the age of 18," including "elementary and high school students" in the summer);

*United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), *aff'd*, 638 F.3d 458

(4th Cir. 2011), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111 (upholding ban on

carrying loaded guns in motor vehicles in National Parks, which travel on "extensively regulated

thoroughfares frequented by large numbers of strangers, including children").  The sensitivity of

such places finds considerable support in early American laws prohibiting guns in "any school

room or other place where persons are assembled for educational, literary or scientific purposes."

1870 Tex. Gen. Laws 63, ch. 46, § 1.[12]

These laws were designed to, among other things, protect vulnerable groups of people

who, because of their age or physical state, cannot easily escape attack, much less defend

themselves.  *See, e.g., Masciandaro*, 648 F. Supp. 2d at 791 (explaining that "schools" are

treated as sensitive places because "possessing firearms in such places risks harm to great

numbers of defenseless people (e.g., children)" (internal quotation marks omitted)).  As courts

have long recognized, the right to bear arms does not entitle individuals to carry "weapons" into

places where "people were assembled for" a "school exhibition."  *State v. Wilforth*, 74 Mo. 528,

529–31 (1881) (upholding defendant's conviction for carrying "fire-arms" into a "church house"

---

[12]     *See, e.g.,* 1878 Miss. Laws 176, § 4 ("Any student of any university, college or school
who shall carry concealed in whole or in part any weapon of the kind or description in the first
section of this act described, or any teacher or instructor or professor who shall knowingly suffer
or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a
misdemeanor."); 1879 Mo. Laws § 1274 (prohibiting "concealed" carry of "firearms" in "any
school-room or place where people are assembled for educational, literary or social purposes").

holding a school literary event).  For those and other reasons, such places have been deemed

paradigmatic sensitive places for purposes of the Second Amendment.  *See, e.g.,* Joseph Blocher

& Darrell A.H. Miller, *The Positive Second Amendment* 106 (2018) (describing "a school" as

"the model sensitive place" in part due to "the presence of children").

### 2.   The Category of "Sensitive Places" Does Not Depend on the Perceived Need of Gun Owners to Carry Their Weapons in a Particular Location.

As the above examples show, the sensitive-places exception in no way depends on the

perceived "need" to carry guns in a particular area.  After all, many "paradigmatic 'sensitive

places'" are "open to the public, without any form of special security or screening," including

many schools and post offices, where "the risk of crime may be no different than in any other

publicly accessible building."  *Class*, 930 F.3d at 465.  Yet the Supreme Court has left "intact

bans on firearm possession in those places," thus underscoring that "the 'level of threat' posed"

does not determine which "places are 'sensitive' for purposes of the Second Amendment."  *Id.*

Indeed, as *Bruen* makes clear, the question is whether the regulated space is "analogous" to a

historically sensitive place, 142 S. Ct. at 2133–34, which turns on the nature of the property at

issue as well as "'the people found there' or the 'activities that take place there,'" *Class*, 930

F.3d at 465 (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga.

2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012)).

The D.C. Circuit's decision in *Class* illustrates the point.  The defendant there argued that

his conviction for possessing firearms on Capitol Grounds violated the Second Amendment

because, although the Capitol itself may be a "sensitive place," his guns were in a car parked

1,000 feet away on Maryland Avenue.  930 F.3d at 462–63.  The D.C. Circuit rejected that claim.

Although "the Capitol Grounds ban was only extended to the Maryland Avenue parking lot in

1980," the lot was nonetheless covered by the "sensitive places exception," because the question

is not how long guns have been banned "*in that location*," but whether the "particular *type* of regulation" is "longstanding." *Id.* at 463–65.  Drawing an analogy to the Capitol, the Circuit reasoned that, because the parking lot enabled staffers "to freely and safely travel to and from work," banning guns in that area was as essential to the "operation of the national legislature" as "the ability of members of Congress and their staff to conduct business inside the Capitol." *Id.* at 464 (recognizing also that the parking lot was "on land owned by the government").  In so holding, the Circuit expressly rejected the argument that the exception applies only to "places that are off-limits to the public (like the White House lawn) or protected by metal detectors and security guards (like the Capitol building)," and thus made clear that the sensitive-places exception is not limited to areas where the perceived "need to have a gun for self-defense is lessened." *Id.* at 464–65.[13]

**B.   The Metro Law Governs Sensitive Places That Fall Outside the Second Amendment's Scope.**

The Metro's trains, buses, and stations are sensitive places where guns can be banned consistent with the Second Amendment because the District has dedicated that government property to the uniquely governmental activity of providing safe, reliable public transportation for federal employees, large numbers of residents and visitors, and schoolchildren.  *See Class*, 930 F.3d at 464–65 (recognizing the government's "broad discretion" under the Second Amendment "to regulate conduct on its property" (quoting *Bonidy*, 790 F.3d at 1126)); *GeorgiaCarry*, 788 F.3d at 1326 (same).  The Metro is therefore a sensitive place based on the

---

[13]     Plaintiffs in fact concede that this is a central holding of *Class* (Pls.' Mem. at 22 n.7), and they do not appear to dispute its continuing vitality after *Bruen* (Pls.' Mem. at 20–24 & n.8).  For good reason.  As explained, *Class* was decided based on the Second Amendment's scope under a mode of analysis that *Bruen* endorsed as "broadly consistent with *Heller [I]*" and appropriately "rooted in the Second Amendment's text, as informed by history," 142 S. Ct. at 2127.

nature of the space, the activities that take place there, and the people who frequent it.  For each

of those dispositive reasons—and all of them, collectively—Plaintiffs' Second Amendment

claim fails.

> **1. The Metro is a Sensitive Place Because of the Governmental Nature of the Property, Including its Use and Ownership.**

To begin, the Metro's unique role in the operation of the federal government makes it a

sensitive place.  As law-enforcement agencies have recognized, the Metro has a "close

association with the federal government," not only "because so many stations are located

adjacent to landmark federal facilities," but also "because the Metrorail system carries such a

high percentage of the federal workforce resident in this area to work on a daily basis."  *Am.*

*Freedom Def. Initiative v. WMATA*, 898 F. Supp. 2d 73, 75–77 (D.D.C. 2012) (internal quotation

marks omitted; quoting affidavit by defendant WMATA).  Given the Metro's critical role in

governmental operations, it has been treated as "a unique target for terrorist attacks" and has, in

fact, been the subject of "previous threats."  *Id.* (internal quotation marks omitted).[14]  That the

Metro is government-owned property used to transport the federal workforce only heightens the

sensitive, governmental nature of its operations.  *See Class*, 930 F.3d at 464 (applying the

sensitive-places exception to "land owned by the government" that allowed federal employees

"to freely and safely travel to and from work").  To borrow Plaintiffs' phrase, the Metro is

strikingly similar to other sensitive places where the "'misuse of arms may prevent the operation

of courts and other institutions of a free government.'"  Pls.' Mem. at 22 (quoting Kopel &

Greenlee, *supra* at 209).  Accordingly, like other crowded and potentially vulnerable locations

---

[14]     *See, e.g., Virginia Man Arrested For Plotting Attacks On D.C.-Area Metro Stations With People He Believed To Be Al-Qaeda Members*, Department of Justice (Oct. 27, 2010), https://tinyurl.com/ck2s4u9u.

populated by essential government workers, the Metro should be treated as a sensitive place for purposes of the Second Amendment.  *See Class*, 930 F.3d at 463–66.

2. **The Metro is a Sensitive Place Because of the Activities that Take Place There.**

As noted, governments have long restricted the carrying of firearms in spaces involving particularly dense and intense activities, and public transportation by its nature entails the very same types of activities—in crowded, confined, and fast-moving spaces.  *See* Background Section II; Defs.' SOF at 5, ¶¶ 8, 9.  That is another independent reason why the Metro should be considered sensitive.  Unlike almost anywhere else in public life, Metro riders may be packed shoulder to shoulder with masses of strangers from all walks of life for long periods of time, and then pressed to move with or against the flow as cars or buses load and unload.  *Id.*  Physical jostling and emotional frustration are inevitable and routine, as are fast-moving, hasty riders and inter-rider conflict—all on crowded platforms surrounded by deep track beds with energized rails.  *See Am. Freedom*, 898 F. Supp. 2d at 82 (noting WMATA's concern that "inter-passenger disputes" could create a "risk that passengers on its subway platforms could fall down into the energized tracks"); Background Section I.C (noting the D.C. Council's concerns that "use of a weapon" in such "confined spaces" would injure bystanders).  Add to this the fact that the Metro is a public conveyance run by the government using government property, and the sensitive nature of the space becomes obvious.

Perhaps not surprisingly, every modern mode of interstate transportation prohibits the carrying of loaded firearms on one's person, including commercial aircraft, interstate buses, and

cruise ships.  *See* 49 U.S.C. § 46505; 49 C.F.R. §§ 1540.111, 1540.5.[15]  This is also true, most notably, of Amtrak passenger trains.  As Amtrak's rules explain, passengers on such vehicles categorically cannot carry firearms or ammunition in their carry-on baggage, and no passenger can store a loaded gun in their checked baggage unless, among other things, they provide notice at least 24 hours before departure and keep the gun "in an approved, locked hard-sided container."  *Firearms in Checked Baggage*, Amtrak, https://tinyurl.com/2bbypc9j.  This restriction comports with longstanding federal law requiring passengers on interstate common carriers to notify the carrier that they are transporting guns or ammunition and to "deliver said firearm and ammunition into the custody of the pilot, captain, conductor or operator" of the carrier "for the duration of the trip."  18 U.S.C. § 922(e); *see United States v. Hartzog*, 983 F.2d 604, 605–08 (4th Cir. 1993) (Luttig, J.); *United States v. Krug*, 20 F. App'x 271, 275–76 (6th Cir. 2001).

These regulations exist for the same reason as their historical precursors.  In dense spaces characterized by jostling and interpersonal conflict, the risk of a gun being accidentally discharged or hastily fired is tragically high—not only for the innocent bystanders who may be shot, but also for the countless other victims who may be crushed or thrown from a platform by a panicked crowd.  What is more, any incident involving a firearm could disrupt transit for the hundreds or thousands of people relying on government-provided transportation each day.

---

[15]     *Prohibited and Permitted Items*, Greyhound Lines, https://tinyurl.com/4vkndadw; *Terms and Conditions*, Megabus.com (updated Jan. 3, 2020), https://us.megabus.com/terms; *Baggage Policies*, Trailways, https://trailways.com/baggage-information/; *Baggage*, Peter Pan Bus Lines, https://peterpanbus.com/travel-info/baggage/; *What to Pack & Bring*, Carnival Cruise Line, https://www.carnival.com/help; *What Items Are Prohibited Onboard A Royal Caribbean Cruise Ship?*, Royal Caribbean International, https://tinyurl.com/3vd7twuy.

### 3. The Metro is a Sensitive Place Because of the People Found There.

In addition, the Metro is a sensitive place because it functions as the District's school bus, meaning that a large concentration of children may be riding trains and buses at any given time. The Metro is a government-owned system that carries tens of thousands of vulnerable children each year to and from school.  Defs.' SOF at 6, ¶¶ 18–20.  Unlike other towns where "kids walk outside and get on the school bus," the District's "school bus is, in fact, the Metro system." Abigail Hauslohner, *D.C. Students Will Be Riding Metro For Free This Year*, Washington Post (Aug. 17, 2015) (quoting Mayor Bowser) (attached as Ex. Y).  In this capacity, the Metro functions much like a natural extension of the schoolhouse itself, which is a "paradigmatic" sensitive place, *Class*, 930 F.3d at 464–65.  And the District is hardly unique in regulating such areas.  As Plaintiffs concede (Pls.' Mem. at 32–34), "the broad consensus of states" treats schools as "sensitive locations," including Maryland and Virginia, the latter of which "prohibits carry on school grounds" *and* "school buses."  *See, e.g.*, N.Y. Penal Law § 265.01-a (prohibiting "possession of a weapon on school grounds," including "upon a school bus").  The frequent presence of vulnerable children on the Metro traipsing to and from school is reason enough by itself to recognize that the District's law regulates sensitive places beyond the scope of the Second Amendment.

### 4. Plaintiffs' Arguments to the Contrary Lack Merit.

The historical pedigree of treating the Metro as a sensitive place, moreover, is not at all undermined by colonial laws limiting the unarmed travel of militiamen.  For one thing, those laws are entirely beside the point:  Plaintiffs readily and rightly concede that, whatever "tradition" may have existed of citizens carrying guns when they "traveled from their homes," it

surely did not extend to sensitive places (Pls.' Mem. at 24, 26–27).  *See Wrenn*, 864 F.3d at 657,

662, 667 (emphasizing that the right to carry arms "beyond the home" was always "subject to

longstanding restrictions" and "traditional limits," like "longstanding bans on carrying near

sensitive sites").  For another thing, the laws are historically inapposite.  That some early

American localities believed it would be unwise for their militiaman to venture through

dangerous and uncharted frontiers without arms hardly suggests that civilians in the Founding

Era believed themselves entitled to carry arms wherever they chose.  If anything, the militia rules

indicate that colonists were *not* historically entitled to choose where they did or did not carry

guns in all instances.  And they provide no support at all for the proposition that colonists had an

unfettered right to carry guns on government property, surrounded by schoolchildren and public

servants who, because of age or place of work, cannot lawfully carry firearms in such places.[16]

Nor can Plaintiffs draw support from the so-called "traveller" defense that applied to some

early gun laws.  As Plaintiffs acknowledge (Pls.' Mem. at 38–41), states began to restrict public

carry soon after the Second Amendment's ratification, just as some colonies had beforehand, *see,*

*e.g.*, 1686 N.J. Laws, ch. 9 ("[N]o person or persons . . . shall presume privately to wear any pocket

pistol."), in *The Grants, Concessions, and Original Constitution of the Province of New Jersey*, at

289–90 (2d ed. 1881).  While many of these laws contained few if any exceptions, some provided

a narrow affirmative defense for those who carried a gun while "travelling on a journey."  1813

---

[16]     Even more misplaced is Plaintiffs' reliance on laws requiring militiamen to guard
churches during compulsory religious services (Pls.' Mem. at 35–37), as this case does not
present the question of whether churches qualify as sensitive places.  In any event, there is little
in the laws Plaintiffs cite to suggest that militiamen regularly *entered* any churches carrying
arms, and from a purely tactical perspective, it seems more likely that they would have patrolled
the perimeter and kept watch from a strategic distance, rather than huddling together with
civilians inside the church.

Ky. Law, ch. 89, *reprinted in Acts Passed at the First Session of the Twenty-First General Assembly for the Commonwealth of Kentucky*, 100–01 (1813).

Yet this was not the capacious right to carry that Plaintiffs attempt to conjure. As a leading treatise of the time explained, "traveling" meant far more than just "going from home." Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* § 788*a*, at 486 (2d ed. 1883). It meant a "journey" of significant distance beyond one's customary surroundings, habits, and acquaintances. *Eslava v. State*, 49 Ala. 355, 357 (1873); *see* Bishop, Statutory Crimes § 788*a*, at 486 ("A man on his daily return from his place of business in the city to his home in the country is not a traveller.").[17] One jurisdiction in fact stated that if "travelers stop at any settlement for a longer time than fifteen minutes they" are no longer "actually prosecuting their journey," and thus "shall remove all arms from their person or persons, and not resume the same until upon eve of departure." 1887 Terr. of N.M. Laws, § 9, *reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session* 55, 58 (1887). The reasons for these constraints were simple: A broader defense would swallow the general prohibition and

---

[17] *See, e.g.*, *Hathcote v. State*, 17 S.W. 721, 721 (Ark. 1891) ("Persons traveling within the circle of their general acquaintance are supposed to be within its protection, and exempt from perils of the highway to which they are exposed when they pass beyond it. So within the circle of their general acquaintance they are held not to be on a journey, while beyond it they are on a journey."); *McGuirk v. State*, 1 So. 103, 104 (Miss. 1887) ("[N]o matter how far appellant had been from home, he received the pistol in returning, within 10 or 12 miles of his residence; and carrying it home concealed, in this state of facts, was not within the statutory exception."); *Gholson v. State*, 53 Ala. 519, 521 (Ala. 1875) ("[T]he defendant, in passing to and from Tuscumbia, was in the pursuit of his ordinary duties and business, and within the circle of his friends and acquaintances."); *see also Easlick v. United States*, 104 S.W. 941, 942 (Indian Terr. 1907) ("One who is going from home by the highway to a definite point far enough distant to carry him beyond the circle of his neighbors and to detain him throughout the day, and not within the routine of his daily business, is upon a journey within the meaning of the exception in the statute against carrying weapons."); *Rosaman v. City of Okolona*, 37 So. 641, 641–42 (Miss. 1905) (holding that defendant who arrived in town Friday evening was "not a traveler" on Saturday).

cause "cities and towns to be infested with armed men." *Stilly v. State*, 11 S.W. 458, 458–59 (Tex. Ct. App. 1889) (rejecting "travelers" defense where defendant stopped during 50-mile wagon journey); *see Ellington v. Denning*, 138 S.W. 453, 453 (Ark. 1911) (recognizing that, in "modern civilization," there were "no perils of the highway against which the traveler needs for protection a deadly weapon," and it was "absurd to say that he needs a pistol to protect himself from attack").

If anything, this history squarely undermines Plaintiffs' claims. By their own admission, Plaintiffs seek to carry guns on the Metro "in their day-to-day activities," Pls.' Mem. at 33, which bears little resemblance to the kind of long-distance frontier traveling that provided a limited defense to the otherwise unlawful carrying of arms in earlier times. In any event, Plaintiffs provide no sensible reason to assume that the desolate roadways of 19th century are at all analogous to the Metro's gated, underground, and densely packed transit zones.

In addition, Plaintiffs' argument that public transit cannot be subject to firearms restriction because there is no "twin" regulation in early American history falls flat. In *Bruen*, the Court explained that its test for whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding would have both "fairly straightforward" applications and also applications that require "a more nuanced approach" because they implicate "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2131, 2132. The Court characterized as "straightforward" situations where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," but there is a "lack of a distinctly similar historical regulation addressing the problem." *Id.* at 2131. By contrast, the Court indicated that it would require a more nuanced analysis to determine whether "modern regulations that were unimaginable at the founding" are consistent with

historical regulation.  *Id.* at 2132.  In those situations, courts will often need to "reason[ ] by analogy" and determine whether the challenged regulation is "relevantly similar" to historical regulation.  *Id.*  But the Court also emphasized that upholding a modern regulation does not require identification of "a historical *twin*" but only a "historical *analogue*."  *Id.* at 2132–33 (emphasis in original).

Urban public transit is a uniquely modern phenomenon, so reasoning by analogy is appropriate and necessary here.  Plaintiffs concede that "[p]ublic transportation systems did not exist as they do today at the founding of the nation."  Pls.' Mem. at 35.  As explained by historian Dr. Zachary Schrag, public transit within the meaning of the Metro Law can be categorized as a form of "urban mass transit," which "generally refers to scheduled *intra*-city service on a fixed route in shared vehicles."  Declaration of Zachary Schrag (Schrag Decl.) at 5, ¶ 14 (emphasis added) (attached as Ex. J).  "Such systems appeared in the United States as early as the 1830's, with the introduction of omnibuses (stagecoaches modified for local service) and horsecars (which ran instead on iron rails)."  *Id*.  Relevant here, transit service "was provided almost exclusively by private actors and companies until the mid-twentieth century, when control shifted almost exclusively to state and local governments until the late twentieth century … ."  *Id*. at 6, ¶ 17.  Until at least the mid-20th century, inter-city mass transit has also been primarily provided by private actors.  Defs.' SOF at 7, ¶ 26; *see also* Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America*, Oxford Research Encyclopedias, Mar. 2, 2015, *available at* https://tinyurl.com/mw9tys58.  Accordingly, some reasoning by analogy is required and, as explained above, historical analogues to the Metro Law are abundant and sufficient to sustain the law here.

31

Equally meritless is Plaintiffs' assertion that the Metro Law is "a substantial infringement" for those "who regularly use the Metro system in their day-to-day activities," and especially for "persons of limited means lacking access to alternative transportation." Pls.' Mem. at 33. Many forms of "alternative transportation" are free, *e.g.*, walking, riding in a car with a friend, and nothing in the Metro Law prevents those of "limited means" from lawfully carrying a firearm during "their day-to-day activities" outside public transit. In any event, a law does not infringe the Second Amendment "simply because it makes the right more expensive or more difficult to exercise," *Kwong v. Bloomberg*, 723 F.3d 160, 167–68 (2d Cir. 2013) (internal quotation marks omitted), or because it "declines to use government funds or property to facilitate the exercise of that right," *Nordyke*, 644 F.3d at 788. Plaintiffs are in essence demanding that the District facilitate their carrying of firearms on the District's property—all because it would otherwise be inconvenient or expensive for them to carry their guns using "alternative transportation," Pls.' Mem. at 33. That remarkable theory has no basis in the text of the Second Amendment, and it marks an extraordinary and unwarranted expansion of the narrow holdings in *Heller I* and *Bruen*.

**III.** **Plaintiffs Will Not Suffer Imminent, Irreparable Harm Absent Relief.**

Contrary to Plaintiffs' assertions (Pls.' Mem. at 46–47), the mere "allegation" of a Second Amendment violation does not show "irreparable injury." As courts have made clear, only a constitutional deprivation that "is shown to be likely" in the absence of an injunction can constitute "irreparable injury." *Archdiocese of Wash.*, 897 F.3d at 334. But the mere "possibility" of a constitutional violation does not. *See Winter*, 555 U.S. at 21–22 ("Plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."). Otherwise, anyone fearing a perceived infringement of their rights would enjoy a

presumption of irreparable injury when seeking equitable relief in federal court.  That is not the law.

And, to the extent Plaintiffs contend, alternatively, that the "risk [of] physical injury" they might suffer on the Metro without their firearms on their person also qualifies them for preliminary injunctive relief, Pls.' Mem. at 47, they are sadly mistaken:  They have not submitted any evidence—which is their burden, not the District's—to show that their alleged "risk" of future injury is particularly probable or imminent, nor has any individual Plaintiff testified that he *has to* ride the Metro at all—as opposed to taking other modes of transportation while the Court entertains the merits of the dispute in the ordinary course.  *Cf. Class*, 930 F.3d at 463–65 (citizens "can preserve an undiminished right of self-defense by not entering those [sensitive] places" or by "taking an alternate route").  Plaintiffs here have thus not demonstrated an imminent, irreparable injury, especially given their failure to show that they are likely to succeed on the merits of their claims, *see supra*, Section II.[18]

## IV.    The Balance of the Equities and Public Interest Weigh Against an Injunction.

Plaintiffs' newfound desire to carry guns on the Metro pales in comparison to the public's paramount interest in being free of gun violence on public transit and avoiding the tragic risk of accidental firearm discharges in the densely crowded and frequently chaotic Metro system. Indeed, the Metro Law has been in place since 2015, and the Second Amendment much longer, yet Plaintiffs fail to explain their sudden need to carry handguns while riding public transit.  Nor can they.  Enjoining the Metro Law will merely allow them to carry firearms on public transit on

---

[18]     Plaintiffs' reliance (Pls.' Mem. at 46) on isolated language from the plurality opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), is misplaced.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d 290, 300 n.7 (D.C. Cir. 2006) ("Because the [*Elrod*] plurality's discussion of irreparable harm did not enjoy support from a majority of Justices, it is not binding precedent.").

those relatively few times they use it.  Angelo, for example, uses public transit a few times a month to get around town, and Miller appears not to have used public transit much at all in the last few years.  Pls.' Answer to Defs.' Interrog. No. 3 at 7.  Yzaquirre might commute with a gun, but only if his employer, and his employer's lease, permit firearm possession once he arrives at work.  Pls.' Answer to Defs.' Interrog. No. 1 at 5–6.  Likewise, Erickson commutes on public transit, but because he works in the House of Representatives and cannot carry his gun into his workplace, he could not, practically speaking, carry on his commute even if the Metro Law were enjoined.  *Id.*; 18 U.S.C. § 930(a), (g)(1); 41 C.F.R. § 102-74.440.  Because the requested relief will thus offer Plaintiffs' little benefit, the equities tip decidedly against them and the public interest lies in the denial of their Motion.

V.   **Plaintiffs Are Not Entitled to Summary Judgment or a Trial on the Merits.**

In addition to denying the preliminary injunction, this Court should also decline Plaintiffs' premature invitation to decide the merits of their constitutional claim at this early stage of the case.  As an initial matter, Plaintiffs are not entitled to summary judgment given their failure to show a likelihood of success on the merits, *supra*, Section II.  But even if it was a closer call, Plaintiffs cannot reasonably contend that Defendants have failed to satisfy *Bruen*'s in-depth historical test, while at the same time barring Defendants from conducting the in-depth research necessary to satisfy that test.  Such a Catch-22 has no basis in law and would severely prejudice Defendants.  This Court should accordingly stay consideration of summary judgment and decline to consolidate the preliminary-injunction hearing with a merits trial so that Defendants can conduct proper discovery.  *See Convertino*, 684 F.3d at 99–100 (instructing courts to be "generous" in granting time for discovery); *see also Camenisch*, 451 U.S. at 395; *NRDC*, 147 F.3d at 1023.

34

When assessing whether to provide a party with additional time to conduct discovery, courts essentially ask three questions: (1) What evidence is the party seeking to discover? (2) Why does the party not already have it? And (3) how will the party get it?  *Convertino*, 684 F.3d at 99–100.  Each question points to the need for additional expert discovery and fact development in this case.  *See* Declaration of Andrew J. Saindon at 4, ¶¶ 7–8 (attached as Ex. A).

*First*, Defendants and their experts require a reasonable period of time to scour the relevant historical precedents—many of which may not be published in a readily accessible format—for historical analogues.  Plaintiffs argue that the District's ban on carrying firearms on public transportation is unconstitutional because "it lacks any historical justification" and has no "historical analogues."  Compl. at 4–5, ¶¶ 14–16.  Plaintiffs then summarily conclude that "[n]othing in the text, history or tradition of the Second Amendment supports upholding a ban on arms carry of public transportation."  *Id*. at 23, ¶ 47.  In an attempt to justify their blanket assertion, Plaintiffs purport to identify laws spanning more than 500 years that allegedly do not support banning firearms on public transportation.  *Id*. at 23–33, ¶¶ 47–80.  Defendants now simply seek sufficient time to test Plaintiffs' assertions and to conduct their own research into historical tradition and relevant historical analogues.

To give just one example, additional research may reveal a historical tradition of gun regulation by private common carriers, which share at least some traits with government-run public transit that may prove relevant.  While the 18th- and 19th-century rulebooks of such carries are not readily accessible today, initial research has revealed that, similar to the Metro, at least some early common carriers prohibited passengers from carrying guns on their person.

For example, a copy of the "Rule and Regulations for Running the Trains on the North Pennsylvania Railroad, Adopted June 1, 1875," specifies that the "passenger conductor" will,

among other duties, "see that … passengers do not take into the cars guns, dogs, valises, large bundles or baskets." Ex. L at 17, ¶ 41. Similarly, a Texas case from 1886 narrates facts in which the plaintiff, a train passenger, "was met at the door of the passenger coach by a servant of the company and told that he could not take his gun into the coach, but must place it in the baggage car." *Int'l & G.N.R. Co. v. Folliard*, 1 S.W. 624, 625 (Tex. 1886). An historian retained by the District has obtained papers of the Union Pacific Railroad dating from the early 20th century that includes information about confiscation of firearms by railway police. Declaration of Brennan Gardner Rivas (Rivas Decl.) at 8–9, ¶ 21 (attached as Ex. K). Many more examples may be found, but not without the full benefit of time in discovery to conduct research. *Cf. id.* at 8–12, ¶¶ 19–27.

*Second*, Defendants do not already have this evidence because accessing the necessary sources is difficult and time-consuming and certainly could not have been done in 60 days. As detailed in the declarations of Drs. Zachary Schrag and Brennan Gardner Rivas, the historical research contemplated by *Bruen* will require physically traveling to locations across the country and, once there, navigating restrictions on who can review the material, when they can do so, and how much they can do at one time. Schrag Decl. at 12–13, ¶¶ 31–33; Rivas Decl. at 7–11, ¶¶ 17–25. Defendants simply could not collect the necessary historical evidence in such a compressed timeframe.

*Third*, and finally, as also explained by Drs. Schrag and Rivas, the historical evidence that Defendants seek is discoverable. It will just require time and effort to find it. *See* Schrag Decl. at 15–16, ¶¶ 41–42; Rivas Decl. at 6–9, ¶¶ 15–21. This is not a case where the evidence sought has been destroyed or where a potential legal issue would prevent Defendants from accessing it. *Cf. Convertino*, 684 F.3d at 100.

Plaintiffs' contrary arguments lack merit.  They urge the Court to reach the merits now because "the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings."  Pls.' Mem. at 51.  Plaintiffs posit that "[t]o the extent any questions of disputed material fact exist[ ], those questions involve only legislative facts that bear on the justification for legislation, not adjudicative facts that must be determined at trial."  *Id*. (internal quotation marks and citation omitted).  Plaintiffs' distinction between adjudicative and legislative facts misses the point.  Regardless of the label applied to the evidence that Defendants seek to proffer, it remains the case that Defendants have not had sufficient time to collect it, analyze its persuasive value, and consult with the relevant experts— all to ensure that the Court has a complete picture of the pertinent historical record.  Given that the challenged law implicates important public safety issues, and that the Court's decision could have ramifications for a host of other laws intended to protect the public from gun violence, the Court should refrain from prematurely reaching a decision on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Application for Preliminary Injunction and Motion for Summary Judgment.

Date: September 16, 2022.                          Respectfully Submitted,

                                                   KARL A. RACINE
                                                   Attorney General for the District of Columbia

                                                   CHAD COPELAND
                                                   Deputy Attorney General
                                                   Civil Litigation Division

                                                   */s/ Matthew R. Blecher*
                                                   MATTHEW R. BLECHER [1012957]
                                                   Chief, Civil Litigation Division, Equity Section

*/s/ Helen M. Rave*

ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
HELEN M. RAVE*
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7520
Email: helen.rave@dc.gov

*Counsel for Defendants*

*Admitted to practice only in the State of
New York.  Practicing in the District of
Columbia under the direct supervision of
Matthew Blecher, a member of the D.C. Bar,
pursuant to LCvR 83.2(e) and D.C. Court of
Appeals Rule 49(c)(4).