# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GREGORY T. ANGELO, TYLER YZAGUIRRE, ROBERT M. MILLER, and CAMERON M. ERICKSON<br><br>       *Plaintiffs*,<br><br> v.<br><br>DISTRICT OF COLUMBIA and CHIEF ROBERT J. CONTEE III,<br><br>       *Defendants*. | Civil Action No.<br>1:22-cv-01878-RDM |

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION
FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT**

Alison C. Barnes (Bar #484184)
Lauren Cassady Andrews (Bar #888314680)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Phone: (202) 775-4500
abarnes@kramerlevin.com

*Counsel for Amicus Curiae
Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTEREST OF AMICUS CURIAE ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 2

ARGUMENT ........................................................................................................... 3

    I.    Plaintiffs Have Not Met Their Burden to Establish that the Second
        Amendment's Plain Text Covers Their Conduct ........................................... 3

    II.   The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ................. 5

    III.  The Historical Inquiry Continues Beyond 1868 ........................................... 9

CONCLUSION ...................................................................................................... 11

# TABLE OF AUTHORITIES

## CASES

*Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*,
910 F.3d 106 (3d Cir. 2018) ........................................................................... 1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ 2, 4, 5, 9

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................................... 5, 6

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ................................................ 5

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022) ........................ 3

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .......................................... 6

\* *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) ...................... *passim*

*Rehaif v. United States*, 139 S. Ct. 2191 (2019) ............................................... 2

*Rupp v. Becerra*, 401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded*,
No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022) .......................... 1

*Teter v. Connors*, 460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*,
No. 20-15948 (9th Cir. May 19, 2020) ........................................................ 1

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) ...................................... 4

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ..................................... 6

## OTHER AUTHORITIES

\* A. Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ..................... 8

Brief for Independent Institute as Amicus Curiae, *N.Y. State Rifle & Pistol Ass'n v. Bruen*,
No. 20-843 ............................................................................................... 9

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .... 9

\* K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021)
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ..................... 8

\* K. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439
(2022) ...................................................................................................... 5, 7

Transcript of Oral Argument, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 .................... 7

## INTEREST OF AMICUS CURIAE

Everytown is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including more than 46,000 in the District of Columbia (the "District"). Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Washington, D.C. Mayor Muriel Bowser is a member of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 50 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

*docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 nn.4 & 7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District of Columbia's prohibition on the carrying of handguns within its public-transit system (the "Metro Law") is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons stated in Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for Summary Judgment (Dkt. 18).[2] Everytown for Gun Safety submits this amicus brief to expand on three points. First, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to show that their proposed conduct, *i.e.*, carrying loaded handguns within the District's public-transit system, falls within the Second Amendment's plain text, and they have failed to carry that burden. Second, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the analysis should center on 1868, not 1791. This is as true for a D.C. regulation like the Metro Law (to which the Second Amendment applies directly) as it is for state gun laws (to which the Second Amendment applies through its incorporation under the Fourteenth Amendment). Third, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should deny Plaintiffs' application for preliminary injunction in its entirety, stay consideration of Plaintiffs' motion for summary judgment, and decline to consolidate the preliminary injunction hearing with a trial on the merits for all the reasons the District sets out. *See* Dkt. 18 at 20-21 (Plaintiffs lack standing); *id.* at 21-38 (Plaintiffs have not established likelihood of success on Second Amendment claim); *id.* at 38-40 (Plaintiffs have not established other conditions for injunctive relief); *id.* at 40-43 (Court should decline to reach a final decision on the merits at this early stage of the case).

critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added).

## ARGUMENT

**I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. The court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the District notes (Dkt. 18 at 9), Plaintiffs have the burden on the initial, textual inquiry. This is so for at least two reasons. First, *Bruen* itself makes it clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of constitutional litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Supreme Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that, "[u]nder th[e] Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [his] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Plaintiffs make virtually no effort to carry their textual burden. They assert that "[n]othing in the text, history, or tradition of the Second Amendment supports upholding a ban on arms carry on public transportation." Mem. of P. & A. in Supp. of Appl. for Prelim. Inj. (Dkt. 6-1) at 35. But Plaintiffs barely mention the Second Amendment text itself, and they engage in no analysis as to how the Amendment's plain text would cover their "proposed course of conduct," *Bruen*, 142 S. Ct. at 2134, *i.e.*, carrying loaded handguns within the District's crowded public-transit system.

To be clear, nothing in the Metro Law restricts Plaintiffs' ability to keep or bear arms so long as they do not choose to enter the District's public-transit vehicles or stations. *Cf. United States v. Class*, 930 F.3d 460, 465-66 (D.C. Cir. 2019) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places." (alteration in original) (citation omitted)). The Metro Law stands in stark contrast to the laws struck down in *Heller* and *Bruen*—respectively, an unusually "severe" restriction that "totally ban[ned] handgun possession in the home," *Heller*, 554 U.S. at 628-29, and a carry regime that "prevent[ed] law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose," *Bruen*, 142 S. Ct. at 2150. Accordingly, Plaintiffs cannot rest their textual claim on the simple assertion that they wish to carry handguns in public. At the very least, Plaintiffs should be required to prove that their desire to carry loaded handguns on D.C. public transit is something that the text of the Second Amendment protects. They have failed to do so, and so they are not entitled to injunctive relief.[3]

---

[3] In support of their motion, Plaintiffs point not to the Second Amendment's text, but to colonial-era laws requiring militia members to carry firearms while traveling or at church meetings and to the exception for travelers that existed in some early American laws restricting the public carry of firearms. *See* Dkt. 6-1 at 35-41. As the District explains (Dkt. 18 at 33-36), these laws are inapposite and do not support Plaintiffs' claims. And, in any event, they cannot change the text of the Second Amendment to cover Plaintiffs' desire to carry loaded handguns on the District's public-transit system. *Id.* at 38 (noting that Plaintiffs' "remarkable theory has no basis in the text of the Second Amendment").

## II.     The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified. That ratification not only made the Second Amendment applicable to the states, but, as scholars have explained, "it also requires an updated 1868 understanding of the Bill of Rights itself." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022); *see Bruen*, 142 S. Ct. at 2138. Accordingly, under this originalist approach, it is the 1868 understanding of the right to keep and bear arms that should govern in all Second Amendment cases after *Bruen*—including challenges, like this one, to the District's gun laws.

To begin with, in a case involving a state law, a focus on 1868 is the only way to answer the originalist question: how did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

Several circuits reached this conclusion in analyzing the tradition of firearm regulation at the first, historical step of the Second Amendment framework that courts applied prior to *Bruen*.[4]

---

[4] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under

*See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).")); *Ezell  v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*). *Bruen* does nothing to alter that conclusion.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald*, 561 U.S. at 770-78. It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Further confirmation that 1868 is the correct focus, at least as to Second Amendment challenges to state gun laws, appears in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

---

intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, No. 20-843.

To be sure, the choice between 1791 and 1868 is a less straightforward one with respect to challenges, like this one, to the District's gun laws, to which the Second Amendment applies directly rather than through the Fourteenth Amendment. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government [and federal enclaves like D.C.] and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Lash, 97 Ind. L.J. at 1441. But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope of a right held against both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant touchstone for understanding the Second Amendment's scope. *Bruen*, 142 S. Ct. at 2138. And it pointed to "ongoing scholarly debate on

whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* Notably, the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to not only the states, but also the federal government (and federal enclaves such as the District).[5] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government, including the District.[6]

---

[5] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

[6] Although Plaintiffs focus their historical arguments primarily on laws from the colonial and founding eras, they do not appear to contest that Reconstruction-era and later laws should inform the Court's Second Amendment analysis in this case. *See* Dkt. 6-1 at 35-45 (discussing

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of "sensitive places" restrictions. There, the Supreme Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis. 142 S. Ct. at 2133 (emphasis added). This would be an incomprehensible statement from the Court if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[7]

In the end, for the reasons set out in the District's brief, this Court should uphold the Metro Law whether it focuses on the period around 1791 or the period around 1868. *See, e.g.*, Dkt. 18 at 23-28 (citing to analogous historical laws from both the founding and Reconstruction eras); *see also id.* at 37 (noting that "[u]rban public transit is a uniquely modern phenomenon, so reasoning by analogy is appropriate and necessary here"). But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868, not 1791, is the correct focus for the historical inquiry.

## III.    The Historical Inquiry Continues Beyond 1868

In recognizing that the period around 1868 is most relevant in determining the scope of the right, this Court should acknowledge that 1868 is not a cutoff; *Heller* instructs that "examination

---

laws from a wide range of historical periods).

[7] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018) (citing no 19th-century laws); *id.* at 244-47 (citing 1873 Texas law and 1874 decision upholding 1870 Georgia law; article also cites 1870 Louisiana and 1874 and 1886 Maryland laws in same section, at 245); Br. for Independent Institute as Amicus Curiae at 11-17, *Bruen*, No. 20-843 (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting James Madison).

Here, ongoing research into laws and rules from the second half of the 19th century and early 20th century—which are fully consistent with earlier regulations—is likely to further establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption and demonstrate the constitutionality of the Metro Law. *See, e.g.*, Dkt. 18 at 41-42 (citing Declaration of Brennan Gardner Rivas (Dkt. 18-14), which discusses ongoing historical research into 19th- and early-20th-century transit laws and rules).[8] And even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider later historical evidence and recognize that such evidence "settle[s] the meaning of" the right as one that allows for sensitive-places regulations like the Metro Law.

---

[8] To be clear, as the District explains (*see* Dkt. 18 at 36-37), the question before this Court is not whether laws precisely like the Metro Law existed in 1868 (or 1791). *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

## CONCLUSION

The Court should deny Plaintiffs' application for preliminary injunction, stay consideration of Plaintiffs' motion for summary judgment, and decline to consolidate the preliminary injunction hearing with a trial on the merits.


Dated: September 23, 2022                    Respectfully submitted,


/s/ *Alison C. Barnes*
Alison C. Barnes (Bar #484184)
Lauren Cassady Andrews (Bar #888314680)
KRAMER LEVIN NAFTALIS & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Phone: (202) 775-4500
abarnes@kramerlevin.com

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*