## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GREGORY T. ANGELO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 22-cv-1878 (RDM) |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF BRADY, TEAM ENOUGH, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES ACTION FUND AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

———————————————

**Of Counsel:**

Shira Lauren Feldman
Brady and Team ENOUGH
840 First Street NE
Suite 400
Washington, D.C.  20002
(202) 370-8160
sfeldman@bradyunited.org

Esther Sanchez-Gomez
Giffords Law Center to Prevent
Gun Violence
268 Bush St. #555
San Francisco, CA  94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Malone
March For Our Lives
90 Church Street
Suite 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

Jonathan L. Diesenhaus (D.C. Bar No. 423753)
Alex Schulman (D.C. Bar No. 1655499)
Toccara Nelson (D.C. Bar No. 1671708)
Alexandria Reid (D.C. Bar No. 1738632)
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
(202) 637-5911 (fax)

Ira M. Feinberg
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTERESTS OF *AMICI CURIAE* ............................................................................. 1

INTRODUCTION ...................................................................................................... 3

ARGUMENT .............................................................................................................. 7

I.   THE DISTRICT'S METRO TRANSIT SYSTEM IS MADE UP OF SENSITIVE

PLACES UNDER *HELLER* AND *BRUEN* ..................................................... 7

A.   The Physical Characteristics of D.C.'s Trains and Buses Support Their Treatment As

Sensitive Places ............................................................................................... 7

B.   Many Vulnerable School-Aged Youth Use D.C.'s Transit System ........................... 10

C.   The D.C. Metro System's Ridership Includes Numerous High-Value Symbolic

Targets ............................................................................................................ 12

D.   Defenseless Metrorail and Bus Passengers Would be Even More Vulnerable Amongst

Other, Armed Passengers ................................................................................. 14

E.   Public Transportation in D.C. Provides Access to Many Politically and Culturally

Sensitive Locations and Historically Important Gathering Points ........................... 15

F.   Historical Analogues Support D.C.'s Firearm Restriction ........................................ 17

CONCLUSION ........................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
    50 Tenn. 165 (3 Heisk) (1871)..................................................................20

*\*Bonidy v. U.S. Postal Serv.*,
    790 F.3d 1121 (10th Cir. 2015) ............................................7, 8, 14, 15

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
    281 Va. 127 (2011) ....................................................................................24

*\*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................................... *passim*

*Fla. Carry, Inc. v. City of Miami Beach*,
    564 F. Supp. 3d 1213 (S.D. Fla. 2021) ................................................13

*GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*,
    212 F. Supp. 3d 1348 (N.D. Ga. 2016) ...............................................11

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*,
    788 F.3d 1318 (11th Cir. 2015) ............................................................21

*Hall v. Garcia*,
    No. C 10-03799 RS, 2011 WL 995933 (N.D. Cal. Mar. 17, 2011).........11

*Hill v. State*,
    53 Ga. 472 (1874) ....................................................................................20

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)...................................................................................2

*Miller v. Smith*,
    No. 18-CV-3085, 2022 WL 782735 (C.D. Ill. Mar. 14, 2022).................11

*\*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................ *passim*

*New York State Rifle & Pistol Association, Inc. v. City of New York*,
    140 S. Ct. 1525 (2020)...............................................................................2

*New York v. Ferber*,
    458 U.S. 747 (1982)..................................................................................11

*United States v. Class,*
  930 F.3d 460 (D.C. Cir. 2019) ...................................................................... *passim*

United States v. Davis,
  304 F. App'x 473 (9th Cir. 2008) ............................................................... 22

United States v. Dorosan,
  350 F. App'x 874 (5th Cir. 2009) ...........................................................14, 16

United States v. Graham,
  275 F.3d 490 (6th Cir. 2001) ......................................................................13

United States v. Hayes,
  555 U.S. 415 (2009) ....................................................................................2

Wade v. Univ. of Michigan,
  320 Mich. App. 1 (2017), *appeal granted*, 506 Mich. 951, 950 N.W.2d 55
  (Mich. 2020) ...............................................................................................24

**Statutes**

49 U.S.C. § 46505 ...........................................................................................22

1786 Va. Acts 33 .............................................................................................19

1837 Md. Acts 108 §§ 1-2 ...............................................................................18

1877 Va. Acts 305, Offenses Against The Peace §21 ...................................21

1901 Ariz. Acts 1252 .......................................................................................21

1895 Cal. Penal Code § 627 ...........................................................................19

Colo. Rev. Stat. § 18-9-118 ..............................................................................9

D.C. Code Ann. § 7-2509.07(6)........................................................................2

1870 Ga. Laws 421 .........................................................................................20

1903 Ga. Laws 71, § 1 ....................................................................................19

Haw. Rev. Stat. Ann. §§ 134-23(a), 134-24(a), 134-25(a), 134-27(a) ............9

1870 La. Acts 159-60......................................................................................20

1783 Mass. Acts 218–219, ch. 13 ..................................................................19

1647 Md. Laws 216 .........................................................................................19

1650 Md. Laws 273 ..................................................................................................19

1877 Mo. Laws 306, art. IV, § 3 ..............................................................................19

1879 Mo. Laws § 1274 ..............................................................................................20

1903 Mont. Laws 49 ..................................................................................................21

1792 N.C. Sess. Laws 60-61 .....................................................................................20

1868-1869 N.C. Sess. Laws 59-60, ch. 18, § 1 .......................................................19

1820 N.H. Laws 322, § 49 ........................................................................................19

1741 N.J. Laws 101 ...................................................................................................18

1771 N.J. Laws 346 ...................................................................................................18

1721 Pa. Laws 254 .....................................................................................................18

1843 R.I. Pub. Laws 13, § 38 ....................................................................................19

1869-70 Tenn. Pub. Acts 23-24 .................................................................................20

1870 Tex. Gen. Laws 63 ............................................................................................20

1859 Wash. Sess. Laws 119, § 76 .............................................................................19

**Other Authorities**

8 Va. Admin. Code 35-60-20....................................................................................23

1 *Laws of the Commonwealth of Pennsylvania* (John Bioren & M. Carey, 1810)
       (1803)...............................................................................................................18

2 *Digest of the Laws of Pennsylvania* (Kay & Brother, 1873) .................................19

*Acts of the General Assembly of the Commonwealth of Kentucky* (State Printing
       Office, 1866) ....................................................................................................18

Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the
       Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government
       Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60 (2022) ......................23, 24

Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. &
       Mary Bill Rts. J. 459 (2019) .............................................................................24

iv

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018).................................................................................................20

Del. Const., art. 28 (1776)...............................................................19

Eric M. Ruben & Darrell A. H. Miller, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) .......................................18

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121 (2015) ..............................19

*The General Statutes of the Commonwealth of Kentucky* (S. I. M. Major, 1873) ......................19

*The General Statutes of the Commonwealth of Massachusetts* (William White, 1860) ................................................................................19

Local Civil Rule 7(o) ...................................................................3

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007)..............................................17

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ......................................18

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.)......................20

*The Statutes of Oklahoma, 1890* (State Capital Printing Co., 1891) ...........................21

**INTERESTS OF *AMICI CURIAE***

Originally founded in 1974, **Brady** is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live, and protecting the authority of democratically elected officials to address the nation's gun violence epidemic.  Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to act to prevent gun violence.  Brady leads a number of initiatives aimed at combating gun violence, including Veterans for Gun Reform, the End Family Fire Program, and #ShowYourSafety.

**Team ENOUGH** is a youth-led, diverse, Brady-sponsored program that educates and mobilizes young people in the fight to end gun violence.  Team ENOUGH believes preventing gun violence not only requires regulating access to firearms, but also addressing systemic racism and environmental factors that facilitate the gun violence epidemic.  Team ENOUGH is committed to bringing a fresh perspective and a common-sense approach to America's gun policy through, for example, its youth-led Team ENOUGH Lobbying Collective program.

Formed in 1993 by a group of attorneys after a gun massacre at a San Francisco law firm, **Giffords Law Center to Prevent Gun Violence** ("Giffords Law Center") is a nonprofit organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve community safety.  The organization was renamed the Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.  Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.  Together with

1

its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

**March For Our Lives Action Fund** ("MFOL") is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.  Born out of the tragic mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL organized the largest, single day of protest against gun violence in history on March 24, 2018.  Four years later, MFOL held its second March For Our Lives, joined by tens of thousands of people in over 450 marches worldwide.  From its Road to Change initiative that registered 50,000 new voters in 2018 to its successful advocacy for dozens of state, local, and federal laws, MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all.

*Amici*'s experience and expertise in advocating on gun violence prevention issues is longstanding and includes filing *amicus* briefs in major Second Amendment cases, such as *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *New York State Rifle & Pistol Association, Inc. v. City of New York*, 140 S. Ct. 1525 (2020); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *United States v. Hayes*, 555 U.S. 415 (2009); and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

*Amici* respectfully submit that Plaintiffs err in claiming that D.C. Code Ann. § 7-2509.07(6) is unconstitutional.  The Supreme Court's decisions in *Heller* and *Bruen* both affirmed that banning guns in sensitive places is constitutional.  Plaintiffs' theory, if adopted, would bring about disastrous consequences for the District of Columbia and for everyone who lives, works, or visits our nation's capital.  Gun violence is already a significant issue in D.C. and nationwide, as shown

by the consistent, yearly increase in mass shootings.  A ruling that the District cannot prohibit the carrying of guns on the Metro or D.C. buses would substantially increase the number of guns carried in public, and undoubtedly increase the frequency of gun usage, injury, and death.  This result is not constitutionally required, and would undercut D.C.'s use of a commonsense regulation to protect residents and visitors from gun violence.

For all of these reasons, *amici curiae* have a strong interest in this case and support the District's Opposition to Plaintiffs' Application for a Preliminary Injunction and Motion for Summary Judgment.[1]

## INTRODUCTION

Gun violence is a continuing and increasing problem in the District.  In 2021, D.C. experienced a twenty-year high in homicides, a notable uptick likely to continue in 2022. Stephanie Ramirez, *DC leaders react to recent juvenile violence*, FOX5DC, Jan. 27, 2022.[2]  And D.C. has already seen 221 more gun-involved crimes during the first half of 2022 compared to the same period last year.  Paige Hopkins, *Gun violence is on the rise in D.C.*, Axios, Jul. 12, 2022.[3]

Gun violence particularly threatens D.C. public transportation.  In the past year, shootings have occurred at a Metrorail station and within a Metrobus.  *See* Lindsay Watts, *Innocent bystander injured in L'Enfant Plaza Metro Station shooting as concerns over violence grow*, FOX 5 DC, Sept. 1, 2022;[4] Matt Pusatory, *Police search for suspects after shootout aboard Metrobus*, WUSA 9,

---

[1] Pursuant to Local Civil Rule 7(o), *amici* state that no party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party contributed money to fund the preparation or submission of this brief, and no person other than *amici* contributed money to fund the preparation or submission of this brief.

[2] *Available at* https://www.fox5dc.com/news/dc-leaders-react-to-recent-juvenile-violence.

[3] *Available at* https://www.axios.com/local/washington-dc/2022/07/12/gun-violence-is-on-the-rise-in-dc.

[4] *Available at* https://www.fox5dc.com/news/innocent-bystander-injured-in-lenfant-plaza-metro-station-shooting-40-year-old-charged.

Dec. 8, 2021.[5]  D.C.'s law prohibiting carrying firearms on its Metro system properly seeks to protect its residents and visitors in these vulnerable places.

In *District of Columbia v. Heller*, the U.S. Supreme Court held that the individual right to keep and bear arms protected by the Second Amendment "is not unlimited," and leaves room for governments to protect "sensitive places."  554 U.S. 570, 626 (2008).  *Heller* did not fully elucidate the interplay between "sensitive places" and the Second Amendment, but identified "presumptively lawful regulatory measures" like "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or [ ] imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27 & n.26.

The Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), did not disturb *Heller*'s "sensitive place" analysis; indeed, it reinforced it.  In general, *Bruen* held that to justify laws regulating firearm carriage otherwise protected by the Second Amendment, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  142 S. Ct. at 2126.  But *Bruen* recognized that "historical analogies" are not always "simple to draw," especially in "cases implicating unprecedented societal concerns or dramatic technological changes."  *Id.* at 2132. Accordingly, what is "require[d is] only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* at 2133.  And *Bruen* explicitly cited *Heller*'s "sensitive places" discussion as an example of a context where "courts can use analogies to [ ] historical regulations . . . to determine that modern regulations [concerning] analogous

---

[5] *Available at* https://www.wusa9.com/article/news/crime/shots-fired-aboard-metrobus-in-dc/65-b0eea455-fed4-4888-a0df-250c2f98aafb

sensitive places are constitutionally permissible." *Id.*; *see also id.* at 2157 (*Bruen* did not "disturb [ ] anything that we said in *Heller* . . . about restrictions that may be imposed on the . . . carrying of guns") (Alito, J., concurring).  Moreover, nothing in *Bruen* undermined the D.C. Circuit's holding that places can be considered sensitive "for purposes of the Second Amendment because of '*the people found there*' or the '*activities that take place there*.'"  *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (emphasis added) (holding that guns could be barred in and around the Capitol).[6]

Plaintiffs now ask the Court to both enjoin and summarily invalidate the District's judgment that its Metro transit system is a sensitive place from which the carrying of firearms must be prohibited.  Pl. Mem. at 2, 29-40; Compl. ¶ 20.  The Court should decline that request for several reasons.

First, the physical characteristics of the system's trains and buses justify D.C.'s designating the system as a sensitive place.  These are tight, enclosed vehicles where riders often stand shoulder-to-shoulder during rush hour.  Numerous Metrorail stations lie underground (many are deep underground) with bottleneck exit points few and far between.  These characteristics make it difficult and dangerous for patrons to quickly escape gunfire while avoiding injury.  Indeed, that is why, contrary to Plaintiffs' assertion that "carry restrictions on public transportation are rare," Pl. Mem. at 30, many jurisdictions already impose similar bans, as do federally regulated transit systems like Amtrak and air travel.

---

[6] *Amici* recognize that *Class* referenced the two-step test for applicability of the Second Amendment that *Bruen* abrogated.  930 F.3d at 463.  But *Class*' sensitive-place analysis ruled that weapons carriage in a sensitive place is unprotected by the Second Amendment at step one of the test (*i.e.*, prior to applying any means-ends scrutiny), *see id.*, which *Bruen* approved as "broadly consistent with *Heller*."  142 S. Ct. at 2127.

D.C.'s regulation is also supported by compelling public safety rationales arising from the specific vulnerabilities of much of the system's ridership, including children, government workers, and tourists.  Many vulnerable children and teens ride the Metro to school every day since it is free for D.C. students and uniquely serves the function of the District's school transportation system. Tourists are symbolic targets for terrorists, often using the Metro for travel to federal landmarks and memorials.  Government workers also must travel daily to government buildings, and are similarly major potential targets for those looking to wreak havoc on the institutions of our democracy.

All of these passengers regularly use the Metro system for travel to constitutionally gun-free areas like schools and government buildings.  *See Heller*, 554 U.S. at 626-27 & n.26.  D.C. is amply justified in determining that the transport these various groups depend upon is also a sensitive place where firearms can and should be prohibited.  But Plaintiffs' stance would impose a historically unsupported burden on civilians to combat gun violence with even more gun violence.

The validity of the District's designation of the Metro and D.C. buses as sensitive places is also supported by how the Metro system serves D.C. as a whole.  It connects countless federal government buildings, landmarks, and other similar spaces of government and symbolic importance.  These make D.C. a common destination for all types of travelers, from the tourist, to the protest organizer, to the school field trip participant.  Invalidating this law would destroy the public's sense of safety in a jurisdiction where it is critically important that the ability to travel freely and fearlessly is preserved to benefit other constitutionally protected rights.

Examples from the colonial and Reconstruction eras fully support D.C.'s judgment that its transportation system is a sensitive place.  Across the span of our nation's history, states and

localities have barred firearms from a long list of sensitive places for public gathering, from government assemblies to universities, churches, fairs, and parade grounds.  Reflecting evolving public safety needs, these historical examples support D.C.'s analogous attempt to address conditions endangering its residents' safety and peace of mind while using D.C.'s public transportation system.

## ARGUMENT

### I.     THE DISTRICT'S METRO TRANSIT SYSTEM IS MADE UP OF SENSITIVE PLACES UNDER HELLER AND BRUEN.

#### A.  The Physical Characteristics of D.C.'s Trains and Buses Support Their Treatment As Sensitive Places.

The physical characteristics of the Metro system's trains and buses support D.C.'s conclusion that they should be treated as sensitive places.  Generally, "[t]he right to carry weapons in public for self-defense poses inherent risks to others," as "[f]irearms may create or exacerbate accidents or deadly encounters[.]"  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015).  The attributes of certain enclosed locations can substantially elevate those risks and justify restrictions on firearms, including enclosed spaces crowded with targets and vulnerable to accidents.  *See id.* at 1140 n.10 (Tymkovich, J., concurring in part and dissenting in part).  D.C.'s trains and buses are enclosed and often crowded spaces that are mostly inescapable when in operation.  Allowing firearms in those vehicles haphazardly increases passengers' risk of injury.

The mere presence of a firearm risks accidental or inadvertent discharge.  A passenger with a firearm can accidentally harm or kill another without even intending to fire the weapon.  The CDC reported that 45,222 people died from firearm injury in 2020, an almost fourteen-percent increase from 2019.  *Guns*, National Safety Council, last visited September 8, 2022.[7]  About 535

---

[7] *Available at* https://injuryfacts.nsc.org/home-and-community/safety-topics/guns/.

of those deaths were categorized as "preventable or accidental," and this does not include preventable or accidental firearm injuries not resulting in death.  *Id.*  The odds of an injury resulting from accidental or inadvertent discharge are vastly increased by the enclosed and crowded nature of D.C.'s trains and buses.

Indeed, the very essence of a train or bus – a confined container with limited escape routes – distinguishes public transportation from other, less sensitive public areas where people can scatter if facing an attack.  The Metrorail system is a particularly dangerous place to encounter an attack due to its lack of cellular service, lack of exits, and hindrances to potential emergency response.  For instance, a federal government worker died in 2015 after an electrical malfunction filled D.C.'s L'Enfant Plaza Metrorail station with "thick, black smoke."  *Woman Killed in Smoky Metro Tunnel Was 61, Mom of 2*, NBC Wash. (updated Jan. 19, 2015).[8]  Witnesses described the scene on the train as "chaotic" as passengers tried to escape.  *Id.*  One passenger stated that he felt "trapped" and another described having to evacuate the train through a tunnel that lacked electricity and visibility.  *Id.*  Passengers recalled waiting for more than half an hour for emergency responders to arrive; more than 200 people were evaluated and seventy people were taken to the hospital, including the passenger who died.  *Id.*  The same concerns apply equally to Metrorail stations and platforms, which are often subject to dangerous overcrowding.  *See* Kery Murakami, *DC Rider's Answer Line: Why hasn't Metro done anything to ease crowding at Union Station?*, Washington Post, Jan. 24, 2019.[9]

---

[8]*Available at* https://www.nbcwashington.com/news/local/1-dead-dozens-hospitalized-after-deadly-metro-incident/1965423/.
[9] Available at https://www.washingtonpost.com/express/2019/01/25/dc-riders-answer-line-why-hasnt-metro-done-anything-ease-crowding-union-station/.

These inherent characteristics and limitations of rail transportation systems have benefitted shooters in the past and exacerbated firearm-related emergencies.  For example, earlier this year, a man disguised as a construction worker released two smoke grenades on a New York City subway car and platform and fired thirty-three rounds from his handgun, wounding nineteen passengers.  Joe Marino et al., *At least 29 injured in Brooklyn subway shooting, undetonated devices found*, New York Post (Apr. 12, 2022).[10]  The shooter evaded the police by blending in with other commuters and boarding another train.  *Id.*  The next month, 48-year-old Daniel Enriquez was riding the subway on his way to Sunday brunch when a gunman shot and killed him in what appeared to be a random and unprovoked killing.  *Police looking for suspect in unprovoked subway shooting*, NBC News (May 23, 2022).[11]  A witness described the scene as an "absolute terror" and detailed how other passengers could only disperse to the ends of the subway car because they had no way to escape.  *Id.*

Indeed, many state jurisdictions and federal agencies have decided that allowing firearms on certain modes of transportation is intolerably hazardous.  As Plaintiffs acknowledge, New York lawmakers deemed New York's public transportation system a "sensitive location" in response to *Bruen*, making it a crime to carry firearms on its subways and buses.  Pl. Mem. at 30 & n.24.  And besides the jurisdictions listed by Plaintiffs, *see* Pl. Mem. at 30, Colorado and Hawaii also restrict weapons carriage on public transportation.  *See* Colo. Rev. Stat. § 18-9-118; Haw. Rev. Stat. Ann. §§ 134-23(a), 134-24(a), 134-25(a), 134-27(a).

---

[10]    *Available at* https://nypost.com/2022/04/12/nypd-investigating-possible-explosion-in-brooklyn-subway-station/.

[11]    *Available at* https://www.nbcnews.com/nightly-news/video/police-looking-for-suspect-in-unprovoked-subway-shooting-140657221839.

Moreover, Amtrak prohibits passengers nationwide from carrying firearms and ammunition on the train or carry-on baggage. *Firearms in Checked Baggage*, Amtrak.[12] Instead, passengers must place their firearms and ammunition in checked baggage, in addition to complying with other firearm restrictions, such as notifying Amtrak that the passenger will be checking firearms and ammunition at least twenty-four hours before train departure. *Id.* And the Transportation Security Administration ("TSA") similarly bars travelers from carrying firearms and ammunition on airplanes, except "in a locked hard-sided container as checked baggage." *Transporting Firearms and Ammunition*, TSA.[13] Both the Amtrak and TSA policies effectively prohibit a passenger from accessing their gun or ammunition while on board the train or airplane.

**B.  Many Vulnerable School-Aged Youth Use D.C.'s Transit System.**

Many children and teens regularly rely on the D.C. Metro system for travel to and from school. Under the District's Kids Ride Free program, for example, students aged five through twenty-one who reside in D.C. and are enrolled in a D.C. elementary or secondary public, charter, private, or parochial school can ride free on the Metro system. *See* District Department of Transportation, *Kids Ride Free Program*.[14] Almost fifty-thousand students attended the first day of classes this year in District of Columbia Public Schools (DCPS) alone. DCPS, *DC Public Schools Welcomes Back Students to Strong Schools for First Day of 2022-2023 School Year*, Aug. 29, 2022.[15] In this sense, the D.C. Metro system functions as a giant school bus network, daily transporting thousands of vulnerable kids and teens to and from their schools.

---

[12] *Available at* https://www.amtrak.com/firearms-in-checked-baggage.
[13] *Available at* https://www.tsa.gov/travel/transporting-firearms-and-ammunition.
[14] *Available at* https://ddot.dc.gov/node/537462, last visited Sept. 5, 2022.
[15] *Available at* https://dcps.dc.gov/release/dc-public-schools-welcomes-back-students-strong-schools-first-day-2022-2023-school-year.

The safety of these kids, in terms of both physical and mental health, is vital.  *See New York v. Ferber*, 458 U.S. 747, 756 (1982) (calling it "evident" that children's "physical and psychological well-being" be "safeguard[ed]" (citation omitted)).  As federal courts have recognized in other contexts, the imperative to protect children is an important factor in analyzing whether a place is sufficiently sensitive to justify prohibiting firearms.  *See, e.g.*, *Miller v. Smith*, No. 18-CV-3085, 2022 WL 782735, at *8 (C.D. Ill. Mar. 14, 2022) ("A number of courts have held or implied that the presence of children militates in favor of a given place being "sensitive.") (citing cases); *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *5 (N.D. Cal. Mar. 17, 2011).  Sensitive-place designations can also apply to areas related to other presumptively lawful sensitive places.  *See, e.g.*, *Class*, 930 F.3d at 464; *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1362 (N.D. Ga. 2016); *Hall*, 2011 WL 995933 at *4-5.

Thus, the large-scale use of the Metro system by schoolchildren further justifies its sensitive-place designation under *Heller* and *Bruen*.  The opposite result would mean that children and teens would suffer more exposure to weapons, more actual and potential violence, and increased anxiety about their safety.  Exposure to gun violence not only harms D.C. students' physical safety, it also harms their education; an analysis of Washington, D.C. school attendance found that students were ten percent more likely to miss school the next day if violent crime occurred within 250 feet of their homes.  NIJ, *Children Exposed to Violence*, Sept. 21, 2016.[16] Further, "[e]xposure to violence," whether directly or as a bystander, "can harm a child's emotional, psychological and even physical development."  *Id*.  The child will be "more likely to

---

[16] *Available at* https://nij.ojp.gov/topics/articles/children-exposed-violence#:~:text=%5B1%5D%20Exposure%20to%20violence%20can,in%20criminal%20behavior%20as%20adults.

have difficulty in school, abuse drugs or alcohol, act aggressively, suffer from depression or other mental health problems and engage in criminal behavior as adults." *Id.*

The physical and emotional trauma of gun violence on anyone is compelling enough, but kids are especially impacted. Studies have shown that youth are particularly traumatized by exposure to weapons. *See* Eryn Brown, *Weapons exposure linked to trauma symptoms in U.S. kids, study says*, L.A. Times, June 8, 2015.[17] Moreover, increased exposure to guns and violence may also increase the likelihood that youth will themselves engage in violent crime.[18] *See* Jared Wadley, *Childhood exposure to gun violence increases risk of violent behavior as adults*, Univ. of Mich., July 20, 2021.[19] This has already been seen in the District in recent years. *See* Delia Goncalves, *DC youth advocate blames cycle of trauma for uptick in juvenile crime*, WUSA9, last updated Feb. 11, 2022.[20] In this light, keeping the District's public transportation free from guns protects children's mental health as much as their physical safety.

### C. The D.C. Metro System's Ridership Includes Numerous High-Value Symbolic Targets.

Plaintiffs also argue that the D.C. Metro system is "not populated with individuals who would be high value targets to a terrorist or active killer," Pl. Mem. at 20, but that is self-evidently

---

[17] *Available at* https://www.latimes.com/science/sciencenow/la-sci-sn-children-weapons-trauma-20150608-story.html

[18] Numerous studies show that states with easier firearm access suffer from increased gun violence. *See, e.g.*, Emma Tucker and Priya Krishnakumar, *States with weaker gun laws have higher rates of firearm related homicides and suicides, study finds*, CNN, May 27, 2022, *available at* https://www.cnn.com/2022/01/20/us/everytown-weak-gun-laws-high-gun-deaths-study/index.html; Milenko Martinovich, *States with right-to-carry concealed handgun laws experience increases in violent crime, according to Stanford scholar*, Stanford News, June 21, 2017, *available at* https://news.stanford.edu/2017/06/21/violent-crime-increases-right-carry-states/.

[19] A*vailable at* https://news.umich.edu/childhood-exposure-to-gun-violence-increases-risk-of-violent-behavior-as-adults/.

[20] A*vailable at* https://www.wusa9.com/article/news/local/dc-youth-advocate-blames-cycle-of-trauma-for-uptick-in-juvenile-crime/65-6a841c4d-dffb-41b5-a634-443d952417ed.

untrue.  D.C. and its residents are obviously prime targets for international and domestic terrorists.
*See United States v. Graham*, 275 F.3d 490, 498 (6th Cir. 2001) (chronicling a defendant's militia
activity, which included a plan to attack "federal prosecutors, judges, and other federal officials as
well as . . . members of Congress.").  Any rush-hour Metro train will contain dozens of passengers
with ID badges issued by government agencies, congressional offices, press offices, and advocacy
groups working with government organizations.

The Metro system also serves the massive numbers of tourists who visit D.C. each year to
safely experience the Nation's heritage and sacred sites, from the Smithsonian museums to the
Martin Luther King, Jr. Memorial.  That festivals, concerts, and tourist destinations are vulnerable
to mass shootings is unfortunately an inherent feature of their ability to gather many people who
seek to enjoy them together.  *See Fla. Carry, Inc. v. City of Miami Beach*, 564 F. Supp. 3d 1213,
1219, 1227 (S.D. Fla. 2021) (noting that the police's detention of a group of men "visibly armed
with semi-automatic pistols" was reasonable, in part, because they gathered at "crowded tourist"
areas described as "potential targets for mass-shooting and terrorist attacks.").  *See also* Jonathan
Bernstein and Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*,
Rolling Stone, Sept. 21, 2022;[21]  *Highland Park parade shooting: What we know about the victims,
suspect, community, and aftermath*, Chicago Tribune, Aug. 3, 2022;[22]  Ariel Zambelich & Alyson
Hurt, *3 Hours in Orlando: Piecing Together an Attack and Its Aftermath*, June 26, 2016;[23]  *Guard
Killed in Holocaust Museum Shooting*, CBS News, June 10, 2009.[24]

---

[21]  Available at https://www.rollingstone.com/music/music-features/las-vegas-shooting-route-91-
country-festival-1234593953/.
[22]  Available at https://www.chicagotribune.com/news/ct-cb-highland-park-parade-shooting-
20220705-yf3sayw6wrh5po7lucbooadylm-list.html.
[23]  *Available at* https://www.npr.org/2016/06/16/482322488/orlando-shooting-what-happened-
update.
[24]  *Available at* https://www.cbsnews.com/news/guard-killed-in-holocaust-museum-shooting/.

**D.  Defenseless Metrorail and Bus Passengers Would be Even More Vulnerable Amongst Other, Armed Passengers.**

Almost 370,000 federal employees are stationed in the D.C. – Maryland – Virginia area. U.S. Bureau of Labor Statistics and Federal Reserve Bank of St. Louis, *All Employees: Government: Federal Government in Washington-Arlington-Alexandria, DC-VA-MD-WV (MSA) [SMU11479009091000001SA]*, retrieved from FRED, Federal Reserve Bank of St. Louis, last updated Aug. 20, 2022.[25]  Given the well documented evidence that guns increase the risk of workplace violence,[26] federal workplaces properly prohibit them, and thus the many workers who use the Metro to commute to their jobs do so unarmed.  *See, e.g.*, *Class*, 930 F.3d at 463-64; *Bonidy*, 790 F.3d at 1125; *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009).

Plaintiffs argue the Metro system is "not substantially populated with persons lacking the physical ability to defend themselves with a firearm or other tool," Pl. Mem. at 20, but this point misses the mark.  Implicit in Plaintiffs' argument is the rationale that permitting arms carriage on trains and buses will enable carriers to act as last-resort defenders.  But "no research . . . suggests expanding public carry has any public safety benefits."  Giffords Law Center, *Guns in Public: Concealed Carry*, last visited Sept. 7, 2022.[27]  *See also* Susan Milligan, *Uvalde, Buffalo Shootings Expose the Myth of the 'Good Guy With a Gun'*, U.S. News, May 27, 2022 (noting that citizens killed active shooters in only four out of 345 cases between 2000-2019, and six out of 103 cases in 2020-2021).[28]  Further, scholarly research supports the existence of a "weapons effect" as it

---

[25] *Available at* https://fred.stlouisfed.org/series/SMU11479009091000001SA.

[26] *Available at* https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0184-0

[27]  *Available at*   https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/concealed-carry/.

[28]  *Available at*   https://www.usnews.com/news/the-report/articles/2022-05-27/uvalde-buffalo-shootings-expose-the-myth-of-the-good-guy-with-a-gun.

relates to guns: individuals simply in the presence of a weapon tend to become more aggressive.[29] Indeed, the data suggest that the ability to carry guns would do little to increase the safety of the Metro system's unarmed ridership, and would instead put them in greater peril by potentially flooding crowded and hard-to-flee spaces with firearms, increasing the likelihood of accidental discharges, arguments that turn violent, and so forth.

However, even if the data justified Plaintiffs' guns-everywhere approach to public safety, the large-scale presence of federal employees makes the Metro system a sensitive place, since their destinations preclude them from carrying firearms, effectively rendering them "defenseless" even under Plaintiffs' faulty premises. Government workers frequently use the Metro system to reach locations that bar and screen for guns in a way that has long passed constitutional scrutiny and prevented gun violence. *See Bonidy*, 790 F.3d at 1123-25. Moreover, millions of tourists use the Metro system to travel to federal buildings with the same restrictions. And the youth who use the Metro as transport to and from school cannot lawfully own or carry firearms at all.

### E. Public Transportation in D.C. Provides Access to Many Politically and Culturally Sensitive Locations and Historically Important Gathering Points.

The politically sensitive nature of the many activities in which public transportation plays a critical role in the District also justifies D.C.'s determination that the D.C. Metro system must be treated as a sensitive place from which firearms can be banned. Plaintiffs claim that the "Metro is not an area of intellectual debate, voting, or where demonstrations regularly take place." Pl. Mem. at 21. But that claim completely disregards the fact that the participants in those activities

---

[29] *See, e.g.*, Jillian Peterson, Ph.D. et al., *Presence of Armed School Officials and Fatal and Nonfatal Gunshot Injuries During Mass School Shootings, United States, 1980-2019*, JAMA Network, Feb 16, 2021, a*vailable at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2776515; Alan Yuhas, *Mere sight of a gun makes police – and public – more aggressive, experts say*, The Guardian, Aug. 5, 2015, *available at* https://www.theguardian.com/us-news/2015/aug/05/gun-police-public-more-aggressive-psychology-weapons-effect.

regularly use Metro buses and trains to *travel* to such activities and places.  And for many people, these transportation systems provide the only means of participating in person.

The D.C. Metrorail system, for example, directly stops at or under a number of federal and quasi-federal buildings and hubs, places where "regular government business" and other activities often occur, like the National Archives, Federal Center, Federal Triangle, Judiciary Square, the Smithsonian, and Union Station.  *Dorosan*, 350 F. App'x at 875 (holding that the use of a USPS parking lot "as a place of regular government business [caused it to] fall[] under [*Heller*'s] 'sensitive places' exception.").  D.C. has every reason to treat the transportation system that is essential to transport people to its unquestionably sensitive places itself as a sensitive place.

D.C. is a highly concentrated metropolitan area.  *See The most (and least) densely populated cities in America*, BuffaloNews, Jan. 28, 2021 (listing Washington, D.C. as the seventh most densely populated large city in the U.S. based on 2019 data).[30]  Moreover, it has been a "protest battleground" where groups organize large demonstrations in public spaces for decades. *See* Marissa J. Lang, *D.C. is becoming a protest battleground. In a polarized nation, experts say that's unlikely to change*, Washington Post, Jan. 1, 2021, (explaining how D.C. "has averaged more than 800 permitted demonstrations annually in recent years and many more that gather without permits");[31] Annalisa Merelli, *The largest marches on Washington DC topped 1 million people*, Quartz, last updated July 20, 2022.[32]  The Metro is an indispensable means of transportation to get people to such protests and other political events.  Indeed, street closures often

---

[30] A*vailable at* https://buffalonews.com/lifestyles/the-most-and-least-densely-populated-cities-in-america/article_3006340e-00fa-5554-8720-6ce1f9f27387.html.

[31] *Available at* https://www.washingtonpost.com/local/washington-dc-protests/2021/01/01/da743c20-4a68-11eb-839a-cf4ba7b7c48c_story.html.

[32] *Available at* https://qz.com/887192/the-largest-marches-on-washington-dc-topped-one-million-people/.

accompany these large assemblies, making the Metro essential for individuals intending to participate. *See, e.g.*, Valerie Bonk, *DC Metro ridership soars during Saturday protests*, WTOPNews, June 7, 2020;[33] WMATA, *Metro advises customers of possible disruptions to bus service due to demonstration activity expected this weekend*, March 4, 2022 (encouraging Metrorail use in light of protests).[34]

It is in no one's interest to permit those going to and from such hot-blooded sites of protest to carry guns. Indeed, ensuring that such spaces are gun-free is essential to protecting democratic engagement through other forms of constitutionally protected conduct: people must feel safe to express their viewpoints, and historically silenced groups will suffer most if the threat of violence in political discourse becomes omnipresent. The ready availability of firearms at protests will create a substantial risk of additional violence, whether premeditated or spontaneous. *See supra*, at n.29. This further supports D.C.'s judgment that its Metro system is a sensitive place from which guns must be banned.

### F. Historical Analogues Support D.C.'s Firearm Restriction.

The history of American firearm regulation amply validates D.C.'s position that the Metro system is a sensitive place where it can therefore lawfully restrict gun carriage. From colonial times through Reconstruction and into the modern era, regulation of public carriage based on place-sensitivity has been considered legitimate and tracked states' responses to social problems. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 161–62 (2007) ("[C]olonial and early state governments routinely exercised their police powers to restrict the

---

[33] *Available at* https://wtop.com/local/2020/06/dc-metro-ridership-soars-during-saturday-protests/.
[34] *Available at* https://www.wmata.com/about/news/Metro-advises-customers-of-possible-disruptions-to-bus-service-due-to-demonstration-activity-expected-this-weekend.cfm.

time, place, and manner in which Americans used their guns."); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 515 (2004) (explaining and citing the "variety of [ ] laws in the pre-Civil War Era [that] enacted time, place, and manner restraints on firearms use"); Eric M. Ruben & Darrell A. H. Miller, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 64, 79 (2017) (explaining the long tradition of laws "restrict[ing the] carrying of firearms . . . in crowded places" and "laws [that] barred firearms carrying and discharges in . . . public places"). Plaintiffs suggest that this tradition is exhausted by the handful of nineteenth century laws whose designations they call "consisten[t] with modern day sensitive place restrictions." Pl. Mem. at 29. That is misleading.  History shows broad authority to regulate sensitive time-place-manner issues, both as to the sites from which Plaintiffs concede firearms can be barred (like government buildings) and many others.

For example, from colonial times, laws aimed at specific practices or safety hazards frequently proscribed carriage of guns in particular locations completely, without any intent or negligence requirement.  Firearm possession at certain locales was viewed as so dangerous that governments disallowed the carriage of guns to avoid even their accidental use.  This was most common with respect to hunting laws.  For example, a 1760 Pennsylvania hunting ordinance outlawed "carry[ing] any gun . . . on any inclosed or improved lands" not one's own.  1 *Laws of the Commonwealth of Pennsylvania* 229 (John Bioren & M. Carey, 1810) (1803).[35]  The same lack

---

[35] *See also* 1721 Pa. Laws 254 (illegal to "carry any gun or hunt on the improved or inclosed lands of an[other's] plantation" or "carry any gun, or hunt in [another's] woods"); 1741 N.J. Laws 101 and 1771 N.J. Laws 346 (same); 1837 Md. Acts 108 §§ 1-2 (illegal to be "on board [any] open skiff, canoe or open boat [with] any offensive weapon, gun, musket, fowling piece or pistol," which was *prima facie* evidence of intent to hunt); *Acts of the General Assembly of the Commonwealth of Kentucky* 52 (State Printing Office, 1866) ("[N]o person shall . . . on the Sabbath day, enter or

of any mens rea requirement marked a colonial-era Boston fire-safety law that prohibited carrying loaded weapons into "an[other's] Dwelling House, Stable, Barn, Out House, Ware House, Store, Shop, or other Building."  1783 Mass. Acts 218–219, ch. 13.  Numerous states passed laws in the nineteenth century banning soldiers from bringing loaded firearms to parades.  *See* 1820 N.H. Laws 322, § 49; 1843 R.I. Pub. Laws 13, § 38; 1877 Mo. Laws 306, art. IV, § 3; *The General Statutes of the Commonwealth of Massachusetts* 107 (William White, 1860); 2 *Digest of the Laws of Pennsylvania* 1071 (Kay & Brother, 1873); *The General Statutes of the Commonwealth of Kentucky* 669 (S. I. M. Major, 1873).  In 1859, Washington State criminalized "convey[ing] [weapons] into any penitentiary, jail or house of correction, or house of reformation," 1859 Wash. Sess. Laws 119, § 76, as did Georgia in 1903, *see* 1903 Ga. Laws 71, § 1.

Indeed, firearm regulation based on place sensitivity has manifested itself historically in politically sensitive areas, like many parts of D.C.  Maryland banned coming armed "into either of the [legislative] houses whilst they are set, with any gun or weapon" as early as the mid-seventeenth century.   1647 Md. Laws 216; 1650 Md. Laws 273.   Delaware specified in its founding-era state constitution that "no person shall come armed to any [election]."  Del. Const., art. 28 (1776).  A 1786 Virginia statute modeled after the English Statute of Northampton forbade "rid[ing] armed . . . in fairs or markets," 1786 Va. Acts 33, as did North Carolina in 1792.  Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum*

---

go upon the land of another … having in his possession a gun"); 1868-1869 N.C. Sess. Laws 59-60, ch. 18, § 1 (illegal to "be found off of [ ] premises on the Sabbath, having . . . a shot-gun, rifle or pistol"); 1895 Cal. Penal Code § 627 (possessing a shotgun "in [a] field, on marsh, bay, lake, or stream, shall be prima facie evidence of its illegal use").

*Case Law in Context*, 125 Yale L.J. F. 121, 129 & n. 43 (2015) (citing, *inter alia*, 1792 N.C. Sess. Laws 60-61).[36]

This tradition reached its apogee in the Reconstruction era.  In 1869 Tennessee outlawed carrying "deadly or dangerous weapon[s]" while "attending any election in this State" and at "any fair, race course, or other public assembly of the people."  1869-70 Tenn. Pub. Acts 23; *see also Andrews v. State*, 50 Tenn. (3 Heisk) 165, 181–82 (1871) (explaining that the right to bear arms "is limited by the duties and proprieties of social life" whereby "a man may well be prohibited from carrying his arms to church, or other public assemblage"); *Hill v. State*, 53 Ga. 472, 476 (1874) (state constitution's right to bear arms provision was compatible with restrictions on sensitive places like "concerts, and prayer-meetings, and elections").  A Texas law passed the following year prohibited going armed into churches or religious assemblies, schools, social gatherings, election precinct during election days, and other similarly public areas.  1870 Tex. Gen. Laws 63.[37]  Also in 1870, Georgia prohibited carrying deadly weaponry "to any court of justice or any election ground or precinct, or any place of public worship," or any other public gathering in the state, 1870 Ga. Laws 421, and Louisiana prohibited carrying guns "on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration." 1870 La. Acts 159-60; *see also* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine:*

---

[36] The 1328 Statute of Northampton prohibited riding or going armed in public places or in the presence of state officials.  2 Edw. 3, c. 3 (1328) (Eng.).  *Amici* recognize that *Bruen* rejected New York's citation of colonial adoptions of the Statute of Northampton in support of a near-complete prohibition of public carry, reasoning that at least by the founding era such laws included an "[intent] to terrorize" element.  142 S. Ct. at 2142-43.  But we make a different point here:  laws of this kind demonstrate a historical tradition of demarcating certain public places as too uniquely sensitive to permit firearms carriage.

[37] Missouri passed a virtually identical law. *See* 1879 Mo. Laws § 1274.

*Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 245-46 (2018) (citing similar election time-and-place-based laws in Texas and Maryland).  Virginia a few years later prohibited carrying weapons "to any place of worship while a meeting for religious purposes is being held at such place."  1877 Va. Acts 305, Offenses Against The Peace, § 21.  Oklahoma's 1890 law was similarly structured as Texas's law quoted above, and added "any circus, show or public exhibition of any kind . . . or [ ] any place where intoxicating liquors are sold, or [ ] any political convention," *The Statutes of Oklahoma 1890*, 496 (State Capital Printing Co., 1891), a reformulation adopted by Arizona in 1901, *see* 1901 Ariz. Acts 1252, and Montana in 1903, *see* 1903 Mont. Laws 49.

The designation of locations as "sensitive places" where firearms must be banned tracks evolving social and public safety concerns.  *Bruen,* 142 S. Ct. at 2132 (noting that "unprecedented societal concerns or dramatic technological changes" must be considered when weighing historical analogies).  The targeting of crowded, spectacular, or otherwise symbolic sites by would-be terrorists or mass shooters, and interpersonal violence incited by emotional political discourse are contemporary societal concerns that citizens rightfully expect their elected officials to address. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1328 (11th Cir. 2015); *Class*, 930 F.3d at 464.  The notion that it is permissible to prohibit guns in analogous sensitive sites of public gathering and access to them should govern the analysis here, as *Heller* and *Bruen* recognized, rather than the search for one-to-one historical correspondence.

Plaintiffs therefore muddy the waters with their claim that "there is not a tradition or history of prohibitions of carrying firearms on public transportation vehicles."  Pl. Mem. at 21.  Although they admit that "[p]ublic transportation systems did not exist as they do today at the founding of the nation," Plaintiffs argue that there was nevertheless "a tradition of firearms carry when citizens

traveled from their homes." *Id.* at 24; *see also id.* at 28, 29. But this argument proves too much, because it neglects *Bruen*'s guidance to apply "a more nuanced approach" to cases "implicating unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. It cannot be the case that the traveler's exceptions found in historical laws, or the riverboat and stagecoach proscriptions not found in them, are dispositive as to applying *Bruen*'s "consistent with . . . historical tradition" test. *Id.* at 2130. If that were the case, *Bruen* would now require (*inter alia*) legalizing the carriage of handguns on airplanes, despite Congress's recognizing the potential dangers of allowing guns on airplanes in 49 U.S.C. § 46505, which makes carrying a weapon on an aircraft a federal offense. And the courts have confirmed that the criminalization of carrying firearms on airplanes is consistent with the Second Amendment. *See United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008) (rejecting post-*Heller* Second Amendment challenge to law against carrying a weapon on an aircraft because "nothing in that opinion was intended to cast doubt on the prohibition of concealed weapons in sensitive places"). If, as Plaintiffs seem to suggest, stagecoaches and riverboats are the only appropriate historical analogues for the Metro system, *see* Pl. Mem. at 29, they would be equally the historical analogues for Amtrak and air travel.

If Plaintiffs' argument were accepted, there is no real limiting principle to their claim that the right to armed self-defense must be recognized on all public transportation systems. Plaintiffs appear to believe that the legitimacy of many of D.C.'s other sensitive-place designations, which they concede are valid (*i.e.*, at government buildings, hospitals, and penal institutions) hinges on the fact that there are entrant screening and/or security services at those sites. *Id.* at 11-13, 15-16. This belief is deeply flawed. First, it improperly ties the government's power to regulate with its enforcement abilities at particular locations, without any historical basis. And this position is

fundamentally inconsistent with Plaintiffs' own argument that after *Bruen*, D.C. may only justify prohibitions based on strict historical analogues.  Our historical tradition decidedly does **not** evince a limitation of sensitive places to those where the state or another actor guarantees entrants' disarmament by screening for weapons (like the security perimeter of airports).  *See* Carina Bentata Gryting & Mark Anthony Frassetto, NYSRPA v. Bruen *and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E-Supplement I.-60, 65-66 (2022).

For example, Plaintiffs concede that "there cannot be any serious debate" that the White House qualifies as a sensitive place.  Pl. Mem. at 19.  Yet, for most of the nineteenth century the White House was "open to the public without serious security provisions."  Gryting & Frassetto, 63 B.C.L. Rev. E-Supplement at 65-66.  This again shows the importance of *Bruen*'s allowance for "nuance[ ]" in the historical translation of *Heller*'s "sensitive places" category to the situations of today.  Plaintiffs similarly concede the sensitivity of many places for which there are no (hospitals) or few (schools) historically analogous prohibitions – the interplay between arms carriage and such places was simply not recognized as an issue 250 years ago.  *See also Class*, 930 F.3d at 465 (rejecting government screening ability as test for sensitive places).

Moreover, when the Virginia Supreme Court approved a law banning weapons carriage "on [George Mason University] property in academic buildings, administrative office buildings, student residence buildings, dining facilities, or while attending sporting, entertainment or educational events," 8 Va. Admin. Code 35-60-20, the Court did not base its approval on disarmament or security guarantees at these sites; nor did the Court demand precisely analogous historical regulations.  Rather, simply because this regulation was "tailored [to] those places where people congregate and are most vulnerable," it was a legitimate "sensitive place" regulation.

*DiGiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 136-37 (2011); *see also Wade v. Univ. of Michigan*, 320 Mich. App. 1, 15 (2017) (holding universities are "sensitive places" within *Heller* framework), *appeal granted*, 506 Mich. 951, 950 N.W.2d 55 (Mich. 2020) (mem.).  In other words, the decision was understandably couched in terms of a general approach to place-sensitivity, as *Heller* and *Bruen* require, even though university firearm bans date back to the early republic.  *See* Gryting & Frassetto, 63 B.C.L. Rev. E-Supplement at 63-64 & n.19-20 (2022) (citing 1810 University of Georgia rule and 1824 University of Virginia rule); Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 471 & n.120 (2019) (noting that "Harvard University banned students from having guns on campus sometime around 1655").  That was a lawful approach, and it remains the correct one.

*Bruen* reiterated the legitimacy and importance of *Heller*'s "sensitive places" carveout, while indicating that historical tradition was to serve as guidance for sensitive-place jurisprudence, not as a yoke preventing contemporary governments from addressing novel social concerns. Invalidating D.C.'s considered judgment as to arms carriage on the Metro system is ill-advised, and would lead us toward a world that even Plaintiffs understandably seem to fear – a world where sensitive places like hospitals and airplanes would no longer be the gun-free locations that our society quite legitimately wants and needs them to be.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Application for a Preliminary Injunction and Motion for Summary Judgment.

Dated: September 23, 2022

Respectfully submitted,

**Of Counsel:**

Shira Lauren Feldman
Brady and Team ENOUGH
840 First Street NE
Suite 400
Washington, D.C.  20002
(202) 370-8160
sfeldman@bradyunited.org

Esther Sanchez-Gomez
Giffords Law Center to Prevent
Gun Violence
268 Bush St. #555
San Francisco, CA  94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Malone
March For Our Lives
90 Church Street
Suite 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

*/s/ Jonathan L. Diesenhaus*
Jonathan L. Diesenhaus (D.C. Bar No. 423753)
Alex Schulman (D.C. Bar No. 1655499)
Toccara Nelson (D.C. Bar No. 1671708)
Alexandria Reid (D.C. Bar No. 1738632)
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
(202) 637-5911 (fax)

Ira M. Feinberg
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2022, I filed the foregoing document via the Court's CM/ECF system. The document will be served electronically on counsel of record for the parties.

*/s/ Jonathan L. Diesenhaus*

Jonathan L. Diesenhaus
