**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GREGORY T. ANGELO, *et al.*,

     Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.*,

     Defendants,

Case No. 1:22-cv-1878-RDM

Hon. Randolph D. Moss,
District Judge

**BRIEF FOR THE STATES OF ILLINOIS, CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, HAWAII, MARYLAND, MASSACHUSETTS,
MINNESOTA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, RHODE
ISLAND, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' APPLICATION FOR AN INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION AND INTEREST OF AMICI STATES ........................................... 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ..................................................................................................... 2

    I.   The Second Amendment allows States to implement varied regulations. ........................... 2

        A.    The Second Amendment allows and local conditions require States to take varied approaches to protect against gun violence. .......................................................... 3

        B.    The District's regulation is consistent with measures taken by other States, localities, and public transportation systems .......................................................................... 7

    II.   Firearms pose unique dangers on public transportation. ............................................. 10

CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller*, 554 U.S. 570 (2008).......................................................... 1, 4, 5, 6
*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ............................................. 6
*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) .............................................. 5
*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ....................................................... 6
*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................................................ 2, 4
*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) ..................................................................... 3
*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)............................................................... 10
*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)................................ 2, 4, 5
*United States v. Morrison*, 529 U.S. 598 (2000) ................................................................ 3

**Statutes**

430 Ill. Comp. Stat. 66/65.............................................................................................. 10, 11
49 U.S.C. § 46505........................................................................................................ 8
Cal. Penal Code § 171.7 ............................................................................................... 10
Cal. Penal Code § 25400 .............................................................................................. 10
Cal. Penal Code § 25850 .............................................................................................. 10
Colo. Rev. Stat. § 18-9-118 ........................................................................................... 9
D.C. Code § 7-2509.07 ................................................................................................. 11
Fla. Stat. § 790.06 ....................................................................................................... 9
H.B. 183, 2013 Ill. Legis. Serv. P.A. 98-63 (Ill. 2013)........................................................ 10
Ky. Rev. Stat. § 237.110 ............................................................................................... 9
Md. Code Ann., Transp. § 7-705 ..................................................................................... 9
Minn. Stat. § 609.855 ................................................................................................... 10
Mont. Code § 87-5-401 ................................................................................................. 9
N.D. Cent. Code § 20.1-11-13 ........................................................................................ 9
N.Y. Penal Law § 265.01-e............................................................................................ 11
Wash. Rev. Code § 9.41.040........................................................................................... 10

**Regulations**

39 C.F.R. § 232.1 ........................................................................................................ 7
49 C.F.R. § 1540.111 ................................................................................................... 7
49 C.F.R. § 1540.5 ...................................................................................................... 7
N.Y. Comp. Codes R. & Regs. tit. 21, § 1040.9 ................................................................. 9

**Other Authorities**

Alaska Railroad, *Baggage Policy*, available at https://bit.ly/3BLfeCh ...................................... 11
Alejandro Tirachini et al., *Crowding in public transport systems: effects on users, operation and
   implications for the estimation of demand*, 53 Transp. Res. Part A Policy & Prac. 36 (2013). 17
Amici Curiae Brief of the City of Chicago and Eleven Other Cities in *N.Y. State Rifle & Pistol
   Ass'n v. Bruen*, available at https://bit.ly/3Ak1wWa ......................................................... 7

Amtrak, *Firearms in Checked Baggage*, available at www.amtrak.com/firearms-in-checked-baggage.................................................................................................................................. 11

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018)..... 17

CBS News, *Shooting shuts down West Oakland BART, causing systemwide delays* (June 15, 2022)................................................................................................................................... 14

Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Public Health 2034 (Nov. 2009)............................................................................... 16

Darryl C. Murphy, *'Gotta walk through violence': What it means to commute to school after a deadly summer*, WHYY (Aug. 4, 2021)............................................................................... 14

David Hemenway et al., *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263 (2000) ...................................................................................... 15, 16

David Meyer, *NYC subway service snarled by Sunset Park, Brooklyn mass shooting*, N.Y. Post (Apr. 12, 2022)....................................................................................................................... 14

Doha Madani, *Why Brooklyn subway shooting and growing transit crimes threaten N.Y.C. 'return to normal,'* NBC News (Apr. 12, 2022) ...................................................................... 14

FBI, *Murder: Crime in the United States 2018, tbl. 20*, https://bit.ly/3qHhoMY (last visited Sept. 15, 2022)..................................................................................................................................... 7

FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017), https://bit.ly/3BKBJqE (last visited Sept. 15, 2022)........................................................................................................ 7

Hao Ding et al., *Homelessness on public transit: A review of problems and responses*, 42 Transport Reviews 134 (2021) ............................................................................................... 17

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (Dec. 2019) ................................................................. 18

Heather Stuart, *Violence and mental illness: an overview*, 2 World Psychiatry 121 (2003)........ 17

John J. Donohue et al., *Right to Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State Level Synthetic Control Analysis*, 16 J. Empirical Legal Studies 198 (2019) ........................................................................................................................... 15

Julia A. Wolfson et al., *US Public Opinion on Carrying Firearms in Public Places*, 107 Am. J. Pub. Health 929 (Jan. 2017) ................................................................................................. 14

Julie Bosman et al., *Cities Want to Return to Prepandemic Life. One Obstacle: Transit Crime*, N.Y. Times (Apr. 25, 2022) ............................................................................................. 14, 19

Justin Tyndall, *Waiting for the R train: Public transportation and employment*, 54 J. Urban Studies 520, 535 (2015) ......................................................................................................... 13

Kessler Foundation, National Employment and Disability Survey 2015 Executive Summary, .. 13

Kristin Blagg et al., *The Extra Mile: Time to School and Student Outcomes in Washington, DC*, Urban Institute (Sept. 2018), available at https://bit.ly/3S75zeU ............................................. 13

Mary Wisniewski, *For CTA's youngest riders, a course on the fourth R – riding the 'L' and bus*, Chi. Tribune (Feb. 26, 2018)................................................................................................. 13

Mass. Bay Transportation Authority, *Rider Rules and Regulations*, available at https://bit.ly/3qCLpNT ........................................................................................................... 11

Md. Dep't of Transp., *Mobility/Paratransit Services Ride Guide*, available at https://bit.ly/3ek3Rb3 .............................................................................................................. 8

iv

Metra, *Ridership Trends: 2021 Annual Report* (Feb. 2022) ......................................... 16

Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm and Homicide Rates in the United States*, 107 Am. J. Public Health 1923 (2017) ............................ 15

N.Y. Times, *Police Search for Gunman in Attack on Brooklyn Subway* (Apr. 15, 2022)............ 17

Olga R. Rodriguez, *San Francisco police release photo of alleged subway shooter*, ABC News (June 23, 2022)...................................................................................................... 18

Robyn R.M. Gershon, *Public Transportation: Advantages and Challenges*, 81 J. Urban Health 7 (2005) ........................................................................................................ 12, 13, 14

San Diego Metro. Transit System, *Rules for Riding*, available at https://bit.ly/3KXxE5G.......... 11

U.S. Census Bureau, *Commuting by Public Transportation in the United States: 2019* (Apr. 2021), available at https://bit.ly/3RkuHyr ................................................................. 7

Veronica Canales, *Man arrested after firing round that ricocheted off L'Enfant Plaza station platform, striking woman*, WTOP News (Sept. 2, 2022) ......................................... 16

WTOP News, *Shooting on Metro Red Line causes service delays* (Dec. 15, 2020) ................... 14

## INTRODUCTION AND INTEREST OF AMICI STATES

Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Washington ("amici States") submit this brief in support of Defendants the District of Columbia and Robert J. Contee, III, pursuant to Local Civil Rule 7(o).

The amici States have a substantial interest in the public health, safety, and welfare of their communities, which includes protecting their residents from the harmful effects of gun violence and promoting the safe use of firearms. To serve that compelling interest, the amici States have long exercised, or intend to exercise, their governmental prerogative to regulate the use and possession of firearms in "sensitive places" where deadly weapons pose special risks. Many States have determined, like the District of Columbia, that firearms should be restricted in public transportation vehicles and facilities, see *infra* Section IB.

Although the amici States have taken different approaches to regulation in this area, they share an interest in protecting their right to address the problem of gun violence in a way that is tailored to the specific circumstances in each of their States. Enjoining the District of Columbia's restriction of firearms on public transportation would interfere with this interest. Accordingly, the amici States urge this Court to deny the plaintiffs' Application for Preliminary Injunction, dkt. 6 ("PI App.").

## SUMMARY OF ARGUMENT

The District of Columbia's ban on carrying firearms on public transportation represents a lawful exercise of its police power. As the Supreme Court repeatedly emphasized in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Second

Amendment permits States to enact a variety of regulations to combat the problem of gun violence, including "solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785. This local flexibility is an essential element of the federalist system, and it ensures that firearm regulations appropriately and effectively address the specific circumstances in each State. The District's public transportation regulation fits comfortably within this framework and aligns with laws enacted by other States. Indeed, at least ten States have a statute regulating firearms in public transportation, while additional measures apply under local rules and regulations. These measures vary, and collectively they demonstrate that the regulation of firearms on public transit constitutes precisely the kind of tailored solution to a local problem that the Second Amendment authorizes.

The States' power to implement such measures is particularly important in the context of public transportation, where firearms can disrupt the operation of transit systems and pose a heightened risk of injury and death. In many States, public transportation is critical to the public good: It is a central way employees commute, children get to and from school, and people with disabilities can participate fully in their communities. The plaintiffs' request to enjoin the District's firearms prohibition would not only disrupt the operation of the District's public transportation system but also endanger the lives of many individuals who depend on public transportation. Plaintiffs' application for an injunction should be denied.

## ARGUMENT

### I.    The Second Amendment allows States to implement varied regulations.

States have long exercised their police power to protect the health, safety, and welfare of their residents. States have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks omitted). These responsibilities include enacting measures

to promote safety, prevent crime, and minimize gun violence within their borders. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

In the amici States' experience, such measures are more effective when tailored to local needs. The determination made by the District of Columbia here—that prohibiting the carrying of firearms in a public transportation vehicle and station is necessary to promote public safety and prevent crime—fits comfortably within its longstanding police power and the bounds of the Second Amendment. *See* Defs.' Opp. to Mot., dkt. 18, at 11-12 (describing the "care with which the D.C. Council crafted this provision"). And, despite plaintiffs' characterizations to the contrary, *see* PI App. at 41-45, the District's restriction is not at all unusual considering firearms restrictions that apply to public transportation systems located in states as diverse as California, Colorado, Illinois, Maryland, Massachusetts, Minnesota, Missouri, Montana, New Mexico, New York, Oregon, South Carolina, and Washington.

### A. The Second Amendment allows and local conditions require States to take varied approaches to protect against gun violence.

The Supreme Court acknowledged in *Heller*, *McDonald*, and *Bruen* that States play an important role in protecting their residents from the harms of gun violence. *Heller* made clear that the Second Amendment right to keep and bear arms is "not unlimited." *Heller*, 554 U.S. at 595; *see also McDonald*, 561 U.S. at 802 ("No fundamental right—not even the First Amendment—is absolute."). Although government entities may not ban handgun possession by responsible, law-abiding individuals in certain contexts, governments still possess "a variety of tools" to combat the problem of gun violence via regulation. *Heller*, 554 U.S. at 636. States may, for example, implement measures prohibiting certain groups of individuals from possessing firearms, such as

"felons and the mentally ill," or "imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. In *McDonald*, moreover, the Court emphasized that the Second Amendment "by no means eliminates" the States' ability to devise solutions to social problems that suit local needs and values." *McDonald*, 561 U.S. at 785. Rather, the Court recognized that "conditions and problems differ from locality to locality." *Id.* at 783.

These principles were reaffirmed most recently in *Bruen*, where the Court explained that the Second Amendment does not place State and local governments in a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. On the contrary, the Court made clear that regulatory variation and evolution were permissible, since "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. Accounting for this reality, the Court empowered courts to use "analogical reasoning"—a method that does not require uniformity—to determine whether the challenged regulation is consistent with historical tradition. *Id.*

The concurring opinions in *Bruen* further confirm that the majority opinion did not disturb the States' flexibility to devise local solutions as set forth in *Heller* and *McDonald*. Three members of the majority joined opinions emphasizing that the States retain authority to enact diverse types of firearms regulations. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)); *id.* at 2157 (Alito, J., concurring) (explaining that the majority opinion does not "disturb[] anything that we said in *Heller* or *McDonald*[] about restrictions that may be imposed on the possession or carrying of guns").[1]

--------

[1] In his dissent in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011), then-Judge Kavanaugh further expounded on this principle: "[J]ust because gun regulations are assessed by

4

Multiple circuits have applied the principles of federalism described in these cases to confirm the constitutionality of State and local regulations designed to protect against gun violence. In *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), for example, the Seventh Circuit upheld a local government's ban on assault weapons and large-capacity magazines, noting that although "*Heller* and *McDonald* set limits on the regulation of firearms," they did not "take all questions about which weapons are appropriate for self-defense out of the people's hands." *Id.* at 412. As the court explained, "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity." *Id.* In a similar context, Judge Wilkinson observed that the *Heller* Court's establishment of "the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" did not "abrogate" the States' "core responsibility" of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

The regulatory flexibility discussed in *Heller*, *McDonald*, and *Bruen* is critical to the States' power to protect their citizens from violent crimes. According to the Federal Bureau of Investigation, a wide variety of factors "affect the volume and type of crime occurring from place to place," including population density, variations in the youth concentration in the composition of the population, poverty level, job availability, modes of transportation, climate, criminal justice

---

reference to history and tradition does not mean that governments lack flexibility or power to enact gun regulations. Indeed, governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny." *Id.* at 1274.

system policies, and educational and recreational characteristics.[2] These factors, which vary from State to State, produce disparities in the number and characteristics of firearm-related murders and other crimes.[3] As a result, States and municipalities have developed a panoply of laws and regulations designed to combat firearm violence.[4]

The need for locally tailored regulations of firearms is especially pronounced in the context of public transportation, which varies substantially across different regions. This variation corresponds to pronounced differences across the country in terms of both ridership and the type of public transportation used by commuters.[5] Indeed, public transportation systems are often designed to meet very specific regional needs, such as ferry networks in California, Massachusetts, and Washington State. States and local governments also operate services, including specialized paratransit services, geared toward particular populations who may be unable to use other transit options.[6] Taken together with the diverse public safety challenges faced by cities and States across the country, the variability in public transit infrastructure means that State flexibility in the regulation of firearms on public transit is essential to their prerogative to protect their citizens from harm.

---

[2] FBI, *Uniform Crime Reporting Statistics: Their Proper Use* (May 2017), https://bit.ly/3BKBJqE (last visited Sept. 15, 2022).

[3] *See, e.g.*, FBI, *Murder: Crime in the United States 2018, tbl. 20*, https://bit.ly/3qHhoMY (last visited Sept. 15, 2022).

[4] *See, e.g.*, Amici Curiae Brief of the City of Chicago and Eleven Other Cities in *N.Y. State Rifle & Pistol Ass'n v. Bruen* at 14-17, available at https://bit.ly/3Ak1wWa (summarizing the diverse State- and local-level policy responses to gun violence).

[5] U.S. Census Bureau, *Commuting by Public Transportation in the United States: 2019* (Apr. 2021), at 3-5, available at https://bit.ly/3RkuHyr.

[6] For example, Maryland's MobilityLink paratransit system provides transportation to people with disabilities in certain locations. *See* Md. Dep't of Transp., *Mobility/Paratransit Services Ride Guide* at 5, available at https://bit.ly/3ek3Rb3.

Given their varying conditions and needs, the States must be able to implement different measures to address gun violence and protect the health and safety of their residents, as *Heller*, *McDonald*, and *Bruen* acknowledged. This Court should apply that principle here.

**B. The District's regulation is consistent with measures taken by other States, localities, and public transportation systems.**

The District's regulations at issue here not only fall within the legal parameters just discussed, but they also are consistent with public safety measures implemented across the country. Plaintiffs' arguments to the contrary, *e.g.*, PI App. at 41-45, are directly contradicted by the abundance of relevant firearms restrictions by States, localities, and public transportation systems.

As an initial matter, it is more common than not for a State to regulate firearms in a place it considers sensitive. States have reached different conclusions on where to allow the carrying of firearms—as they are permitted to do, *see supra* Section I.A. As a baseline, federal law uniformly prohibits carrying firearms in some sensitive places, such as post offices, parts of airports, and airplanes.[7] Most States supplement those prohibitions with restrictions in additional locations depending on the needs of the State. For example, Montana and North Dakota prohibit firearms in wildlife preserves,[8] while Florida and Kentucky prohibit firearms in bars.[9] The amici States prohibit firearms in a variety of sensitive locations from schools to entertainment venues.[10]

---

[7] *See* 39 C.F.R. § 232.1 (post offices); 49 U.S.C. § 46505(b) (airplanes); 49 C.F.R. §§ 1540.111(a), 1540.5 (parts of airports).

[8] Mont. Code § 87-5-401(1) (game preserves); N.D. Cent. Code § 20.1-11-13(3) (game refuges and game management areas).

[9] Fla. Stat. § 790.06(12)(a)(12); Ky. Rev. Stat. § 237.110(16)(e).

[10] *See, e.g.*, Cal. Penal Code § 626.9(h) (college and university campuses); 430 Ill. Comp. Stat. 66/65(a)(12) (playgrounds); Md. Code Regs. 13A.16.10.04(G) (childcare centers); Mass. Gen. Laws ch. 269, § 12F(b) (airports); Minn. Stat. § 609.66, subd. 1d (schools); N.Y. Penal Law § 265.01-e(2)(p) (performance, art entertainment, gaming, and sporting event venues); N.C. Gen.

Many States, like the District, specifically limit firearms in public transportation vehicles and facilities. Plaintiffs acknowledge four state statutes that prohibit carry on public transportation (Illinois, Missouri, New Mexico, and South Carolina), and a fifth prohibiting firearms on trains (Montana). *See* Compl. ¶ 65; PI App. at 41. Other States ban firearms in public transportation as well. For example, Colorado prohibits carrying a loaded firearm into a public transportation facility or vehicle, *see* Colo. Rev. Stat. § 18-9-118, while Maryland prohibits carrying weapons aboard any vehicle or inside any building under the control of the Maryland Transit Administration (MTA), *see* Md. Code Ann., Transp. § 7-705(b)(6). The MTA is one of the largest multi-modal transit systems in the United States, operating the Baltimore Metro Subway, Baltimore Light Rail, local buses, commuter buses, the Maryland Area Regional Commuter (MARC) Train Service, and a comprehensive paratransit system. Additional state statutes apply to restrict the use or carrying of firearms in public transit. For example, Minnesota and Washington criminalize uses of firearms in a public transit vehicle or facility.[11] California generally prohibits carrying firearms in most public places without a license, *see* Cal. Penal Code §§ 25400 & 25850, but also specifically prohibits those without licenses from carrying firearms in particular parts of public transit facilities.[12] Most recently, New York passed legislation in the wake of *Bruen* listing prohibited sensitive places in its penal code—including any place or vehicle used for public transportation. *See* N.Y. Penal Law 265.01-e(2)(n).[13]

---

Stat. § 14-277.2 (parades); Or. Rev. Stat. §§ 166.360, 166.370 (hospitals); Wash. Rev. Code § 9.41.284 (voting facilities).

[11] Minn. Stat. § 609.855; Wash. Rev. Code § 9.41.040.

[12] Cal. Penal Code §§ 171.7(b)(1), 171.7(c)(2).

[13] In addition to New York, other States without "shall issue" licensing schemes may choose to prohibit firearms in sensitive places following *Bruen*. The Illinois experience is illustrative: for many years, Illinois prohibited public carry and thus had no need to identify sensitive places.

On top of the ten state measures referenced above, there are additional regulations in other States tailored to specific public transportation systems. For example, by far the largest public transit system in Oregon is TriMet, which provides bus and light rail service in Portland and its suburbs. Its ordinances are not found in Oregon's statutes, but rather are in TriMet Code, section 28.15(D)(2), which prohibits bringing firearms on TriMet vehicles. Although there are many similar regulations of firearms on transit systems throughout the country, they are not captured in centralized databases, which may contribute to the erroneous view that such regulations are rare or exceptional. *See, e.g.*, Compl. ¶ 65. On the contrary, local- and system-level regulations of firearms on transportation abound.[14] Indeed, the top four rail rapid transit systems in the United States by ridership—the New York City subway, the Washington, D.C. Metro, the Chicago "L", and "the T" in Massachusetts—all prohibit firearms under a state, local, or system rule.[15]

---

However, immediately after the Seventh Circuit Court of Appeals found Illinois's restrictions unconstitutional, *see Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Illinois General Assembly passed legislation establishing a new framework for regulating public carry, *see* H.B. 183, 2013 Ill. Legis. Serv. P.A. 98-63 (Ill. 2013). As part of this framework, the General Assembly listed sensitive places where firearms would *continue to be* prohibited—including on public transportation. 430 Ill. Comp. Stat. 66/65(a)(8).

[14] *See, e.g.*, Alaska Railroad, *Baggage Policy*, available at https://bit.ly/3BLfeCh (last visited Sept. 15, 2022) ("Concealed weapons are not allowed onboard any trains or in any depot."); San Diego Metro. Transit System, *Rules for Riding*, available at https://bit.ly/3KXxE5G (last visited Sept. 15, 2022) ("Firearms are not allowed on any bus or Trolley."); N.Y. Comp. Codes R. & Regs. tit. 21, § 1040.9 (prohibiting any "weapon, dangerous instrument, or any other item intended for use as a weapon" in or on facilities or trains of the Staten Island Railway). Of course, State and local restrictions on passengers *carrying* firearms do not necessarily prohibit them from safely *transporting* firearms. *See, e.g.*, Amtrak, *Firearms in Checked Baggage*, available at www.amtrak.com/firearms-in-checked-baggage (prohibiting firearms in carry-on baggage but allowing unloaded, declared firearms in checked baggage).

[15] N.Y. Penal Law § 265.01-e(2)(n)*;* D.C. Code § 7-2509.07(a)(6); 430 Ill. Comp. Stat. 66/65(a)(8); Mass. Bay Transportation Authority, *Rider Rules and Regulations*, available at https://bit.ly/3qCLpNT (last visited Sept. 15, 2022) (prohibiting firearms in vehicles and stations).

In short, the District's prohibition is a permissible variation of a larger tradition of States regulating firearms in certain locations. State and local firearms restrictions on public transit vehicles or facilities are not "outliers," PI App. at 41, as demonstrated by the many laws, ordinances, and rules applicable to public transport systems in at least California, Colorado, Illinois, Maryland, Massachusetts, Minnesota, Missouri, Montana, New Mexico, New York, Oregon, South Carolina, and Washington. This Court should decline to single out the District of Columbia.

## II.   Firearms pose unique dangers on public transportation.

The District of Columbia's decision to treat public transportation vehicles and stations as sensitive places reflects a recognition that firearms create special risks to health and safety when carried on public transportation. State and local governments invest significant resources to ensure that public transit systems are safe and accessible to the communities they serve. Requiring firearms to be allowed on these systems would jeopardize their effective operation and cause significant social and economic harm. It also would threaten the lives of individuals who rely on public transit every day, which includes children and people with disabilities who use public transportation.

In many regions, public transportation services are essential to economic prosperity and social well-being. The United States has one of the world's largest mass transit networks, serving tens of millions of riders on an average weekday.[16] This transportation infrastructure helps ensure that workers are able to access more employment opportunities, while also providing employers

---

[16] Robyn R.M. Gershon, *Public Transportation: Advantages and Challenges*, 81 J. Urban Health 7, 7 (2005), available at https://bit.ly/3RByBmg.

with a greater pool of potential employees.[17] In some areas, children depend on public transit to get to and from school.[18] Generally, public transportation serves "community members that depend on it as their sole source of transportation, such as the elderly, disabled, low income, young adults, and others," and thus "support[s] the inclusion and community participation of all" community members.[19] Access to transportation can be a vital component of inclusion; a 2015 national survey found that more than a quarter of non-working job seekers with disabilities identified a lack of transportation as the main barrier to finding a job.[20]

Gun violence threatens the ability of public transportation systems to serve these crucial functions. Shootings on mass transit systems cause massive disruptions to service when they occur.[21] Even the perceived risk of gun violence on public transportation discourages ridership and undermines its effective operation. Historically, crime on subways has been a major deterrent to

---

[17] *Id.* (noting that mass transit "provides employees with a means to get to work," "provides for workforce accessibility," and "reduces the reliance on unemployment assistance, as workers are more likely to stay employed if they have easy and affordable means of getting to work"); *see also* Justin Tyndall, *Waiting for the R train: Public transportation and employment*, 54 J. Urban Studies 520, 535 (2015) (finding that "public transportation access plays a meaningful role in setting the level of local unemployment").

[18] *See* Mary Wisniewski, *For CTA's youngest riders, a course on the fourth R – riding the 'L' and bus*, Chi. Tribune (Feb. 26, 2018), available at https://bit.ly/3cQB8tW (noting that about 135,000 children use Chicago's CTA trains and buses on schooldays); *see also* Kristin Blagg et al., *The Extra Mile: Time to School and Student Outcomes in Washington, DC*, Urban Institute (Sept. 2018) at 3, available at https://bit.ly/3S75zeU (finding that nearly a quarter of students in the District use public transit to get to school).

[19] Gershon, *Public Transportation: Advantages and Challenges*, supra n. 16, at 7.

[20] Kessler Foundation, National Employment and Disability Survey 2015 Executive Summary, available at https://bit.ly/3RL9sWp.

[21] *See, e.g.*, David Meyer, *NYC subway service snarled by Sunset Park, Brooklyn mass shooting*, N.Y. Post (Apr. 12, 2022), available at https://bit.ly/3Qtzc8p; CBS News, *Shooting shuts down West Oakland BART, causing systemwide delays* (June 15, 2022), available at https://cbsn.ws/3cTpf6B; WTOP News, *Shooting on Metro Red Line causes service delays* (Dec. 15, 2020), available at https://bit.ly/3cTUrTj.

potential riders, and increased safety through policing activities helped to boost ridership over the course of decades.[22] Concerns about the safety of public transit persist today and make individuals less willing to use trains and buses.[23] Requiring firearms to be allowed on public transit would only cause riders to feel more unsafe, particularly because most people—gun owners included—oppose allowing guns in similarly sensitive public places.[24]

Prohibiting State and local governments from regulating firearms on public transit systems would not only jeopardize the operation of those systems but also undermine the safety and health of riders. Contrary to the plaintiffs' assertions, the presence of firearms increases the rate of violent crime. On a large scale, research demonstrates that States that adopt permissive firearm carry laws experience substantially higher overall violent crime rates as a result.[25] This holds true for the concealed carry of handguns, contradicting the hypothesis that permissive concealed-carry laws deter crime.[26] Indeed, "[r]egular citizens with guns, who are sometimes tired, angry, drunk or

---

[22] *See* Gershon, *Public Transportation: Advantages and Challenges*, supra n. 16, at 8.

[23] *See, e.g.*, Julie Bosman et al., *Cities Want to Return to Prepandemic Life. One Obstacle: Transit Crime*, N.Y. Times (Apr. 25, 2022), available at https://nyti.ms/3Rt3DNE; Doha Madani, *Why Brooklyn subway shooting and growing transit crimes threaten N.Y.C. 'return to normal,'* NBC News (Apr. 12, 2022), available at https://nbcnews.to/3REf84i; Darryl C. Murphy, *'Gotta walk through violence': What it means to commute to school after a deadly summer*, WHYY (Aug. 4, 2021), available at https://bit.ly/3Bni28u.

[24] *See* Julia A. Wolfson et al., *US Public Opinion on Carrying Firearms in Public Places*, 107 Am. J. Pub. Health 929 (Jan. 2017), available at https://bit.ly/3QmD0Z5 ("Although liberals and non–gun owners were more likely to support limiting the public places legal gun owners can bring guns, 4 out of 5 (78%) conservative gun owners also supported placing some restrictions on the public places guns can be carried.").

[25] John J. Donohue et al., *Right to Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State Level Synthetic Control Analysis*, 16 J. Empirical Legal Studies 198 (2019).

[26] Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm and Homicide Rates in the United States*, 107 Am. J. Public Health 1923, 1928 (2017), available at https://bit.ly/3DmpwtR.

afraid, and who are not trained in dispute resolution or when it is proper to use a firearm, have many opportunities for inappropriate gun use."[27] As a result, "gun use against adults to threaten and intimidate is far more common than self defense gun use."[28] Another study similarly found that possessing a firearm does not prevent those who possess them from being shot, and may even increase the risk of becoming a victim of gun violence.[29]

The unique characteristics of public transportation amplify these inherent risks of widespread firearm possession. First, public transportation vehicles and facilities are often crowded because ridership is concentrated when there are large events and during peak commuting hours.[30] The presence of firearms in such a confined space creates obvious risks of injury and death from stray bullets and accidental discharge. In one recent case, a man fired a weapon during an altercation at the District's L'Enfant Plaza Metro station, and the bullet ricocheted and struck a nearby woman.[31] Even where an innocent bystander avoids being shot, the chaotic aftermath of a shooting can be as just as dangerous. In the April 2022 Brooklyn subway shooting, for example,

---

[27] David Hemenway et al., *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263, 266 (2000), available at https://bit.ly/3TIAE9U.

[28] *Id.* at 267.

[29] Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Public Health 2034, 2037 (Nov. 2009), available at https://bit.ly/3KRjRxv.

[30] In the Chicago area, for example, 65% of riders of the commuter rail system are concentrated during peak hours heading in the peak direction. Metra, *Ridership Trends: 2021 Annual Report* at 8 (Feb. 2022), available at https://bit.ly/3Rykw9m. *See also* Defs.' Opp. to Mot., dkt. 18, at 14-16 (describing the density of ridership on the D.C. Metro, which is heightened for special events such as Inauguration Day and the Fourth of July).

[31] Veronica Canales, *Man arrested after firing round that ricocheted off L'Enfant Plaza station platform, striking woman*, WTOP News (Sept. 2, 2022), available at https://bit.ly/3xr6PkT.

at least 13 of the victims were not struck with bullets but suffered injuries related to smoke inhalation, falls, and panic attacks.[32]

Moreover, the crowded public transportation environment itself heightens the risk of violent confrontations, as riders of busy transit systems experience elevated perceptions of threats to personal safety and security.[33] The presence of weapons in this context invites the deadly escalation of conflicts. For example, research has identified a "weapons effect," wherein the presence of a firearm primes individuals to think and act more aggressively.[34] And riders' erroneous perceptions of risk may be further elevated when encountering riders who are experiencing mental health crises.[35] In short, the possibility of stress and conflict on public transportation, coupled with the fact that mass transit often requires confining many people in a small area, makes it an unusually dangerous environment in which to carry firearms. These factors can combine to produce tragic results: in one recent incident, a heated verbal argument on a San

---

[32] N.Y. Times, *Police Search for Gunman in Attack on Brooklyn Subway* (Apr. 15, 2022), available at https://nyti.ms/3cLuYvr.

[33] Alejandro Tirachini et al., *Crowding in public transport systems: effects on users, operation and implications for the estimation of demand*, 53 Transp. Res. Part A Policy & Prac. 36 (2013), available at https://bit.ly/3QmdoLS.

[34] *See, e.g.*, Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018), available at https://bit.ly/3qjvhAt.

[35] *See* Heather Stuart*, Violence and mental illness: an overview*, 2 World Psychiatry 121, 123 (2003), available at  https://bit.ly/3QDknR7 ("Members of the public undoubtedly exaggerate both the strength of the relationship between major mental disorders and violence, as well as their own personal risk from the severely mentally ill."); *see also* Hao Ding et al., *Homelessness on public transit: A review of problems and responses*, 42 Transport Reviews 134 (2021), available at https://bit.ly/3BktWje (noting that people with mental illness who are experiencing homelessness disproportionately depend on public transportation for shelter).

Francisco subway train escalated into gunfire that killed one man and wounded a 70-year-old bystander.[36]

Finally, while all of the above factors make firearms on public transportation dangerous for the average rider, the risks are particularly stark for the many riders who are members of vulnerable groups. In one city alone, daily riders on public transportation can include more than a hundred thousand children, who, as noted above, rely on public transportation to get to and from school. *See* supra at 11. Not only do children have a diminished ability to keep themselves safe during a violent confrontation, meaning that they are greater risk of being victimized directly, but exposure to gun violence also causes special psychological harm to young people. Children of all ages suffer trauma from both direct and indirect experiences of gun violence, including witnessing a shooting or being forced to flee or hide.[37] For younger children, simply hearing guns fired in public places causes posttraumatic symptoms.[38] Exposing children and other riders to gun violence undermines public transportation as a safe and accessible resource for communities and profoundly threatens the health and well-being of those communities.

• • •

State and local governments across the country, including the amici States, face the ongoing challenge of ensuring safety on public transit.[39] This effort requires that States retain the power to develop locally tailored laws and regulations to prevent gun violence on trains, buses,

---

[36] Olga R. Rodriguez, *San Francisco police release photo of alleged subway shooter*, ABC News (June 23, 2022), available at https://abcn.ws/3S9YuJY.

[37] Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (Dec. 2019), available at https://bit.ly/3qlUaLS.

[38] *Id.*

[39] *See* N.Y. Times, *Cities Want to Return to Prepandemic Life*, supra n. 23.

and various other forms of public transportation on which the general public relies. Enjoining the District of Columbia from exercising its authority to prohibit firearms on public transit would threaten the safety and security of countless riders, and plaintiffs' request should be rejected.

## CONCLUSION

For these reasons, this Court should deny the plaintiffs' application for a preliminary and permanent injunction.

Respectfully submitted,

September 23, 2022

KWAME RAOUL
Attorney General for the
State of Illinois

/s/ Kathryn Hunt Muse
KATHRYN HUNT MUSE
Deputy Chief
Public Interest Division

Office of the Attorney General for the State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000
kathryn.muse@ilag.gov

On behalf of:

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

HOLLY T. SHIKADA
*Attorney General*
State of Hawaii

BRIAN E. FROSH
*Attorney General*
State of Maryland

MAURA HEALEY
*Attorney General*
Commonwealth of Massachusetts

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

JOSH STEIN
*Attorney General*
State of North Carolina

PETER F. NERONHA
*Attorney General*
State of Rhode Island

KEITH ELLISON
*Attorney General*
State of Minnesota

LETITIA JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

ROBERT W. FERGUSON
*Attorney General*
State of Washington

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2022, a true and accurate copy of the foregoing brief was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

/s/ Kathryn Hunt Muse
KATHRYN HUNT MUSE