IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| GREGORY T. ANGELO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-01878 (RDM) |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

## INTRODUCTION

Four individuals have filed suit to enjoin the District of Columbia's law prohibiting the carrying of handguns on public transit.  The United States supports preserving the flexibility of local governments and public transit authorities to take reasonable means to enhance the security of public transit based on local conditions, including by restricting firearms in sensitive places such as public transit systems.  In addition, given the federal workforce's heavy reliance on the District of Columbia's public transit system and the interconnection between United States government facilities and that transit system, the United States respectfully submits this statement of interest and urges the Court to hold that the challenged statute, D.C. Code Ann. § 7-2509.07(a)(6), is consistent with the Second Amendment.  As the District explained, the public transit system within the District of Columbia constitutes a sensitive place, where local transit authorities may lawfully restrict firearms without violating the Second Amendment.  Defs.' Opp'n to Pls.' Application for Prelim. Inj. & Mot. for Summ. J. ECF No. 18 ("Opp'n").

## BACKGROUND

### I.      Firearms Restrictions Post-*Bruen*

In *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court reiterated that "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" are presumptively valid.  Indeed, the Court assumed it "settled" that "arms carrying could be prohibited consistent with the Second Amendment" in sensitive places like "legislative assemblies, polling places, and courthouses."  *Id*. at 2133, 2139 (citation omitted).  And the Court explained that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  *Id*. (emphasis in original).  Justice Kavanaugh's concurring opinion, joined by the Chief Justice, similarly

1

emphasized that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," and approvingly quoted the portion of the Court's decision in *District of Columbia v. Heller* noting that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]" *Id.* at 2162 (quoting *Heller*, 554 U.S. 570, 626 (2008)).

## II. The United States' Substantial Interests in Transportation Security and in the District of Columbia's Public Transit System

### A. Agency Interests

The Federal Transit Administration (FTA), an operating administration within the U.S. Department of Transportation (DOT), works with public transit systems regarding safety regulation in transportation.  Specifically, FTA provides financial and technical assistance to public transit systems, including buses, subways, urban rapid transit operations, and commuter railroads.  FTA also administers a Public Transportation Safety Program for certain regulated transit agencies falling under its authority.  Because firearms possession on public transportation systems is an important safety concern for transit agencies, workers, and riders, DOT has an interest in ensuring that States, localities, and transit systems across the country retain the flexibility to impose reasonable limitations on firearms carried within public transportation systems.

Under FTA's Public Transportation Agency Safety Plan (PTASP) Rule, 49 C.F.R. § 673.5, a transit agency's safety plan requires the implementation of a Safety Risk Management (SRM) process that includes safety hazard identification, safety risk assessment, and safety risk mitigation. 49 C.F.R. § 673.25.  If a transit agency identifies the presence of firearms as a safety risk, it would need to address that risk using the SRM process described in the agency's safety plan.  A transit agency must certify compliance with the PTASP Rule annually to remain eligible for certain FTA

funding. 49 U.S.C. § 5307(c)(1)(L). Accordingly, transit agencies and the jurisdictions in which they operate should have significant latitude to set the policies they need to create a safe system for the riding public.

The Transportation Security Administration (TSA) is another federal entity with an interest in transportation security. *See* Aviation and Transportation Security Act, Pub. L. No. 107-71, § 101(a), 115 Stat. 597 (2001); 49 U.S.C. § 114. Among other things, TSA enforces statutes and regulations that prohibit the carrying of accessible firearms on airplanes, and into "sterile" portions of airports. *See, e.g.,* 49 U.S.C. § 46505; 49 C.F.R. § 1540.111.

In certain circumstances, TSA deploys Visible Intermodal Prevention and Response (VIPR) teams to surface transportation venues, including Washington Metropolitan Area Transit Authority (WMATA) Metrorail and bus stations, to deter and detect threats to transportation security. 6 U.S.C. § 1112. TSA and VIPR teams also provide support for National Special Security Events (NSSEs) that require heightened security, such as inaugural ceremonies and the Super Bowl. Certain NSSEs occur in the District of Columbia at locations that are accessible via Metrorail. In light of TSA's participation with other federal agencies and local law enforcement entities to provide additional security for the NSSEs that occur in D.C., TSA supports the District's desire to prohibit the carriage of firearms on public transit within the District.

### B. The Federal Government's Employee Workforce Relies Heavily on the District of Columbia's Public Transit System

Before the COVID-19 pandemic, more than 600,000 passengers entered a Metrorail station on an average day. *See* WMATA: Rail Ridership Data Viewer, https://wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm (last visited Sept. 29, 2022) (selecting 2019 data generally). Federal employees made up approximately 40 percent of commuters on WMATA rail and buses during that time. *See* Washington Post, *Federal Workers Were the Backbone of the Metro*,

available at https://www.washingtonpost.com/transportation/2021/09/25/metro-pandemic-federal-worker-commuters/ (last visited Sept. 29, 2022).   In addition, D.C. Metrorail lines and stations are placed under and very close to numerous federal government facilities.   There are 15 Metrorail stops in the District that are within a quarter mile of a federal building, or just over 1,000 feet, with several that are even closer.   *See* DOT Map, https://usdot.maps.arcgis.com/apps/ mapviewer/index.html?webmap=2e7e62777d0c44a2bfe4aa506208227a (last visited Sept. 29, 2022).

## DISCUSSION

### I. The District of Columbia's Limits on Carrying Firearms on its Public Transit System Satisfies the Sensitive Places Doctrine

#### A. Government-Owned Property

Courts have repeatedly recognized that governments have broader authority to regulate and prohibit firearms on their property.   "[A]s the owner of the [property], the government—like private property owners—has the power to regulate conduct on its property." *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019); *see also Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (noting that USPS has broad discretion to govern its business operations— including parking lots—as a government-owned business and proprietor of that business); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (similar).   Such prohibitions echo historical regulations demonstrating that the government has greater authority to regulate firearms on its own property, *see, e.g.,* Maryland: 1650 Md. Laws 273 (barring "any gun or weapon" from the state legislatures), just as private land owners may restrict guns on their own property.

"Metro is government-owned property," which "heightens the sensitive, governmental nature of its operations."   Opp'n at 24.   The District of Columbia, Maryland, and Virginia created WMATA pursuant to Congressional authorization.   The District of Columbia exercises significant

control over WMATA through, among other things, the WMATA board of directors, which allots two seats each to the District, Maryland, Virginia, and the federal government.  *See* WMATA Compact as Amended, https://www.wmata.com/about/board/upload/Compact_Annotated _2009_final.pdf (last visited Sept. 29, 2022).  Any WMATA rule or regulation that conflicts with the law of the District is void within that jurisdiction.  *See Morris v. WMATA*, 781 F.2d 218, 227 (D.C. Cir. 1986) (holding that this provision "provid[es] a potent method for controlling WMATA").  In addition, the D.C. government, through the District Department of Transportation, owns and operates numerous bus routes and a streetcar line in the District.  In short, because of its ownership and/or control over the public transit system within its jurisdiction, the D.C. government enjoys greater authority to regulate firearms therein.

Like the District, the United States also regulates firearms on its own property, where appropriate.  In fact, multiple federal laws and regulations restrict the carriage of firearms in property owned and operated by the federal government.  *See, e.g.,* 18 U.S.C. § 930(e) (prohibiting knowingly carrying firearm in federal facility); 32 C.F.R. § 234.10 (prohibiting possession of a weapon on the Pentagon Reservation); 4 C.F.R. § 25.14 (prohibiting possession of firearms prohibited in GAO Building, except for "official purposes").  The above-cited authorities, among others, could be undermined if the Court here finds that a government-owned transit system does not constitute a "sensitive place."

Moreover, certain federal statutes and regulations protect not only the area within federal buildings and property but also the area adjacent to such sensitive places.  Courts have upheld such prohibitions against overbreadth challenges under Second Amendment.  *See, e.g., Class*, 930 F.3d at 466 (holding that ban on firearms in "almost 300 acres of the District," comprising the Capitol Grounds, was not overbroad); *Bonidy*, 790 F.3d at 1125 ("The parking lot should be considered as

a single unit with the postal building itself to which it is attached and which it exclusively serves."). An unduly narrow view of sensitive places in the context of public transit could undermine federal authority to restrict firearms from other, analogous sensitive areas, such as the area around government buildings.

### B.  The District's Public Transit System Uniquely Impacts the Federal Government's Operations

WMATA's Metrorail and bus stations, and their routes, exist in, around, and under a host of federal government facilities, including courthouses, the Capitol, and scores of other federal buildings.  As noted above, there are 15 Metrorail stops in the District that are within a quarter-mile of a federal building, or just over 1,000 feet.  *Supra* DOT Map; *accord Class*, 930 F.3d at 464 (upholding firearms prohibition where gun was possessed "less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building").  These federal facilities qualify as sensitive places.  *See Bonidy*, 790 F.3d at 1125 ("[T]he Second Amendment right to carry firearms does not apply to federal buildings, such as post offices.").  And courts have held that the same sensitivity concerns that attach to these buildings extend to their immediate surroundings.  *See Class*, 930 F.3d at 464 ("The same special security concerns that apply to the employees while in the Capitol apply when they walk to and from their cars on Capitol property.").

The federal government's interest in the security of the District's public transit system is thus manifest, and it is critical for the District to retain the flexibility to employ reasonable restrictions on firearms possession as a component of that security.

### C.  Crowded Locations

The frequently crowded nature of public transit system in Washington, D.C. also strongly supports the conclusion that public transit stations and vehicles qualify as a sensitive place.  Opp'n

at 25.  Indeed, the extremely crowded nature of mass transit stations and vehicles exceeds most other locations even in urban areas, and therefore gives rise to a sensitive place.

Before COVID, more than 600,000 passengers entered a Metrorail station on an average day, and 24,000 people entered the Metro Center station alone, with thousands more transferring daily through that single subway hub.  *See* WMATA: Rail Ridership Data Viewer, *https://wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm* (selecting 2019 data generally and for Metro Center in that year).  And once on Metrorail cars, during peak ridership times, passengers can have as little as five square feet available per person, or a square about two feet, two inches per side.  *See* Transportation Research Board: *Transit Capacity and Quality of Service Manual* at 3-29, https://www.trb.org/publications/tcrp/tcrp_webdoc_6-c.pdf.  In extreme crowds, especially in locations with limited ingress and egress, the risks of collateral and unintended injuries due to the firing of a gun into a crowd, including in instances of accidental discharge, as well as any ensuing stampede to safety, warrant granting greater flexibility to jurisdictions to impose reasonable limitations on firearms.  Such tight quarters meaningfully distinguish Metrorail stations and vehicles from urban areas generally, and the crowded nature of public transit thus supports its designation as a sensitive place.

Like the District, the United States restricts firearms in certain crowded, sensitive locations subject to federal control.  For instance, the federal government enforces statutes and regulations that prohibit carrying of accessible firearms on airplanes, and into "sterile" portions of airports.  *See, e.g.,* 49 U.S.C. § 46505; 49 C.F.R. § 1540.111.  Courts have rejected Second Amendment claims challenging these prohibitions.  *See, e.g., United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008); *Davis v. Bragg*, Case No. CV 09-02892-RGK, 2009 WL 10740797, at *4 (C.D. Cal. Dec. 21, 2009) ("[T]he Second Amendment right to possess firearms does not extend to

sensitive places such as airports and airplanes.").   And many federal buildings and property proscribe carrying firearms by all but authorized officials.  18 U.S.C. § 930; 41 C.F.R. § 102-74.440 (GSA regulations).

### D.  Vulnerable Individuals

Public transit in the District is also a sensitive place because vulnerable individuals, like children, frequently use the system.  Indeed, WMATA has a "Kids Ride Free" program, which encourages K-12 students to ride its system to school and school-related activities for free.  Opp'n at 8, 27.  Governments have long restricted firearms possession in crowded locations especially where vulnerable individuals such as children were present.  *See, e.g.,* Texas: *1870 Tex. Gen. Laws 63, An Act Regulating The Right To Keep And Bear Arms, chap. 46, § 1* (banning firearms from "any church or religious assembly" or "any school-room" or "public exhibition of any kind").  In line with this authority, the United States enforces 18 U.S.C. § 922(q)(2)(A), which prohibits knowingly possessing a firearm in a designated school zone.  The United States accordingly has a strong interest in securing sensitive places where vulnerable individuals are present.

<u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the District's restrictions on possession of firearms on public transit comport with the Second Amendment.

8

Respectfully submitted this 30th day of September, 2022.


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY R. FARBY
Assistant Director, Federal Programs Branch

/s/ *Michael Drezner*
MICHAEL DREZNER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: (202) 514-4505
Email: Michael.L.Drezner@usdoj.gov

*Attorneys for the United States of America*