**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GREGORY T. ANGELO, ET AL.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-1878 RDM |
| | ) | |
| **DISTRICT OF COLUMBIA, ET AL.** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO**
**OPPOSITIONS TO APPLICATION FOR PRELIMINARY INJUNCTION**

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   October 30, 2022

# Table of Contents

Table of Authorities …………………………………………………………..……… ii

SUMMARY OF ARGUMENT …………………………………….……………........ 1

ARGUMENT …………………………………………………………………….…... 3

I.      Plaintiffs have standing to challenge DC Code § 7-2509.07(a)(6) ……………………… 3

II.     The *Bruen* Framework ………………………………………………………............... 12

III.    Neither the government nor amici have shown that a public transportation
        system is a sensitive area where Second Amendment rights may be
        prescribed; as such they have not rebutted Plaintiffs' showing of
        likelihood of success on the merits ……………………………………….…….…... 18

        A.   The history of American public transportation in the 19th Century ………………… 18

        B.   There is an absence of post ratification legislation restricting
             firearm carry on public transportation ……………………………………………… 22

        C.   In the absence of "distinctly similar" historical limits on carry on
             Public transportation, the District and amici rely on inapposite
             Statutes and other authorities, and mischaracterizes many of them ……….…….. 25

        D.   The Court must reject the opposing parties; invitation to engage
             in "interest balancing" which *Bruen* forecloses ……………………………......... 35

IV.     Plaintiffs have shown irreparable injury …………………………………….……........ 41

V.      The balance of equities and the public interest favor grant of the injunction …………… 43

VI.     The Court should issue a permanent injunction ………………………………….…….. 43

VII.    Conclusion …………………………………………………………….................. 44

Exhibits

1.  *TRO, Antonyuk v. Hochul*, No. 22-cv-00986, Doc 27 (N.D.N.Y. Oct. 6, 2022)
2.  *TRO, Hardaway v. Nigrelli*, No. 22-cv-00771, Doc 35 (W.D.N.Y. Oct. 20, 2022)
3.  Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* (March 5, 2015)
4.  Stanford University, *Rise of the Monopolies: The history of American Railroads* (1996)
5.  1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W Blackstone* 142-43 n.18 (1826)
6.  Dean Weingarten, *1884 New York Street Car Scene Shows Carry of Pistols Common Before 1911*, Ammoland (September 18, 2022)
7.  PBS, *The Buffalo War: The Buffalo Yesterday and Today*
8.  Kelly Lynn, *DC Woman assaulted by group of teenagers on Metrobus shares what happened in brutal attack*, WJLA (October 20, 2022)
9.  Gerstein Affidavit, *United States v. Caston,* Case No. 2022 CF3 005172
10. Declaration of Mark G. Briley
11. Declaration of Leon Spears

# Table of Authorities

*Cases*                                                                                       *Pages*

*Abbott Laboratories* v. *Gardner*,
    387 U.S. 136 (1967) ……………………………………………………...……… 9

*ACLU v. Alvarez,*
    679 F.3d 583 (7th Cir. 2012) …………………………………………….…… 7

*Allen v. Wright,*
    468 U.S. 737 (1984) ……………………………………………………... 3

*Antonyuk v. Hochul,*
    Case No. 22-CV-0986 (N.D.N.Y. Oct. 6, 2022),
    admin. stay issued (2d Cir. Oct. 12, 2022) …………………………………..… 6, 26

*Archdiocese of Washington v. WMATA,*
    897 F.3d 314 (D.C. Cir. 2018) ……………………………………………...… 42, 43

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) ……………………………………………………… 7, 8, 11

*Bach v. Pataki,*
    408 F.3d 75 (2d Cir. 2005) ……………………………………………………… 5

*Barke v. Banks,*
    25 F.4th 714 (9th Cir. 2022) ……………………………………………..…… 10

*Bsharah v. United States,*
    646 A.2d 993 (D.C. 1994) ………………………………………………... 29

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) …………………………………………………………… 11

*Chaplaincy of Full Gospel Churches,*
    454 F.3d 290 (D.C. Cir. 2006) …………………………………………... 41, 42

*CityFed Fin. Corp.,*
    58 F.3d 738 (1995) ……………………………………………………..… 42

*Crawford v. Washington,*
    541 U.S. 36 (2004) ………………………………………………………... 22

\* *Denotes principal cases relied upon.*

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) …………………………………………………… 6

*\*District of Columbia v. Heller*,
    554 U.S. 570 (2008) …………………………………………… 8, 10, 12, 13, 14, 15, 31, 42

*Drummond v. Robinson*,
    9 F.4th 217 (3d Cir. 2021) …………………………………………..…… 15

*Elrod v. Burns*,
    427 U.S. 347 (1976) ……………………………………………….. 6, 41, 42

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) …………………………………………… 12, 42

*FEC v. Akins*,
    524 U.S. 11 (1998) ……………………………………………………… 3

*Fisher v. Kealoha*,
    No. 11-00589, 2012 U.S. Dist. LEXIS 90734 (D. Haw. June 29, 2012) ……………… 42

*Frothingham v. Mellon*,
    262 U.S. 447 (1923) …………………………………………………... 5

*Gillespie v. City of Indianapolis*,
    185 F.3d 693 (7th Cir. 1999) ………………………………………………… 6

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) …………………………………………… 6, 43

*Grace v. District of Columbia*,
    187 F. Supp. 3d 124 (D.D.C. 2016) …………………………………………… 42

*Green v. U.S. Dept. of Justice*,
    392 F. Supp. 3d 68 (D.D.C. 2019) ………………………………………..……… 7

*Hardaway v. Nigrelli*,
    No. 22-cv-00771, Doc 35 (W.D.N.Y. Oct. 20, 2022) ………………………..……… 6, 24

*Jackson v. City & Cty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ……………………………………………… 6

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) …………………………………………….……… 10

*Hejira Corp. v. MacFarlane,*
   660 F.2d 1356 (10th Cir. 1981) ………………………………………………………… 6

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011) …………………………………………….……… 12, 33

*Hill v. State,*
   53 Ga. 472 (1874) …………………………………………………………………….... 30

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
   710 F.3d 99 (3d Cir. 2013) …………………………………………………………..… 43

*Kennedy v. Louisiana,*
   554 U.S. 407 (2008) ………………………………………………………………… 15

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) …………………………………………………………………... 6

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ……………………………………………………………… 8, 38

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) ……………………………………………………………....… 8, 9

*\*MedImmune, Inc. v. Genentech, Inc.,*
   427 F.3d 958 (Fed. Cir. 2005) …………………………………………………….... 8, 9

*Mills v. District of Columbia,*
   571 F.3d 1304 (D.C. Cir. 2009) …………………………………………………...… 42

Milton, Pat, *Colin Ferguson Convicted of Murdering Six in Train Massacre,*
   Associated Press (February 18, 1995) …………………………………………… 39

*Mobil Oil Corp. v. Attorney General of Virginia,*
   940 F.2d 73 (4th Cir. 1991) …………………………………………………....… 5, 6

*Morris v. United States Army Corps of Eng'rs,*
   990 F. Supp. 2d 1082 (D. Idaho 2014) …………………………………………….... 42

*Navegar, Inc. v. U.S.,*
   103 F.3d 994 (D.C. Cir. 1997) …………………………………………………… 4, 11

*Nevada Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011) …………………………………………………………....….. 22

*New Hampshire Right to Life Political Action Comm. v. Gardner*,
   99 F.3d 8 (1st Cir.1996) …………………………………………………...… 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022) ………………………………………………….... passim

*New York State Rifle & Pistol Ass'n v. City of New York*,
   140 S.Ct. 1525 (2020) ………………………………………………… 1, 4, 5, 8

*New York State Rifle & Pistol Ass'n v. City of New York*,
   883 F.3d 45 (2d Cir. 2016) ………………………………………………… 5

*New York State Rifle & Pistol Ass'n v. City of New York*,
   86 F. Supp. 3d 249 (S.D.N.Y. 2015) …………………………………………… 5

*New York Times Co. v. United States*,
   403 U.S. 713 (1971) ……………………………………………………… 42

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007), *aff'd District of Columbia v. Heller*,
   554 U.S. 540 (2008) ……………………………………………………… 10

*Peoples Rights Organization, Inc. v. Columbus*,
   152 F.3d 522 (6th Cir. 1998) …………………………………………...… 6

*Public Citizen v. United States Dep't of Justice*,
   491 U.S. 440 (1989) …………………………………………………... 3, 4

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*,
   199 F.3d 26 (1st Cir. 1999) ……………………………………………… 7

*Rhode v. Becerra*,
   445 F. Supp. 3d 902 (S.D. Cal. 2020) …………………………………… 42

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) …………………………………………………...… 5

*Seegars v. Gonzalez*,
   396 F.3d 1248 (D.C. Cir. 2005), *reh. en banc denied*,
   413 F.3d 1 …………………………………………………… 1, 3, 4, 10

*Steffel v. Thompson*,
   415 U. S. 452 (1974) …………………………………………………..… 7, 9

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) …………………………………………………... 7, 8

*Tennessee Elec. Power Co. v. TVA*,
   306 U. S. 118 (1939) …………………………………………………….. 6

*Terrace* v. *Thompson*,
   263 U.S. 197 (1923) …………………………………………………... 9

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) …………………………………………... 12

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) …………………………………… 25, 31, 32, 33, 34, 35

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) …………………………………………..…… 12

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ……………………………………….…… 11

*Virginia v. American Booksellers Ass'n*,
   484 U.S. 383 (1988) …………………………………………………... 7

*Virginia v. Moore*,
   553 U.S. 164 (2008) …………………………………………………… 22

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) …………………………………………... 31, 36

## *Statutes and Rules*

Act of Sept. 5, 1961, Pub. L. No. 87-197 ……………………………………… 24

Antihijacking Act of 1974, Pub. L. 93-366, title I, Aug. 5, 1974, 88 Stat. 409 ……………….. 24

Cal. Penal Code §171.7(b)(1) …………………………………………………… 23

Cal. Penal Code § 171.7(c)(2) …………………………………….…………... 23

DC Code § 7-2501.01 et seg ………………………………………………..……….. 32

DC Code § 7-2502.03(a)(2) ……………………………………………………… 11

DC Code § 7-2509.02(a)(4)(E) ……………………………………………………… 38

DC Code § 7-2509.07(a)(6) ……………………………………………... 1, 3, 6, 11, 29, 30, 36, 42, 43

vi

DCMR 24.2335.1(d) ……………………………………………………....… 38

Minn. Stat. §609.85 ……………………………………………………….…… 23

Violent Crime Control and Law Enforcement Act of 1994,
  Pub.L. No. 103-322, 108 Stat. 1796 …………………………………………….. 4

Wash. Rev. Code §9.41.040 ……………………………………………………… 23

### *Other Authorities*

1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W Blackstone*
  (1826) …………………………………………………………………………... 26

Aftermath, *2021 Accidental Gun Death Statistics in the U.S.*, available at
  https://tinyurl.com/5n7ay7u7.................................................................…………… 38

*A History of Riverboats in Mississippi*,
  available at https://tinyurl.com/mtfp7pd5 …………….………………………… 21, 22

Berkowitz, L., & LePage, A. *Weapons as aggression-eliciting stimuli,*
  7 J. of Personality and Social Psychology, 202 (1967) ………………………… 37

Blocher, Joseph & Darrell A.H. Miller,
  *The Positive Second Amendment* (2018) …………………………………….… 32

Brief for Independent Institute as *Amicus Curiae*,
  Case 20-843 (U.S.) ………………………………………………………....… 16

Bison on Rails," (1871),
  available at https://tinyurl.com/hfxcna4y …………………………..……………...… 28

Churchill, Robert H., *Gun Regulation, the Police Power, and the Right to Keep Arms
  in Early America: The Legal Context of the Second Amendment*,
  25 Law & Hist. Rev. 139 (2007) ………………………………………………… 28

Crime Prevention Resource Center, *CPRC in Fox News: Police are extremely
  Law-abiding, but concealed handgun permit holders are even more so*
  (February 24, 2015), available at https://tinyurl.com/3t95b4zj …………………....… 39

Debonis, Mike, *Security, not street crime, at risk after gun ruling, D.C. Police Chief
  Cathy Lanier says*, The Washington Post (July 30, 2014),
  available at https://tinyurl.com/4h9tcr46……………………………….....…………… 39, 40

Frodi, A. The effect of exposure to weapons on aggressive behavior from
  a cross-cultural perspective, 10 Intl. J. of Psychology 283 (1975) …………………….. 37

Gerstein affidavit,  *United States v. Caston*,
  Case 2022 CF3 005172 (D.C. Super. 2022) ……………………………………………… 37

https://4-hshootingsports.org/ …………………………………………………………….. 37

https://crsreports.congress.gov/product/pdf/R/R42346/18#page=10 ……………………………… 34

http://usscouts.org/usscouts/mb/mb123.asp ........................................................................ 37

Johnson, Nicholas, *Lawful Gun Carriers (Police And Armed Citizens): License, Escalation,*
  *And Race*, 80 Law And Contemporary Problems 209 (2017) ………………… 39, 40, 41

Joint App'x, Case No. 18-280 (US May 7, 2019) (amended complaint) ……..…………..…….. 5

*Kopel, David & Joseph Greenlee, *The "Sensitive Places" Doctrine*,
  13 Charleston L. Rev. 205 (2018) ……………………….…... 16, 17, 18, 24, 25, 31, 33

Lynn, Kelly, *DC woman assaulted by group of teenagers on Metrobus shares*
  *what happened in brutal attack,* WJLA (October 20, 2022) ………………………….. 36

Legends of America, *Buffalo Hunters,*
  available at https://www.legendsofamerica.com/we-buffalohunters/ ………………… 27

Marquette, Chris and Michael Macagnone,
  *Capital Police teams were lacking in weapons certifications*,
  Roll Call (June 15, 2021), available at https://tinyurl.com/y6c6tnr3 ……………....... 34

Marvell, Thomas and Carlisle Moody, *Do Right to Carry Laws Increase Violent Crime?*
  *A Comment on Donohue, Aneja, and Weber*,
  16 Econ Journal Watch 84 (March 2019) …………………………………………..…….. 37

Meiklejohn, Alexander, *Free Speech and its Relation to Self Government*
  (Harper Bros. Pub. 1948) ………………………………………………………..……… 8

PBS, *The Buffalo War: The Buffalo Yesterday and Today* (undated) ……………..………… 27

Schmidt, H. D., & Schmidt-Mummendey, *A. Weapons as aggression-eliciting*
  *stimuli: A critical inspection of experimental results*,
  5 Zeitschrift für Sozialpsychologie, 201 (1974) …………………………………….. 37

Stanford University, *Rise of the Monopolies: The history of American railroads* (1996) …. 20, 21

Transcript of Oral Argument, *N.Y. State Rifle & Pistol Ass'n v. Bruen*,

No. 20-843 (U.S. Nov. 3, 2021) …………………………………………………… 33, 37

Weingarten, Dean, *1884 New York Street Car Scene Shows Carry of Pistols Common Before 1911*, Ammoland (September 18, 2022) ………………………………….……… 27

Young, Jay, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* (March 5, 2015) …………………………………………………………………... 18, 19, 20

### SUMMARY OF ARGUMENT

The District's attack on Plaintiffs' standing is without merit. This case is distinguishable from *Seegars v. Gonzalez,* 396 F.3d 1248 (D.C. Cir. 2005) (hereinafter "*Seegars*") because Plaintiffs here, unlike in *Seegars*, have no other option but a pre-enforcement challenge to violating the law and facing arrest and prosecution. Moreover, whatever validity *Seegars* had when it was decided, recent Supreme Court decisions have made it clear that pre-enforcement challenges are justiciable outside the First Amendment arena, the most recent being *New York State Rifle & Pistol Ass'n v. City of New York,* 140 S.Ct. 1525 (2020) (hereinafter "*NYSR&P*"). Plaintiffs aver they would carry on the Metro system, but for fear of arrest and prosecution. Under these facts, Supreme Court precedent says that is sufficient to confer standing on them to contest the Metro ban.

Plaintiffs meet all preliminary injunction requirements. They are likely to prevail on the merits because DC failed to point to established, representative "distinctly similar" restrictions from the founding era banning firearm carry on public transportation vehicles. Public transportation arose shortly after ratification of the Second Amendment and grew throughout the 19th Century to include ferry service, riverboats, omnibuses, commuter rail, interstate passenger rail and street cars. In the early 20th Century subway service developed. Defendants point to no laws prohibiting gun carry on these conveyances during the relevant period, much less an established tradition of banning gun carry on public transportation. That dooms DC Code § 7-2509.07(a)(6).

The Metro system is not analogous to schools or the Capitol grounds. The mere fact minors and government workers are present does not convert a public place into a sensitive place. If guns could be banned everywhere children or government workers might be, in no place in the city could Plaintiffs exercise their Second Amendment right to carry a firearm for personal protection. The Court should eschew opposing parties' invitation to engage in interest balancing and focus

instead on the Supreme Court's requirement that DC demonstrate its regulation is consistent with the Nation's historical tradition of firearms regulation. *See New York State Rifle & Pistol Ass'n v. Bruen,* 142 S.Ct 2111 (2022) (hereinafter *"Bruen"*). The District has not met that requirement. The few place restrictions DC and amici point to, other than the voting precincts, legislative assemblies, and courts *Bruen* discussed, were enacted in the late 19th Century and thus are far removed from the Second Amendment's adoption, were enacted in only a few states and territories, were not long standing, and most importantly did not ban gun carry on public transportation.

Even today, carry on public transportation is banned in only a handful of states, and the pedigree of those laws dates only back to the late 20th Century. The largest state in the Nation, California – not a particularly favorable state for Second Amendment freedoms – specifically allows carry on public transportation for those with a carry license like Plaintiffs. New York did not ban public transportation carry until a fit of pique following its loss in *Bruen,* and a New York District Court has issued a TRO restraining enforcement of that provision. Because the DC has failed to justify its carry ban as *Bruen* requires, Plaintiffs are likely to succeed on the merits.

Because this case involves a claim of abridgement of Constitutional rights, the merits element drives the remaining preliminary injunction factors. Plaintiffs suffer irreparable injury because infringement of their Constitutional freedoms constitutes irreparable damage. Likewise, Plaintiffs prevail on the balance of interests because the District has no legitimate interest in denying a Constitutional right. Finally, the public interest is always served by vindication of Constitutional rights. Given that Plaintiffs prevail on all four preliminary injunction factors, grant of a preliminary injunction is necessary to protect their Second Amendment rights.

Grant of a permanent injunction is also justified. The District has had enough time to perform legal research into 19th Century locational gun bans. It has come up empty. It apparently

wants to spend a year inquiring into private policies of carriers during the 19th Century, but that inquiry is irrelevant since *Bruen* talks in terms of legislative prohibitions. Obviously, private actors are not governed by the Bill of Rights, so their actions, whatever they might have been during the relevant period, are irrelevant.

## ARGUMENT

### I.   *Plaintiffs have standing to challenge DC Code § 7 2509.07(a)(6).*

Plaintiffs are concealed pistol license holders and users of the Metro system in the city. Docs 6-5 – 6-8. They aver an intent to exercise their right under the Second Amendment to carry concealed pistols in public, including on the Metro system. They refrain from doing so, however, as DC Code § 7-2509.07(a)(6) makes such conduct a crime. They fear arrest and prosecution should they violate the public transportation carry ban. *Id.* Thus, they bring a pre-enforcement challenge to the District law seeking a declaratory judgement of unconstitutionality, rather than violating the law, facing arrest and prosecution, and asserting unconstitutionality as a defense.

The District has never disclaimed an intent to enforce the Metro carry ban. Yet, the District argues these facts fail to constitute an imminent injury in the Second Amendment context sufficient to grant Plaintiffs standing to contest the carry ban. Doc 18 at 20. The District relies on *Seegars,* 396 F.3d 1248 for the view that to obtain standing Plaintiffs must be personally singled out or uniquely targeted for prosecution. Doc 18 at 20-21.[1] As we discuss below, *Seegars* implies – as

---

[1] The District's assertion is not a fair reading of *Seegars.* The Court in *Seegars* actually stated,

> To the extent that this language implied that plaintiffs must be individually or specifically burdened in a way distinct from some broader class of potential prosecutees, it is at variance with Supreme Court precedent. Although injuries that are shared *and* generalized – such as the right to have the government act in accordance with the law – are not sufficient to support standing, see *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), "where a harm is concrete, though widely shared, the Court has found injury in fact." *FEC v. Akins,* 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (internal quotation marks omitted); see also *Public Citizen v. United States Dep't of Justice,* 491 U.S.

have other courts in this circuit – that in non-First Amendment cases litigants must meet a higher threshold to show standing in pre-enforcement challenges. This is not the law under binding Supreme Court precedent. Moreover, *Seegars* is distinguishable.

To the extent *Seegars,* and before that, *Navegar, Inc. v. U.S.,* 103 F.3d 994 (D.C. Cir. 1997), on which *Seegars* relied,[2] was good law, they have been eviscerated by the recent decision in *NYSR&P,* 140 S.Ct. 1525. That case involved a New York City ordinance which prevented plaintiffs from transporting their guns to a second home, firing range, or shooting competition outside the city. *Id.* at 1526. The record there contains no evidence plaintiffs were singled out or otherwise threatened with prosecution beyond the general expectation the city would enforce its

---

440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (plaintiffs had standing to challenge non-disclosure of information even where innumerable other parties might make identical requests for disclosure).

*Seegars*, 396 F.3d at 1253. The harm Plaintiffs face here is not shared by the general public; it is specific to persons like Plaintiffs who are licensed to carry a concealed handgun in public for self-defense and who operate under detailed regulations concerning when and where they may carry their concealed handguns.

[2] *Navegar* found a lack of standing for a pre-enforcement challenge to a portion of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, 108 Stat. 1796 ("the Act") which referred to weapons and accessories sharing certain features, rather than to particular brands and models of weapons. 103 F.3d at 1000. The court held that "because the general nature of the language in these portions of the Act makes it impossible to foretell precisely how these provisions may be applied, the issues presented in these challenges are less fit for adjudication, suggesting additional concerns as to their ripeness." *Id.* at 1001. The court in *Seegars* considered itself bound by the holding in *Navegar,* while raising doubt as to its conformity with then existing Supreme Court precedent. *See Seegars*, 396 F.3d at 1253-56.

Significantly, *Navegar* states, "To require litigants seeking resolution of a dispute that is appropriate for adjudication in federal court to violate the law and subject themselves to criminal prosecution before their challenges may be heard would create incentives that are perverse from the perspective of law enforcement, unfair to the litigants, and totally unrelated to the constitutional or prudential concerns underlying the doctrine of justiciability." 103 F.3d at 1000-01. As we show herein, application of *Seegars* to deny Plaintiffs the right to litigate the Constitutionality of the Metro carry ban creates just such perverse incentives and unfairness to the litigants unrelated to the prudential concerns underlying the doctrine of justiciability.

law. *See* Joint App'x, Case No. 18-280 at 26-48 (US May 7, 2019) (amended complaint). *See also New York State Rifle & Pistol Ass'n v. City of New York,* 883 F.3d 45 (2d Cir. 2016); *New York State Rifle & Pistol Ass'n v. City of New York,* 86 F. Supp. 3d 249 (S.D.N.Y. 2015). After the Supreme Court granted certiorari, the city repealed its regulation and sought dismissal of the case as moot. 140 S.Ct. at 1526. Although the Court found the *NYSR&P* plaintiffs had received all the relief they requested in their complaint, rather than dismissing the case as moot, the Court vacated the judgement below and remanded for the Court of Appeals and the District Court to determine whether the plaintiffs could add a damage claim. *Id*. at 1526-27.

The Supreme Court raised no issue as to standing of the *NYSR&P* plaintiffs to make a pre-enforcement challenge. 140 S.Ct. 1525. Indeed, Justices Thomas, Alito and Gorsuch would have decided the case on the merits in plaintiffs' favor. *See* 140 S.Ct. at 1540-44 (Alito, J. dissenting). If plaintiffs had needed to be singled out or personally threatened to have standing, the Court would have never reached the question whether the claims were moot, nor would the Court have vacated and remanded for a determination whether the plaintiffs could assert a damage claim for violation of their Second Amendment rights. The Court would have simply dismissed the case for lack of jurisdiction, as standing is a requirement under Article III's requirement of a case or controversy. *See, e.g., Frothingham v. Mellon,* 262 U.S. 447 (1923); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 225-26 (1974). Because the Supreme Court's resolution of *NYSR&P* is inconsistent with the District's view that Plaintiffs must be singled out or personally threatened with arrest to have standing, the conclusion that Plaintiffs here have standing to challenge the Metro carry ban is manifestly clear.[3]

---

[3] No other circuit requires a person pursuing a pre-enforcement challenge in a non-First Amendment context to be singled out or personally threatened to have standing to challenge the offending statute. *See, e.g., Bach v. Pataki,* 408 F.3d 75 (2d Cir. 2005); *Mobil Oil Corp. v. Attorney*

This case does not involve a generalized grievance. Plaintiffs are personally coerced by DC Code § 7-2509.07(a)(6) into not carrying their licensed handguns on the Metro system lest they face arrest and prosecution. The right to bear arms is a fundamental individual right which Plaintiffs must forego on the Metro because of the risk of arrest and prosecution. Cases are clear that even the momentary loss of Constitutional rights constitutes irreparable injury for obtaining a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (hereinafter "*Elrod*"). *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (hereinafter *"Gordon"*). *See also Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346). By alleging that the defendants have deprived Plaintiffs of a fundamental individual constitutional right, and that this deprivation may be remedied by judicial relief, Plaintiffs have adequately satisfied the Article III standing requirements. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992); *Tennessee Elec. Power Co. v. TVA*, 306 U. S. 118, 137–138 (1939).

---

*Gen. of Va.,* 940 F.2d 73, 75 (4th Cir. 1991); *Peoples Rights Organization, Inc. v. Columbus,* 152 F.3d 522 (6th Cir. 1998); *Gillespie v. City of Indianapolis,* 185 F.3d 693 (7th Cir. 1999); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014); *Hejira Corp. v. MacFarlane,* 660 F.2d 1356 (10th Cir. 1981).

In *Antonyuk v. Hochul*, Case No. 22-cv-00986, Doc 27 (N.D.N.Y. Oct. 6, 2022), admin. stay issued (2d Cir. Oct. 12, 2022), the court temporarily restrained New York's recently enacted public transportation carry ban. *See* Exhibit 1, hereto. The court's order fails to indicate plaintiffs there were singled out or directly threatened with arrest. Rather the court pointed to the local sheriff saying he would be enforcing the provision, albeit conservatively, while noting that carrying a firearm into any sensitive area is a felony. *Id.* at 15. *See also Hardaway v. Nigrelli*, No. 22-cv-771, Doc 35 at 7-9 (W.D.N.Y. Oct. 20, 2022) (hereinafter *"Hardaway"*) (court found plaintiff had standing to contest New York's recently enacted ban on gun carry in churches, stating that in light of the recency of the law and lack of any indication that it will be repealed the court will presume the government will enforce it) (Copy attached as Exhibit 2).

Nor is this rule peculiar to First Amendment cases.  It is true that many pre-enforcement challenges come in the First Amendment arena. *See, e.g., Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289 (1979) (hereinafter "*Babbitt*"); *Virginia v. American Booksellers Ass'n,* 484 U.S. 383 (1988); *ACLU v. Alvarez,* 679 F.3d 583, 590 (7th Cir. 2012); *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 33 (1st Cir. 1999). And the Supreme Court has relaxed the standing rules in some First Amendment cases, particularly in overbreadth challenges.  *See, e.g., United States v. Stevens*, 559 U.S. 460 (2010). Cases in this circuit have accordingly suggested a relaxed standing requirement applies in the First Amendment arena compared to other challenges, including challenges alleging violation of Second Amendment rights and have distinguished *Seegars* from First Amendment pre-enforcement challenges on that basis. *See, e.g., Green v. U.S. Dept. of Justice,* 392 F. Supp. 3d 68, 82-84 (D.D.C. 2019). But this takes the Supreme Court's standing doctrine in First Amendment cases too far. There is no practical difference in abstaining from speech because of fear of arrest under an unconstitutional regulation and abstaining from the fundamental Second Amendment right because of fear of arrest under an unconstitutional infringement of the right to keep and bear arms.

The Supreme Court, moreover, has expressly disclaimed that a challenger to a criminal law must violate the law and face criminal prosecution before challenging it. "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), citing *Steffel v. Thompson*, 415 U. S. 452 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"). "Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159, citing *Babbitt*, 442 U. S. at 298. The Court did not suggest this standard applies only to First Amendment cases.

*Heller* makes it plain that Second Amendment rights are routed in the fundamental right of self-defense. Although no one can minimize the importance of free speech and an informed electorate in a representative republic, *see e.g.,* Alexander Meiklejohn, *Free Speech and its Relation to Self Government* (Harper Bros. Pub. 1948), political rights are meaningless if one is not alive to exercise them. Moreover, *Bruen* explicitly warned that , "[th]e constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' *McDonald [v. City of Chicago],* 561 U.S. [742,] 780, 130 S.Ct. 3020 [2010] (plurality opinion)." *Bruen,* 142 S.Ct. at 2156.[4] Just as the Second Amendment is not subject to a separate set of rules substantively, it is not subject to a separate set of rules jurisdictionally. The Supreme Court's admonition applies with no less force to unduly restrictive interpretations of Article III standing that are designed to keep the courthouse doors closed to meritorious Second Amendment claims.

Even before *NYSR&P,* Supreme Court precedent did not support a lesser standing requirement when a First Amendment restriction is under a pre-enforcement challenge. As the Court explained in *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 128-29 (2007) (hereinafter "*MedImmune"*), "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—

---

[4] The Court in *Bruen* suggested parallels in the treatment of First and Second Amendment rights, stating, the standard it was adopting for analysis of Second Amendment rights "accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *[District of Columbia v.] Heller* repeatedly compared the right to keep and bear arms. 554 U.S. [570,] 582, 595, 606, 618, 634-635 [2022]." *Bruen*, 142 S.Ct. at 2130.

for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." (Emphasis in original.) The Court discussed various pre-enforcement challenges, including *Terrace* v. *Thompson*, 263 U.S. 197 (1923) (involving a state law which prohibited leasing land to an alien and

> *Steffel* v. *Thompson*, 415 U.S. 452 (1974), [where] we did not require the plaintiff to proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution. *Id.,* at 458–460. As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.,* at 480. In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. See *Terrace*, *supra,* at 215–216; *Steffel*, *supra,* at 459. The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 152 (1967).

549 U.S. at 129.

*MedImmun* was not a First Amendment challenge. Rather the plaintiff was a party to a patent license agreement and sought a declaratory judgement that the patent was invalid. The Federal Circuit dismissed the case, finding a lack of standing because the plaintiff continued to pay royalties under the agreement and was in no danger of being sued for infringement. 427 F.3d 958 (2005). The Supreme Court, however, held "petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed." *MedImmune*, 549 U.S. at 137. *MedImmune* simply cannot be squared with a view there is one standing requirement for First Amendment cases and another for others.

Finally, even if *Seegars* and *Navegar* survive *NYSR&P*, those cases are distinguishable. *Seegars* involved a challenge to the DC handgun ban, stuck down in *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter "*Heller*"). Although *Seegars* indicates plaintiffs there would have had standing if personally threatened with arrest for possessing handguns in DC in violation of the law, as Chief Judge Ginsburg observed in concurring in the denial of rehearing *en banc*, the *Seegars'* plaintiffs had a ready means for seeking relief with respect to the DC handgun ban without awaiting criminal prosecution. *See* 413 F.3d 1 (D.C. Cir. 2005). They could have applied to register a pistol and then challenged the subsequent denial.[5] *Id.* Thus, a pre-enforcement challenge was not their "sole means of seeking relief" to challenge the DC handgun ban. *Id.* That distinction between the *Seegars* plaintiffs and Plaintiffs here is important. No Supreme Court decision has ever held that relief is unavailable unless either the plaintiff has been prosecuted or has a special, personalized threat of prosecution. That officials will enforce laws is presumed, absent substantial and credible evidence to the contrary. "Thus, in numerous pre-enforcement cases" the Supreme Court "did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but rather the Court "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). Here, the District has not disavowed enforcement of the Metro Ban.

The District argues Plaintiffs must demonstrate the harm they suffer is imminent, but the test for that inquiry is merely whether there is "a creditable threat of enforcement." *Barke v. Banks*, 25 F.4th 714, 718-19 (9th Cir. 2022). Under that standard, "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need

---

[5] Dick Heller followed this course in overturning the District's unconstitutional handgun ban. *See Parker v. District of Columbia,* 478 F.3d 370, 375-76 (D.C. Cir. 2007), *aff'd Heller,* 554 U.S. 540.

not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Babbitt,* 442 U.S. at 302. *See New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14-15 (1st Cir.1996) ("This standard -- encapsulated in the phrase "credible threat of prosecution" – is quite forgiving."), citing *Babbitt*, 442 U.S. at 302. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 n.5 (9th Cir. 2013) ("we have never held that a specific threat is necessary to demonstrate standing").

Under the District's view of *Seegers*, a constitutional violation enforced by a zero-tolerance policy would be unchallengeable since everyone faces the same generalized threat of prosecution. That is obviously not a correct statement of the law. Were the DC Circuit to adopt this view it should expect reversal pursuant to the Supreme Court's supervisory authority. *See e.g., Caetano v. Massachusetts*, 577 U.S. 411 (2016). Here Plaintiffs' sole remedy, other than breaking the law, risking arrest and prosecution, is a pre-enforcement challenge to DC Code § 7-2509.07(a)(6). They seek a declaratory judgement that the Metro ban is unconstitutional. This is not a generalized grievance. Plaintiffs hold licenses to carry handguns in public for self-defense. They have registered their guns with MPD. A specific statute governs when and where they may carry their firearms.[6] The ramifications of violating the statute are substantial: fines, imprisonment and the loss forever in the District of their Second Amendment rights. *See* DC Code § 7-2502.03(a)(2) (disqualifying persons from registering a firearm if ever convicted of a weapons offense). An actual case and controversy exists here conferring Article III jurisdiction. DC vigorously enforces its gun laws and has not disclaimed the intention to enforce this statute. Indeed, given its response

---

[6] *Cf. Navegar, Inc. v. U.S.,* 103 F.3d at 1001 ("[B]ecause the general nature of the language in these portions of the Act makes it impossible to foretell precisely how these provisions may be applied, the issues presented in these challenges are less fit for adjudication, suggesting additional concerns as to their ripeness").

herein, the city considers the ban essential to protect public safety. Standing plainly exists. Finally, to the extent the Court is uncertain as to standing, Plaintiffs intend to explore the city's intent to enforce the subject ban in discovery.

## II.     The **Bruen** *framework.*

Both the government and amici demonstrate a fundamental misunderstanding of *Bruen.* Their filings essentially suggest that the Court in conducting the sensitive places analysis here engage in the same means-ends interest balancing *Bruen* rejected. Their essential argument spread throughout their filings is guns are dangerous and guns are especially dangerous on the Metro. Although the first point is indisputable, the second is debatable, but largely irrelevant under the analysis *Bruen* requires. Accordingly, it is appropriate to review *Bruen's* framework.

In *Bruen,* the Court expressly rejected means-end scrutiny generally, and specifically the watered-down intermediate scrutiny that had predominated in the lower federal courts:[7] "Today, we decline to adopt that two-part approach. . . . Despite the popularity of this two-step approach, it is one step too many." *Bruen*, 142 S.Ct. at 2127. Means-end scrutiny is inappropriate because it allows courts to "defer to the determinations of legislatures." *Id.* at 2131. "[W]hile that judicial deference to legislative interest balancing is understandable – and, elsewhere, appropriate – it is not deference that the Constitution demands here." *Id.*[8] *Bruen* reiterated *Heller*'s refusal "to engage in means-end scrutiny generally" and expressly rejected "the intermediate-scrutiny test that respondents and the United States now urge us to adopt." *Id.* at 2129.

---

[7] *See, e.g., Heller v. District of Columbia,* 670 F.3d 1244, 1252 (D.C. Cir. 2011) (hereinafter *"Heller II"*); *Ezell v. City of Chicago,* 651 F.3d 684, 701-04 (7th Cir. 2011) (hereinafter "*Ezell"*); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

[8] The amicus brief submitted by Illinois and several other states, essentially calls for the same type of deference to state legislative judgements *Bruen* rejected. *See* Doc 24 at 10.

*Bruen* endorsed a test based **solely** on text, history, and tradition. "We reiterate that the standard for applying the Second Amendment is as follows: "When the Second Amendment's plain text covers an individuals' conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. In such cases, "the government may not simply posit that the regulation promotes an important interest," rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id. at* 2126. *See Id.* at 2150 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.")

*Bruen* thus abrogated the two-step, intermediate scrutiny test lower federal courts had predominately followed in assessing Second Amendment claims. Rather, this Court must now stop at the first step of that "two step" analysis. "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S.Ct. at 2126. The first step is to examine whether the regulation at issue regulates a matter that falls within the "plain text" of the Second Amendment. *Bruen*, 142 S.Ct. at 2129-30. Here the conduct at issue is carrying a firearm in public for self-defense by law abiding persons, conduct *Bruen* confirms the Second Amendment protects. We know Plaintiffs are law abiding because the District has vetted them prior to issuing their concealed carry pistol licenses. The regulation at issue limits their Constitutionally protected conduct by prohibiting them from carrying their concealed handguns on public transportation.

*Bruen* reiterates *Heller's* holding, 554 U.S. at 582, that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Bruen*, 142 S.Ct. at 2132, quoting *Heller*, 554 U.S. at 582. *Heller* established conclusively that possession of commonly owned firearms for self-defense comes under the protection of the Second Amendment. *See Heller*, 554 U.S. at 592 (Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation.") *Bruen* extends *Heller's* holding to carrying firearms for personal protection. So, Plaintiffs meet the first portion of the *Bruen* test. *Bruen* instructs that where the plain text of the Second Amendment covers the individual's conduct, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2130. At that point "[t]he government must then justify its regulation by demonstrating it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

"'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–635). The government must thus look to 1791 (when the Bill of Rights were adopted), or at the latest, 1868 (when the Fourteenth Amendment was adopted). *See Bruen*, 142 S.Ct. at 2135 ("The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."). Thus, contrary to amicus Everytown's argument (Doc 23 at 6-7), "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154. Likewise, *Bruen* refused even to address "any of the 20th-century historical evidence brought to bear by respondents or their amici," ruling that such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

14

The government must "identify a **well-established and representative** historical analogue to its regulation" dating back to *circa* 1791. *Id.* at 2133 (emphasis added). In conducting this analysis, *Bruen* states "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133, quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021). Rather, "the government [must] identify a well-established and representative historical *analogue.*" *Id.* Outliers are not acceptable. *Bruen*, 142 S.Ct. at 2133, 2153, 2156, 2147 n.22. Thus, *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *Id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *Id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *Id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *Id.* at 2155–56.[9]

Here, the conduct DC's statute targets does not represent an unprecedented societal concern nor does it arise from dramatic technological change. *See Heller*, 554 U.S. at 633. The threat of interpersonal violence in an urban setting is not a new phenomenon. And even if modern laws alone could demonstrate a broad tradition of a regulation – and under *Bruen* they cannot – there must at least be a strong showing that such laws are common in the states. *See, e.g., Kennedy v. Louisiana*, 554 U.S. 407, 423–26 (2008) (only six states permitting death penalty for child rapists shows national consensus against it). Opposing parties fail in this regard as well.

---

[9] The Court did not necessarily agree with the government's reading of the colonial laws or the early state laws, but the Court stated that "even if" the government's reading were correct, the record would not justify the challenged regulation. *See Bruen*, 142 S.Ct. at 2144.

Thus, here, as in *Bruen*, the historical analysis is "fairly straightforward" and "simple." *Bruen*, 142 S.Ct. at 2131–32. The historical analysis is straightforward when, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, **the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment**." *Id.* at 2131 (emphasis added). The historical analysis is also straightforward when "the Founders themselves could have adopted [a 'distinctly similar' historical regulation to the challenged law] to confront that problem" but did not. *Id.* "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* As we show herein, neither the government nor amici have pointed to a "distinctly similar" regulation to the Metro ban, much less a **well-established representative distinctly similar regulation**. Doc 18 at 10. The District never acknowledges this test. *Bruen* also would allow consideration of "relevantly similar" analogues, but only in "cases implicating unprecedented societal concerns or dramatic technological changes." *Bruen,* 142 S.Ct. at 2132. Those circumstances do not exist here; nor has the District met this slightly less intensive, relevantly similar, test.

*Bruen* further explained, "Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited – e.g., legislative assemblies, polling places, and courthouses – we are also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* at 2133, citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018) (hereinafter "Kopel, 'The Sensitive Places Doctrine'") and Brief for Independent Institute as *Amicus Curiae* at 11-17**,** Case No. 20-843 (US)**.** "We therefore can assume it settled that these locations were

'sensitive places'… [a]nd courts can use analogies to **those** historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (Emphasis added.) When assessing "which similarities are important and which are not" the Court looks at (1) "whether modern and historical regulations impose a comparable burden on [a law-abiding citizen's] right of armed self-defense," and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2132-33.

 *Heller* and *Bruen* "exemplifie[d] this kind of straightforward historical inquiry." *Bruen*, 142 S.Ct. at 2131. Both examined laws enacted to remedy centuries-old problems. Both found those laws lacked an established representative historical analogue. Both, accordingly, declared those laws unconstitutional. In *Heller,* the DC law "addressed a perceived societal problem – firearm violence in densely populated communities" by banning handgun possession in the home. *Bruen*, 142 S.Ct. at 2131. Although "the Founders themselves could have adopted [a similar law] to confront that problem," they did not. *Id*. The Court found it dispositive that no "Founding-era historical precedent" banned handgun possession in the home. *Id*. *Bruen* examined New York's proper cause requirement for obtaining a handgun carry license, which "concern[ed] the same alleged societal problem addressed in *Heller*: handgun violence, primarily in urban area[s]." *Id.* (cleaned up). In striking down New York's proper cause requirement, the Court deemed it controlling that the law lacked an analogue from "before, during, and even after the Founding." *Id.* at 2131–32. As we discuss below, these same points apply equally to DC's Metro carry ban.

 At the Founding, the preferred means of addressing the threat of violence was to require individuals to be armed. States "typically required that arms be brought to churches or to all public meetings," and "statutes required arms carrying when traveling or away from home." *See* Kopel

The "Sensitive Places" Doctrine, at 232 (2018) (cited with approval in *Bruen*, 142 S.Ct. at 2133). Plaintiffs here simply want to exercise the same behavior when traveling on public transportation.

**III.    *Neither the government nor amici have shown that a public transportation system is a sensitive area where Second Amendment rights may be proscribed; as such they have not rebutted Plaintiffs' showing of likelihood of success on the merits.***

Plaintiffs have shown they are law-abiding persons issued licenses to carry pistols in public in the District, that they would carry their licensed pistol on the Metro system for personal protection, but they decline to do so out of fear of arrest and prosecution. They thus show they come under the plain text of the Second Amendment, which encompasses the right to carry a firearm in public for self-defense. The Constitution presumptively protects that conduct. *Bruen,* 142 S.Ct. at 2126. It was thus incumbent on DC to show, based on the Nation's historical tradition of firearms regulation, that carrying firearms on public transportation may be prohibited. The District has failed to do so. As such, the conclusion Plaintiffs are likely to prevail on the merits of their claim that the Metro ban is unconstitutional is plainly evident. A review of the history of public transportation in the United States will underscore this conclusion.

**A.    *The history of American public transportation in the 19th Century.***

Although not prevalent when the Second Amendment was adopted, mass transit systems appeared soon after the founding. Streetcars, elevated and commuter rail, subways, buses, ferries, and other transportation vehicles serving large numbers of passengers and operating on fixed routes and schedules have been part of the urban scene in the United States since the early 19th century. Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America* at 1 (March 5, 2015) (Exhibit 3 hereto).

In 1785, none other than the father of our country, George Washington, established the Patowmack Company to improve the navigability of the Potomac River using canals in what now

the Washington, DC metro area. Soon after, ferry boats regularly crossed the waters of American cities in the early 19th century providing an important precedent to the mass transit industry that emerged later in the century. *Id.* at 2. Steam ferry service, established by Robert Fulton, the steamboat's inventor, connected Brooklyn and New Jersey to Manhattan in the early 1810s and horse-drawn omnibuses plied city streets starting in the late 1820s. *Id.* at 1. The development of ferry service illustrates the dominant role New York City would play in American urban mass transit. *Id.* at 2. By the 1860s, annual ridership of New York's ferries expanded to more than 32 million. *Id.* Thirteen companies employed 70 steamboats on more than 20 different routes. *Id.* Similar service spread to other northeastern cities, such as Philadelphia, Pittsburgh and Cincinnati. *Id.*

Expanding networks of horse railways emerged by the mid-19th Century prior to the adoption of the 14th Amendment. *Id.* By the late 1820s, New York became home to the first significant form of land-based mass transit: the omnibus. *Id.* This operation involved a large horse-drawn wheeled carriage similar to a stagecoach, open for service to the general public at a set fare. *Id.* Abraham Brower brought the service to New York in 1828 when he launched a route running along Broadway. *Id.* Brower's original vehicles held approximately 12 passengers. *Id.* Three years after Brower inaugurated service, more than 100 omnibuses traveled New York streets. *Id.* By the 1840s, Boston, Philadelphia, Baltimore, and other American cities had omnibus service. It spread from larger to smaller cities in subsequent decades. *Id.*

Horsecars, set on rails, allowed for more passenger capacity and reduced the time and cost of commuting to and from the city's central core. *Id.* at 3. The first horsecar line began service in New York in 1832. *Id.* Following a slow start, other American cities adopted horsecars by the 1850s. *Id.* Typically, a private company ran lines under a municipal franchise. *Id.* By the end of the 1850s, New Orleans, Boston, Philadelphia, Baltimore, Pittsburgh, Chicago, and Cincinnati

provided the service. *Id.* Further expansion developed during the 1860s. *Id.* Two decades later, some 20,000 horsecars traveled on more than 30,000 miles of street railway across the Nation. *Id.*

By the mid-19th century, commuter railways using steam locomotives connected residents living in suburban areas to places of work and entertainment in large cities. *Id.* at 4. Steam power allowed for the introduction of elevated trains in large urban areas such as New York City and Chicago, but they also existed in smaller cities such as Sioux City, Iowa, and Kansas City, Missouri. *Id.* Electric power later led to establishment of cable car lines, street cars and subways. *Id.* at 5. Cable cars were propelled by a moving cable within a street conduit. *Id.* The first cable car line was established in San Francisco in 1873. *Id.* at 5. Most large cities across the United States soon followed building cable car networks. *Id.* Electric street cars made their debut in the 1890s, and by 1913 most cable car lines were replaced by street cars. *Id.* Subway service commenced in Boston in 1898 and in New York City in 1904. *Id.* at 6.

The idea to build a railroad in the United States is attributed to Colonel John Stevens, in 1812. *See* Stanford University, *Rise of the Monopolies: The history of American railroads* (1996) (Exhibit 4, hereto). The earliest railroads consisted of horse drawn cars running on tracks, used for transporting freight. *Id.* The first built was the Granite Railway of Massachusetts, which ran approximately three miles in 1826. *Id.* The first regular passengers and freight carrier was the Baltimore and Ohio railroad, completed in 1827. *Id.* On Christmas Day, 1830, the South Carolina Canal and Railroad Company completed the first mechanical passenger train, marking the birth of the modern railroad industry. *Id.*

By 1835, dozens of local railroads existed. *Id.* With each passing year, the number of railway systems grew exponentially. *Id.* By 1850, more than 9,000 miles of track had been lain. *Id.* The proliferation of railroads let to increased standardization. *Id.* An ideal locomotive was developed which served as the model for subsequent trains. *Id.* Various companies

began to cooperate with one another, to both maximize profits and minimize expenditures. *Id.* In 1850, the New York Central Railroad Company was formed by merging a dozen railroads between the Hudson River and Buffalo. *Id.* Between 1851 and 1857, the U.S. government issued land grants to Illinois to construct the Illinois Central railroad. *Id.* The government set a precedent with this action, fostering the growth of one of the larger companies in the nation. *Id.*

With the onset of the Civil War, production of new railroads fell dramatically. *Id.* At the same time, however, usage of this mode of transportation increased significantly. *Id.* For example, the Battle of Bull Run was won by a group of reinforcements shuttled in on a railroad car. *Id.* By the conclusion of the war, the need for an even more diverse extension of railways was extremely apparent. *Id.* Soon after the war, the first transcontinental railroad was constructed. *Id.* The Union Pacific Railroad company started building from the east, while the Central Pacific began from the west. *Id.* The two companies met at Promontory Point, Utah, on May 10, 1869. *Id.* As they drove the Golden Spike uniting the two tracks, a new age was born. *Id.* Several more transcontinental railroads were built before the end of the century. *Id.*

In the 19th Century riverboat travel on the Mississippi river and its tributaries was another means of public transportation. The first steamboat to travel the Mississippi was the *New Orleans,* whose October 1811 maiden voyage began in Pittsburgh, PA, and ended in New Orleans after traveling along the Ohio and Mississippi Rivers. "A History of Riverboats in Mississippi," available at https://tinyurl.com/mtfp7pd5. By the 1830s, steamboats existed all along the Mississippi River and its major tributaries. *Id.* Propelled by steam-driven paddle wheels, steamboats could navigate the river more quickly and effectively than barges or flatboats. They carried goods such as cotton, timber, and livestock up and down the river, expanding trade throughout the growing U.S. *Id.* Wealthy persons could enjoy leisure

travel on a showboat -- a riverboat used for theater and musical performances. *Id.* Showboats were ornately decorated and would announce their arrival at a port by playing loud music. *Id.*

During the civil war, many steamboats carried troops, provisions, and supplies along the Mississippi river. *Id.* Demand for ships was so high that both the Union and Confederate governments chartered steamboats. *Id.* Riverboat gambling became popular in the early 1900s due to legislation surrounding gaming. *Id.* By keeping games of chance restricted to a riverboat, business owners could evade anti-gambling laws in effect on land in states along the Mississippi. *Id.* According to National Geographic, by 1900, the growth of railroads across the U.S. significantly reduced demand for transporting goods and people via steamboat. *Id.* Many riverboats were retired, but a few showboats remained as a testament to this period. This is yarn.

**d. The history and absence of post ratification legislation restricting firearm carry on public transportation.**

Given the ubiquity of public transportation systems post enactment, the absence of gun carry restrictions is remarkable. Neither DC nor its amici cite a single instance, much less an established history and tradition, of legislation banning gun carry on public transportation in the relevant time period, be that from the founding to the 14th Amendment, or the period following the 14th Amendment's ratification to the beginning of the 20th Century, a time *Bruen* regards as much less significant, 142 S.Ct. at 2137, notwithstanding Everytown's plea to the contrary. *See* Doc 23 at 6-7.[10] That is sufficient to doom the District's public transportation carry ban.

---

[10] As the Court in *Bruen,* explains (142 S.Ct. at 2137-28):

> [W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 42-50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168-169, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-125, 131 S.Ct. 2343, 180 L.Ed.2d 150 (2011) (First Amendment).

As shown above, public transportation systems have existed from shortly after the founding. This is thus not a case "implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S.Ct at 2132. Although public transportation today is not far removed from public transportation as it evolved during the 19th Century, even were we to telescope the historical inquiry to the 20th Century, which *Bruen* says we cannot (*see* 142 S.Ct. at 2137, 2154), the lack of long-standing regulations against gun carry on public transportation is still clear. Although Illinois cites a few additional late 20th Century statutes relating to firearms on public transportation (Doc 24 at 13), it fails to indicate how long these statutes have been outstanding, nor does it dispute that the earliest enactment of the handful of statutes we cited date back at the earliest to 1980s. *See* Doc. 6-1 at 41. Moreover, several of the laws Illinois cites (*Id.*) relate to discharge of firearms on public transportation (*see* Minn. Stat. §609.85; Wash. Rev. Code §9.4I.040), not carriage of firearms. And the California statutes cited (Cal. Penal Code §§171.7(b)(1), 171.7(c)(2)), as Illinois admits, specifically exempt persons with a carry license such as Plaintiffs here. *Id.* In sum, at the founding and throughout most of the 19th Century there were few location specific carry restrictions, and no carry restrictions that DC or amici have pointed to at any time in the 19th Century or early 20th Century relating to public transportation.

This is consistent with *Bruen's* observation that in the founding period, location carry restrictions were limited to courts, legislative assemblies, and voting precincts. *Bruen,* 142 S.Ct. at 2133. Although DC and amici at various points (*see, e.g., Doc 18 at 23*) cite such laws, we see no need to respond because they are neither distinctly nor relevantly similar to DC's public transportation carry ban. We agree DC may ban carry in those locations. It is noteworthy, however, that these three locations share a unifying characteristic. They lie at the heart of representative government: where laws are made, where laws are enforced, and where the people's

representatives are chosen. In other words, they are the key locations in our representative republic essential to safeguarding the rule of law, areas where the presence of firearms might intimidate or obstruct official proceedings. *See generally* Kopel, *The "Sensitive Places" Doctrine*. *See also Hardaway,* at 30 (Exhibit 2, hereto) ("In contrast [to churches] legislative assemblies, polling places and courthouses are civic locations sporadically visited in general where a bad-intentioned armed person could disrupt key functions of democracy.")

Nor in the context of ground-based public transportation does this case deal with an "unprecedented societal concern." Interpersonal violence was a concern at the founding, just as it remains a concern today. At the founding, the view was that the best solution for minimizing such violence was a well-armed and well-trained populace. The Second Amendment's express wording makes this plain. An actual example of both dramatic technological change and unprecedented societal concern justifying designation of a place as sensitive is that of airliners and airports. The District (Doc 18 at 7) and amici (*see* Doc 25 at 16) suggest if the Metro ban is overturned this will imperil the ban on carrying weapons on airliners. That is an ill-thought-out view.

It is true the ban on guns in planes lacks a "distinctly similar" historical analogue. Not until 1961 did federal law ban passengers from carrying concealed firearms on commercial airliners. *See* Act of Sept. 5, 1961, Pub. L. No. 87-197 (amending section 902 of the Federal Aviation Act of 1958), nevertheless presumably allowing the open carry of firearms.) Later in response to repeated hijackings, Congress mandated screening passengers and carryon bags for weapons. *See* Antihijacking Act of 1974, Pub. L. 93-366, title I, Aug. 5, 1974, 88 Stat. 409.

Airplanes obviously did not exist at the founding, nor at any relevant period thereafter. Air travel represents a mode of transportation that could not have been foreseen at the founding. Moreover, the concern with hijackings of airliners, which often resulted in an airliner landing in a

foreign and hostile country, e.g., Cuba, and potential terrorist activity, represents an unprecedented societal concern inapposite to crime occurring while riding a bus or a subway train. And if that were not enough, the reality that airliners may be turned into weapons of mass destruction conclusively indicates their sensitive nature, notwithstanding that the prohibition on carrying firearms on them is a modern restriction. Moreover, the stringent security protocols existing for passengers and others within the sterile areas of airline terminals, while not necessarily determinative as to sensitive place status, *see, e.g., United States v. Class,* 930 F.3d 460, 465 (D.C. Cir. 2019) (hereinafter "*Class*"), underscore a degree of societal concern for security of air travel if not equal to that of courts, election precincts, and legislatures, certainly closely approaching. *See* Kopel, *The "Sensitive Places" Doctrine* at 490 ("[W]hen a building, such as a courthouse, is protected by metal detectors and  guards, the government shows the seriousness of the government's belief that the building is sensitive.")[11] And one would think an unprecedented societal concern ought to be accompanied by enhanced security measures.

### C. In the absence of "distinctly similar" historical limits on carry on public transportation, the District and amici rely on inapposite statutes and other authorities, and mischaracterize many of them.

Lacking any apposite historical analogues in the founding period, the District and its amici misstate and mischaracterize what few founding era laws they cite. For example, the District (Doc 18 at 25) asserts, "This category of sensitive places is closely tethered to early American laws prohibiting the carrying of arms near parades and on trains." But the parentheticals the District provides to the laws it cites belie this representation. The New Hampshire law regarding parades

---

[11] Kopel also explains (*Id.*) that "Screening and armed guards reduce the burden that is inflicted on citizens by locational arms bans. Disarmed, the citizen in a sensitive place cannot defend herself. But when there are metal detectors, the citizen is assured that criminals cannot bring in guns. When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."

prohibited soldiers from having loaded weapons while parading, a reasonable safety measure considering they were openly handling firearms. *Id.* It is the same with the Rhode Island statute the District cites. *Id.* at n.11. These laws did not bar spectators from being armed at parades, much as the District would like to imply. *Id.* And the Iowa statute DC cites prohibited *firing guns at trains,* an extremely dangerous act highly likely to result in death or serious bodily harm to the innocent. That law in no way prohibited persons from being armed on trains. Throughout the opposing parties' filings, they rely on statutes prohibiting the misuse of firearms to justify banning them. Simply stated, no statutes appear to exist banning guns on public transportation in the 19th Century. Indeed, Illinois glosses over the fact that New York for the entire time its subway system has existed did not ban gun carry on buses and subways until after the *Bruen* decision was issued in June. *But see Antonyuk*, at 37 (temporarily restraining enforcement of that provision due to the lack of a representative historical analogue; administrative stay issued October 12, 2022).

The District also makes an irrelevant assertion that "in early America, it was not entirely common for civilians to carry arms in certain crowded gatherings, such as while 'attending [public] meetings,' 1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W Blackstone* 142-43 n.18 (1826)." Doc 18 at 26. Reference to the actual document the District cites shows no such statement. *See* Exhibit 5, hereto. In any event, *Bruen* is concerned not with what was common or uncommon social practice, but with the history and tradition of firearms regulation. And the quote DC posits, wherever it might have come from, assuming it actually came from somewhere, has no relation to carrying on transportation vehicles. Anecdotal evidence indicates gun carrying on public transportation was not unusual. The following illustration in the April 19, 1884, Police Gazette shows several passengers in a New York City horsecar with handguns. *See* Dean

Weingarten, *1884 New York Street Car Scene Shows Carry of Pistols Common Before 1911*, Ammoland (September 18, 2022) (Exhibit 6, hereto.)



*"How an investigation instituted by a passenger on a New York street car brought a young woman to the front like a little man."*

And as disgusting as the practice may have been, PBS reported that by the middle of the 19th Century, train passengers were shooting bison for sport. *See* PBS, *The Buffalo War: The Buffalo Yesterday and Today* (undated) Exhibit 7, hereto. *See also* "Bison on Rails," (1871) available at https://tinyurl.com/hfxcna4y, reproduced below, stating "Railroad travelers shooting buffalo from a train on the Kansas-Pacific Railroad, between Ellis and Kit Carson. It became a custom, in the not to uncommon event of finding a herd of buffalo on the track, to stop the engine and allow the passengers out to shoot them. Indeed, railroads advertised "hunting    by rail." *See* Legends    of    America,    *Buffalo    Hunters*    available    at    https://www.legendsofamerica.com/we-buffalohunters/  (Hulton Archive/Getty Images).

27



Lacking any "distinctly similar" historical analogue prohibiting carry on public transportation vehicles, the District and its amici are left to assert a host of kitchen sink arguments to defend the public transportation carry ban. Typical is Brady's claim (Doc 25 at 24) that

> From colonial times through Reconstruction and into the modern era, regulation of public carriage based on place-sensitivity has been considered legitimate and tracked states' responses to social problems. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment,* 25 Law & Hist. Rev. 139, 161-62 (2007) ("[C]olonial and early state governments routinely exercised their police powers to restrict the time, place, and manner in which Americans used their guns.").

But Brady's argument is at best misleading as Churchill explains, "Between 1607 and 1815, in clear contrast to English precedent, the colonial and state governments of what would become the first 14 states neglected to exercise any police power over the ownership of guns by members of the body politic." *Id.* at n. 51. He goes on to discuss various militia laws limiting use of guns on the day of muster and requiring "militiamen and other householders to bring their guns to the

muster field twice a year so that militia officers could record which men in the community owned guns." *Id.* at 161. And he states there were regulations over discharge, especially discharge and hunting at night, other hunting regulations, placement of spring (trap) guns, and a Boston prohibition on storing loaded guns, the latter being a fire regulation. *Id.* at 162-64. Churchill, however, says nothing concerning prohibition of possession of firearms at what we would consider to be sensitive places.

Illinois points to modern regulations in Montana and North Dakota prohibiting gun possession in wildlife refuges as well as Florida and Kentucky statutes prohibiting carrying in bars or bar areas of restaurants. Doc 24 at 12. However, Illinois shows no nexus to a ban on public transportation carry of either these hunting or alcohol regulations. *See Id.* DC in turn asserts it has a long history of regulating firearms. Doc 18 at 10-11. Putting aside that several of these regulations have been found unconstitutional and likely many more post *Bruen*, DC omits to highlight that it has never prior to the enactment of DC Code 7-2509.07(a)(6) banned weapons carry on public transportation.[12] We readily concede a historic tradition of firearms regulation exists in America, otherwise it would have been silly for *Heller* and *Bruen* to peg the Constitutionality of firearms regulations to the Nation's history of firearms regulation. But the government's obligation is to demonstrate that *this particular regulation* is consistent with the

---

[12] The District (Doc. 18 at 11) falsely asserts the Metro carry ban "reaffirmed the rule that pistols are not permitted on the District's public-transit systems," citing *Bsharah v. United States,* 646 A.2d 993, 994-1001 & n.5-7, 12 (D.C. 1994), which the District says upheld "convictions for carrying 'a handgun on a crowded subway train'"). The actual charge, however, was carrying a pistol without a license. It just happened to be that the location where defendants were spotted with guns was the subway. Contrary to the false implication DC gives, there was no charge of carrying on the Metro because there was no statute that actually prohibited that conduct, assuming one had a license to carry. It is regrettable the District chooses to shade the facts here.

historic tradition of firearms regulation by showing well established historical analogues, and this is what the opposing parties have failed to do.

The opposing parties do point to late 19th Century laws adopted by a few states prohibiting carry at various places *other than public transportation facilities*. This would include a Washington State law banning guns in penitentiaries (hardly apposite) (*see* Doc 25 at 25) and Texas, Tennessee, Georgia,[13] Oklahoma and Missouri laws that variously banned guns in schools, at churches or religious assemblies, at places of amusement, and in some cases social gatherings. *See* Doc 18 at 23-27; Doc 25 at 25-27. *Heller* indicates that restrictions on carrying guns in schools are presumptively Constitutional and Plaintiffs have not challenged DC Code Section 7-2509.07(a)'s prohibition on carry in schools nor other parts of this statute relating to houses of worship, nor the rather vague (and likely unconstitutional) prohibition in the statute against carrying firearms at a gathering or special event open to the public.

In any event, the statutes the opposing parties cite were all of late 19th Century origin, rather than near the adoption of the Second Amendment, and under *Bruen* are not entitled to significant weight. *Bruen,* at 142 S.Ct. at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier

---

[13] Both the District (Doc 18 at 24) and Brady (Doc 25 at 26) cite the Georgia case of *Hill v. State,* 53 Ga. 472 (1874) which upheld a conviction for carrying a firearm into a court under the cited statute. Although we do not quibble with the ultimate result, i.e., prohibiting carrying arms in courts – it is noteworthy that the court there both disclaimed reliance on the Second Amendment and adopted the militia based collective rights view of the amendment. This is made plain by the court's following statement, "As we have seen, the object of the provision was to secure to the state a well regulated militia. The simple right to carry arms upon the person, either openly or secretly, would not answer the declared purpose in view: Skill and familiarity in the use of arms was the thing sought for." *Id.* Thus, *Hill* is fundamentally inconsistent with both *Heller's* and *Bruen's* holding that the Second Amendment confers individual rights to keep and bear arms unrelated to militia service.

sources.' 554 U.S. at 614, 128 S.Ct. 2783[.]" Moreover, these few late 19th Century statutes hardly

evidence the *established tradition Bruen* requires, even were they to qualify as either "distinctly

similar" or even "relevantly similar," which they do not. Lastly, these statutes show that the

legislatures could have prohibited carry on public transportation systems, which as discussed

above by the time these laws were enacted were well developed throughout the country, yet they

did not, indicating a view such restrictions would have violated state Second Amendment

analogues. *See Bruen,* 142 S.Ct. at 2131.

      DC and its amici attempt to analogize carry on the Metro to prohibitions on carry in schools

and on the Capitol grounds, *see Class,* 930 F.3d 460, the argument being that because numbers of

children and government workers use Metro to get to school and work respectively, they might be

targets of an active killer or terrorist attack, and cannot carry firearms to defend themselves. *See,*

*e.g.,* Doc 18 at 7, 13-14, 27 & 30; Doc 25 at 12 & 19. But that argument proves too much because

children and government workers can be found almost everywhere in the District. Although DC

might want this Court to declare the entire city a sensitive area, *see, e.g., Wrenn v. District of*

*Columbia,* 864 F.3d 650, 659 (D.C. Cir. 2017), that train has left the station and is fundamentally

inconsistent with *Bruen. See* 142 S.Ct. at 2133-34.

      Although the historical case for schools as sensitive places is weak, *see* Kopel, *The*

*"Sensitive Places" Doctrine*, at 287,[14] *Heller's* dicta appear controlling. *See, e.g., Bruen* 142 S.Ct.

at 2162 (Kavanaugh, J., concurring). Schools are likely sensitive areas because they are exclusively

---

[14] "Compared to arms bans in *some* 'government buildings,' arms bans in 'schools' have very
weak historical lineage. The first broad bans on carrying at schools appear in a few states in the
late nineteenth and early twentieth centuries. They are tainted by their obvious overbreadth—in
that they also applied to mixed-sex private social gatherings anywhere in the state. Broad laws
against guns in schools come mainly from the late twentieth century, and thus are too novel to be
part of history and tradition," *Id*. (Emphasis added.)

dedicated to an education purpose and most persons present are minors.[15] Moreover, there is a heightened need for security at schools in light of active killer attacks. Many schools, especially in the District, have instituted heightened security measures including weapons screening and school resource officers. Importantly the burden associated with prohibiting firearms in schools is de minimis to the average licensed firearm carrier as they rarely have a need to enter a school.

The Metro system on the other hand serves the public in general and plainly lacks an educational purpose. Most importantly, the Metro system is a vital aspect of transportation for DC residents. *See* Doc 24 at 15. Its heavy ridership is testament to its utility. Many persons in the District lack personal vehicles and rely on Metro for transportation for their daily life activities. This is especially the case for persons of limited means. The District already makes it expensive for them to acquire and carry a firearm, charging application fees, fingerprint fees, registration fees, mandating 18 hours of training with a DC instructor, and requiring renewal with still more fees and training every two years. *See generally* DC Code § 7-2501.01 et seg. And although DC blithely suggests persons could walk or bum a ride from a friend (Doc 18 at 38), that does not help someone who is mobility impaired, who needs to travel a substantial distance, or who lacks friends on whom they can rely every time they need to go to work or the grocery store. Denying District licensed carriers access to Metro imposes a more than de minimis burden on them as Justice Alito recognized during the oral argument in *Bruen*.[16] *See also Class,* 930 F.3d at 463, stating with

---

[15] DC cites (Doc 18 at 28) Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment* at 106 (2018) as describing schools as a sensitive place due to the presence of children. Actually, the article muses on the question of *whether* it is the presence of children or the educational purpose which make schools a sensitive place. The combination of the two seems the most likely.

[16] "Justice Alito: Could I -- could I -- could I explore what that means for ordinary law-abiding citizens who feel they need to carry a firearm for self-defense? So, I want you to think about people like this, people who work late at night in Manhattan, it might be somebody who cleans offices, it might be a doorman at an apartment, it might be a nurse or an orderly, it might be somebody who washes dishes. None of these people has a criminal record. They're all law-abiding citizens. They

respect to the presumptively lawful bans on carry in schools or government buildings that "A challenger may rebut this presumption only by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller II*, 670 F.3d at 1253."

Moving on to a specific discussion of *Class,* that case affirmed a conviction for possessing a firearm on grounds under the jurisdiction of the Capitol – one of the more sensitive places in the country – holding that the Capitol grounds are sufficiently integrated with the Capitol itself so as to be a sensitive place. 930 F.3d at 464. We note *Class* did not conduct the historical analysis *Bruen* requires to determine whether a location is sensitive. *See* 930 F.3d at 463-64. Had it done so, however, the court would have had no problem concluding that history supports treating legislative assemblies **and** grounds as sensitive areas. *See Bruen,* 142 S.Ct. at 2133, citing Kopel, *The "Sensitive Places" Doctrine,* at 229-236, 244-247, and stating "We therefore can assume it settled that these locations [including legislative assemblies] were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment."

The District and its amici attempt to shoehorn *Class* to the Metro system by asserting the Metro itself is integrated with the federal government since many federal employees use the Metro system to get to work, and many Metro stations are near federal buildings. *See, e.g.,* Doc 18 at 30; Doc 25 at 22. But the parking lot where Class was found with a firearm was a location *exclusively* set aside for the use of Capitol employees with a permit. 930 F.3d at 464. Moreover, its proximity to the Capitol itself could make it a stalking ground for persons seeking to attack high value targets

---

get off work around midnight, maybe even after midnight. They have to commute home by subway, maybe by bus. When they arrive at the subway station or the bus stop, they have to walk some distance through a high-crime area, and they apply for a license, and they say: Look, nobody has told -- has said I am going to mug you next Thursday. However, there have been a lot of muggings in this area, and I am scared to death." Transcript of Oral Argument at 66-67, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).

such as Senators and Congressmen and their staffs. *Id.* Thus, it was an area with a uniquely special security concern. *Id.* We also note that although *Class* indicates this is not determinative, the Capitol grounds are marked by an extensive police presence. *See Id.* at 465.[17] Indeed, it is not unusual to see Capitol Police patrolling the grounds armed with M4 select fire machine guns. *See* Chris Marquette and Michael Macagnone*, Capitol Police teams were lacking in weapons certifications,* Roll Call (June 15, 2021) ("The First Responders Unit carry this rifle [the M4] when standing on post or at the barriers."), available at https://tinyurl.com/y6c6tnr3.

The District claims it can ban carry on the Metro given the "government nature" of Metro's property. Such an argument is not supported by *Bruen,* nor by *Heller*, both of which speak of government buildings. If the government could ban carry on all government property, there would be little left of the right to bear arms since all public roads and sidewalks could be classed as sensitive areas. Moreover, in some states the federal government owns much of the land area, e.g., Nevada (80.1 percent), Idaho (61.9 percent), Alaska (60.9 percent) Oregon (52.3 percent), California (45.4 percent), and 24.7 percent in the District. *See* https://crsreports.congress.gov/product/pdf/R/R42346/18#page=10. There is no support in *Heller* or *Bruen* that government ownership of property is sufficient to make that area a sensitive location.

---

[17] *But see* Justice Alito's discussion during the *Bruen* oral argument:

> So starting with that, could we analyze the sensitive place question by asking whether this is a place where the state has taken alternative means to safeguard those who frequent that place? If it's a—if it's a place like a courthouse, for example, a government building, where everybody has to go through a magnetometer and there are security officials there, that would qualify as a sensitive place. Now that doesn't provide a mechanical answer to every question, and—but it—would that be a way of analyzing—of beginning to analyze this?

Transcript of Oral Argument at 32, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).

The District's attempt to link the discrete area of the Capitol grounds to the wide-ranging Metro train and bus system is also unavailing. As we note above, that argument could justify restrictions on carry throughout the vast majority of the District. As *Class* states, however, "Although there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, Congress has not exceeded it here." *Id.* at 464. "The Maryland Avenue parking lot is just the kind of '*small pocket* of the outside world' where a ban imposes only 'lightly' on the right to carry a weapon in the District of Columbia." 930 F.3d at 465-66 (emphasis added). The Metro train and bus system is simply not a "small pocket of the outside world" where banning carry causes only a de minimis burden on Second Amendment rights.

Finally, the District and amici throughout their submissions rely on various pre-*Bruen* cases, some upholding sensitive area restrictions in places other than public transportation facilities, and other cases – even less on point – sustaining a variety of firearms restrictions. Suffice it to say those cases universally applied the now discredited interest balancing approach, rather than the historical analogue approach *Bruen* mandates. As such they have been abrogated.

### D. The Court must reject the opposing parties' invitation to engage in "interest balancing" which Bruen forecloses.

Beyond this point, the District and its amici seek to seduce the Court into the now taboo realm of interest balancing. *See Bruen,* 142 S.Ct. at 2129-31. The District, for example, argues variously (Doc 18 at 31) that the Metro system should be considered a sensitive place because it is often crowded, with emotionally frustrated passengers, jostling each other with inter-rider conflict, and that the use of a weapon could injure innocent persons and cause panic and more injury. *See also* Doc 25 at 11. Perhaps District counsel is riding a different line than Plaintiffs, as Plaintiffs' experience is that DC Metro riders are overwhelmingly polite and courteous; they

simply wish to go about their business without facing an assault.[18] In any event, *Bruen* and prior cases foreclose the District's argument.

> But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. See Part III-B, *infra.* Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

*Bruen,* 142 S.Ct. at 2134. *See also Wrenn*, 864 F.3d at 659-61 (rejecting the District's argument that it could limit the carrying of firearms in the densely populated city).

Unfortunately, as the District's and amici's own evidence (*see, e.g.,* Doc 24 at 18-19) shows guns seem to get on the Metro despite DC Code § 7-2509.07(a)(6), just from persons who do not bother to go through the time and expense to obtain a DC carry license and the requisite training necessary to obtain that license, or they cannot because they have a disqualifying felony record.[19] As Justice Alito pointed out " There are -- there are a lot of armed people on the streets of New York and in the subways late at night right now, aren't there? . . . But the people -- all --

---

[18] Kelly Lynn, DC woman assaulted by group of teenagers on Metrobus shares what happened in brutal attack, WJLA (October 20, 2022) (Exhibit 8, hereto).

[19] Take for instance Demarvzia Angelo Caston, arrested September 1, 2022, for assault with a dangerous weapon and various other charges relating to a shooting at the L'Enfant Metro Station. According to the Gerstein affidavit submitted in *United States v. Caston,* Case No. 2022 CF3 005172 (attached as Exhibit 9, hereto, Mr. Caston, interjected himself into a dispute, producing "from his waistband a Glock style handgun, racked the gun, and pointed his gun at victim 1 and fired one round, striking the platform tile. *Id.* The round then ricocheted and struck victim 2 in the right foot. *Id.* Victim 2 suffered minor non-life-threatening injuries. *Id.* Mr. Caston, who was sporting an unregistered Polymer 80 "Ghost Gun," did not have a DC concealed pistol license. *Id.* In fact, he was ineligible given his record of convictions for "crimes punishable by terms of imprisonment for more than a year." *Id.* He was previously thrice convicted of assault with a dangerous weapon, as well as possession of a firearm during a crime of violence in 2010; unlawful possession of a firearm, robbery and unlawful possession of sawed-off shotgun in Virginia in 2001. *Id.* The Metro ban did not seem to stop him from having a gun on the Metro.

all these people with illegal guns, they're on the subway --." Transcript of Oral Argument at 68-69, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).

Brady wants the Court to consider various social science studies – none of which it actually provides the Court – among which it claims that the presence of guns incites aggression (Doc 25 at 21 & n.29) and that children are mentally damaged by exposure to firearms (Doc 25 at 17-18). The latter is likely news to the hundreds of thousands of children, age 8-18, participating in the 4-H shooting sports programs, *see* https://4-hshootingsports.org/, and the many Boy Scouts earning their riflery merit badges, *see* http://usscouts.org/usscouts/mb/mb123.asp. It is far more likely that children would be traumatized by seeing innocent persons harmed by violent criminal predators as is happening far too often on the Metro system.[20]

Illinois similarly relies on discredited psychological theories claiming that merely seeing guns "primes" aggressive thoughts. Doc 24 at 19 & n.34). The study relied on used flawed, unreproducible research methodology.[21] Subsequent research found opposite effects, insignificant effects, or alternative explanations for the results.[22] The Court should also wonder how one would see firearms required by DC law to be concealed.

---

[20] Considerable disagreement exists in academia concerning the validity of studies like those Brady cites. For example, Brady (Doc 24 at nn. 25-26) cites a study by Donahue that right to carry laws result in an increase in crime. Thomas Marvell and Carlisle Moody report serious flaws in Donahue's study. *See Do Right to Carry Laws Increase Violent Crime? A Comment on Donohue, Aneja, and Weber*, 16 Econ Journal Watch 84 (March 2019). Their evaluation revealed no significant effect on violent crime from the adoption of right to carry laws in the 33 states that had as of that time adopted them.

[21] Berkowitz, L., & LePage, *A. Weapons as aggression-eliciting stimuli*, 7 J. of Personality and Social Psychology, 202 (1967).

[22] *See* Frodi, A. *The effect of exposure to weapons on aggressive behavior from a cross-cultural perspective*, 10 Intl. J. of Psychology 283 (1975); Schmidt, H. D., & Schmidt-Mummendey, *A. Weapons as aggression-eliciting stimuli: A critical inspection of experimental results*, 5 Zeitschrift für Sozialpsychologie, 201 (1974).

The Supreme Court in *Bruen*, *Heller*, and *McDonald* paid no heed to any psychological studies or crime statistics in recognizing an historical right of law-abiding citizens to peaceably carry guns for self-defense. Defendants' and amici's pleas from academic studies are effectively part of a means-end test or cost-benefit analysis.[23] Suffice it to say that *Bruen* opted for judges to rely "on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing right* … [as] more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field" *Bruen,* 142 S.Ct. at 2130, quoting *McDonald v. City of Chicago*, 561 U.S. at 790-791 (plurality opinion) (emphasis in original).

Fundamentally, DC and its amici suppose that DC licensed concealed carriers present a threat to innocent persons on the Metro system. In fact, Brady goes as far as to suggest even that the presence of *armed police officers* may increase the prevalence of active killing incidents. *See Id.* at n.29. Their suppositions lack evidentiary support, especially with respect to licensed concealed carriers.[24] DC concealed pistol license holders are required to be schooled in conflict de-escalation and avoidance.[25] And the Chief denies licenses to persons who have exhibited a history of violence or instability, even if they have never been convicted of any violation of the law. *See* DCMR 24.2335.1(d) (A person is suitable for a carry license if he or she "[H]as not

---

[23] Few gun control laws could pass a cost-benefit analysis because they sweep broadly upon the rights of law-abiding citizens while attempting to constrain the actions of a relatively few criminals who will not obey the laws anyway.

[24] Brady (Doc 24 at 13) raises the prospect of accidental or inadvertent discharges. Most such incidents happen in the home and generally happen to persons under 25 who are shot by a friend (43 percent)_or family member (47 percent), often an older brother. *See* Aftermath, *2021 Accidental Gun Death Statistics in the U.S.*, available at https://tinyurl.com/5n7ay7u7.

[25] *See* DC Code § 7-2509.02(a)(4)(E); Declaration of Mark A. Briley (Exhibit 10, hereto); Declaration of Leon Spears (Exhibit 11, hereto).

exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another").

Conspicuously lacking in DC's and its amici's speculative and conjectural predictions is that licensed gun carry on the Metro system is and has been legal in Virginia and Maryland, and there is zero evidence from opposing parties of criminal violence perpetrated by any person legally carrying a firearm pursuant to a Virginia concealed handgun permit or a Maryland wear and carry permit. Likewise, opposing parties fail to point to a single such incident by a licensed carrier on New York's subway system. Nonetheless, as Justice Alito noted, criminals carry guns on subways and buses despite laws to the contrary. Consider how many innocent lives could have been saved and injuries prevented if just one legally armed individual had been present when Colin Ferguson shot 25 persons in a Long Island railroad car on December 7, 1993. *See* Pat Milton, *Colin Ferguson Convicted of Murdering Six in Train Massacre,* Associated Press (February 18, 1995).

The District and its amici may distrust licensed gun carriers, but the evidence is compelling that licensed gun carriers are far more law abiding than the average citizen *or* the police. *See* Nicholas Johnson, *Lawful Gun Carriers (Police And Armed Citizens): License, Escalation, And Race*, 80 Law And Contemporary Problems 209 (2017) ("As private gun carriers and state laws facilitating them proliferated, skeptics offered dire warnings about the consequences. Fortunately, that parade of horribles did not materialize.") *See also Moore v. Madigan,* 702 F.3d 933, 937-38 (7th Cir. 2012) ("The available data about permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders"); Crime Prevention Resource Center, *CPRC in Fox News: Police are extremely Law-abiding, but concealed handgun permit holders are even more so* (February 24, 2015), available at https://tinyurl.com/3t95b4zj. As former MPD Chief Cathy Lanier pointed out, "Law-abiding

citizens that register firearms, that follow the rules, are not our worry." Mike Debonis, *Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says*, The Washington Post (July 30, 2014), available at https://tinyurl.com/4h9tcr46.

As Johnson explains, "One of the most significant things about the spread of the private carry movement is that laws allowing millions of ordinary Americans to carry guns did not turn them into robbers and murderers. This result undercuts the predictions of carnage that were based on the theory that the simple presence of a firearm would transform parking lot bumps into shootouts." Johnson, *Lawful Gun Carriers* at 210. He supports this conclusion with various state data showing very few persons ever have their carry licenses or permits revoked for committing a violent crime. *Id.* at 219-20. Examples from states with high numbers of permits follow:

> FLORIDA. Between, October 1, 1987, and November 30, 2008, Florida issued permits to 1,439,446 people. 166 had their permits revoked for any type of firearms related violation-about 0.01 percent. These revocations overwhelmingly involved individuals accidentally carrying concealed handguns into restricted areas.

> MICHIGAN. During 2007, there were over 155,000 licensed permit holders and 163 revocations-about 0.1 percent.44 Over the period from July 1, 2001, to June 30, 2007, there was one permit holder convicted of manslaughter, though it did not involve the use of a gun. Three other people were also convicted of "intentionally discharging a firearm at a dwelling." No one was convicted of "intentionally discharging a firearm at or towards another person."

> NORTH CAROLINA. With 246,243 permits issued and 789 revocations, about 0.3 percent of North Carolina permit holders have had their permits revoked over the twelve years from when permits started being issued. "One frequent reason [for revocation] is when the police pull someone over for a traffic violation, [permit holders] fail to tell them that they are a CCW holder."

> OHIO. From April 2004 to the beginning of August 2006, 73,530 permits were issued in Ohio. There were 217 revocations, but 69 of these came from the Cuyahoga County Sheriff's Office after a weapons instructor was accused of not providing the training required by state law. Excluding revocations due to improper training, about 0.2. percent of permit holders had their permits revoked. There were no reported incidents of any permit holder having his permit revoked for committing a violent crime. A major reason for revocations was that a licensee moves out of state or dies.

TEXAS. In 2006, there were 258,162 active permit holders. Out of these, 140 were convicted of either a misdemeanor or a felony, a rate of 0.05 percent. That is about one seventh the conviction rate in the general adult population, and the convictions among permit holders tend to be for much less serious offenses. The most frequent type of revocation, with 33 cases, involved carrying a weapon without their license with them. The next largest category involved domestic violence, with 23 cases. Similar numbers have been reported in Texas every year.

UTAH. With 134,398 active concealed-handgun permits as of December 1, 2008, there were 12 revocations for any type of violent crime over the preceding twelve months-a 0.009 percent rate. None of those involved any use of a gun. Thirteen revocations involved any type of firearms-related offense, a revocation rate of less than 0.01 percent. Since 1994, two permit holders have been convicted of murder, including a police officer who shot his wife. The other murder was not committed with a gun.

(Cleaned up, footnotes omitted.)

* * *

In sum, opposing parties have failed to show that DC's public transportation carry ban is consistent with the Nation's historical tradition of firearms regulation. As such, Plaintiffs are likely to prevail on the merit in this action. And for this reason, they are entitled to issuance of a preliminary injunction.

### IV.    *Plaintiffs have shown irreparable injury.*

The District denies Plaintiffs suffer an irreparable injury from the Metro carry ban, but its argument is particularly weak. *See* Doc 18 at 38-39. DC admits that if Plaintiffs show they are likely to succeed on the merits, then irreparable injury is presumed from a Constitutional deprivation. Doc. 18 at 38. The District nonetheless questions the teaching of *Elrod v. Burns,* 427 U.S. 347, 373 (1976) that the loss of Constitutional rights for even minimal periods constitutes irreparable injury. Doc. 18 at 39 n. 18, citing *Chaplaincy of Full Gospel Churches,* 454 F.3d 290, 300 n.7 (D.C. Cir. 2006) (noting that *Elrod* was a plurality opinion). The D.C. Circuit has recently

been much more definitive on the matter, however. In *Mills v. District of Columbia,* 571 F.3d

1304, 1312 (D.C. Cir. 2009) the D.C. Circuit said:

> We further conclude that appellants have sufficiently demonstrated irreparable
> injury, particularly in light of their strong likelihood of success on the merits. *See*
> *CityFed Fin. Corp.*, 58 F.3d [738,] 747 [(1995)]. . . . It has long been established
> that the loss of constitutional freedoms, "for even minimal periods of time,
> unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373,
> 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (citing *New York Times*
> *Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)).

Indeed, DC cites *Archdiocese of Washington v. WMATA,* 897 F.3d 314 (D.C. Cir. 2018)

(Doc. 18 at 38-39). That case teaches that Plaintiffs here would prevail on the irreparable injury

factor if they show a likelihood of success on the merits because the loss of Constitutional freedoms

even for a minimal amount of time constitutes irreparable injury. *Id.* at 334. Moreover, this case is

a particular type of case where the legislation at issue serves to chill Constitutional conduct. *See*

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 301. As the 7th Circuit explained:

> The Second Amendment protects similarly intangible and unquantifiable
> interests. *Heller* held that the Amendment's central component is the right to
> possess firearms for protection. 554 U.S. at 592-95. Infringements of this right
> cannot be compensated by damages. In short, for reasons related to the form of the
> claim and the substance of the Second Amendment right, the plaintiffs' harm is
> properly regarded as irreparable and having no adequate remedy at law.

*Ezell*, 651 F.3d at 699-700 (footnote omitted). *Accord Fisher v. Kealoha*, No. 11-00589, 2012 U.S.

Dist. LEXIS 90734, at *40 (D. Haw. June 29, 2012); *Morris v. United States Army Corps of Eng'rs*,

990 F. Supp. 2d 1082, 1089 (D. Idaho 2014); *Grace v. District of Columbia*, 187 F. Supp. 3d 124,

150 (D.D.C. 2016.) "'The right to bear arms enables one to possess not only the means to defend

oneself but also the self-confidence and psychic comfort that comes with knowing one could

protect oneself if necessary.' *Grace*, 187 F. Supp. 3d at 150." *Rhode v. Becerra*, 445 F. Supp. 3d

902, 954 (S.D. Cal. 2020). Thus DC Code § 7-2509.07(a)(6), which bars Plaintiffs from possessing

the means to defend themselves on the Metro system, imposes irreparable injury on them.

***V.***      ***The balance of equities and the public interest favor grant of the injunction.***

As we pointed out in our preliminary injunction application, the D.C. Circuit has acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), as have other circuits. *E.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest.") Those cases are dispositive of the balance of harms factor and the public interest factor. *See also Archdiocese of Washington v. WMATA,* 897 F.3d at 335.

* * *

Plaintiffs have shown they are likely to succeed on the merits of their claim; that they suffer irreparable injury from DC Code § 7-2509.07(a)(6); that the balance of interests favors them as does the public interest. As such they are entitled to issuance of a preliminary injunction barring enforcement of the public transportation carry ban.

***VI.***      ***The Court should issue a permanent injunction.***

Defendants had 60 days to perform their historical analogue research to justify the public transportation carry ban. They failed to point to any such established distinctly similar legislation enacted during the founding period through the end of the 19th Century, much less showing an established tradition of such legislation. Defendants only rejoinder is they may be able to find private carriers with rules that banned firearms on their conveyances. Doc 18 at 41; Doc 18-14 at 6. That, however, is irrelevant. The Bill of Rights applies to state action, not private action. Private actors generally are free to allow or disallow guns on their premises. That they do or do not is irrelevant to whether the state can make that choice for them under the Second Amendment.

Defendants' expert Brennan Rigas seeks a delay of a year or more to conduct her historical research, not into legislative historical analogues, but into passenger rules of private carriers. *See* Doc 18-14 at 11. DC's other expert, Zachery Schrag, has not even been engaged to conduct whatever historical research DC might pursue. *See* Doc 18-13 at 3. No basis exists for the delay DC is requesting, and the focus of DC's experts is plainly not on the type of historical showing *Bruen* requires of *legislative* restrictions on gun carry on public transportation. DC sought an extraordinary extension of time to respond to Plaintiffs' request for an injunction. It came up dry. The Court need not give it another year to research extraneous matters unrelated to government regulation of gun carry on public transportation. To the extent the Court might nonetheless afford the District some *brief* additional time in this regard to respond to the permanent injunction request, that would be an even more compelling reason to grant Plaintiffs preliminary relief, rather than forcing them to continue to suffer deprivation of their Second Amendment rights.

## VII.   *Conclusion.*

Plaintiffs have met the requirements for grant of a preliminary injunction. They have shown likelihood of success on the merits, that they suffer irreparable injury, that the balance of harms favors an injunction and that an injunction is in the public interest. Plaintiffs request the Court grant the requested preliminary injunction. Moreover, since the District has had sufficient time to proffer support for its public transportation carry ban and has failed to support it as *Bruen* requires, the Court should declare the ban unconstitutional and permanently enjoin its enforcement.

Respectfully Submitted,

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By: /s/ *George L. Lyon, Jr.*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

Dated:  October 30, 2022          *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants through the court's ECF system, this 30th day of October, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678