# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GREGORY T. ANGELO,** *et al.*, | : | |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | Civil Action No. 1:22-cv-01878-RDM |
| **District of Columbia,** *et al.*, | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## AMICUS BRIEF OF THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT

Adam Kraut
D.C. Bar No. PA0080
SECOND AMENDMENT FOUNDATION
12500 N.E. Tenth Place
Bellevue, Washington 98005
akraut@saf.org
(800) 426-4302 (t)

*Counsel for Amicus Curiae*
*Second Amendment Foundation*

## CORPORATE DISCLOSURE STATEMENT

Second Amendment Foundation has no parent corporations. It has no stock; hence no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ ii

TABLE OF CONTENTS ................................................................... iii

TABLE OF AUTHORITIES ............................................................... iv

INTEREST OF AMICUS CURIAE ......................................................... 1

I.   The Bruen Test Places the Burden on the Government to Demonstrate their Law is Consistent with the History and Tradition of this Nation 2

II.  Bearing Arms on Modern Modes of Transportation fits within the Second Amendment's Plain Text ...................................................... 3

III. The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791 ...................... 4

IV.  The DC Metro is not a Permissible Sensitive Place ........................... 7

     a.  Crowded Places ........................................................... 8

     b.  Government Employees and Children ....................................... 9

V.   Because Individuals Have a Right to Carry Arms in Public, the "Sensitive Places" Doctrine Cannot Swallow the Rule ........................... 14

CONCLUSION ............................................................................ 16

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Hochul*, 1:22-cv-0986, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ......... 4

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. Sup Ct. 2017)..... 11

*Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) .................... 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ 2, 3, 5, 15

*Furman v. Georgia*, 408 U.S. 238 (1972) .................................................................. 6

*Gamble v. United States*, 139 S. Ct. 1960 (2019) ..................................................... 5

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ................................................................... 5

*Marsh v. Chambers*, 463 U.S. 783 (1983) ................................................................ 6

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................. 3, 6, 9

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................................. 15

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...... passim

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).......................... 15

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) .............................................. 15

*United States v. Watson*, 423 U.S. 411 (1976) .......................................................... 5

*Virginia v. Moore*, 553 U.S. 164 (2008)..................................................................... 6

*Warren v. Dist. of Columbia*, 444 A.2d 1 (D.C. 1981) .................................................. 8

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .................................... 3

## Statutes

1778 N.J. Laws 44-45 .................................................................................................. 12

## Other Authorities

Carlos Santos, *Bad Boys: Tales of the University's tumultuous early years,*
  VIRGINIA (Winter 2013)........................................................................................ 12

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young
  Adults*, 43 S. ILL. U.L.J. 495 (2019).......................................................................... 12

David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational
  Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203 (2018)....... 8, 12

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the
  Critical Period for Historical Analogues is when the Second Amendment was
  Ratified in 1791, and not 1868*, (Oct. 1, 2022) ..................................................... 4, 7

## INTEREST OF AMICUS CURIAE

The Second Amendment Foundation, Inc., ("SAF") is a non-profit membership organization founded in 1974 with over 720,000 members and supporters, in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the Constitutional right to keep and bear arms. SAF has an intense interest in this case because it has many members residing in and around the District of Columbia who would carry loaded operable firearms on the District of Columbia's public transit system ("DC Metro"), as well as other States that prohibit individuals from bearing loaded operable firearms on public-transportation for self-defense and other lawful purposes. SAF currently is supporting or litigating two challenges to similar bans in Illinois (*Schoenthal, et al. v. Raoul, et al.*, No. 3:22-cv-50326 (N.D. Ill.)) and New York (*Christian, et al. v. Bruen, et al.*, No. 1:22-cv-00695 (W.D. NY).

## INTRODUCTION

The District of Columbia's ban on the carrying of handguns within its public transportation system (the "Metro ban") is flatly unconstitutional under the plain text of the Second Amendment and binding case law. This brief serves to provide three important points for the Court's consideration. First, a brief overview of the plain text of the Second Amendment and how the Plaintiffs' conduct falls within its scope. Second, an analysis of the proper historical period which needs to be examined to determine whether a relevant historical analogue exists. Finally, this

1

brief will explore the sensitive places doctrine and refute the position that the Metro

ban is lawful because the public transportation system is a "sensitive place".

I.    **The Bruen Test Places the Burden on the Government to Demonstrate their Law is Consistent with the History and Tradition of this Nation**

Earlier this year, the Supreme Court reaffirmed the test that is to be applied

to Second Amendment challenges, which was previously articulated in *District of*

*Columbia v. Heller*, 554 U.S. 570, 584 (2008), when it decided *New York State Rifle*

*& Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Such challenges are to be

analyzed within the framework of the "Second Amendment's text, as informed by

history." *Bruen*, 142 S. Ct. at 2127. And "the government must affirmatively prove

that its firearms regulation is part of the historical tradition that delimits the outer

bounds of the right to keep and bear arms." *Id*. Removing any doubt as to the

standard, the Supreme Court further declared "[w]e reiterate that the standard for

applying the Second Amendment is as follows: When the Second Amendment's plain

text covers an individual's conduct, the Constitution presumptively protects that

conduct. The government must then justify its regulation by demonstrating that it

is consistent with the Nation's historical tradition of firearm regulation. Only then

may a court conclude that the individual's conduct falls outside the Second

Amendment's 'unqualified command.'" *Id*. at 2129-30 (internal citations omitted).

Central to the issue in this case, the Supreme Court "stated in *Heller* and

repeated in *McDonald*" that "'individual self-defense is "the *central component*" of

the Second Amendment right.'" *Bruen*, 142 S. Ct. at 2133 (internal citations

omitted); *see also Heller*, 554 U.S. at 628, ("the inherent right of self-defense has been central to the Second Amendment right."); *Wrenn v. District of Columbia*, 864 F.3d 650, 659 (D.C. Cir. 2017)("[T]he Amendment's core generally covers carrying in public for self-defense."). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U. S., at 599.)." *Id.* at 2133 (internal citations cleaned up).

## II. Bearing Arms on Modern Modes of Transportation fits within the Second Amendment's Plain Text

In *Bruen*, the Supreme Court held that individuals have a constitutional right under the Second Amendment to publicly carry firearms for self-defense. Put another way, the text of the Second Amendment "presumptively protects" Plaintiffs' proposed course of conduct: "carrying handguns publicly for self-defense." 142 S. Ct. at 2130, 2134. Fourteen years ago, the Supreme Court engaged in a textual analysis, focusing on the "normal and ordinary" meaning of the Second Amendment and declared that the right to "bear arms" was consistent with being able to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 576, 584. Thus, there can be no question that Plaintiffs' proposed course of conduct, carrying loaded operable firearms for self-defense and other lawful purposes on the DC Metro is soundly within the plain text of the Second Amendment.

3

Defendants and their *amici* fail to meaningfully dispute that the proposed conduct is presumptively within the scope of the Second Amendment. *See Antonyuk v. Hochul*, 1:22-cv-0986, 2022 WL 5239895, at *14 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*") ("The Court respectfully reminds Defendants that, because the Second Amendment's plain text covers the conduct in question (carrying a handgun in public for self-defense), the Constitution presumptively protects that conduct." (internal quotation marks omitted)). As such, it is the Defendants who bear the burden to show that history supports the Metro ban. *Bruen*, 142 S. Ct. at 2130, ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").

### III. The Correct Historical Period in Examining the Public's Understanding of the Right to Keep and Bear Arms is 1791

For this Court to properly apply the test spelled out in *Bruen*, it is imperative that it look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Defendants may rely upon to justify their Metro ban. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller*, 554 U. S. at 634-35. (emphasis added). The Second Amendment was adopted in 1791. *See* generally Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, (Oct. 1, 2022), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297.

While *amicus* Everytown urges this Court to look to the period surrounding the ratification of the 14th Amendment in 1868, the Supreme Court has already dismissed such as improper. To begin, Supreme Court precedent has made clear that with respect to the federal government, 1791 is the proper period to examine to determine the original meaning of the various provisions in the Bill of Rights. *See, e.g.*, *Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."); *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *United States v. Watson*, 423 U.S. 411, 421 (1976) (citing the Second Congress's understanding and grant of arrest powers for a felony without a warrant to federal marshals as consistent with the Fourth Amendment)*; cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance.").

Despite its efforts to attain statehood, the District of Columbia *is not* a state, but merely a creation of Article I, Section 8, Clause 17 of the United States Constitution. Moreover, it is *Congress* that exercises authority of Washington, D.C. Thus, it is only proper to conduct the analysis as if it were against the federal government itself.

Regardless, even if incorporation through the Fourteenth Amendment were somehow at issue, the Supreme Court has once again provided guidance as to the proper historical period. "[W]e have generally assumed that the scope of the

protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137-38. *See also Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983) (discussing prayer before legislative sessions and referencing practices of the First Continental Congress, First Congress, Senate and House Committees, and payment of Chaplains to perform such services just three days prior to the agreement on the language of the Bill of Rights); *Furman v. Georgia*, 408 U.S. 238, 319-20 (1972) (tracing history of the Founder's understanding of cruel and unusual punishment from English law through the adoption of the Eighth Amendment); and *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (discussing that the Court looks "to the statutes and common law of the founding era to determine the norms that the Fourth Amendment" protects). While *amicus* Everytown questions the Supreme Court's clarity on the matter, "[b]ut if the majority believes those decisions controlled the issue, it would have said so," (*Amicus Brief of Everytown for Gun Safety in Support of Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for Summary Judgment* ("*Everytown Brief*"), Doc. 19-1 at 7), there is no need to wonder. In *McDonald*, the Court was exactingly clear when it stated that it has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald*, 561 U.S. at 765 (internal quotation marks omitted).

While *amicus* Everytown urges this Court to consider Professor Lash's and Professor Amar's views on 1868 being proper, such a consideration need not be pursued. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*, 48-52 (Oct. 1, 2022), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297. (Finding five major problems with Professor Lash's approach including "his analysis is completely contrary to Supreme Court precedents," and that Professor Amar's book "was written ten years before *Heller* was decided, and his specific analysis of the Second Amendment rests on foundations that were rejected by *Heller*.").

No matter which path one travels, all roads lead to 1791. Having set the stage for the proper historical period, attention must be turned to this nation's history and tradition of firearms regulation.

## IV.   The DC Metro is not a Permissible Sensitive Place

SAF does not dispute that the Supreme Court has determined that the government may ban the carry of firearms in so-called "sensitive places." *Bruen*, 142 S. Ct. at 2133. In fact, the Supreme Court has provided a list of places which it believes are sensitive places including government buildings, legislative assemblies, polling places, and courthouses. *Id*. This Court "can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*.

7

*a.  Crowded Places*

To begin, despite Defendants' and their *amici's* beliefs to the contrary, simply being crowded *is not* a basis for declaring an area to be a "sensitive place." Moreover, history does not support such a proposition. "Americans certainly did not think that bringing guns to town was a problem; to the contrary, laws typically required that arms be brought to churches or to all public meetings." David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 232 (2018). It is hard to imagine public meetings, particularly at the time of the founding, that lacked – much like Defendants and some of their *amici* posit occurs on the Metro – "emotional frustration[s]" which were "inevitable and routine." *Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for Summary Judgment* ("*Defendants' Opposition*"), Doc. 18 at 25.

If the prevailing rationale were that the carrying of arms could be banned anywhere that was crowded, bans would be enacted in any number of places which would offend the constitutional protection of the right to individual self-defense, leaving individuals to rely on the police for protection – the very same police who have no duty to protect them. *See Bruen,* 142 S. Ct. at 2134, ("Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."). *Cf. Warren v. Dist. of Columbia*, 444 A.2d 1, 3 (D.C. 1981) (en banc) ("[A] government and its agents are under no general duty to

provide public services, such as police protection, to any particular individual citizen. The duty to provide public services is owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists.") (quotation marks and citation omitted). Such a notion cannot pass constitutional muster, particularly given that "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, (quoting *Heller*, 554 U. S., at 599.).

      *b.  Government Employees and Children*

      Defendants and their *amici* spend a great many pages postulating that the District of Columbia public transportation system is a sensitive place because it provides public transportation for "federal employees…and schoolchildren," (*Defendants' Opposition*, Doc. 18 at 23); *Defendants' Opposition*, Doc. 18 at 27 ("the Metro is a sensitive place because it functions as the District's school bus, meaning that a large concentration of children may be ridings trains and buses at any given time."); *Brief of Brady, Team Enough, Giffords Law Center to Prevent Gun Violence, and March for Our Lives Action Fund as Amici Curiae in Support of Defendants* ("*Brady Brief*"), Doc. 21-2 at 10 ("students…who reside in D.C. and are enrolled in a D.C. elementary school or secondary public, charter, private, or parochial school can ride free on the Metro system."); *Brief for the States of Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Washington as Amici Curiae in Support of Defendants' Opposition to Plaintiffs' Application for Injunction*

("*States' Brief*"), Doc. 20-1 at 25 ("daily riders on public transportation can include more than a hundred thousand children, who, as noted above, rely on public transportation to get to and from school.") or that it "directly stops at or under a number of federal and quasi-federal buildings and hubs." *Brady Brief*, Doc. 21-2 at 16. Yet, this logic fails to logically flow from the pedigree of any of the "sensitive places" outlined by the Supreme Court.

As mentioned *supra*, "courts can use analogies to *those* historical regulations of 'sensitive places'", not invent them out of whole cloth. *Bruen*, 142 S. Ct. at 2133. In other words, this court must assess whether the DC Metro is a "sensitive place" by determining whether it is "distinctly similar" to restrictions which were found in "sensitive places" such as legislative assemblies, polling places, and courthouses.

Polling places, legislative assemblies, and courthouses are where our nation's leaders are elected, where our laws are made, and where our laws are interpreted. The DC Metro's only connection to those places is that it may carry people who work there or may stop at or near one of those facilities. Simply carrying government workers[1] to and from work is too tenuous of a connection to justify a total ban on the carrying of arms on the DC Metro. Government business is not conducted on the DC Metro as it would be within a legislative assembly or a courthouse. Nor are

---

[1] Defendants' brief references a statement of Rep. Shontel M. Brown, Ohio in which she states, "approximately 40% of Metrorail's peak period customer base are Federal employees." (*Defendants' Opposition*, Doc. 18 at 7-8). Put another way, almost two thirds of the people riding the Metrorail at its peak periods are not federal employees, yet Defendants and their *amici* would like to subject them to a total ban on their right to self-defense, merely because they use the same transit system.

individuals casting a vote. The burden on one's Second Amendment rights in the context of a total ban on the DC Metro is far greater than the one imposed in legislative buildings, courthouses, and polling places.

For the average citizen who is not a government employee, the annual or bi-annual trip to the polling place, legislative assembly, or even court is likely a rare occurrence at best. And, unlike the aforementioned places, use of the DC Metro is not an infrequent occurrence, at least not for Plaintiffs. *See Memorandum of Points and Authorities in Support of Application for Preliminary Injunction*, Doc. 6-1 at 21 ("Each of the Plaintiffs is a regular rider of the DC Metro system."). "In contrast to a permissible sensitive place such as a courthouse [or legislative assembly], where visitors are screened by security," the DC Metro "[does] not have controlled entry points." *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 659 (Del. Sup Ct. 2017). Individuals may come and go as they please without having to pass through security in a manner that a true "sensitive place" requires. Regardless, there is no logical nexus on the basis for bans on carrying arms in polling places, legislative assemblies, and courts to that of the DC Metro.

Defendants and their *amici* attempt to offer school children as an alternative mechanism to have the DC Metro declared a "sensitive place." This argument misses the mark. While the Supreme Court may have indicated it would find schools to be a "sensitive place", this nation's history and tradition seemingly contradict that position. During the colonial and founding periods, college students as well as professors were almost always required to possess firearms for militia

11

service. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495 (2019) (describing all colonial and founding era militia statutes from the states that ratified the Second Amendment). Even when some students or professors were exempted from the militia requirements, *see e.g.*, 1778 N.J. Laws 44-45 (excluding "Professors and Tutors of Colleges"), nothing prohibited them from keeping arms of their own volition. Thus, firearms were commonly kept on campuses and "gun-free" campuses were unheard of.

"The first notable arms ban at an American university was at the University of Virginia in 1824." Kopel & Greenlee, *Sensitive Places*, at 247. The ban was the result of "students brandish[ing] guns freely, sometimes shooting in the air, [and] sometimes at each other." Carlos Santos, *Bad Boys: Tales of the University's tumultuous early years*, VIRGINIA (Winter 2013).[2] The University banned, among other things, the *student's* ability to keep or use of weapons or arms of any kind. Kopel & Greenlee, *Sensitive Places*, at 248. However, faculty and staff were not incorporated into the ban and remained free to bear arms. Presumably, this ability extended to visitors as well. In sum, while there was one example of a restriction as to students themselves bearing arms in 1824, there was no such ban as to teachers and visitors.

Even if this Court were to accept that schools are in fact a "sensitive place", it cannot logically follow to extend the meaning well beyond the schoolhouse walls. To do so, in this context, would render an entire transit system utilized by thousands of

---

[2] http://uvamagazine.org/articles/bad_boys.

other people at all hours of the day a sensitive place simply because children take it to and from school twice a day for limited periods of time. While Defendants and their *amici* liken the DC Metro to a school bus (*Defendants' Opposition*, Doc. 18 at 27 and *Brady Brief*, Doc. 21-2 at 10), they are in fact quite different. To start, a school bus, in the context of taking children to and from school, does just that. On the other hand, as Defendants and their *amici* admit, the DC Metro serves a large quantity of people, most of whom are not school children. While it may be permissible to bar the carriage of arms on vehicles whose sole purpose is to transport children to and from school, the same cannot be said for a vehicle whose purpose is to transport the public to a variety of different places, including many which are not "sensitive places." To do so would prevent thousands of individuals from exercising their right to self-defense simply because the District of Columbia cannot efficiently set up a dedicated form of transportation for school children. To extend the "sensitive places" doctrine to any place where children may be present, would open Pandora's Box as to areas which now may fall within its purview.[3]

Moreover, the Defendants and their *amici* completely ignore that Plaintiffs lives are not simply cabined to their day on the DC Metro.[4] The DC Metro is simply a mechanism to go from one point to another, meaning the Metro ban also burdens

---

[3] Arguably, this could constitute entire cities, which the Supreme Court has already proclaimed to be a bridge too far. *See Bruen*, 142 S. Ct. at 2133-34.

[4] Notably, neither Maryland nor Virginia bans the carrying of arms on the very same Metro which services the District of Columbia. *See* Washington Metropolitan Area Transit Authority ("WMATA") Maps, available at https://www.wmata.com/schedules/maps/ (showing singular WMATA routes passing through the District of Columbia and Maryland or Virginia).

their right to armed self-defense at the beginning and end of their destinations.[5] This Court surely cannot countenance such a proposition.

Perhaps most importantly, Defendants nor their *amici* offer any specific founding era provisions or traditions which one could reasonably import to justify the Metro ban. Admittedly, they make use of case law, but none of which is post-*Bruen*, leaving the question whether the courts to which they cite engaged in a proper examination of the history and tradition of this nation as required. However, and likely much to the District of Columbia's chagrin, it is not the place of the *amici* to attempt to carry its burden in showing that there is a historical analogue.[6] That, and that alone, is for the Government to demonstrate. *Bruen*, 142 S. Ct. at 2127.

## V.   Because Individuals Have a Right to Carry Arms in Public, the "Sensitive Places" Doctrine Cannot Swallow the Rule

History informs the understanding that the right and practice of bearing arms in public was the rule—not the exception. Moreover, the Supreme Court has repeatedly held that there is nothing that requires the "State to protect the life . . . of its citizens against invasion by private actors." *Deshaney v. Winnebago Cty. Dep't of*

---

[5] While *Amicus* does not believe that crime statistics are at all relevant to any analysis *post-Bruen*, it would offer the following in support of the aforementioned point. Defendants proclaim there were fewer than 8 crimes per million passengers in 2021. *Defendants' Opposition*, Doc. 18 at 11. However, Defendants fail to mention that there were 4,117 instances of violent crime reported in 2021 – up three percent from the year before. *See* https://mpdc.dc.gov/page/district-crime-data-glance. Put another way, Plaintiffs potential need for armed self-defense is not limited to the platforms and cars of the subway or buses.
[6] *Amicus* does not concede that any of the Defendants *Amici* did in fact demonstrate a proper historical analogue.

*Soc. Servs.*, 489 U.S. 189, 195, (1989); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005).[7]

Just as students are not forced to "shed their constitutional rights . . . at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), nor should individuals be forced to shed their right of "being armed and ready for offensive or defensive action in a case of conflict with another person," *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (Ginsburg, J., dissenting)), by virtue of their use of the DC Metro. To reiterate, "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 554 U.S. at 628. Completely depriving an individual of the ability to exercise that right merely because their journey that day requires them to use the DC Metro due to cost, convenience, or any other reason[8], offends the very notion of that right.

---

[7] If the Government voluntarily disarms those who cross through its doors, while providing security for its occupants, it would seem that they owe a duty of care that might not otherwise exist to members of the public walking down the street or utilizing government funded/provided transit. *C.f. Deshaney*, 489 U.S. at 199-200 ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). While there is an obvious difference in the detention against one's will, there remains the issue of being disarmed against one's will. It offends reason and common sense to believe that in the first instance the government bears a heightened responsibility for an individual's wellbeing but in the second instance, the government can disarm those it is providing services to, shrug its shoulders, and bear no responsibility.

[8] *See States' Brief*, Doc. 20-1 at 11 ("Generally, public transportation serves 'community members *that depend on it as their sole source of transportation*, such as the elderly, disabled, low income, young adults, and others."). (Emphasis added). *Cf. Defendants' Opposition*, Doc. 18 at 32, ("Many forms of 'alternative transportation' are free, *e.g.*, walking, riding in a car with a friend, and nothing in the Metro Law prevents those of 'limited means' from lawfully carrying a firearm…outside public transit.").

**CONCLUSION**

For these reasons, this Court should grant the Plaintiffs' Application for

Preliminary Injunction and Motion for Summary Judgment.

Respectfully submitted,

/s/ Adam Kraut
Adam Kraut
D.C. Bar No. PA0080
SECOND AMENDMENT FOUNDATION
12500 N.E. Tenth Place
Bellevue, Washington 98005
akraut@saf.org
(800) 426-4302 (t)

*Counsel for Amicus Curiae*