# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY T. ANGELO, *et al.*,

     *Plaintiffs*,

     v.

DISTRICT OF COLUMBIA, *et al.*,

     *Defendants.*

Civil Action No. 22-1878 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiffs, residents of District of Columbia and Virginia who hold licenses to carry concealed pistols in the District, challenge the constitutionality of a District law that prohibits them from carrying their firearms on "public transportation vehicle[s], including the Metrorail transit system and [in] its stations." D.C. Code § 7-2509.07(a)(6). A "[p]ublic transportation vehicle" is defined to include "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train." *Id.* § 7-2509.07(g)(3). Plaintiffs each aver that, "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 at 1 (Angelo Decl. ¶ 4); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 at 1 (Miller Decl. ¶ 4); Dkt. 6-5 at 1 (Erickson Decl. ¶ 4). They assert that the prohibition on carrying a pistol on Metrobus or Metrorail train, which is allegedly enforced by Defendants the District of Columbia and the Chief of the Metropolitan Police Department ("MPD"), violates Plaintiffs' Second and Fifth Amendment rights. Dkt. 1 (Compl.).

Pending before the Court is Plaintiffs' motion for preliminary injunction. Dkt. 6. Plaintiffs ask the Court to enjoin Defendants from enforcing D.C. Code § 7-2509.07(a)(6) while

the Court considers the merits of their constitutional claim.  Because Plaintiffs have not shown that they likely have standing to challenge § 7-2509.07(a)(6), the Court will **DENY** their motion for a preliminary injunction.

## I. BACKGROUND

District of Columbia law permits individuals to carry pistols "concealed on or about their person" if they have "a license issued pursuant to District of Columbia law."  D.C. Code § 22-4504(a); *see id.* § 7-2509.07(e) (prohibiting individuals from "carry[ing] a pistol openly or otherwise in a manner that is not concealed").[1]  To obtain a license, an applicant must demonstrate to the satisfaction of the MPD Chief of Police that she has registered the firearm she wishes to carry; has satisfied certain age and mental health requirements; and has completed a series of required firearms training courses.  *See id.* § 7-2509.02(a).  But even after obtaining a license, gun owners may not carry their pistols everywhere they go.  *See id.* § 7-2509.07; *see also id.* § 7-2509.06 (prohibiting individuals from carrying a pistol while "impaired" by drugs or alcohol).  D.C. law provides that "[n]o person holding a license shall carry a pistol" in, among other places, "[a] building or office occupied by the District of Columbia;" at "[t]he building [or] grounds" of a childcare facility, school, or university; at "[a] hospital," "[a] penal institution" or "[a] polling place while voting is occurring;" or at federal landmarks such as "[t]he public memorials on the National Mall and along the Tidal Basin," at "[t]he White House Complex and its grounds," or at "[t]he U.S. Naval Observatory."  *Id.* § 7-2509.07(a)(1)–(5), (10)–(12).

As relevant here, the law also prohibits licensed gun owners from carrying a pistol on "[a] public transportation vehicle, including the Metrorail transit system and its stations."  *Id.*

---

[1] D.C. law defines "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length."  D.C. Code § 7-2501.01(12).

§ 7-2509.07(a)(6). "Public transportation vehicles" include "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train." *Id.* § 7-2509.07(g)(3). If a licensee "carries a concealed pistol and approaches [one of these] prohibited location[s]," she must secure the unloaded pistol in her vehicle as described in D.C. Code § 22-4504.02(b) or "immediately leave the prohibited location." *Id.* § 7-2509.07(c)(1)–(2). A licensee may also "carry the firearm to any other place where [s]he may lawfully possess and carry" it, *id.* § 22-4504.02(a), but only if the firearm is "[u]nloaded," "[i]nside a locked container," and "[s]eparate from any ammunition, *id.* § 22-4504.02(c). Any licensed gun owner convicted of carrying a pistol in a prohibited place may be fined or imprisoned for up to 180 days or, in the alternative, may be subject to "[c]ivil fines, penalties, and fees." *Id.* § 7-2509.10(a). Any prosecution for a violation of these rules must be brought by the D.C. Attorney General "in the name of the District of Columbia." *Id.* § 7-2509.10(b).

Plaintiffs Gregory T. Angelo, Tyler Yzaguirre, and Cameron M. Erickson live in the District of Columbia. *See* Dkt. 6-2 at 1 (Angelo Decl. ¶ 1); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 1); Dkt. 6-5 at 1 (Erickson Decl. ¶ 1). Plaintiff Robert M. Miller is a resident of Virginia. *See* Dkt. 6-4 at 1 (Miller Decl. ¶ 1). Each avers that he "hold[s] a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department" and that he "regularly ride[s] the Metro subway and Metro buses," *see* Dkt. 6-2 at 1 (Angelo Decl. ¶¶ 2–3); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶¶ 2–3); Dkt. 6-4 at 1 (Miller Decl. ¶¶ 2–3); Dkt. 6-5 at 1 (Erickson Decl. ¶¶ 2–3). Erickson and Yzaguirre use public transportation to commute to work, Dkt. 18-4 at 5–6 (Defs.' Ex. A) (Pls.' Interrog. Resp.), and, although he works from home, Angelo estimates that he used public transportation in the District "[a]n average of 24 times a month from 2019 and 2022," *id.*

at 7 (Defs.' Ex. A). Miller indicates that his use of public transit in D.C. "was very limited" between 2020 and 2022 "because of COVID-19[-related closures]," but that, in 2019, he "traveled to, from, and within DC on public transit approximately 45 times per month." *Id.* Plaintiffs each declare, moreover, that "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 at 1 (Angelo Decl. ¶ 4); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 at 1 (Miller Decl. ¶ 4); Dkt. 6-5 at 1 (Erickson Decl. ¶ 4).

On June 30, 2022, Plaintiffs sued the District of Columbia and Robert J. Contee III, the Chief of the D.C. Metropolitan Police Department, for declaratory and injunctive relief under 42 U.S.C. § 1983,[2] alleging that D.C. Code § 7-2509.07(a)(6) violates Plaintiffs' Second and Fifth Amendment rights by prohibiting them from carrying their firearms on public transportation vehicles. Dkt. 1 at 33–34 (Compl. ¶¶ 81–83). Plaintiffs moved for a preliminary injunction on July 11, 2022, requesting that this Court enjoin Defendants from enforcing § 7-2509.07(a)(6) during the pendency of this action. Dkt. 6. Plaintiffs also ask that the Court "merge" the preliminary injunction proceeding with the ultimate merits and issue a permanent injunction barring Defendants from enforcing § 7-2509.07(a)(6).[3] Dkt. 6-1 at 50–51. Plaintiffs' motion is fully briefed, and the Court heard oral argument on December 12, 2022.

_____

[2] Although Plaintiffs style their complaint as one for "Declaratory, Injunctive Relief and Damages," Dkt. 1 at 1 (Compl.), it is unclear whether the complaint in fact seeks damages. Beyond the title of the complaint, damages are mentioned only in passing—and only in following a claim for attorney's fees under 42 U.S.C. § 1988. *See id.* at 35 (Compl.). Notably, the complaint contains no allegation relating to any monetary loss that any Plaintiff has suffered. In any event, the question of damages is not presently before the Court.

[3] Federal Rule of Civil Procedure 65 allows the Court to "advance the trial on the merits and consolidate it with the hearing [on a motion for a preliminary injunction]." Fed. R. Civ. P. 65(a)(2). This Court has adopted that approach when "resolving . . . the merits would not involve exploration of additional factual issues" beyond those necessary for resolving the

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, "[t]he movant must: (1) establish a likelihood of 'succe[ss] on the merits;' (2) show 'irreparable harm in the absence of preliminary relief;' (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that 'an injunction is in the public interest.'" *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (second alteration in original) (quoting *Winter*, 555 U.S. at 20). Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, however, the D.C. Circuit has hinted on several occasions that *Winter* should be read to suggest that "a likelihood of success is an independent, free-standing requirement for a preliminary injunction," *id.* at 393 (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)), but it "has not yet needed to decide th[e] issue," *League of Women Voters of U.S*

---

preliminary injunction, as long as no prejudice to either party would result. *Melinta Therapeutics, LLC v. U.S. Food & Drug Admin.*, 22-cv-2190, 2022 WL 6100188, at *1 n.2 (D.D.C. Oct. 7, 2022) (internal quotation marks omitted); *see also, e.g.*, *Republican Nat'l Comm. v. Pelosi*, --- F.3d ---, 2022 WL 1295409, at *6 n.3 (D.D.C. May 1, 2022) (consolidating the preliminary-injunction motion with the trial on the merits where "the record [was] sufficient for a determination on the merits under the summary judgment standard" (quoting *March for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015))), *vacated as moot*, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022). Because the Court concludes that Plaintiffs have not established a substantial likelihood that the Court has jurisdiction, the Court declines to consolidate the preliminary-injunction inquiry with what would be a premature trial on the merits.

*.v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

In any event, the D.C. Circuit has declared in unequivocal terms that "[a] party seeking a preliminary injunction 'must show a substantial likelihood of standing.'" *Green v. U.S. Dep't of Just.*, --- F. 4th ---, 2022 WL 17419644, at *3 (D.C. Cir. Dec. 6, 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *see also Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.) ("The affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that the plaintiff has standing." (internal quotation marks omitted) (emphasis in original)); *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (noting that "regardless of whether the sliding scale approach applies, parties seeking a preliminary injunction must" establish a likelihood that all "jurisdictional prerequisites" are satisfied. That rule makes eminent sense, as "[d]efect[s] of standing" constitute "defect[s] in subject matter jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), and courts must proceed with caution when their jurisdiction is in doubt. Whatever the precise contours of the authority of courts sitting in equity, it is safe to conclude that—at a bare minimum—a court ought not issue an injunction, which could remain in place for many months while the parties litigate the case to a final judgment, when the court is unpersuaded that it has jurisdiction—or even that it "likely" has jurisdiction—and the injunction is unnecessary to preserve the court's jurisdiction.

Plaintiffs must support their standing to bring suit "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir.

2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, and the court should dismiss a claim for lack of jurisdiction only if the plaintiffs have failed to "state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits," *Food & Water Watch, Inc.*, 808 F.3d at 913 (alteration in original) (quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)). But because, on a motion for preliminary injunction, the Court should "evaluate[] Plaintiffs' standing to bring their claims under the heightened standard for evaluating a motion for summary judgment," *id.* at 912 (internal quotation marks omitted), the plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken as true," *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).

## III. ANALYSIS

To establish Article III standing, Plaintiffs must demonstrate that they are suffering an "injury in fact"—"an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). "The plaintiff[s'] injury must be 'fairly traceable to the challenged action of the defendant,' and likely to be 'redressed by a favorable decision.'" *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 560–61). "In a case of this sort, where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Rather, Plaintiffs must show that they are "suffering an ongoing injury" or

that they "face[] an immediate threat of injury." *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

No plaintiff in this case has been arrested and prosecuted—or threatened with arrest or prosecution or with the imposition of a civil penalty—for violating the provision of D.C. law at issue here. But Plaintiffs contend that they are suffering continuing, adverse effects sufficient to support standing because § 7-2509.07(a)(6) "prohibit[s] them from carrying their registered personal protection handguns in . . . public transportation vehicles and stations in violation of their Second Amendment right." Dkt. 6-1 at 12. "Where," as here, "a plaintiff has yet to face prosecution under a statute he seeks to challenge," the Supreme Court "requires that he establish Article III standing by '(1) alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and [by] (2) demonstrating that 'there exists a credible threat of prosecution thereunder.'" *Ord*, 587 F.3d at 1140 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).

### A.

The first of the preenforcement standing requirements is easily satisfied here. The D.C. Circuit has disavowed any requirement that plaintiffs asserting preenforcement challenges express an "*unconditional* intention to engage in the proscribed behavior, regardless of whether the statute is invalidated." *Seegars v. Gonzales*, 396 F.3d 1248, 1251 (D.C. Cir. 2005) (emphasis in original). As a result, the first *United Farm Workers* prong is satisfied where, for example, plaintiffs who did not own firearms at the time of litigation alleged that they forewent the "additional security of possessing pistols" "because of the threat of criminal prosecution." *Id.* at 1251; *see also Ord*, 587 F.3d at 1143 (concluding that a plaintiff had standing to bring a preenforcement challenge where "his complaint and affidavit c[ould] only be understood to mean

that if the threat of arrest [were] removed, he intend[ed] to travel to D.C. while armed").  Here, Plaintiffs aver, under the penalty of perjury, that, "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution."  Dkt. 6-2 (Angelo Decl. ¶ 4); Dkt. 6-3 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 (Miller Decl. ¶ 4); Dkt. 6-5 (Erickson Decl. ¶ 4).  That course of conduct—*i.e.*, the carrying of pistols on public transportation—moreover, is one "arguably affected with a constitutional interest."  *Ord*, 587 F.3d at 1140 (quoting *United Farm Workers*, 442 U.S. at 298); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (concluding that the Second Amendment "protect[s] the right of an ordinary, law-abiding citizen" to "carry handguns publicly for their self-defense").

It is at the second prong of the *United Farm Workers* test where Plaintiffs' claim of standing falters.  Significantly, binding D.C. Circuit case law "demands more than does *United Farm Workers*," *Ord*, 587 F.3d at 1141—at least where the plaintiff presents a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings," *Seegars*, 396 F.3d at 1254.  In those contexts, plaintiffs must establish that the threat of prosecution is not only "credible," but also "imminent."  *Ord*, 587 F.3d at 1140.  In other words, plaintiffs bringing a preenforcement challenge must "demonstrate that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the . . . government for prosecution.'"  *Id.* at 1140–41 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007)).

The D.C. Circuit first articulated this imminence requirement in *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), which required the court to evaluate the Article III standing of gun manufacturers to bring a preenforcement challenge to various provisions of the

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796. The challenged law, among other things, made it unlawful for any person to "manufacture, transfer, or possess a semiautomatic assault weapon," *Navegar, Inc.*, 103 F.3d at 997 (quoting 18 U.S.C. § 922(v)(1) (1994)), and defined "semiautomatic assault weapon" to include "any of the firearms . . . known as . . . INTRATETEC-9, TEC-DC9, and TEC-22; and . . . revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12," *id.* (quoting 18 U.S.C. § 921(a)(30)(A) (1994)). The statute also outlawed the transfer or possession of any "large capacity ammunition feeding device," which was defined to include "ammunition magazines . . . which can hold more than ten rounds of ammunition." *Id.* (quoting 18 U.S.C. § 922(w)(1) (1994)). In considering the plaintiffs' challenges to those provisions, the D.C. Circuit explained that "[t]he question of whether a threat of prosecution adequate to satisfy the requirements of justiciability is present in any particular preenforcement challenge is a factual and case-specific one." *Id.* at 999. In that vein, the court distinguished between the Act's ban on "large capacity ammunition feeding devices" more generally, *id.* at 1001, and those that "specifically name[d] products made only by the [challengers]," *id.* at 1000.

As to the statutory provisions that explicitly named the plaintiffs' products, the court held that, "[b]ecause it is clear to whom these provisions of the Act would be applied were they to be applied at all," the fear of prosecution was "firmly grounded in the language of the Act;" the only context in which that fear could be deemed "speculative" would be "if it [were] likely that the government [would] simply decline to enforce these provisions at all." *Id.* But for those statutory provisions that identified prohibited materials by their characteristics, rather than by their manufacturers, the D.C. Circuit held that the asserted injury (or prospect of injury) was too speculative to establish Article III standing. *Id.* at 1001–02. Even though inspection agents from

the Bureau of Alcohol, Tobacco and Firearms ("ATF") had visited the challengers' facilities and "informed officers of the[] companies [about] the [relevant] prohibitions," *id.* at 997, the court stressed that "nothing in . . . [the Act] indicate[d] any special priority placed upon preventing these parties from engaging in specified conduct," *id.* at 1001. The gun manufacturers, accordingly, lacked standing to challenge the characteristic-specific provisions.

The D.C. Circuit reaffirmed this approach to preenforcement challenges eight years later—at least as to those that challenge "a criminal statute not burdening expressive rights and not in the form of appeal from an agency decision." *Seegars*, 396 F.3d at 1253. In *Seegars v. Gonzalez*, a group of D.C. residents who wished "lawfully [to] possess pistols in the District" challenged a series of firearms registration laws that effectively prohibited them from "purchas[ing] and lawfully possess[ing] a new pistol" (unless the pistol was registered "before September 24, 1976") and from, in one plaintiff's case, "remov[ing] the trigger lock" on the shotgun that she stored in her home. *Id.* at 1250–51. The *Seegars* plaintiffs averred that "because of the threat of criminal prosecution, they fore[went] what they believe[d] would be the additional security of possessing pistols or possessing a shotgun ready for immediate use." *Id.* at 1251.

In considering whether the *Seegars* plaintiffs had standing to challenge these laws, the D.C. Circuit acknowledged that its analysis in *Navegar* was "in sharp tension with" both the "standard rules governing preenforcement challenges to agency regulations" and with the D.C. Circuit's "cases upholding preenforcement review of First Amendment challenges," where the court's apparent concern with "'chilling effects' on speech" had allowed plaintiffs to bring preenforcement challenges even absent a specific threat of enforcement or a high probability thereof. *Id.* at 1253–54. But "[d]espite these apparent tensions, [the court] faithfully appl[ied]

the analysis articulated by *Navegar*," *id.* at 1254, and held that the plaintiffs lacked Article III standing because they had not "allege[d] . . . prior threats against them or any characteristics indicating an especially high probability of enforcement against them," *id.* at 1255. In doing so, the *Seegars* court disavowed any requirement that the plaintiffs had to be "individually or specifically burdened in a way distinct from some broader class of potential prosecutees;" rather, the court recognized that an injury could be cognizable where it was "widely shared," but only if it was also "concrete." *Id.* at 1253 (quoting *FEC v. Akins*, 524 U.S. 11, 24 (1998)).

Two years after its decision in *Seegars*, the D.C. Circuit once again considered a preenforcement challenge to the same laws challenged in *Seegars*; the Court, again, reached the same conclusion as to all but one plaintiff. *See Parker*, 478 F.3d at 374–78. As in *Seegars*, the *Parker* plaintiffs alleged that the D.C. licensing and trigger-lock requirements precluded them from "possess[ing] what they describe[d] as 'functional firearms'"—*i.e.*, "ones that could be 'readily accessible to be used effectively when necessary' for self-defense in the home," *id.* at 374—because they "fear[ed] arrest, criminal prosecution, incarceration, and fine" under the statute, Compl. at 2, *Parker v. District of Columbia*, 311 F. Supp. 2d 103 (D.D.C. 2004). But because the plaintiffs failed to allege that they "ha[d] been singled out or uniquely targeted by the D.C. government for prosecution," the D.C. Circuit, bound by *Seegars* and *Navegar*, concluded that the *Parker* plaintiffs—with the exception of one who had "applied for and been denied a registration certificate to own a handgun"—lacked Article III standing to challenge the laws. *Parker*, 478 F.3d at 375–76. The court reached that conclusion even though the District indicated during the course of litigation that it intended to "enforce the law" against the *Parker* plaintiffs "if, in fact, they br[oke] [it]," Br. of Appellant at 21, *Parker*, 478 F.3d 370 (No. 04-7041), reasoning that those statements, standing alone, did not evidence the requisite

"'special priority' for preventing *these* appellants from violating the gun laws, or a particular interest in punishing *them* for having done so," *Parker*, 478 F.3d at 375 (emphasis in original). "Rather," the Court explained, "the District appear[ed] to be expressing a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished." *Id.*[4]

These cases paint a clear picture: to establish Article III standing, a plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written. Measured against this standard, Plaintiffs' grounds for asserting standing fall short. At this stage, Plaintiffs rest their entire standing argument on the facial contention that "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 (Angelo Decl. ¶ 4); Dkt. 6-3 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 (Miller Decl. ¶ 4); Dkt. 6-5 (Erickson Decl. ¶ 4). Although the *Seegars* court observed, in describing the imminence requirement, that "clarity prevails only at the poles," 396 F.3d at 1252, Plaintiffs—who could not, at oral argument, identify a single person "with a concealed carry permit [who has] ever been arrested for carrying a handgun on public transportation in the District of Columbia while not engaged in another crime," Rough Tr. at 8–9 (Dec. 12, 2022 Hearing)—have done little to establish that the threat of enforcement is more than "speculative," *Seegars*, 396 F.3d at 1252.

Notably, notwithstanding binding D.C. Circuit precedent on the issue, Plaintiffs made no colorable effort to establish standing in moving for a preliminary injunction; surprisingly, they

---

[4] The D.C. Circuit's decision in *Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), is not to the contrary. In that case, a warrant had been issued for the plaintiff's arrest after he allegedly violated the D.C. firearms licensing law that he wished to challenge. *Id.* at 1138. Although the D.C. government later declared a nolle prosequi as to Ord, the Court concluded that the past warrant and the District's concession, in litigation, that Ord would likely be prosecuted in the future suggested that "the District of Columbia place[d] a special priority on enforcing the laws against *him*." *Id.* at 1142 (emphasis added).

do not even mention *Navegar*, *Seegars*, or *Parker* in their opening brief. *See* Dkt. 6-1. For the first time in their reply, Plaintiffs argue that "[t]he District has never disclaimed an intent to enforce the Metro carry ban." Dkt. 29 at 13. But nowhere do Plaintiffs allege (much less show a likelihood of establishing) that they "have been singled out or uniquely targeted by the D.C. government for prosecution," *Parker*, 478 F.3d at 375, and they point to no "prior threats against them" and to no "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255. The Court, accordingly, finds no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all. *See id.* at 1251; *see, e.g.*, Compl. at 1, *Parker*, 311 F. Supp. 2d 103.

**B.**

Rather than squarely address their burden to establish standing under *Navegar* and its progeny, Plaintiffs argue that the D.C. Circuit's precedents are either "not the law under binding Supreme Court precedent" or are "distinguishable" from the present case. Dkt. 29 at 14. The Court is unpersuaded.

Plaintiffs first contend that *Seegars* and *Navegar* "have been eviscerated" by the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. City of New York* ("*NYSR&P*"), 140 S. Ct. 1525 (2020) (per curiam). *See* Dkt. 29 at 14. In *NYSR&P*, three gun owners challenged a New York City rule that regulated the transportation of handguns, alleging that the rule unconstitutionally prevented them from transporting their firearms to their second residences and to shooting ranges outside of the city. *See N.Y. State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 253 (S.D.N.Y. 2015). The Second Circuit concluded that the rule did not violate the Second Amendment, *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d

45, 64 (2d Cir. 2018), and the Supreme Court granted certiorari, *see* 139 S. Ct. 939 (mem.).

Before the Supreme Court heard oral argument in the case, the State and City of New York

amended their statutes and rules, respectively, which effectively awarded the plaintiffs "the

precise relief that [they] requested in . . . their complaint." *NYSR&P*, 140 S. Ct. at 1526. The

Supreme Court, accordingly, concluded that the case was moot and vacated the judgment of the

Court of Appeals, remanding for "such proceedings as are appropriate" and leaving the door

open for "the Court of Appeals and the District Court" to consider, on remand, "whether

petitioners m[ight] still add a claim for damages" with respect to the City's old rule. *Id.* at 1526–

27.

In Plaintiffs' view, the Supreme Court's per curiam order—which said nothing about

standing—implicitly rejected the D.C. Circuit's preenforcement standing precedents. "If

plaintiffs had needed to be singled out or personally threatened to have standing," they argue,

"the Court would have never reached the question whether the claims were moot, nor would the

Court have vacated and remanded for a determination whether the plaintiffs could assert a

damage claim." Dkt. 29 at 15. That argument is unavailing for at least three reasons. First, as

the Supreme Court has repeatedly recognized, courts may resolve the question of mootness

"without first determining whether [the plaintiffs] ha[ve] standing because the former question"

(mootness), "like the latter" (standing), "goes to the Article III jurisdiction of this Court and the

courts below, not to the merits of the case." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43,

66–67 (1997); *see also Burke v. Barnes*, 479 U.S. 361, 364 (1987) (declining to address standing

because the Court determined that the case was moot); *Friends of the Earth, Inc. v. Laidlaw

Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (endorsing this same approach). To be sure,

"subject-matter jurisdiction necessarily precedes a ruling on the merits." *Ruhrgas AG v.*

*Marathon Oil Co.*, 526 U.S. 574, 584 (1999).  But "the same principle does not dictate a sequencing of jurisdictional issues" and "[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."  *Id.* at 585.

Second, it is not evident that the New York City residents challenging the transportation laws faced the same difficulty establishing standing that the Plaintiffs do in this case.  At least two of the three plaintiffs in *NYSR&P* had "been advised by out-of-state ranges that they were not permitted to engage in target practice or [to] participate in shooting competitions at those ranges because of New York City's enforcement" of the handgun-transportation rule.  *N.Y. State Rifle & Pistol Ass'n*, 86 F. Supp. 3d at 257.  Those plaintiffs, accordingly, may well have alleged a concrete injury based on their inability to engage in those activities, regardless of whether they faced a credible fear of prosecution.  *Cf. Cuti v. Garland*, --- F. Supp. 3d --- , 2022 WL 4598536, at *2, *4 (D.D.C. Sept. 29, 2022) (concluding that the plaintiff had "at least plausib[ly] allege[d]" a redressable injury where "licensed ranges and bird hunting facilities located in New Jersey" had indicated "that they would refuse . . . [the plaintiff] access to their guns" based on their interpretation of the challenged federal statute (internal quotation marks omitted)).

Third, although the Supreme Court typically "vacate[s] the judgment with directions to dismiss" when "disposing of a case that has become moot on appeal," the Court does not follow that practice "where the mootness is attributable to a change in the legal framework governing the case, and where the plaintiff may have some residual claim under the new framework that was understandably not asserted previously."  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 482 (1990); *see also NYSR&P*, 140 S. Ct. at 1526 (quoting same).  In those circumstances, the Supreme Court typically "vacate[s] the judgment and remand[s] for further proceedings in which the parties may, if necessary, amend their pleadings or develop the record more fully."  *Lewis*,

494 U.S. at 482.  The Supreme Court opted for the latter approach in *NYSR&P*, but, in doing so, expressed no view as to whether the plaintiffs had standing to assert an as-yet-unpled damages claim—a question that would, presumably, be presented first to the lower courts and only after the plaintiffs filed an amended complaint.  *See NYSR&P*, 140 S. Ct. at 1526–27.  But even if the Supreme Court implicitly assumed, in remanding the case, that the petitioners would—or might—have standing to bring a *damages* claim, that assumption would have no bearing on the distinct question of whether they had standing to bring a preenforcement challenge for *injunctive* relief.  *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("[A] plaintiff must 'demonstrate standing separately for each form of relief sought.'" (quoting *Friends of the Earth*, 528 U.S. at 185)); *Lyons*, 461 U.S. at 102 (explaining that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" (alteration in original) (internal quotation marks omitted)).  The Supreme Court's decision in *NYSR&P*, accordingly, does not speak to—much less "eviscerate"—the *Navegar* line of cases.  And none of Plaintiffs' tea-leaf reading comes close to persuading this Court to disregard binding D.C. Circuit precedent.

Plaintiffs' second argument posits that the *Navegar* line of cases is inconsistent with the Supreme Court's standing precedents, which, in Plaintiffs' view, require only a "credible" threat of prosecution and expressly disavow the notion that an individual must be subject to "arrest, prosecution, or other enforcement action" before challenging a criminal statute.  Dkt. 29 at 17–18 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014)); *see also United Farm Workers*, 442 U.S. at 298.  Of particular relevance to Plaintiffs' argument is the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), in which the Court concluded that a party to a patent license agreement had standing to "challenge the validity

of [a] patent without terminating or breaking the agreement," *id.* at 135. Because *MedImmune*, unlike *Susan B. Anthony List* and *United Farm Workers*, did not allege an infringement of First Amendment rights, Plaintiffs argue that the case undermines D.C. Circuit precedent suggesting that "there is one standing requirement for First Amendment cases and another for others." Dkt. 29 at 19.

But *MedImmune* casts less doubt on *Navegar* and *Seegars* than Plaintiffs suggest. As the Supreme Court recounts, before the petitioner in *MedImmune* brought suit, the respondent (Genentech) sent a letter to MedImmune that MedImmune "considered . . . to be a clear threat to enforce [the challenged] patent, terminate the [relevant] license agreement, and sue for patent infringement if petitioner did not make royalty payments as demanded." *MedImmune, Inc.*, 549 U.S. at 122. That letter prompted MedImmune to "pa[y] the demanded royalties" rather than to risk the serious consequences of a patent infringement suit. *Id.* That threat alone distinguishes MedImmune from the plaintiffs in *Seegars* and *Parker*, none of whom faced specific threats that the challenged laws would be enforced against them. *See, e.g.*, *Seegars*, 396 F.3d at 1255 (finding it significant that "plaintiffs allege[d] no prior threats against them"); *cf. Parker*, 478 F.3d at 375 (determining that the threats of enforcement lodged against the plaintiffs during litigation were insufficiently targeted). Moreover, unlike the plaintiffs in *Seegars* and *Parker*, whose gun ownership, if commenced, might have gone unnoticed, Genentech would have known as soon as MedImmune stopped making the required royalty payments—a fact that, in itself, increased the certainty of an enforcement action.

To be sure, the Supreme Court's First Amendment precedents are more difficult to square with *Navegar* and its progeny. Although the Supreme Court has emphasized even in the First Amendment context that the "threatened enforcement [must be] sufficiently imminent" to

warrant "preenforcement review," *Susan B. Anthony List*, 573 U.S. at 159, the Court has not always required, in that context, that challengers "have been singled out or uniquely targeted by the . . . government for prosecution," *Parker*, 478 F.3d at 375. In *Babbitt v. United Farm Workers*, for example, the Supreme Court concluded that the plaintiffs had standing to bring a preenforcement suit challenging a statute that barred the use of "dishonest, untruthful, and deceptive publicity" based on allegations that the plaintiffs had "actively engaged in consumer publicity campaigns in the past," intended to continue doing so, and that "erroneous statements [were] inevitable" in those future publicity campaigns. 442 U.S. at 301–02 (internal quotation marks omitted). And in *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988), the Court concluded that a group of booksellers had standing to challenge a Virginia law that criminalized the display of certain types of sexually explicit materials for commercial purposes simply because "the State ha[d] not suggested that the newly enacted law w[ould] not be enforced" and because the booksellers, accordingly, had "an actual and well-founded fear that the law will be enforced against them." *Id.* at 392–93. That last point is in tension with the D.C. Circuit's conclusion, in the Second Amendment context, that a "general threat of prosecution" does not establish standing. *Parker*, 478 F.3d at 374.

Notwithstanding that tension, "[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court," *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979), and it is the province of the D.C. Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions should be overruled, *see Critical Mass Energy Proj. v. Nuclear Reg. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (noting that decisions of the D.C. Circuit "bind the circuit 'unless and until overturned by the court en banc or by Higher Authority'" (quoting *Save Our Cumberland Mountains, Inc. v. Hodel*, 826

F.2d 43, 54 (D.C. Cir. 1987), *vacated in part en banc*, 857 F.2d 1516 (D.C. Cir. 1988) (en

banc))).  That principle has particular force where, as here, the D.C. Circuit itself has reckoned

with the tension between *Navegar* and the Supreme Court's First-Amendment precedents,

including *United Farm Workers* and *American Booksellers Ass'n*.  Notably, in *Parker*, the D.C.

Circuit explained that the Supreme Court "took a far more relaxed stance on pre-enforcement

challenges" in those First Amendment cases than "*Navegar* and *Seegars* permit" in the context of

other constitutional challenges.  478 F.3d at 375; *see also Seegars*, 396 F.3d at 1254 (articulating

the "tension between *Navegar* and [the D.C. Circuit's] cases upholding preenforcement review

of First Amendment challenges to criminal statutes").[5]  Multiple judges on the D.C. Circuit have,

moreover, called for reconsideration of *Navegar* en banc—some of them precisely on the

grounds that the decision is at odds with *United Farm Workers*.  *See, e.g.*, 396 F.3d at 1257

(Sentelle, J., dissenting) ("I know of no hierarchy of Bill of Rights protections that dictates

different standing analysis."); *Ord*, 587 F.3d at 1146 (Brown, J., dissenting in part) (calling on

the en banc D.C. Circuit to "rehear this appeal *sua sponte* and overrule *Navegar*"); *Seegars v.

Gonzales*, 413 F.3d 1, 2 (D.C. Cir. 2005) (mem.) (Williams, J.) (explaining his "call for

rehearing en banc" of the panel decision in *Seegars*).  "Nevertheless," the D.C. Circuit has

explained that, "unless and until [the] en banc [D.C. Circuit] overrules these recent precedents,

_____

[5] Although the *Seegars* dissent is correct in explaining that there is no "hierarchy of Bill of
Rights protections" that necessarily "dictates different standing analysis," *Seegars*, 396 F.3d at
1257 (Sentelle, J., dissenting), the Court notes that the Supreme Court has adopted a particularly
expansive view of standing in the First-Amendment context, *see, e.g.*, *Am. Booksellers Ass'n*,
484 U.S. at 392–93 ("[I]n the First Amendment context, '[l]itigants . . . are permitted to
challenge a statute not because their own rights of free expression are violated, but because of a
judicial prediction or assumption that the statute's very existence may cause others not before the
court to refrain from constitutionally protected speech or expression.'" (alteration in original)
(quoting *Sec. State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956–57 (1984))).  Given existing
precedent, it is for the en banc D.C. Circuit or the Supreme Court, and not this Court, to decide
whether that distinction matters outside the context of an overbreadth challenge.

[the court] must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*." *Parker*, 478 F.3d at 375. Whatever the merits of Plaintiffs' doctrinal critiques, then, this Court must, just like the D.C. Circuit, remain faithful to these precedents.

Lastly, Plaintiffs contend, to no avail, that *Seegars* and *Navegar* are distinguishable, even if they remain good law. Dkt. 29 at 20. Unlike the plaintiffs in *Seegars*, who "could have applied to register a pistol and then challenged the subsequent denial," a preenforcement challenge is, in Plaintiffs' view, the only "means of seeking relief" here—aside from risking arrest and prosecution. *Id.* (internal quotation marks omitted). But that argument is squarely foreclosed by the D.C. Circuit's decision in *Seegars*, which made clear that "the lack of an administrative remedy, while it increases the hardship resulting from denial of preenforcement review, still does not enable [the plaintiff] to meet the *Navegar* test." 396 F.3d at 1256. *Contra Seegars*, 413 F.3d at 1 (Ginsburg, J., concurring in the denial of rehearing en banc) (suggesting, contrary to the decision of the panel, that the availability of administrative remedies to the *Seegars* plaintiffs was among the reasons to deny preenforcement review). And even if, as Plaintiffs suggest, the D.C. Circuit's standing doctrine would make § 7-2509.07(a)(6) altogether "unchallengeable," Dkt. 29 at 21, that fact alone would not militate in favor of a different interpretation of the D.C. Circuit's precedents, for "[t]he assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (first alteration in original) (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)).

Plaintiffs also suggest, although only in passing, that this case is distinct from *Navegar* because "[a] specific statute governs when and where [these plaintiffs] may carry their firearms," Dkt. 29 at 21, while "the general nature of the language" in some portions of the Act at issue in

*Navegar* "ma[de] it impossible to foretell precisely how [the Act's] provisions [would] be applied," *Navegar, Inc.*, 103 F.3d at 1001. But the "general nature of the language" at issue in *Navegar* "suggest[ed] [to the D.C. Circuit] additional concerns as to the[] [claim's] *ripeness*" and did not seem to factor into the plaintiff's *standing* to bring the suit. *Id.* (emphasis added); *see Worth v. Jackson*, 451 F.3d 854, 857–61 (D.C. Cir. 2006) (articulating that standing addresses the nature and redressability of the plaintiff's injury while the related doctrine of ripeness ensures that the courts do not "entangl[e] themselves in abstract disagreements"). Moreover, even if *Navegar*'s generality concern factored into the Court's standing analysis, *see Seegars*, 396 F.3d at 1258 (Sentelle, J., dissenting) (distinguishing *Navegar* on this ground), the statute in *Navegar*, which prohibited, among other weapons, "large capacity ammunition feeding devices" (*i.e.*, those with a capacity of "more than 10 rounds of ammunition"), was no less specific than the statute at issue in this case. *Navegar*, 103 F.3d at 1001 (quoting 18 U.S.C. §§ 922(w)(1) and 921(a)(31) (1994)). *Cf. Parker*, 478 F.3d at 373, 375 (concluding that certain plaintiffs did not have standing to challenge a number of specific laws, including one "requiring that all lawfully owned firearms be kept unloaded and disassembled or bound by a trigger lock or similar device").

Finally, the Court notes that it is far from clear that Plaintiffs have shown enough to establish standing—or a likelihood that they have standing—even under a standard less onerous than that set forth in the *Navegar* line of cases. In *United Farm Workers*, for example, the Supreme Court identified three requirements to establish standing in a First Amendment, preenforcement suit: the plaintiff must show that (1) she intends "to engage in a course of conduct arguably affected with a constitutional interest;" (2) her actions are "proscribed by a statute;" and (3) "there exists a credible threat of prosecution" under that statute. 442 U.S. at

298.  Here, Plaintiffs have offered declarations that arguably satisfy the first two elements of this test.  They leave the third element, however, entirely unaddressed.

To be sure, as Judge Williams observed in *Seegars*, "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement."  396 F.3d at 1252.  But the term does provide "clarity . . . at the poles," *id*., and, here, Plaintiffs have failed to proffer *any* evidence relating to any threat or risk of enforcement.  Although they do allege that the MPD Chief is responsible for enforcing D.C. law and "is in fact presently enforcing the challenged laws, customs and practices against plaintiffs," Dkt. 1 at 3 (Compl. ¶ 6), that allegation is insufficient on multiple levels.  To start, it is not even clear that the MPD, as opposed to the Metro Transit Police Department ("MTPD"), bears primary responsibility for policing Metrorail trains and Metrobuses.  More importantly, a conclusory allegation contained in an unverified complaint is insufficient to support a motion for a preliminary (or permanent) injunction.  *See Food & Water Watch, Inc*., 808 F.3d at 913.  Plaintiffs bear the burden of demonstrating that the Court is likely to conclude that they have Article III standing, *id.*, but have offered no evidence indicating that the MPD has had any contact with them regarding the law at issue; that they have contacted the MPD or MTPD; or, more generally, that they have any other reason to believe that they face a threat of prosecution.  Dkts. 6-2, 6-3, 6-4 & 6-5.  Indeed, when asked at oral argument, Plaintiffs' counsel was unable to identify any case in which an individual licensed to carry a handgun has ever been prosecuted simply for carrying a concealed handgun on a Metrorail train or a Metrobus.  *See* Rough Tr. at 8–9 (Dec. 12, 2022 Hearing).  Instead, Plaintiffs' counsel merely speculated that those carrying concealed handguns often pat their sides (to confirm that they have their guns with them) and that, by doing so, they might provide a tell for law enforcement officers and thereby invite arrest, *id.* at 7; he also asserted that the MPD

invariably arrests those who violate any of "the myriad of firearms regulations" in the District of Columbia, *id.* at 9. Neither statement by counsel, however, is evidence, and the evidence that Plaintiffs have offered says nothing about the risk of criminal or civil enforcement of § 7-2509.07(a)(6).[6] As a result, even under the standard set forth in *United Farm Workers*, the Court is unpersuaded that Plaintiffs have shown that they face a "credible threat of prosecution" or civil fine. *See* 442 U.S. at 298 ("[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971))).

In sum, then, Plaintiffs have failed to allege that they satisfy the imminence requirement as articulated by the D.C. Circuit in *Navegar* and *Seegars*; have failed to persuade the Court that the D.C. Circuit's precedents are no longer good law or do not control this case; and, indeed, have failed to offer any evidence regarding whether and how § 7-2509.07(a)(6) is enforced. Because "an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction," *Food & Water Watch*, 808 F.3d at 913, the Court will deny Plaintiffs' motion for temporary and permanent injunctive relief.

---

[6] The risk of a civil enforcement action, moreover, raises very different considerations than the risk of a criminal prosecution. Plaintiffs, however, offer no evidence regarding which, if either, path the D.C. Attorney General typically takes in cases involving first-time violations of § 7-2509.07(a)(6) by license handgun owners.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary and permanent injunctive relief, Dkt. 6, is hereby **DENIED**.

      **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 28, 2022