# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GREGORY T. ANGELO** | ) | |
| 130 M St NE, #908 | ) | |
| Washington, DC 20002 | ) | |
| | ) | |
| **TYLER YZAGUIRRE** | ) | |
| 40 Quincy Place, NE | ) | |
| Washington, DC 20002 | ) | |
| | ) | |
| **ROBERT M. MILLER** | ) | |
| 4094 Majestic Lane # 278 | ) | |
| Fairfax, Virginia 22033 | ) | |
| | ) | |
| **CAMERON M. ERICKSON** | ) | |
| 2516 Q Street NW | ) | |
| Washington, DC 20007 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-1878 |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| Serve: Mayor Muriel Bowser | ) | |
| 1350 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| c/o Office of Attorney General | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| **ATTORNEY GENERAL BRIAN SCHWALB** | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| **CHIEF ROBERT J. CONTEE III** | ) | |
| Metropolitan Police Department | ) | |
| 300 Indiana Avenue, N.W. | ) | |
| Washington, DC 20004 | ) | |

CHIEF MICHAEL ANZALLO                  )
Metro Transit Police                   )
Washington Metropolitan Transit Authority  )
600 5th St NW                          )
Washington, DC 20001                   )
                                       )
                    Defendants.        )
_____    )

## FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

COME NOW the Plaintiffs, Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson, by and through their undersigned counsel, and complain of the Defendants as follows:

1.      This case raises a Second Amendment challenges to the District of Columbia's ban on licensed carry of handguns on public transportation vehicles and stations, specifically DC Code Section 7-2509.06(a)(6) ("Metro Ban").

**THE PARTIES**

2.      Plaintiff Gregory T. Angelo is a natural person and a citizen of the United States and of the District of Columbia. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Angelo has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

3.      Mr. Angelo holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular rider of the Washington Metropolitan Transit Authority ("WMATA") which operates bus and subway lines in the greater Washington, DC area, including in northern Virginia and Montgomery and Prince Georges Counties in

Maryland and in the District of Columbia. He uses the Metro because on balance it is more cost effective and time efficient than other means of transportation within the District.

4.     Mr. Angelo has personally witnessed a criminal assault occurring on a Metrorail train where an individual brandished an edged weapon and threatened passengers on the train, including Mr. Angelo. Mr. Angelo is further aware of additional instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of witnessing the above-described assault and being aware of other instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Angelo is apprehensive for his safety while riding the Metro system.

5.     Because of his apprehension of becoming a victim of criminal violence, Mr. Angelo carries self-defense spray while riding Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious. Moreover, Mr. Angelo is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

6.     Mr. Angelo would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Angelo has in some circumstances avoided using the Metro system out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Angelo has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Angelo is convinced he will have to do likewise in the future unless the Metro ban is declared unconstitutional and voided.

7.      Because District law as discussed herein forbids Mr. Angelo from carrying his concealed firearm within the Metro system, Mr. Angelo has avoided carrying his concealed firearm within the Metro system, thereby forfeiting his Second Amendment rights. If it were legal to do so, Mr. Angelo would carry his concealed firearm on and within the Metro system for self-defense.

8.      If Mr. Angelo were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

9.      Plaintiff Tyler Yzaguirre is a natural person and a citizen of the United States and of the District of Columbia. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Yzaguirre has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

10.     Mr. Yzaguirre holds a Concealed Pistol Carry License issued by the MPD Chief. He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular rider of the Metro system. He uses the Metro because on balance it is more cost effective and time efficient than other means of transportation within the District.

11.     Mr. Yzaguirre is aware of instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Yzaguirre is apprehensive for his safety while riding the Metro system. Because of his apprehension of becoming a victim of criminal violence, Mr. Yzaguirre carries pepper spray while riding the Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not

always effective against an assailant who is intoxicated, enraged or delirious.  Moreover, Mr. Yzaguirre is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

12.     Mr. Yzaguirre would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Yzaguirre has in some circumstances avoided using the Metro system out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Yzaguirre has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Yzaguirre is convinced he will have to do likewise in the future unless the Metro ban is declared unconstitutional and voided.

13.     Because District law as discussed herein forbids Mr. Yzaguirre from carrying his concealed firearm within the Metro system, Mr. Yzaguirre has avoided carrying his concealed firearm within the Metro system thereby sacrificing his Second Amendment rights. If it were legal to do so, Mr. Yzaguirre would carry his concealed firearm on and within the Metro system for self-defense.

14.     If Mr. Yzaguirre were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

15.     Plaintiff Robert M. Miller, Ph.D., is a natural person and a citizen of the United States and of Virginia. He is a law-abiding individual who has never been arrested or convicted of any violent crime. Dr. Miller has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

16.     Dr. Miller holds a Concealed Pistol Carry License issued by the MPD Chief. He also holds licenses and permits issued by the Commonwealths of Virginia, Pennsylvania and the State of Maryland, authorizing him to carry a concealed handgun in those jurisdictions and to other states with reciprocity agreements, most recently in West Virginia. He regularly carries a concealed firearm for personal protection within Virginia, the District, and Maryland where allowed. He is also a regular WMATA rider and carries his firearm when riding the Metro system wholly within the Commonwealth of Virginia and Maryland.

17.     Dr. Miller is aware of frequent instances of criminal violence occurring on the Metro system within the District of Columbia from news reports. As a social scientist in Public Economics, Dr. Miller is aware of the high crime rates within the District, generally. Because of frequent violence within the Metro system, including stabbings and shootings, Dr. Miller is apprehensive for his safety while riding the Metro system within the District of Columbia. Because of his apprehension of becoming a victim of criminal violence, Dr. Miller carries pepper spray while riding the Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged, or delirious. Moreover, Dr. Miller is aware that self-defense spray allows an assailant to get too close for safety's sake, and it is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon, or a firearm. Dr. Miller is aware that pepper spray can adversely affect the user as well as the intended target.

18.     Dr. Miller is aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating the Metro Ban.

19.     Dr. Miller is apprehensive about violating the Metro Ban because he is unacceptably likely to be convicted of a crime involving a firearm, he would have his DC carry

permit permanently revoked, he would forfeit his unlawfully carried firearm worth more than $500, he might be forced to forfeit his $250,000 collection of firearms, he would risk the use of deadly force by police, and such a conviction would adversely affect his right to keep and bear arms in other states.

20.    Dr. Miller would feel better protected riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Dr. Miller has in many circumstances avoided using the Metro system in the District of Columbia out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Dr. Miller has had to expend sums greater for transportation than he would have if he had been using the Metro system, including gasoline, mileage, tolls, and parking expenses. It is certain Dr. Miller must do likewise in the future unless the Metro Ban is declared unconstitutional and voided.

21.    Because of the Metro Ban, Dr. Miller has avoided carrying his concealed firearm within the Metro system thereby forfeiting his Second Amendment rights. If it were legal to do so, Dr. Miller would carry his concealed firearm on and within the Metro system for self-defense.

22.    Because of the Metro Ban, Dr. Miller has been unable to carry his concealed firearm where lawful in Virginia, Maryland, and the District at his origin or destination, infringing his Second Amendment rights for his entire journey, not just on Metro within the District.

23.    If Dr. Miller were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

24.     Dr. Miller has been subjected in the past to public fear, scorn, and ridicule when exercising his right to openly carry firearms in Virginia, Colorado, and Illinois.

25.     Dr. Miller would lose his job with a Federal agency if he were arrested or convicted of any firearm offense, including misdemeanor violation of the DC Metro Ban.

26.     Plaintiff Cameron M. Erickson is a natural person and a citizen of the United States and of Washington, DC. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Erickson has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

27.     Mr. Erickson holds a Concealed Pistol Carry License issued by the MPD Chief. He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular WMATA rider.

28.     Mr. Erickson is aware of instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Erickson is apprehensive for his safety while riding the Metro system. Because of his apprehension of becoming a victim of criminal violence, Mr. Erickson carries pepper spray while riding Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious.  Moreover, Mr. Erickson is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

29.     Mr. Erickson would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Erickson has in some circumstances avoided using the Metro system out of fear of his personal

safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Erickson has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Erickson is convinced he will have to do likewise in the future unless the Metro Ban is declared unconstitutional and voided.

30.     Because District law as discussed herein forbids Mr. Erickson from carrying his concealed firearm within the Metro system, Mr. Erickson has avoided carrying his concealed firearm within the Metro system and prior embarking on the Metro and after disembarking the Metro, thereby forfeiting his Second Amendment rights. If it were legal to do so, Mr. Erickson would carry his concealed firearm on and within the Metro system for self-defense.

31.     If Mr. Erickson were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

32.     Defendant District of Columbia ("DC" or "the District") is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of DC to the mayor and city council of the District.

33.     Defendant Brian Schwalb is the Attorney General of the District of Columbia. General Schwalb is responsible for the prosecution of the District's laws at issue in this lawsuit. General Schwalb and the official acting under him actively and vigorously enforces the myriad of firearms regulations of the District and has not disclaimed prosecution for violation of the law at issue in this proceeding. The prospective prosecution of a violation of the law at issue in this

proceeding by the Attorney General and officials acting under him chills the exercise of Plaintiffs' right to bear arms, including on the Metro system. Defendant Schwalb is sued in both his individual and official capacities.

34.    On January 19, 2023, counsel for Plaintiffs emailed General Schwalb and advised him that Plaintiffs all carry their registered handguns in the District of Columbia when it is otherwise legal to do so. Counsel explained that the Metro carry ban represents a significant hardship to Plaintiffs' Second Amendment rights.

35.    Counsel further explained that the Metro system is the primary means of transportation for Mr. Angelo who does not have a personal vehicle and that Mr. Yzaguirre and Mr. Erickson also do not own a personal vehicle. Counsel also explained that although Dr. Miller does own a personal vehicle, he finds the Metro system to be the most cost-effective means of transportation within DC, Virginia and Maryland and he regularly carries his firearm when riding the Metro system solely within Virginia, his state of residence.

36.    Counsel further explained that Mr. Angelo has previously been threatened with an edged weapon while riding the system. In addition, counsel explained that on January 11, 2023, Mr. Yzaguirre had just left the Metro Center station when he was approached by an individual who made threatening racial comments to him. Mr. Yzaguirre attempted to leave the scene, but the individual followed him continuing his threatening behavior. Counsel explained that Mr. Yzaguirre was quite apprehensive for his safety.

37.    Counsel further explained that all Plaintiffs have on previous occasions declined to ride the Metro system because of concerns for their personal safety in light of the District's Metro carry ban and the violence plaguing the system. As a result, counsel explained that Plaintiffs have expended significantly higher sums for transportation than if they would have used the Metro

service, e.g., using taxis, Uber or in the case of Dr. Miller, his personal vehicle. As a result, counsel explained that Plaintiffs are thus experiencing economic injury as a result of the Metro carry ban as well as a violation of their Second Amendment rights.

38.     Counsel further stated that in light of the above, and in light of the obvious unconstitutionality of the Metro carry ban, "this is to ask you to waive enforcement of the Metro carry ban as to my clients." An identical copy of the letter emailed to General Schwalb was emailed to Defendant Chief Contee.

39.     Counsel received no response from either General Schwalb or Chief Contee.

40.     Defendant Michael L. Anzallo is the Chief of the Washington Metropolitan Transit Authority Police Department ("WMATA-PD").   WMATA-PD has primary responsibility for enforcing the laws of the District of Columbia as they pertain to the Metro System including the law at issue in this proceeding. WMATA-PD is known to take a zero tolerance approach to violations of the law observed by its officers. The prospect of arrest by WMATA-PD officers for violation of the law at issue in this proceeding chills Plaintiffs' exercise of their right to bear arms on the Metro system and at other locations they would transit before and after their use of the Metro system. Defendant Anzallo is sued in both his individual and official capacities.  The Metro has stated publicly with respect to gun carry on the system that it follows the laws of the particular jurisdiction where such carry occurs.

41.     On January 31, 2023, Counsel for Plaintiffs deposited in the U.S. Mail a letter to Chief Anzallo providing substantially the same information as was emailed to General Schwalb and Chief Contee. The letter asked Chief Anzallo "to waive enforcement of the Metro carry ban as to my clients and enter into a non-prosecution agreement" with respect to Plaintiffs' carrying their firearms on the Metro system. Chief Anzallo has not yet responded to the letter.

42.     Defendant Robert J. Contee III is the MPD Chief. Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit including the law at issue in this proceeding. MPD places a priority on enforcement of the city's firearm laws. On information and belief MPD has a policy to arrest for any violation of the District's firearm regulations. Indeed, MPD has a specialized unit, the Gun Recovery Unit, whose job is to search for persons carrying firearms in violation of District law and confiscating such firearms. The aggressive enforcement conducted y the Gun Recovery Unit has long been an issue in the city. MPD regularly publishes compilations of its gun arrests on its web site. *See, e.g.,* https://mpdc.dc.gov/release/mpd%E2%80%99s-weekly-firearm-recoveries-monday-august-1-2022-monday-august-8-2022. MPD's 2021 Annual Report touts that it recovered 2,310 firearms in that year. The prospect of arrest by MPD officers for violation of the law at issue in this proceeding chills Plaintiffs' exercise of their right to bear arms on the Metro system and other areas they would transit during their journeys before and after their use of the Metro system. Defendant Contee is sued in both his individual and official capacities.

43.     Defendant Contee also administers the District's firearm registration and license to carry laws. Officials under Defendant Contee's command regularly revoke carry licenses and firearm registration certificates when concealed carry license holders are arrested for any firearm related offense, even if the arrest is not prosecuted, the arrested person is found not guilty, or the charge is otherwise dismissed. The likely loss of their carry licenses and firearm registration certificates is yet another factor preventing Plaintiffs from exercising their right to carry handguns on the Metro system in light of the Metro Ban.

**JURISDICTION AND VENUE**

44.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

45.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS**

**Modern handguns**

46.     All modern  handguns have multiple safety devices built in by design to prevent them from firing when dropped, bumped, or jostled. That is, firearms do not just "go off" when they are disturbed.

47.     Many firearms have a manual, external safety that physically prevents the firearm from being fired if it is dropped, bumped, or jostled. Other firearms, e.g., a Glock pistol, have multiple, independent internal safeties: (1) a trigger safety that prevents firing unless the trigger is pressed by the user; (2) a striker block safety that prevents firing unless the trigger is pulled; and (3) a drop safety preventing the gun from firing when dropped.

48.     Although trained concealed carriers have a very low chance of negligent discharges, these chances rise substantially at the point when handling a firearm, such as unholstering, loading, unloading, or clearing the firearm. The National Safety Council estimates that about 1 percent of all gun deaths (535 deaths per year) are from negligent discharges.[1] District regulations require firearms to be carried concealed inside a holster covering the trigger, which further prevents a firearm from firing from abrupt contact.

49.     The District uses a roster of approved firearms combining the rosters of California, Massachusetts, and Maryland. Those states rigorously test each firearm on the roster for safety.

---

[1] *See* https://injuryfacts.nsc.org/home-and-community/safety-topics/guns/..

That is, every handgun approved for concealed carry within the District has been rigorously tested to prevent firing unless the user deliberately presses the trigger, and not when the firearm is dropped, bumped, or jostled.

50.     Drawing reasonable inferences from the paragraphs above, the carrying of concealed firearms on crowded Metro buses and trains does not pose a safety risk to the public.

**Lawful Carry of Firearms on DC Metro**

51.     To lawfully transport a concealed carry firearm on the Metro system within the District, a concealed carry permit holder would be required to remove his firearm from concealment and the holster, remove the magazine, clear the firearm, then place the firearm inside of a lockable container carried by the user for such purpose and separate from any ammunition.

52.     If a lawful concealed carrier did this outside of Metro but within the District, removing the firearm from concealment to secure it in a container he would violate District law requiring the gun to be fully concealed.

53.     If a lawful concealed carrier on Metro in Virginia or Maryland approached the District, at some point the carrier would have to unload and clear the firearm, place it within a lockable container, then reverse this process after leaving the DC Metro system.

54.     Removing the firearm from its holster, removing the magazine, clearing it in public, and reversing these processes when leaving Metro in the District, exposes the lawful concealed carrier and the public to a potentially deadly or grievously harmful negligent discharge.

55.     A well accepted rule of handling a firearm is to always point the firearm in a safe direction, which might not be possible to do in public spaces.

56.     Drawing a firearm in a public place to clear and store it is substantially likely to expose the lawful concealed carrier to being killed or assaulted by police or concerned citizens,

and to cause public fear, scorn, and ridicule, regardless of whether the concealed carrier is in complete compliance with the law and safety procedures.

57. Drawing reasonable inferences from the above paragraphs, the District's law prohibiting concealed carry on Metro causes Plaintiffs to violate other District laws, infringes their lawful carry outside the District and within the District but outside the Metro system. The Metro Ban exposes Plaintiffs and the public to the risk of negligent discharges, and puts Plaintiffs at risk of death, assault, and public fear, scorn, and ridicule. In the totality of the circumstances, the Metro Ban causes Plaintiffs substantial harm from many sources.

**The Second Amendment.**

58. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

59. The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* 142 S.Ct. 2111 (2022) (hereinafter "*Bruen*"); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

60. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes

into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

61.     The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (*per curiam*).

62.     Pursuant to the Supreme Court's decision in *Bruen, supra,* and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to carry a handgun in public for self-protection. A necessary component of the right to carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment).

63.     Under the Second Amendment, the District retains the ability presumptively to regulate consistent with the nation's historical tradition of firearms regulation the manner of carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, and prohibit the carrying of arms that are not within the scope of the Second Amendment's protection, such as unusual and dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. *See also Bruen,* 142 S.Ct. at 2128-29. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and their loved ones, such laws are invalid unless supported by the text of the Second Amendment or by well-established representative historical analogues existing at the time of the founding or shortly thereafter. *Bruen*, 142 S.Ct. at 2129-30.

64.     Given the decisions in *Bruen* and *Heller*, The District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusual and dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the text of the Second Amendment and the historical tradition of firearms regulation in the United States. *Id. See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

**The statutory scheme**

65.     The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection. Moreover, to the extent any continuing validity exists of the interest balancing test adopted by the D.C. Circuit in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) – and we suggest there is not – the regulation at issue herein is not justified by an articulated compelling or substantial governmental interest, and lacks sufficient tailoring to achieve whatever governmental interest, if any, might exist to otherwise support it, without unreasonably intruding on Second Amendment liberties.

66.     Following the issuance of *Palmer*, the District enacted a detailed scheme that restricted the public carrying of handguns to persons who are issued licenses to carry concealed pistols.[2] *See* DC Code Section 22-4504(a) ("No person shall carry within the District of Columbia

---

[2] DC Code Section 7-2505.01(12) defines the term "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Generally, in usage, the term "pistol" refers to a handgun having one chamber integral with the barrel, making pistols distinct from the other main type of handgun, the revolver, which has a revolving cylinder containing multiple chambers. Most handgun experts and dictionaries make a technical distinction that views pistols as a subset of handguns. The District uses the term pistol to refer to all handguns,

either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon."). The MPD Chief was given discretion to issue carry licenses to persons who could show good cause and otherwise meet detailed eligibility requirements. *See* DC Code Section 22-4506(a), which provided:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

67. Under this provision, some 123 carry licenses were issued between the date of enactment of Section 22-4506, and the decision of the Court of Appeals in *Wrenn*. Pursuant to *Wrenn*, the District became what is known as a shall issue jurisdiction, meaning that upon an applicant meeting objective qualifications, the Chief was required to issue a license to carry a handgun to the applicant unless the Chief had information indicating that the applicant was otherwise not suitable to carry a handgun, for example, that he presented a danger to himself or others. Such objective criteria include meeting the requirement to take 16 hours of classroom training and two hours of range training from an MPD licensed concealed carry instructor, passing a 50 round shooting test administered by a DC licensed instructor, passing a background check, and not being a person prohibited from possessing firearms and ammunition under federal or District law. *See* DC Code Section 7-2509.02.

---

however. For the sake of clarity, this complaint will use the term "handgun" to refer to both pistols, revolvers and other weapons coming within the term "pistols" as defined by District law.

68.     Based upon MPD's response to a Freedom of Information Act request as of August

29, 2019, the District had issued 3,339 carry licenses. *See* Response to FOIA Request, 2019-FOIA-

05038. On information and belief, the District has issued several thousand more carry licenses

since August of 2019.

69.     The District has adopted strict regulations on the carrying of handguns. For

example, District law substantially limits where handguns may be carried. *See* DC Code 7-

2509.07. Quoting from Code Section 7-2509.07(a), handguns may not be carried in the following

places or in the following circumstances:

> **(1)** A building or office occupied by the District of Columbia, its agencies, or
> instrumentalities;
>
> **(2)** The building and grounds, including any adjacent parking lot, of a childcare
> facility, preschool, public or private elementary or secondary school; or a public or
> private college or university;
>
> **(3)** A hospital, or an office where medical or mental health services are the primary
> services provided;
>
> **(4)** A penal institution, secure juvenile residential facility, or halfway house;
>
> **(5)** A polling place while voting is occurring;
>
> **(6)** A public transportation vehicle, including the Metrorail transit system and its
> stations;
>
> **(7)** Any premises, or portion thereof, where alcohol is served, or sold and consumed
> on the premises, pursuant to a license issued under Title 25; provided, that this
> prohibition shall not apply to premises operating under a temporary license issued
> pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to §
> 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118,
> unless otherwise prohibited pursuant to subsection (b)(3) of this section;
>
> **(8)** A stadium or arena;
>
> **(9)** A gathering or special event open to the public; provided, that no licensee shall
> be criminally prosecuted unless:

(A) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

(B) The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

(11) The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

(12) The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

(13)(A) When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

(i) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

(iii) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

**(14)** When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; …

**(15)** Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

70.    In addition, DC Code Section 7-2509.07(b) provides that carrying a handgun into the residence of another is presumed prohibited unless authorized in advance by the owner or person in control of the property. DC Code Section 7-2509.07(b)(1). A similar provision presumes that carrying a handgun into a place of worship is prohibited unless signage allows it, or the licensee is provided permission personally in advance. DC Code Section 7-2509.07(b)(2). Under DC Code Section 7-2509.07(b)(3), it is presumed that a licensee has permission to carry in and on other non-residential property unless conspicuous signage prohibits handgun carry or the licensee has been personally told not to carry on the property.[3]

---

[3]  DCMR 24-2346.1 specifies that "Signs stating that the carrying of firearms is prohibited on any private property shall be clearly and conspicuously posted at any entrance, open to the public, of a building, premises, or real property."  DCMR 24-2346.2, in turn, provides that "A sign shall be considered conspicuous if it is at least eight (8) inches by ten (10) inches in size and contains writing in contrasting ink using not less than thirty-six (36) point type.

71.     In dicta, *Heller* designated schools and government building as presumptively sensitive areas where carriage of firearms could be restricted. *Heller,* 554 U.S. at 626. In *U.S. v. Class,* 930 F.3d 460, 463 (D.C. Cir. 2019) the D.C. Circuit noted that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia],* 670 F.3d [1244,] 1253 [D.C. Cir. 2011]."  The court in *Class* further explained that the question of what a sensitive area is turns on "the people found there" or the "activities that take place there."  *Class,* 930 F.3d at 465, quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011, *aff'd,* 687 F.3d 1244 (11th Cir. 2012).

72.     *Bruen* appeared to narrow the reach of the sensitive places concept, suggesting that only legislative assemblies, courts and polling places appear to be established as sensitive places and that these . *Bruen,* 142 S.Ct. at 2133. "We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." However, the Court cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.* at 2134.

73.     DC Code Section 7-2509.07 goes far beyond *Heller* or *Bruen* in restricting handgun carry in a variety of locations other than the schools and government buildings *Heller* discussed as presumptively sensitive or courts, polling places and legislative assemblies *Bruen* states as established sensitive places. Although it is questionable whether many of the areas set forth in DC Code Section 7-2509.07 are truly sensitive areas, one area stands far apart from the others in terms of the lack of any basis for its designation as such: that is the prohibition on the carriage of personal

protection firearms on public transportation vehicles such as Metro buses and trains. *See* DC Code Section 7-2509.07(a)(6). Discussion of each of the prohibited locations set forth in DC Code Section 7-2509.07 makes this abundantly clear.

74.    As noted immediately above, under *Heller* government buildings (*see* DC Code Section 7-2509.07(a)(1) are presumptively[4] considered sensitive areas, 554 U.S. at 626, unless the prohibition on firearm carry imposes a more than de minimis burden on a citizen's right to bear arms, *see Class,* 930 F.3d at 463. The logic behind this is not difficult to fathom. Government buildings house government officials and often sensitive information and activities. The buildings themselves have been the subject of terrorist attacks and government officials represent potential prime targets to terrorists, deranged persons, or persons who have some perceived grudge against some governmental action. As Professor Kopel has put it in discussing the sensitive places doctrine, "misuse of arms may prevent the operation of courts and other institutions of a free government."   David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine,* 13 Charleston L. Rev. 203, 209 (2018) (hereinafter "Kopel")[5]

---

[4] We emphasize the word presumptive. Presumptions are just that, presumptions.  Presumptions can be overcome with evidence. *See* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.") Thus, we would not concede that all government buildings in all circumstances are sensitive areas. Consider for example, a government store selling maps and navigational aids. Such a store is indistinguishable from any other commercial establishment. Or consider a bathroom structure in a national park. As discussed above, the D.C. Circuit in *Class*, 930 F.3d at 463, stated that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia]*, 670 F.3d at 1253." Surely, even if the Metro system could be considered a presumptive sensitive place and we suggest it cannot, the burden the Metro Ban imposes on Plaintiffs' right to bear arms is plainly more than de minimis.

[5]  The court in *Bruen* cites to Kopel in its discussion of the "sensitive places" doctrine. *Bruen,* slip op. at 21.

75.     Moreover, one generally enters a government building at one's own volition. Significantly, the vast majority of government buildings in the District of Columbia employ security measures such as armed security guards (designated special police officers in the District), and metal detectors at entrances. Thus, although a person gives up personal security by not being able to carry a firearm in a government building, he does so under the circumstances generally where the prohibited place provides an added layer of security not present in other public places.[6] Thus, the burden presented to his or her personal security and his or her need for self-defense is substantially lessened by the security measures employed.  Finally, traditionally the government has more authority to control its own property than to control other properties.[7]

---

[6] The court in *Class* declined to hold the presence of security as a definitive factor in the determination of whether a location qualified as "sensitive" under *Heller*.  Nonetheless, the presence of armed security and the screening of persons entering a location bear on the degree to which a person entering such a location runs a risk of criminal attack and thus bears directly on the degree of burden on the person's right to bear arms.  It stands to reason that there is less need for an individual to be armed for his or her self-protection if there is the presence of adequate armed security, including screening of persons entering a location, and thus the burden on his or her Second Amendment right to be armed in the event of a violent confrontation is diminished.

[7]  In addressing the issue of firearm carry on the grounds of the U.S. Capitol, the court in *Class,* explained,

> With respect to the Capitol itself, there are few, if any, government buildings more "sensitive" than the "national legislature at the very seat of its operations." *Jeanette Rankin Brigade v. Chief of the Capitol Police*, 421 F.2d 1090, 1093 n.3 (D.C. Cir. 1969). And tragically, gunmen have targeted the Capitol before. [Citation omitted.] … [W]e have little trouble concluding that the same security interests which permit regulation of firearms "in" government buildings permit regulation of firearms on the property surrounding those buildings as well….

> As for the Maryland Avenue parking lot, although it is not a government building, we conclude that it is sufficiently integrated with the Capitol for Heller I's sensitive places exception to apply….

> First, though it is open to the public, the Maryland Avenue parking lot may be used during working hours only by Capitol employees with a permit. This makes the

76.     Schools are also a location presumptively sensitive under *Heller,* 554 U.S. at 626. *See* DC Code Section 7-2509.07(a)(2). Schools are populated by large numbers of persons under the age of 21, the age limit most states have adopted for issuance of carry permits to citizens, and thus unable to defend themselves with firearms due to age. *But see Firearm Policy Coalition, Inc. v. McCraw,* Case No. 21-cv-01245 (N.D. Tex. August 25, 2022) (invalidating Texas law prohibiting 18–20-year-olds from carrying a handgun for self-defense outside the home), appeal dismissed Dec. 21, 2022.

---

area a potential stalking ground for anyone wishing to attack congressional staff and disrupt the operations of Congress….

Second, the lot is close to the Capitol and legislative office buildings. Class possessed a firearm less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building. Although there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, Congress has not exceeded it here.

Finally, as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property. *See Adderly v. Florida*, 385 U.S. 39, 47 (1966) (observing in the free-speech context that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *cf. Bonidy v. U.S. Postal Serv*., 790 F.3d 1121, 1126 (10th Cir. 2015) (observing that when the U.S. Postal Service acts "as a proprietor rather than as a sovereign, [it] has broad discretion to govern its business operations according to the rules it deems appropriate").

In sum, because the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a "sensitive" place where firearms prohibitions are presumptively lawful. *Accord id.* at 1125-28 (finding that a post office parking lot is "sensitive" for Second Amendment purposes); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (same).

930 F.3d at 463-64. *But see Morris v. U.S. Army Corps of Engineers,* 60 F.Supp.3d 1120 (D. Idaho 2014) (invalidating regulation prohibiting firearms on Army Corps of Engineers lands).

77.     In addition, schools generally have some degree of enhanced security compared to most public areas. For example, schools generally have locked doors, the presence of armed school resource officers, and in some schools, students are required to pass through metal detectors. To be sure, schools have been a target of active killers, perhaps emboldened by the prospect of the lack of any effective armed resistance, resulting in calls to allow teachers and other school employees to possess arms to defend against such attacks. *See, e.g.,* Massad Ayoob, *The Case for Arming Teachers and the Reality of How it Works,* Personal Defense World (August 21, 2018), available at https://www.personaldefenseworld.com/2018/08/hard-targets-arming-teachers/. However, these calls do not generally extend to proposing to allow visitors to elementary and secondary schools to carry on school premises without permission of school authorities.[8] Most states prohibit the carrying of firearms in K-12 schools by non-school personnel even with carry licenses or permits.[9]

78.     DC goes beyond the Supreme Court's *Heller* dicta on schools to prohibit licensed carry also at colleges and universities. Plainly the justification for finding such institutions to be sensitive locations is weaker than for elementary and secondary schools, though such institutions also have substantial numbers of persons under the age of 21 who would lack the legal ability to carry a firearm for personal protection. There has been robust public debate over allowing licensed firearm carriers to carry personal protection firearms on college campuses. Some states, allow

---

[8] The Federal Gun Free School Zones Act, passed pre-*Heller*, prohibits firearm carry on and around elementary and secondary school property, but exempts persons holding a carry permit or license issued by the state wherein the school is located.  *Cf. United States v. Lopez,* 514 U.S. 549 (1995) (invalidating the previous iteration of this law on commerce clause grounds).

[9] A notable exception is the State of Utah.  *See* Utah Code Section 76-10-505.5 which allows Utah concealed weapons permit holders to carry in schools.

carriage on college campuses while prohibiting carrying firearms on elementary and secondary

school grounds. Some have noted that gun free zones are the preferred choice of active killers,

while others have suggested that the presence of firearms may limit academic freedom and free

class discussion. *See Room for Debate, Should Guns Be Allowed on College Campuses,* The New

York         Times         (May         31,         2016),         available         at

https://www.nytimes.com/roomfordebate/2016/05/31/should-guns-be-permitted-on-college-

campuses.[10] *See Digiacinto v. The Rector and Board of Visitors of George Mason University,* 281

Va. 127 (2011) (finding parts of George Mason University to be a sensitive place under *Heller*).[11]

79.     Hospitals share with schools the fact that substantial numbers of persons present

are incapable of effectively using a firearm for self-defense due to physical infirmities or illness.

*See* DC Code Section 7-2509.07(a)(3). And although hospitals generally lack the tight security of

government buildings, e.g., use of metal detectors to screen for weapons, hospitals generally will

have a security staff present to provide somewhat of an enhanced degree of security for patients

and staff.

80.     Mental health facilities present an additional factor in determining whether such a

location is a "sensitive" area. Approximately two-thirds of firearm deaths are the result of suicide.

---

[10] According to Campus Safety Magazine, 12 states allow carry on college campuses, while 16 states prohibit the practice as of August 2017.  22 states leave the decision to the individual colleges and universities. *See A List of States that Allow Concealed Guns on Campus,* Campus Safety (August 30, 2017), available at *https://www.campussafetymagazine.com/university/list-of-states-that-allow-concealed-carry-guns-on-campus/.*

[11] The court in *Digiacinto* found that the regulation in question was not a total ban on carrying firearms but was "tailored, restricting weapons only in those places where people congregate and are most vulnerable – inside campus buildings and at campus events. Individuals may still carry or possess weapons on the open grounds of GMU, and in other places on campus not enumerated in the regulation." 281 Va. at 136. *Cf.* Op. *Atty.* Gen. Va. 05-078 (January 4, 2006) (opining that licensed individuals may not be prohibited from carrying firearms in open areas of public universities

*See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*. Thus, at least a plausible basis exists to limit the carrying of firearms at facilities providing mental health treatment. On the other hand, it is questionable whether a compelling basis exists for restricting hospital or medical staff from having the means to protect themselves and their patients from a deadly criminal attack. In one well known incident,

> an enraged man entered a psychiatric clinic and shot a caseworker dead and wounded one of the doctors before the latter drew a small-caliber pistol and shot the man down, limiting the death toll to one. The doctor recovered and, declared a hero by local police, suffered no consequences for being armed in a "gun-free" zone.

Massad Ayoob, 10 Cases Where An Armed Citizen Took Down An Active Shooter, *Personal Defense World* (March 11, 2015), available at https://www.personaldefenseworld.com/2015/03/10-cases-where-an-armed-citizen-took-down-an-active-shooter/.[12] The District's prohibition on its face extends to both staff and to patients and visitors.  DC also extends its prohibition to medical offices in general. There would appear a much weaker basis for upholding such a prohibition based on "sensitive" areas for medical offices in general as opposed to hospitals and locations where mental health treatment is being provided. Recent decisions cast substantial doubt on the District's prohibition on carrying in medical

---

[12] Undersigned counsel is aware of an incident where a psychiatrist employed at a DC university hospital took a patient off a scheduled prescription drug because the patient was abusing the drug with alcohol thus creating a danger to himself. The patient became enraged and showed up at the hospital threatening to kill the doctor. Under the then "may issue" regime, MPD granted the doctor a carry license finding she had a legitimate need for self-protection distinct from the population in general, but she was prohibited from carrying her firearm to work – the most likely place where her patient might try to carry out his threat – because of the various DC prohibitions against carrying in a medical facility, carrying where mental health treatment was provided, carrying in a hospital, or on a college or university grounds. For her, these restrictions resulted in a more than de minimis infringement on her Second Amendment rights.

facilities. *See Antonyuk v. Hochel,* Case No. 22-cv-00968, pp. 123-28 (N.D.N.Y. Nov. 7, 2022) (enjoining enforcement of New York's similar regulation. *See also Koons v. Reynolds,* Case No. 22-cv-07464 (D.N.J. Jan. 9, 2023) (temporarily restraining enforcement of various provisions of New Jersey law designating 'sensitive areas' where guns may not be carried). *Accord Siegal v. Platkin,* 22-cv-07464 (D.N.J. Jan. 30, 2023).

      81.    DC prohibits licensed gun carry in a penal institution or in a secure juvenile residential facility or halfway house. DC Code Section 7-2509.07(a)(4). If any locations would appear to meet the requirements for "sensitive" it would be these locations. Persons incarcerated for crimes plainly have no right to deadly weapons. Penal facilities generally have armed security and the risk of a dangerous person taking a gun away from a firearm carrier is not insubstantial.

      82.    DC prohibits carrying a firearm in a polling place. DC Code Section 7-2509.07(a)(5). Traditionally, governments have had substantial latitude to regulate the conduct of elections. *Burson v. Freeman*, 504 U.S. 191 (1992). It is a common restriction to limit the first amendment right to engage in political speech inside a polling place. *See Minnesota Majority v. Mansky*, 849 F.3d 749 (8th Cir. 2017). There is also a governmental interest in preventing intimidation of voters. The argument could be made that preventing firearms aids in effectuating that latter governmental interest. On the other hand, most polling places do not have police protection and could be a prime candidate for some type of election day terrorist or active killer incident. As discussed above, *Bruen*, states that restrictions on carriage at polling places is historically supported by 18th and 19th century regulations and is thus an established sensitive area. Given this, DC regulation appears valid.

      83.    DC prohibits carrying firearms at taverns and nightclubs, while allowing it at other establishments licensed to sell alcohol, subject to licensees not consuming alcohol. DC Code

Section 7-2509.07(a)(7). This type of prohibition is not unusual among the various states. It is well known that consumption of alcohol impairs judgment, inhibitions, and coordination. Consumption of alcohol increases the risk of firearm accidents and inhibits the ability of an individual to properly evaluate whether use of deadly force in self-defense is legally justified. Under DC law, a licensee is free to go to a restaurant for dinner and carry his firearm as long as he does not consume alcohol. The limitation on carrying into a night club or tavern can be supported by the fact that such establishments are not required to serve food and thus service of alcohol is a primary activity occurring at such an establishment. On the other hand, the flat prohibition on consuming alcohol versus consuming to the point of impairment could indicate that the alcohol prohibition is overbroad. *See Koons v. Reynolds,* Case No. 22-cv-07464, pp. 32-33, 60 (D.N.J. Jan. 9, 2023) (temporarily restraining enforcement of prohibition on carrying firearm into an establishment serving alcohol).

84.     The District bans carrying of firearms at stadia and arenas. DC Code Section 7-2509.07(a)(8). Stadia and arenas are characterized by the presence of large numbers of persons who are concentrated on a sporting event. They are likely not situationally aware. Moreover, alcohol is often served at such events, and persons often are very emotional over their teams, perhaps taking offense at persons cheering for the other team. Fights have been known to break out at such locations. Moreover, such events at least in the District have a substantial police and private security presence, including in some cases metal detector screening. Thus, there is some support for the view these venues could be considered sensitive and the burden on self-defense and Second Amendment rights minimal. Nonetheless, there appears scant historical support for such a prohibition. *See, e.g., Koons v. Reynolds,* Case No. 22-cv-07464, at 33-36 & 60 (D.N.J. Jan.

9, 2023) (temporarily restraining enforcement of ban on carrying firearms in entertainment facilities).

85.     DC prohibits the carrying of a handgun at a "gathering or event open to the public." DC Code Section 7-2509.07(a)(9). Quite frankly, this prohibition, without more, likely suffers from the fatal flaw of vagueness. *See, e.g., Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952)*. The District, however, substantially ameliorates this problem by providing that a person cannot be prosecuted for carrying a firearm at such an event unless there has been advance notice that carrying firearms is prohibited at the event and by posted signage at the event, or unless the licensed carrier is ordered by law enforcement to leave and does not leave. Thus, the degree of interference with the right to carry by this prohibition is substantially less than a regulation that outright prohibits carriage at such events. And the likelihood of a justiciable case being presented with respect to this prohibition is limited. DC law provides that licensees must fully conceal their carried handguns, so it is unlikely that a law enforcement official would even notice that a licensed carrier was attending such an event.[13]

86.     DC's treatment of demonstrations in a public place is similar to its treatment of "public events." *See* DC Code Section 7-2509.07(a)(14). Demonstrations have the potential for confrontations between persons of differing views. Some might argue that this would be just such

---

[13] DC Code Section 7-2509.07(e). *See also* DCMR 24-2344:

> Pistol Carry Methods. 2344.1 A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public. 2344.2 A licensee shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol.

a location where possession of effective self-defense tools would be appropriate due to the potential of a violent attack. However, demonstrations in the District almost always are marked by substantial police presence to prevent violence from breaking out. Nonetheless, there would appear little historical support for such a prohibition. *See Antonyuk v. Hochel,* Case No. 22-cv-00986, at 159-66 (preliminarily enjoining substantially similar New York regulation). The prohibition on carrying at demonstrations also contains a safe harbor provision that violators cannot be prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order;

87.     DC prohibits carry in the public memorials on the Mall and around the Tidal Basin and areas where carrying a firearm is prohibited by federal law, including the Capitol Grounds. DC Code Section 7-2509.07(a)(10). Areas prohibited by federal law needs no further discussion. The memorials are plainly a possible target of a terrorist or active killer given their status as landmarks and symbols of the country. To that extent one could argue that these locations could be considered sensitive; but these facts might also suggest a heightened need for persons to be able to defend themselves. They are also, however, areas that generally have a high degree of police presence to provide added security. However, there would not appear a historical tradition of banning firearm carry in such areas other than the Capitol Grounds.

88.     The District prohibits carrying a firearm around the perimeter of the White House grounds and Lafayette Park and the Vice President's residence. DC Code Section 7-2509.07(a)(11)-(12). In light of the *Class* decision discussed above, there cannot be any serious debate over whether these qualify as sensitive areas. Moreover, the White House and the Vice President's residence are substantially similar to legislative assemblies and courts making these areas in *Bruen's* words "settled" as to their sensitive place nature.

89.     The District requires licensed carriers to stay 1,000 feet away from a motorcade (moving or stopped for an event) carrying domestic or foreign dignitaries under police escort. DC Code Section 7-2509.07(a)(13). The provision contains a safe harbor, however, providing that a licensee cannot be prosecuted for violating this provision unless advanced notice has been given of the prohibited route – which is almost never done – or the area of protection is obvious as a result of a police perimeter, or the licensee is told to leave and refuses to do so. This prohibition is relatively meaningless since law enforcement is not in the habit of providing advance notice of motorcade routes.

90.     DC law essentially allows houses of worship and private property owners to determine if they will allow firearm carry. Thus, the law does not outright ban carrying firearms on private property. Few would argue that there is or should be an unlimited right to conduct oneself as one pleases on the private property of another. However, the District's choosing to establish a default condition of no carry absent express permission has serious constitutional issues according to recent cases. *See Antonyuk v. Hochel,* Case No. 22-cv-00986 at 166-80 (Nov. 7, 2022); *Koons v. Reynolds,* Case No. 22-cv-07464, at 36-48 (Jan. 9, 2023).

91.     There is no need to discuss Code Section 7-2509.07(a)(15), allowing the Chief to designate other sensitive areas, as the Chief has not to our knowledge done so.

**The Metro carry ban violates Plaintiff's Second Amendment rights**

92.     Public transportation vehicles and stations, essentially the DC Metro, share few, if any, of the characteristics that might support the designation of other locations as sensitive areas, assuming historical support exists for such other areas to be considered sensitive. They are not largely populated with persons lacking the physical ability to defend themselves with a firearm or other tool. They are not populated with individuals who would be high value targets to a terrorist or active killer. They are not landmarks or symbols of our nation which would be inviting to terrorists or active killers.[14] The Metro system does not screen persons entering its stations or embarking on a Metro bus or train. The Metro is not an area of intellectual debate, law-making, adjudication, voting, or where demonstrations regularly take place. The Metro is essentially a commercial enterprise providing an essential transportation service to an area with highly congested routes of travel. And although Metro has its own police force, the overwhelming number of trains and buses lack any police presence. Most importantly, there is not an established tradition or history of prohibitions of carrying firearms on public transportation vehicles despite the rise of public transportation shortly after the Founding. In short there is no basis to label the Metro as a sensitive area.

93.     Some might argue that mass transit systems are soft targets of terrorists, and the hijacking of planes might be used to support such an argument; however, soft targets are "soft" because they lack security to harden them from attack. Further, in the case of the terrorist attacks on 9/11, the airliners and their passengers were not targets in and of themselves. Instead, they were

---

[14] Of course, the evidence strongly indicates that active killers seek out gun free zones to accomplish their nefarious plans. Thus, a location that might not otherwise be a target could be endangered by giving it the status of a "gun free zone." *See* Crime Prevention Research Center, *Updated: Mass Public Shootings Keep Occurring in Gun-Free Zones: 94% of Attacks Since 1950* (June 15, 2018).

used as weapons to attack national symbols. The response to that threat was to intensify airport security and to deploy a large cadre of air marshals and screeners. The Metro system lacks such security measures. Rather, DC's prohibition on carrying arms in the Metro system is what would make Metro a soft target for terrorists and criminals alike.

94.     Even if the public transportation vehicles could be considered "sensitive areas," the prohibition on licensed carry on such vehicle is a substantial infringement on carry licensees' Second Amendment rights. This is especially the case as to persons of limited means lacking access to alternative transportation. It is certainly more than a de minimis burden on persons such as the Plaintiffs here who regularly use the Metro system in their day-to-day activities, and thus no presumption of constitutionality would accrue to this prohibition. *See Class,* 930 F.3d at 463. The practical effect is that persons who need to travel around the District via the Metro are disarmed for the entirety of their journey. This is true despite that it is technically possible to transport a handgun on the Metro.

95.     To transport a handgun on the Metro, the firearm must be unloaded, stored in a locked container with the ammunition stored separately. DC Code Section 22-4504.02. Thus, a woman with a DC concealed pistol license could theoretically holster her gun for the walk through her crime ridden neighborhood as she heads out for shopping, but before she could enter the Metro station or get on a Metro bus, she would have to unholster her firearm, unload it, open a lockable container, place the gun in the lockable container, lock it, and store the ammunition separately. *See* DC Code Section 22-4504.02. All of this would be done in public and in violation of the requirement of DC Code Section 7-2509.07(e) that the gun has to be fully concealed.[15] And once

---

[15] The penalties for violating the requirement that the firearm must be fully concealed are enormous. The District provides for a potential jail term of up to six months and a fine of up to $1000 for such violation. *See* DC Code Sections 7-2707.06(a) and 22-3571.01(b)(4). Moreover

getting off the Metro, to continue to her ultimate destination while exercising her constitutional right to be armed in the event of a violent confrontation, she would have to unlock the locked container, remove her firearm from the container, load it, holster it, and conceal it, again all in public.  The likelihood of creating a public disturbance with a dangerous police response and likely arrest is substantial.

96.     Moreover, notwithstanding that DC Code Section 7-2509.07(e) makes it impossible to comply with the transport code section, unnecessary handling of a firearm creates the risk of an accidental or negligent discharge. *See* Farnam, Unnecessary Gun Handling, *Ammoland Shooting Sports News* (July 27, 2015), available at https://www.ammoland.com/2015/07/unnecessary-gun-handling/#axzz5mywSQ2FR; Michalowski, Avoiding a Negligent Discharge, available at https://www.usconcealedcarry.com/blog/avoiding-negligent-discharge/.

97.     *Bruen, Heller* and *Wrenn* teach us that firearm prohibitions are to be evaluated in light of the text of the Second Amendment, and the Nation's history and tradition of firearms regulation. *Bruen,* 142 S.Ct. at 2129-30; *Heller,* 554 U.S. at 576-628*; Wrenn,* 864 F.3d at 657-61*; See also Moore v. Madigan,* 702 F.3d 933, 935-37 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013). Nothing in the text of the Second Amendment, or the Nation's history and tradition of firearms regulation supports upholding a ban on arms carry on public transportation.

---

conviction "in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device" is defined as a "weapons offense." DC Code Section 7-2501.01(18). Conviction of a weapons offense – with very minor exceptions not pertinent hereto – by a DC resident renders that person ineligible for life to register or carry a firearm, thus stripping him of his firearms rights in DC. *See* DC Code Section 7-2502.03(a)(2). Under such circumstances no DC carrier is likely to intentionally expose his firearm and risk losing his firearms rights in the District. We note that MPD actively enforces this provision as it does all of its firearm regulations.

98.     Public transportation systems did not exist at the founding of the nation. However, they developed soon after. Moreover, there was plainly a tradition of firearms carry when citizens traveled from their homes. In modern parlance, Americans carried arms to prevent their gatherings from becoming soft targets. For example, a March 9, 1636, ordinance provided that every person above 18 years of age (except magistrates and elders of the churches) were ordered to "come to public assemblies with their muskets, or other pieces fit for service, furnished with match, powder, & bullets, upon paine of 12*d* for every default… And no person shall travel above one mile from his dwelling house, except in places wheare other houses are nearby together, without some armes, upon paine of 12*d* for every default."  Shurleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston:  William White, 1853), 1:190, 1:210.

99.     Connecticut in 1643 ordered that at least one person in every house "shall bring a musket, pistol or some piece, with powder and shot" to every church meeting. Trumbell, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1950), 1:95, 96., *Records of the Colony and Plantation of New Haven From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), at 131-32. It is reported that several persons were fined for neglecting to bring their arms to meetings. *Id.* at 486.

100.     In the New Haven Colony, militia members were required to arrive at Church with their guns charged. Hoadly, ed. *Records of the Colony and Plantation of New Haven, From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), 131.

101.     Rhode Island ordered "that no man shall go two miles from the Towne unarmed, either with Gun or Sword, and that none shall come to any public Meeting without his weapon." Barlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: Crawford Greene and Brother, 1856), 1:94.

102.    The requirement to carry arms when traveling from home and while attending gatherings was not just a New England requirement. A 1619 statute in Virginia commanded that churchgoers who "bear arms shall bring their pieces, swords, powder and shot" to worship services with violators subject to fine. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner & Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273. Virginia reissued the law in 1632 and again in 1738. Cramer, *Gun Control in the Middle & Southern Colonies*, citing Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* (New York: R & W & G. Bartow, 1832), 1:198 & 5:19. Similarly, a 1743 South Carolina law required church attendees on pain of fine "with minor exceptions to come to church armed." Cramer, Gun Control in the Middle & Southern Colonies at 6.

103.    In *Heller*, the court cited "the most important early American edition of Blackstone's Commentaries," 554 U.S. at 594, by St. George Tucker. Speaking in 1803 of the right to bear arms Tucker noted that in "many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Id.*

104.    The limitation of carrying arms in sensitive places at least reaches as far back as the 14th century. Professor Kopel reports that a 1313 statute provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably.' In other words, Parliament and similar assemblies should be conducted without arms present at the deliberations." Kopel at 209-10 & n. 22.

105.    In 1328, the Statute of Northampton was propounded which in pertinent part prohibited carrying arms around the king's officials: "no man great nor small . . . be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace. . ." Kopel at 212. Professor Kopel explains that the "prohibition served several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort." *Id.* Additional provisions of the statute on its face purported to prohibit riding "armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere. . ." *Id.* Various reiterations of the statute were propounded through the 17th century. *See Id.* at 216-17. However, *Bruen* explains that this provision merely prohibited being armed with unusual weapons that would likely terrorize the populace. 142 S.Ct. at 2139-40.

106.    Various commentators have noted that even at the founding or shortly thereafter, it was not uncommon for the states or localities to enact laws regulating firearms such as regulations for the storage of powder, prohibiting discharge in public, surety laws designed to keep the peace and state variances of the English Statute of Northhampton. *See, e.g.,* Cornell, *The Right to Carry Firearms Outside the Home: Separating Historical Myths and Historical Realities,* 39 Fordham L. Urb. L. J. 1695, 1707-17 & 1719-20 (2012) (hereinafter cited as "Cornell").

107.    The D.C. Circuit in *Wrenn*, acknowledged the existence of these laws but noted that considering *Heller's* analysis, the Statute of Northhampton did not support a prohibition on handgun carry outside the home for the law-abiding citizens. *Wrenn*, 864 F.3d 660 ("[T]he history showcased in *Heller* contradicts the main scholar whose work the District cites for the idea that Northhampton banned all carrying in crowded areas (as opposed to carrying dangerous arms or

carrying so as to terrify."). And *Wrenn* further explained that "surety laws did not deny a responsible person carrying rights … [t]hey only burdened someone reasonably accused of posing a threat." *Id.* 864 F.3d at 661.

108.    In the antebellum era, several states enacted laws prohibiting the carrying of concealed pistols and Bowie knives. The Court in *Heller* noted that state Court decisions on these laws are instructive in understanding the scope of the Second Amendment.  *State v. Reid,* 1 Ala. 612 (1840), for example, cited at 554 U.S. at 688, held it was within the legislature's power to prohibit the carrying of a *concealed* firearm where the legislature had left open the option to carry the weapon *openly*. By contrast, *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822), cited at 554 U.S. 585 n. 9, invalidated a Kentucky statute that criminalized the carry of concealed weapons. *Heller* explained that in *Nunn v. State,* 1 Ga. 243, 251 (1846), "the Georgia Supreme Court construed the Second Amendment as protecting the '*natural* right of self-defense' and therefore struck down a ban on carrying pistols openly." *Heller,* 554 U.S. at 612.

109.    The Heller opinion further cited *State v. Chandler,* 5 La. Ann. 489, 490 (1850), in which the Louisiana Supreme Court held that citizens had a right to carry arms openly: "'This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.'"  *Heller,* 554 U.S. at 613. *See also Wilson v. State,* 33 Ark. 557 (1878)[16]

---

[16] Citing *Fife v. State,* 31 Ark. 455 (1876) the court said the legislature might constitutionally prohibit the carrying of such pistols and other arms easily concealed about the person, as are used in quarrels, brawls, and fights between maddened individuals, but that the Constitution guaranteed to the citizens the right to keep and bear arms for defense, etc." Remarking on what we would now call sensitive areas, the court stated that the state could in time of peace ban "wearing war arms [army pistols] to places of public worship or elections" (citing *Andrews v. State,* 50 Tenn. (3 Heiskel) 165 (1871)), [b]ut to prohibit the citizen from wearing or carrying a war arm, except upon

110.     It is noteworthy that the laws at issue in those cases that prohibited the concealed

carry of pistols, generally made an exception for travelers. *See* Cramer, Concealed Weapons Laws

of the Early Republic (Praeger:  Westport, Conn. 1999), Appendix A, p. 143-52. Illustrative is

Kentucky's 1813 statute that criminalized "any person in this commonwealth, who shall wear a

pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling

on a journey, shall be fined in any sum, not less than one hundred dollars[.]" Cramer, at 143.[17]

Indiana enacted a similar exception in its 1820 statute and its 1831 reenactment. *Id.* at 145.[18]

Arkansas also had an exception for travelers carrying concealed weapons in its 1838 statute. *Id.* at

150.[19]

111.     Cornell, who has written extensively in support of restrictions on firearm carry,

cites (at 1719 n. 132) several post Reconstruction state laws regulating the carriage of firearms in

sensitive places, including: 1870 La. Acts 61 (prohibited weapons carrying "on any day of election

during the hours the polls are open, or on any day of registration or revision of registration, within

a distance of one-half mile of any place of registration or revision of registration"); 1870 Tex. Gen.

Laws 63 (prohibiting carry at a church or religious assembly, school or other place where persons

---

his own premises or when on a journey traveling through the country with baggage … is an
unwarranted restriction upon his constitutional right to keep and bear arms." 33 Ark. at 559-60.

[17] Citing *Acts Passed at the First Session of the Twenty First General Assembly for the
Commonwealth of Kentucky* (Frankfurt: Gerald & Berry 1813), 100-01.

[18] Citing *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly*
(Jeffersonville:  Isaac Cox, 1820), 39, and *Revised Laws of Indiana in Which Are Comprised All
Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General
Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

[19] Citing *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General
Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan & Co. 1838), Div. VIII, Art. I § 13, p.
280.

are assembled for educational, literary or scientific purposes, ballroom, social party or other social gathering, election precinct on the day or days of any election, place where people may be assembled to perform any other public duty, or other public assembly);[20] 1878 Va. Acts 37 ("place of worship while a meeting for religious purposes is being held without good and sufficient cause therefor, and on Sundays); and 1859 Wash. Sess. Laws 489 (penitentiary, jail or house of correction). *See also Hill v. State,* 53 Ga. 473 (1874) (upheld a statute prohibiting carrying weapons at sensitive locations such as courts of justice and religious gatherings). With the exception of the outlier Texas legislation, these statutes share a general consistency with modern day sensitive place restrictions. Significantly, Cornell fails to point to any historical restriction on firearm carry on public conveyances. Plaintiffs are aware of none in the relevant Founding era and the time around the adoption of the 14th Amendment.

112.    Although much has been written purporting to discuss the history of public carriage of firearms in the 19th century following the adoption of the Second Amendment, we have been unable to find any authority to support a tradition of prohibiting the carriage of weapons on public conveyances of the time such as riverboats, ferries, trains or stagecoaches. Indeed, the outlier statute at issue in *State v. Duke,* 42 Tex. 455 (1874), which generally prohibited pistol carry outside one's home or place of business except in case of apprehended danger, like the antebellum laws discussed above, also excepted travelers within the state. 42 Tex. at 457.[21]

113.    Given the discussion above, it cannot be said that the Nation's history and tradition of firearms regulation supports treating public transportation vehicles as sensitive for firearm carry.

---

[20] *Bruen*, however, labeled Texas's 1870s restrictions on firearm carry as an outlier not representative of the Nation as a whole. *Slip. op.* at 56-58.

[21] Cornell erroneously claims the Texas law was a comprehensive ban on traveling when armed. Cornell at 1721.

Rather, the historical evidence is that there was an established consensus that persons traveling from their homes had a need to be armed.

114.    Nor does there appear to be a current widespread practice or tradition of treating public transportation facilities as sensitive. Firearm carry restrictions on public transportation are relatively rare and of recent vintage. A survey of available data for state "sensitive area" restrictions, pre-*Bruen,* shows that although restrictions vary considerably from state to state, restrictions on public transportation are not well established. Other than the District of Columbia, only a handful of states, including Illinois, Missouri, New Mexico, and South Carolina prohibit carry on public transportation. *See* 430 Ill Comp. Stat. §66/65; RSMO §§70.441(11) & 577.030(4); NM Stat. Ann. §30-7-13; S.C. Code Ann. §58-23-1830. Montana also prohibits carrying firearms on trains, but not on other public transportation. *See* Mont. Code Ann. §87-5-401. None of these restrictive statutes can be said to be longstanding. The oldest appears to be Missouri's restriction on carry on buses, but it dates back only to 1982. *See* RSMO §577.030(4).

115.    Admittedly, there has been a reaction by some of the more restrictive states to add to their lists of so-called "sensitive places." These recent enactments are irrelevant to an analysis under *Bruen,* and as cases cited above show, largely lack a historical pedigree. Prior to *Bruen,* none of the may-issue states prohibited carry on public transportation by licensed carriers. Connecticut, which was technically a may issue jurisdiction but was liberal in granting carry permits, prohibited carrying firearms in schools, state parks, wilderness management areas, by non-owner employees of a business, on posted property, legislative buildings and in the town-owned                    property                    of                    Woodbridge.                    *See*

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ct-gun-laws/#loc_res

(providing citations to Connecticut authorities).[22]

116.    New Jersey prohibited carrying firearms in schools and universities, state parks and

on ferry cruises to the national landmarks of Ellis Island and the Statue of Liberty.

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/nj-gun-laws/#loc_res.

117.    Rhode Island prohibited the carrying of firearms in state parks and wilderness

management      areas,      secured      areas      in      airports      and      detention      facilities.

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ri-gun-laws/#loc_res.

118.    Massachusetts prohibited carry in schools and universities, courthouses, airports,

and              when              using              off-highway              vehicles.

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ma-gun-laws/#loc_res.

119.    New York had numerous restricted areas: schools and universities, childcare

facilities, public campgrounds, courthouses, mental health facilities, government buildings,

airports, and certain parks and recreation areas. New York also had a narrow public transportation

ban prohibiting the carrying of firearms on Ellis Island and Liberty Island cruises and at the Statue

of Liberty, but the state did not ban the carrying of firearms on subways, buses or ferries.

120.    Maryland restricts firearms carry in public schools, most childcare centers, state

parks, state and national forests, Chesapeake forest lands, state highway rest areas, commercial

aircraft, lodging establishments if the innkeeper so requires, dredge boats, community

rehabilitation centers, state buildings and grounds, legislative buildings, and at demonstrations.

---

[22] The United States Concealed Carry Association maintains an up-to-date web site listing state by
state restrictions on the carry of firearms, including citation to the specific state statutes. *See*
https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/. To review carry restrictions
in any state, one simply clicks on the state, scrolls down to "location restrictions" and clicks on
that link.

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/md-gun-laws/#loc_res.      It does not prohibit carry on the Metro system, however.

121.    California also has a long list of restricted locations: schools and universities, courtrooms, gun shows (if in possession of ammunition for the gun), state capitol and legislative buildings and the residences of state officers and legislators, state parks, wildlife management areas, polling places, labor demonstrations (picketing), bars, the Cal Expo Center, and San Francisco City property.  https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ca-gun-laws/#loc_res. California law allows permitted carriers to carry on public transportation. Cal. Penal Code §§ 171.7(b)(1), 171.7(c)(2).

122.    Hawaii prohibits the carrying firearms in the secured area of an airport, in state and national parks, national forests and wildlife management areas, and in rest stop buildings. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/hi-gun-laws/#loc_res.

123.    Delaware prohibits carrying firearms in schools and universities, vehicles owned or operated by a school, public recreational buildings, sports stadia and fields, prisons, and detention facilities.  https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/de-gun-laws/#loc_res.

124.    With respect to those states with substantial numbers of carry licenses outstanding, while limitations again vary considerably, public transportation limitations do not exist. Where the appropriate warning sign is posted, Texas prohibits the carrying of firearms at schools and private colleges and universities, hospitals and nursing homes, churches, and government meetings. Texas also prohibits carrying firearms in establishments deriving 51 or more percent of their income from alcohol sales, as well as courthouses, correctional institutions, places of execution, certain posted

private property, polling places, racetracks, and the secured area of an airport. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/tx-gun-laws/#loc_res.

125.    Florida prohibits carry in schools and universities including vocational technical centers, school and professional athletic events, police stations, detention facilities, court houses, polling places, legislative meetings, hospitals providing mental health services, bar portions of establishments serving alcohol, The Seaport, Savannas State Reserve, and airport passenger terminals.              https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/fl-gun-laws/#loc_res.

126.    Utah prohibits carrying firearms in any secure area in a correctional, law enforcement, courthouse, airport, mental health facility, and houses of worship and private residences    that    have    given    notice    that    firearms    are    prohibited. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ut-gun-laws/#loc_res.

127.    Neighboring Virginia prohibits carry on school grounds, school buses, and areas open to the public and exclusively used for school-sponsored functions or extracurricular activities while such functions or activities are taking place. Most public colleges and universities have promulgated regulations prohibiting carry in buildings and at events. Carrying firearms is also banned in courthouses, airports, and detention facilities. Carrying is also banned in the Capitol Square in Richmond, in state executive branch offices, on certain Tennessee Valley Authority lands, the portion of Hog Island Wildlife Management Area bordering on the James River north of the Surry Nuclear Power Plant (except while hunting), on Buggs Island, and a portion of the Gaston                      Reservoir                  (Roanoke                      River). https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/va-gun-laws/#loc_res.

128.    In sum, in line with *Heller,* the broad consensus of states regulate schools, court houses, and some government buildings as sensitive locations. Hospitals, polling places, colleges and universities, sports stadia and events, and certain outdoor recreational locations are sometimes treated as sensitive locations as well. But there does not appear a consensus or tradition to treat public transportation facilities as sensitive. Moreover, in those few jurisdictions which do so, the restrictions in questions are not longstanding. Even New York, prior to *Bruen*, which generally had the most restrictive laws on firearms, for 153 years did not ban carry on the New York subway, one of the world's largest underground transit systems.

129.    Thus, an analysis of text, history and tradition requires a conclusion that DC's prohibition of carrying firearms on public transportation facilities and vehicles is not grounded in the nation's historic tradition of firearms regulation, and therefore cannot be restricted as sensitive areas under *Heller* or *Bruen*. Accordingly, DC's prohibition on carrying defensive firearms within public transportation vehicles and stations violates Plaintiffs' Second Amendment right to bear arms in public for self-defense.

**FIRST CLAIM FOR RELIEF:**

**U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS**

130.    DC Code § 7-2509.07(a)(6) prohibits Plaintiffs from carrying their personal protection firearms on public transportation vehicles, including the Metro trains and Metro stations. No national historical tradition of firearms regulation supports this ban, and this ban is a substantial infringement of Plaintiffs' ability to exercise their Second Amendment right to carry and use a handgun for personal protection. As such, the Metro ban violates the Second Amendment rights.

131.    Defendants' laws, customs, practices, and policies banning Plaintiffs from carrying their personal protection handguns on public transportation vehicles violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, polices, and practices.

132.    Plaintiffs have suffered and will suffer monetary damages as a result of compliance with the Metro Ban because of the increased cost of transportation of not using the Metro system. They therefore demand recovery of damages of the defendants in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

133.    DC Code § 7-2509.01(a)(6)'s prohibition on carrying firearms on public transportation vehicles and stations is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to carry firearms for personal protection in public.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgement that DC Code 7-2509.07(a)(6) is arbitrary and irrational under the Second and Fifth Amendments to the United States Constitution.

2. Enter a declaratory judgement that DC Code §7-2509.07(a)(6) violates the Second Amendment to the United States Constitution.

3.  Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DC Code §7-2509.07(a)(6) as to persons holding District of Columbia concealed pistol licenses;

4.  Enter an order awarding Plaintiff's their costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988 and monetary damages to be proven at trial; and

5.  Enter an order providing any other and further relief as the court deems just and appropriate.

Respectfully submitted,

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By:  /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys PLLC
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  February 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I served all counsel of record in this proceeding this day through the court's ECF system.

George L. Lyon, Jr., DC Bar 388678