# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GREGORY T. ANGELO, ET AL.** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 22-cv-1878 |
| ) | |
| **DISTRICT OF COLUMBIA, ET AL.** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTIONS TO DISMISS

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By:  /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys PLLC
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

April 24, 2023

# TABLE OF CONTENTS

I.      *Introduction* ................................................................................................ 1

II.     *Facts* ....................................................................................................... 4

III.    *Plaintiffs have standing to challenge the Metro Carry Ban* ........................................... 10

        a.   *The Metro Carry Ban causes injury to Plaintiffs* ...................................................... 11

             1.   *Plaintiffs have alleged injuries in fact* ........................................................ 11

                  A.   *Plaintiffs' injuries are particularized and concrete* ................................... 12

                  B.   *Plaintiffs' injuries are actual or imminent* ............................................ 13

                  C.   *The Navegar line of cases does not rob Plaintiffs of standing
                       to contest the Metro Carry Ban* ........................................................ 18

                  D.   *Plaintiffs suffer economic injury from the Metro Carry Ban* .................... 29

             2.   *Plaintiffs' injuries are fairly traceable to Defendants
                  and are redressable by this Court* ............................................................ 32

IV.     *Plaintiffs agree that the individual defendants are immune from damages* .................... 34

V.      *Conclusion* ............................................................................................... 34

Exhibit 1, Declaration of Gregory T. Angelo

Exhibit 2, Declaration of Tyler Yaguirre

Exhibit 3, Declaration of Cameron M. Erickson

Exhibit 4, Declaration of Robert M. Miller, Ph.D.

# TABLE OF AUTHORITIES

*Cases*                                                                                          *Page*

520 Michigan Ave. Assocs., Ltd. v. Devine,
    433 F.3d 961 (7th Cir. 2006) ............................................................................. 15

Abbott Laboratories v. Gardner,
    387 U.S. 136, 152 (1967) ........................................................................... 24, 29

Allen v. District of Columbia,
    Case No. 20-cv-2453, slip op. (March 31, 2023) ............................................ 34

Allen v. Wright,
    468 U.S. 737 (1984) ........................................................................................ 25

American Legion v. American Humanist Assn.,
    139 S.Ct. 2067 (2019) .................................................................................... 10

Antonyuk v. Hochul,
    Case No. 22-cv-00986, Doc 27 (N.D.N.Y. Oct. 6, 2022), appeal pending (2d Cir.) ....... 28

Attias v. Carefirst, Inc.,
    865 F.3d 620 (D.C. Cir. 2017) ........................................................................ 29

*Babbitt v. United Farm Workers Nat'l Union,
    442 U.S. 289 (1979) ................................................................. 3, 15, 16, 2, 26, 27

Bach v. Pataki,
    408 F.3d 75 (2d Cir. 2005) .............................................................................. 27

Barke v. Banks,
    25 F.4th 714 (9th Cir. 2022) ........................................................................... 27

Bauer v. Shepard,
    620 F.3d 704 (7th Cir. 2010) ..................................................................... 14, 15

Bolling v. Sharpe,
    347 U.S. 497 (1954) .......................................................................................... 1

Brandt v. Vill. of Winnetka, Ill.,
    612 F.3d 647 (7th Cir. 2010) ..................................................................... 14, 15

California v. Texas,
    141 S. Ct. 2104 (2021) .................................................................................... 32

\* Denotes principle cases relied upon.

*Christian v. Nigrelli,*
22-cv-695, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) ........................................ 3, 4

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
508 U.S. 520 (1993) ................................................................................................. 12

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................................ 14, 29, 30, 32

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,*
149 F.3d 679 (7th Cir. 1998) ..................................................................................... 14

*Davis v. District of Columbia,*
158 F.3d 1342 (D.C. Cir. 1998) ..............................................................................,.... 23

*Delaware Women's Health Organ., Inc. v. Wier,*
441 F. Supp. 497 (D. Del. 1977) ........................................................................... 16, 17

*Diamond v. Charles,*
476 U.S. 54 (1986) ................................................................................................... 15

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................................. 1, 12, 20, 25

*\*Doe v. Bolton,*
410 U.S. 179 (1973) ....................................................................................... 15, 1, 26

*Doster v. Kendall,*
No. 22-3497, 2022 WL 17261374 (6th Cir. Nov. 29, 2022) .................................. 15, 16

*Ellis v. Comm'r, IRS,*
67 F. Supp. 3d 325 (D.D.C. 2014) .............................................................................. 33

*Elrod v. Burns,*
427 U.S. 347 (1976) ................................................................................................. 23

*Evers v. Dwyer,*
358 U.S. 202 (1958) ................................................................................................. 31

*\*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) .......................................................................... 3, 13, 14

*\*Fed. Election Comm'n v. Cruz,*
142 S. Ct. 1638, 1648 (2022) ........................................................... 3, 13, 14, 30, 31, 32

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11(1998) ........................................................................................ 25

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ................................................................. 31, 3

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees,*
    344 F.3d 1288 (11th Cir. 2003) ................................................................... 19

*Gillespie v. City of Indianapolis,* 185 F.3d 693
    (7th Cir. 1999) ............................................................................................. 27

*Grocery Mfrs. Ass'n v. EPA,*
    693 F.3d 169 (D.C. Cir. 2012) ..................................................................... 33

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ..................................................................... 23

*Graham v. Butterworth,*
    5 F.3d 496 (11th Cir. 1993), cert. denied, 511 U.S. 1128 (1994) .................... 16

*Hardaway v. Nigrelli,*
    22-cv-771, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ......................... 4, 28

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .................................................................................... 31

*Haynesworth v. Miller,*
    820 F.2d 1245 (D.C. Cir. 1987) ................................................................... 19

*Hazardous Waste Treatment Council v. Thomas,*
    885 F.2d 918 (D.C.Cir.1989) ...................................................................... 29

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) ........................................................................ 27

*Hejira Corp. v. MacFarlane,*
    660 F.2d 1356 (10th Cir. 1981) ................................................................... 27

*Heuer v. Smithsonian Inst.,*
    17-cv-0147 (D.D.C. August 1, 2022) ........................................................... 31

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig*ation,
    45 F.Supp.3d 14 (D.D.C. 2014) ................................................................... 31

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
  678 F.3d 235 (3rd Cir. 2012) .................................................................... 10, 11

*Jackson v. City & Cty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ............................................................................ 27

*Koons v. Reynolds*,
  22-cv-07464, ECF 34 at 21-37, 2023 WL 128882 (D.N.J. Jan. 9, 2023) .................. 4, 28

*Lewis v. Casey*,
  518 U.S. 343 (1996) .......................................................................................... 13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................ 10, 11, 12, 23

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .......................................................................................... 11

*Maine v. Thiboutot*,
  448 U.S. 1 (1980) .............................................................................................. 34

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) .......................................................................................... 20

*\*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ............................................................................... 14, 21, 24

*Metro Wash. Chapter, Associated Builders & Contractors v. District of Columbia*,
  Case No 22-7014, slip op. (D.C. Cir. March 14, 2023) .................................... 30

*Mobil Oil Corp. v. Attorney Gen. of Va.*,
  940 F.2d 73 (4th Cir. 1991) ............................................................................... 27

*Nat'l Family Planning and Reproductive Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ............................................................................ 31

*National Rifle Ass'n of America v. Magaw*,
  132 F.3d 272, 293-94 (6th Cir. 1997) .................................................................. 28

*Navegar, Inc. v. United States*,
  103 F.3d 994 (D.C. Cir. 1997) .............................................................. 1, 18, 24, 26

*New Hampshire Right to Life Political Action Comm. v. Gardner*,
  99 F.3d 8 (1st Cir.1996) ......................................................................... 16, 27, 32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ........................................................................... passim

*New York Rifle & Pistol Ass'n  v. New York,*
    140 S.Ct. 1525 (2020) ...................................................................... 20, 21, 22

*New York State Rifle & Pistol Ass'n v. City of New York,*
    883 F.3d 45 (2d Cir. 2016) ............................................................................ 20

*New York State Rifle & Pistol Ass'n v. City of New York,*
    86 F. Supp. 3d 249 (S.D.N.Y. 2015) ................................................ 20, 21, 22

*Ord v. District of Columbia,*
    587 F.3d 1136, 1140 (D.C. Cir. 2009) ...................................................... 18, 20

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007),
    *affirmed District of Columbia v. Heller,* 554 U.S. 570 (2008) .............................. 1, 18, 26

*Peoples Rights Organization, Inc. v. Columbus,*
    152 F.3d 522 (6th Cir. 1998) ........................................................................ 27

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ...................................................................................... 12

*Poe v. Ullman,*
    367 U.S. 497 (1961) ...................................................................................... 16

*Public Citizen v. United States Dep't of Justice,*
    491 U.S. 440 (1989) ...................................................................................... 25

*Rhode Island Assoc. of Realtors v. Att'y General,*
    199 F.3d 26 (1st Cir. 1999) ........................................................................... 17

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ........................................................................................ 11

*Samuels v. District of Columbia*
    770 F.2d 184 (D.C. Cir. 1985) ....................................................................... 34

*Seegars v. Gonzalez,*
    396 F.3d 1248 (D.C. Cir. 2005) ...................................................... 1, 18, 21, 25

*Seegars v. Gonzalez,*
    413 F.3d 1 (D.C. Cir. 2005) ........................................................................... 26

*Siegel v. Platkin,*
    22-cv-07464, ECF 51 (D.N.J. Jan. 30, 2023) ............................................................ 4, 28

*Silha v. ACT, Inc.,*
    807 F.3d 169 (7th Cir. 2015) ......................................................... 10, 11, 32

*Spokeo, Inc. v. Robbins,*
    578 U.S. 330 (2016) ............................................................................. 12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................. 34

*Steffel v. Thompson,*
    415 U.S. 452 (1974) .............................................................. 14, 15, 23, 24

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................... 3, 14, 16, 23, 24

*Tennessee Elec. Power Co. v. TVA,*
    306 U. S. 118, 137–138 (1939) ............................................................... 23

*Terrace v. Thompson,*
    263 U.S. 197 (1923) ........................................................................... 24

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ............................................................ 10, 11, 12, 14

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021) ......................................................................... 10

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ................................................................ 27

*Vermont Right to Life Comm., Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000) .................................................................. 17

*Virginia v. Amer. Booksellers Ass'n, Inc.,*
    484 U.S. 383 (1988) ................................................................ 3, 8, 13, 15

*Warth v. Seldin,*
    422 U.S. 490 (1975) ....................................................................... 11, 13

*Whole Woman's Health v. Jackson,*
    142 S.Ct. 522 (2021) ........................................................... 18, 19, 20, 21

*Williams v. Lew,*
    819 F.3d 466 (D.C. Cir. 2016) ........................................................................ 32

*Wilson v. Stocker*,
    819 F.2d 943 (10th Cir. 1987) ................................................................. 15, 17

*Woodhull Freedom Foundation v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) ....................................................................... 17

*Younger v. Harris,*
    401 U.S. 37 (1971) ....................................................................................... 15

**Statutes**

DC Code § 7-2501.01(18) ...................................................................................... 7

DC Code § 7-2502.03(a)(2) ..................................................................... 7, 25, 28, 29

DC Code § 7-2502.08 ............................................................................................. 7

DC Code § 7-2507.02 ............................................................................................. 7

DC Code § 7-2507.06 ............................................................................................. 7

DC Code § 7-2508.07 ............................................................................................. 7

DC Code § 7-2509.07 ....................................................................................... 12, 26

DC Code § 7-2509.07(a)(2) ............................................................................. passim

DC Code § 7-2509.07(b) ........................................................................................ 8

DC Code § 7-2509.07(e) ........................................................................................ 6

DC Code § 7-2509.10(a)(1) .................................................................................... 7

DC Code § 7-2509.10(b) ........................................................................................ 7

DC Code § 9-1107.01(76(a)) .................................................................................. 8

DC Code § 22-3571 .01 .......................................................................................... 7

42 U.S.C. § 1983 .......................................................................................... 1, 3, 34

**Other Authorities**

Johnson, *Lawful Gun Carriers (Police And Armed Citizens): License, Escalation, And Race,*
    80 Law and Contemporary Problems 209 (2017) ........................................................... 25

Joint App'x, Case No. 18-280 (US May 7, 2019) ....................................................................... 20

Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*,
    17 Suffolk U. L. Rev. 881 (1983) ............................................................................... 10, 23

## I.    *Introduction.*

Imagine an alternate reality. In this reality, the DC Council decides public safety demands the segregation of the races at lunch counters, restaurants and other places of public accommodation. The Council enacts a ban on mixed race seating at such establishments. The law provides no exceptions. Violators of the ban are subject to a mandatory minimum punishment of five years in prison. Plaintiffs Angelo, Erickson, Miller and Yzaguirre all have family or friends of another race and all wish to go to dinner with them in DC. They write to the MPD Chief and the DC Attorney General pointing out the law's obvious unconstitutionality and ask these officials to agree not to enforce the ban against them. There is no response. Plaintiffs are unwilling to violate the law due to the Draconian penalties associated with violation. After the law takes effect, no one violates it due to the harsh penalty if they "bet the farm" and ultimately lose. *See Free Enterprise Fund,* 561 U.S. 477, 490 (2010).

Plaintiffs sue DC and District officials for injunctive and declaratory relief in the DC US District Court under 42 U.S.C. § 1983 to redress this violation of the Fifth Amendment's due process guarantee, *see Bolling v. Sharpe,* 347 U.S. 497 (1954) (due process clause of the Fifth Amendment encompasses the same protection as the 14th Amendment's equal protection clause). DC moves to dismiss the action alleging Plaintiffs lack standing in this non-First Amendment pre-enforcement challenge because Plaintiffs have not shown they have suffered an injury as they have not been uniquely targeted or personally threatened with enforcement of the law. DC cites the DC Circuit's decisions in *Navegar, Inc. v. United States,* 103 F.3d 994 (D.C. Cir. 1997), *Parker v. District of Columbia,* 478 F.3d 370 (D.C. Cir. 2007), *affirmed District of Columbia v. Heller,* 554 U.S. 570 (2008), and *Seegars v. Gonzalez,* 396 F.3d 1248 (D.C. Cir. 2005). The District court, considering itself bound by these cases, denies the injunction and ultimately dismisses the case.

The absurdity of the *Navegar* line and how the District views these cases is made plain by the foregoing example. Under DC's interpretation of standing, DC could resegregate lunch counters and no one could seek a pre-enforcement challenge to such a law unless they are personally threatened with enforcement or can show they have been uniquely targeted, and the District could stymie any pre-enforcement challenge by simply staying mute as to its enforcement intent. That is not the law under binding Supreme Court precedent, and if it is the rule under DC Circuit precedent, this court is not required to follow it as it defies the Supreme Court.

Plaintiffs here have standing in this case to mount a pre-enforcement constitutional challenge to the Metro Carry Ban.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that individuals have a constitutional right under the Second Amendment to carry firearms for self-defense outside the home. Yet, under DC law, ordinary, law-abiding persons like Plaintiffs here, who are duly licensed to carry concealed handguns, cannot legally exercise this right if they travel outside their homes via public transportation such as the Metro bus and subway system. *See* DC Code § 7-2509.07(a)(6)("Metro Carry Ban"). This imposes a burden on Plaintiffs' Second Amendment rights well beyond being disarmed on public transportation—which itself is unconstitutional. After all, if an individual cannot carry a firearm while on public transportation, that necessarily means both (1) that he cannot carry his firearm before boarding and (2) that he is deprived of carrying his firearm after departing as he goes to his final destination. DC's ban effectively bars carrying before the journey, while on the journey, and after the journey. Under the applicable framework established by *Heller* and *Bruen*, the Metro Carry Ban is unconstitutional.

The District defendants and Metro Police Chief Anzallo move to dismiss this action. They allege Plaintiffs lack standing to contest the Metro ban, arguing that they have not been injured

because they have not been singled out or personally threatened with enforcement. *See* ECF 42-1 at 12; ECF 44-1 at 5-9. Defendants also move to dismiss damage claims against the individual defendants on various bases of immunity. *See* ECF 41-1 at 5 -11; ECF 44-1 at 11-14. We agree that monetary damage claims against the individual defendants do not lie. However, the District itself is subject a monetary damage claim, and all defendants are subject to injunctive and declaratory relief pursuant to 42 U.S.C. § 1983.  As to Defendants' standing arguments they should be rejected. Plaintiffs have shown a sufficient personal stake in the litigation to support Article III standing.

The Amended Complaint's allegations demonstrate Plaintiffs have standing. Additionally, Plaintiffs provide the court sworn declarations reiterating and expanding on the Amended Complaint's allegations.[1] Each Plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest," i.e., to carry his firearm outside the home on the Metro system in DC. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). This is "proscribed by statute, and there exists a credible threat of prosecution" for violating the Metro Carry Ban. *Id. See also Virginia v. Amer. Booksellers Ass'n,* 484 U.S. 383, 393 (1988).

Additionally, as the Supreme Court reaffirmed just this past term, it is unnecessary for Plaintiffs to subject themselves "to the very framework" of laws they allege "unconstitutionally burden" their rights. *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1648 (2022). Plaintiffs need not break the law or be arrested to challenge the unconstitutionality of a statute. Instead, "it is well-established that pre-enforcement challenges are within Article III." *Ezell v. City of Chicago*, 651 F.3d 684, 695 (7th Cir. 2011) (internal quotation marks omitted). *See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *Christian v. Nigrelli*, 22-cv-695, 2022 WL 17100631,

---

[1] See Declaration of Gregory Angelo, Exhibit 1 hereto; Declaration of Tyler Yzaguirre, Exhibit 2, hereto; Exhibit of Cameron Erickson, Exhibit 3, hereto; Declaration of Robert Miller, PhD., Exhibit 4, hereto.

at *3–*4 (W.D.N.Y. Nov. 22, 2022); *Hardaway v. Nigrelli*, 22-cv-771, 2022 WL 16646220, at *3–*4 (W.D.N.Y. Nov. 3, 2022); *Koons v. Reynolds,* 22-cv-07464, ECF 34 at 21-37, 2023 WL 128882 (D.N.J. Jan. 9, 2023); *Siegel v. Platkin,* 22-cv-07464, ECF 51 at 14-21 (D.N.J. Jan. 30, 2023).

Because the Metro Ban imposes injuries on Plaintiffs which are traceable to Defendants and would be redressed by an order of this Court, Plaintiffs have adequately alleged standing to challenge the Metro Carry Ban.

**II.    *Facts.***

Plaintiffs are four persons licensed by Defendant Contee to carry concealed handguns within the District of Columbia. That is conduct the Second Amendment protects. *Bruen*, 142 S. Ct. 2111. Each has a present and ongoing intent to ride the Metro system while exercising their Second Amendment right to carry handguns for self-defense. Each is denied that right because of threatened enforcement of the Metro Carry Ban.

None of the Plaintiffs have been arrested or convicted of any crime. *See* Exhibits 1-4. They have great respect for the rule of law and the legal processes and are loath to break the law even to challenge an unconstitutional law, and would not break the law intentionally. *Id.* They are regular riders of the Metro subway and Metro buses. *Id.* Plaintiffs Angelo and Yzaguirre do not own personal motor vehicles. *See* Exhibits 1-2. The Metro system is a primary if not the primary means of transportation within the District for all plaintiffs and their preferred mode of transportation in the District if they could carry their firearms on the Metro system. *See* Exhibits 1-4.

Plaintiffs are aware of many instances of criminal violence occurring on the Metro system within the District. *Id.* Plaintiff Angelo personally witnessed a criminal assault occurring on a Metrorail train where an individual brandished an edged weapon and threatened passengers on the train, including him. Exhibit 1. That incident was extremely upsetting to him, as was the fact that

had that person carried through on his threats Mr. Angelo would have been constrained in his ability to defend himself without his firearm. *Id.* Likewise Plaintiff Yzaguirre, after exiting a DC Metrorail station was harassed, followed and threatened by an individual making racially motivated threats against him. Exhibit 2. Because he had been riding the Metro system, Plaintiff Yzaguirre was not carrying his concealed firearm for his personal protection. *Id.* Mr. Yzaguirre was apprehensive for his safety during that incident. *Id.*

As a result of being aware of such instances of violence occurring within the Metro system, including attacks involving deadly force such as stabbings and shootings, Plaintiffs are apprehensive for their safety while riding the Metro system. *See* Exhibits 1-4. Because of their apprehension of becoming victims of criminal violence, Plaintiffs often carry pepper spray while riding Metro. *Id.* However, having pepper spray does not fully assuage their apprehension because they are aware pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious. *Id.* Moreover, they are aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm. *Id.* And Plaintiff Miller explains that because of limited range, self-defense sprays allow an assailant to get dangerously close to a potential victim. Exhibit 4.

Plaintiffs would feel more comfortable riding the subway and Metro buses if allowed to carry their concealed firearms for self-defense and state they would carry their firearms while riding the Metro system if it were legal to do so. *See* Exhibits 1-4. Plaintiffs further state they have in some instances avoided using the Metro system out of fear of their personal safety because they could not within the law carry their concealed firearms for personal protection. *Id.* As a result, they have had to spend sums greater for transportation than they would have if they had been using the Metro system. *Id.* They are convinced they will have to do likewise in the future unless the Metro

carry ban is declared unconstitutional and voided. *Id.* If it were legal to do so, they would carry their concealed firearms on and within the Metro system for self-defense when traveling in the District. *Id.*

Plaintiffs also point out that in addition to prohibiting them from carrying on the Metro system itself, the Metro carry ban interferes with their exercise of their Second Amendment rights at other locations where the law allows them to carry. *Id.* This occurs both before and after they ride the system. *Id.* Prior to entering a Metro station or getting on a Metro bus, to legally transport their concealed firearms within the Metro system in the District, they would have to unload and clear their firearms and store them in a locked container with the ammunition separate. *Id.* However, doing so in public would violate the law that requires their firearms to be fully concealed. *Id. See* DC Code § 7-2509.07(e). And finding a private place to do so, such as a public bathroom would be problematic. *See* Exhibits 1-4. Metro has no public bathrooms. Likewise, upon exiting a Metro subway station or getting off a Metro bus, they would have to expose their guns in public in violation of the law to remove them from the lockbox in which the law requires their guns to be stored, and load and holster their guns. *Id.* Again, finding a private place to do so would be problematic. *Id.* Plaintiffs would end up exposing themselves to a substantial risk of arrest, being killed or assaulted by police or concerned citizens, as well as making themselves a potential victim from criminals intent on stealing their guns. *Id.* Furthermore, unnecessary gun handling risks a negligent discharge which would endanger Plaintiffs and other persons nearby. *Id.* In addition, Plaintiffs likely would face public fear, scorn, and ridicule if their firearms are seen by members of the public. *Id.* This has happened to Plaintiff Miller when he has been carrying a firearm outside the District. Exhibit 4. In sum, but for DC law, Plaintiffs would carry their concealed handguns on

Metro trains and buses for self-defense, but do not do so now because they fear among other things, arrest, prosecution and physical injury. *Id.*

DC Code § 7-2509.07(a)(6) bans carrying of firearms on public transportation vehicles and stations, including on the Metro system. A person convicted of a violation of the Metro Carry Ban is subject to a fine as set forth in DC Code § 22-3571.01, or imprisonment for not more than 180 days. DC Code § 7-2509.10(a)(1). Civil fines, penalties, and fees may be imposed as alternative sanctions for violation of the provision. All prosecutions for violations of this provision "shall be brought in the name of the District of Columbia and prosecuted by the Office of the Attorney General for the District of Columbia." DC Code § 7-2509.10(b). However, Plaintiffs face an even more severe sanction for violation of the Metro Carry Ban, the loss of their Second Amendment rights within the District. "In addition to any other penalty provided by law, any person who violates this section shall be subject to revocation of his or her license." DC Code § 7-2509.07(f). And pursuant to DC Code § 7-2502.03(a)(2), conviction for a weapons offense "(but not an infraction or misdemeanor violation under § 7-2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) . . . in this or any other jurisdiction" disqualifies a person for life from registering a firearm in the District. Registration of a firearm is a pre-requisite to possess a firearm for personal protection within the District.[2]

Because of the threat of arrest, criminal penalties and potential loss of their Second Amendment rights within the District, Plaintiffs do not presently carry their firearms when they ride the Metro system, and in many instances they have avoided riding the Metro system because

---

[2] DC Code § 7-2501.01(18) defines a weapons offense as "any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device." Conviction for violation of the Metro Carry Ban would thus be a weapons offense.

of the inability carry a firearm to defend themselves. Exhibits 1-4. *See Virginia v. Amer. Booksellers Ass'n,* 484 U.S. at 393 ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.")

Defendant Anzallo is the Chief of Police of the Washington Metropolitan Area Transit Authority ("Metro") Metro Transit Police Department ("MTPD"). ECF 41-1 at 1. MTPD enforces DC law within the District. DC Code § 9-1107.01(76(a)). "In fact, the WMATA Compact, as codified in the D.C. Code *requires that MTPD enforce all* [DC] criminal laws…." *Id.* at 7 & n. 3, citing DC Code § 9-1107.01(76(a)) (emphasis added). MTPD "is not charged with prosecutorial decision-making authority." *Id.* at 8.

Defendant Contee is the MPD Chief of Police. "MTPD and MPD share concurrent jurisdiction within the Metro system." ECF 41-1 at 7, citing DC Code § 9-1107.01(76(a)).

Defendant Schwalb is the Attorney General of the District of Columbia and is responsible for the prosecution of violation of the District's laws at issue in this case. Complaint at para. 34; DC Code § 7-2509.07(b).

On January 19, 2023, counsel for Plaintiffs emailed General Schwalb and advised him that Plaintiffs all carry their registered handguns in the District of Columbia when it is otherwise legal to do so. Complaint at para. 34. Counsel explained that the Metro carry ban represents a significant hardship to Plaintiffs' Second Amendment rights. Complaint at para. *Id*. Counsel further explained that the Metro system is the primary means of transportation for Mr. Angelo who does not have a personal vehicle and that Mr. Yzaguirre and Mr. Erickson also do not own a personal vehicle.[3] *Id.* Counsel also explained that although Dr. Miller does own a personal vehicle, he finds the Metro

---

[3] Counsel has learned that Mr. Erickson does own a personal vehicle but that it is predominately used by his wife for her transportation.

system to be the most cost-effective means of transportation within DC, Virginia and Maryland and he regularly carries his firearm when riding the Metro system within Virginia, his state of residence. Complaint at para. 35.

Counsel further explained that Mr. Angelo had previously been threatened with an edged weapon while riding the system. Complaint at para. 36. In addition, counsel explained that on January 11, 2023, Mr. Yzaguirre had just left the Metro Center station when he was approached by an individual who made threatening racial comments to him. *Id.* Mr. Yzaguirre attempted to leave the scene, but the individual followed him continuing his threatening behavior. *Id.* Counsel explained that Mr. Yzaguirre was quite apprehensive for his safety during that incident. *Id.*

Counsel further explained that all Plaintiffs have on previous occasions declined to ride the Metro system because of concerns for their personal safety in light of the District's Metro carry ban and the violence plaguing the system. *Id.* at para. 37. As a result, counsel explained that Plaintiffs have expended significantly higher sums for transportation than if they would have used the Metro system, e.g., using taxis, Uber or in the case of Dr. Miller, his personal vehicle instead of Metro. *Id.* As a result, counsel explained that Plaintiffs are experiencing economic injury as a result of the Metro Carry Ban as well as the violation of their Second Amendment rights. *Id.*

Counsel further stated that in light of the above, and in light of the obvious unconstitutionality of the Metro carry ban, "this is to ask you to waive enforcement of the Metro carry ban as to my clients." *Id.* An identical copy of the letter emailed to General Schwalb was emailed to Defendant Chief Contee. *Id.* at  para. 38. Counsel received no response from either General Schwalb or Chief Contee. *Id.* at para. 39.

On January 31, 2023, Counsel for Plaintiffs deposited in the U.S. Mail a letter to Chief Anzallo providing substantially the same information as was emailed to General Schwalb and

Chief Contee. *Id.* at para. 41.The letter asked Chief Anzallo "to waive enforcement of the Metro carry ban as to my clients and enter into a non-prosecution agreement" with respect to Plaintiffs' carrying their firearms on the Metro system. *Id.* Chief Anzallo did not respond to the letter. *Id.*

### III.     *Plaintiffs have standing to challenge the Metro Carry Ban.*

"[U]nder Article III, a federal court may resolve only 'a real controversy with real impact on real persons.' *American Legion v. American Humanist Assn.*, [139 S.Ct. 2067, 2103 (2019)]."

*TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021). As Justice Kavanaugh put it,

> For there to be a case or controversy under Article III, the plaintiff must have a "'personal stake'" in the case—in other words, standing. *Raines [v. Byrd,*] 521 U.S. [811,] 819, 117 S.Ct. 2312 [1997]. To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: "'What's it to you?'" Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).

*Transunion LLC v. Ramirez*, 141 S.Ct. at 2203. The "what's it to" Plaintiffs here is the right to exercise their Second Amendment rights in the District when using the Metro system to travel within the District without being subject to fear of and arrest, prosecution, death or serious bodily harm or increased cost.

"To satisfy the irreducible constitutional minimum of Article III standing," Plaintiffs must "establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct" of Defendants and "seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (cleaned up). Plaintiffs have demonstrated standing here. As with "any other matter on which the plaintiff bears the burden of proof," the "manner and degree of evidence required" varies based on the "stage[] of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, an assessment of standing turns on the pleadings. Accordingly, "in evaluating whether a complaint adequately pleads the elements of standing, courts apply the same analysis used to review whether a complaint adequately states a claim." *Silha v. ACT, Inc*., 807 F.3d 169,

173 (7th Cir. 2015). *Accord In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3rd Cir. 2012). In the same way a court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff" when considering a motion to dismiss, the court must apply the same standard when evaluating whether a plaintiff "sufficiently alleged a basis of subject matter jurisdiction." *Silha*, 807 F.3d at 173 (internal quotation marks omitted). And, in doing so, the Supreme Court has instructed that a court is to "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Each of the four Plaintiffs has alleged an adequate basis for standing in the Amended Complaint.[4] Additionally, recognizing it is "within the trial court's power to allow" litigants "by affidavits" to provide "further particularized allegations of fact deemed supportive of plaintiffs' standing," Plaintiffs have also submitted sworn declarations (Exhibits 1-4) in support of their standing. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The Declarations further demonstrate Plaintiffs have a sufficient "personal stake" in the case for standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. at 2203.

### a. *The Metro Carry Ban causes injury to Plaintiffs.*

#### 1. *Plaintiffs have alleged injuries in fact.*

An injury in fact must be "concrete, particularized, and actual or imminent." *TransUnion*, 141 S.Ct. at 2203. The denial of Plaintiffs' Second Amendment right to carry for self-defense "outside the home" is one such injury in fact. *Bruen*, 142 S. Ct. at 2122. *See TransUnion*, 141 S.Ct.

---

[4] Of course, this Court's jurisdiction is secure if a single plaintiff has standing, and therefore once the Court determines that is the case it need not evaluate the standing of other plaintiffs. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006).

at 2004 (injuries "may include harms specified by the Constitution itself.")  Plaintiffs have alleged injuries in fact.

### A.       Plaintiffs' injuries are particularized and concrete.

"For an injury to be 'particularized,'" it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). Here, the alleged injury is the denial of Plaintiffs' Second Amendment rights when using the Metro system, and it is beyond dispute that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Bruen*, 142 S. Ct. at 2127 (quoting *Dist. of Columbia v. Heller*, 554 U.S. at 592). Here, Plaintiffs are denied the individual right to carry firearms for self-defense each time they ride the Metro  system or decline to ride the system because they cannot lawfully carry their handguns on the Metro system. The Metro Carry Ban is particularly directed at Plaintiffs because they possess licenses to carry concealed handguns throughout the District, except where DC Code § 7-2509.07 prohibits them from carrying. Persons without carry licenses are generally prohibited altogether from carrying any firearm outside their homes or their owned businesses.

"Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Spokeo,* 578 U.S. at 339. The alleged denial of an individual constitutional right is one such concrete injury. By "concrete," the Supreme Court has explained that the alleged injury must be "'real, and not abstract.'" *Id*. at 340. As Justice Kavanaugh explained in *TransUnion*, 141 S. Ct. at 2204, "Various intangible harms can . . . be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." Traditional harms include those "specified by the Constitution itself." *Id. See also Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*,

555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise of religion)). An alleged violation of the Second Amendment is no less concrete than the violation of any other individual constitutional right. *Ezell*, 651 F.3d at 695 ("[T]he City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing."). *See Bruen*, 142 S. Ct. at 2130 (analogizing the standard applicable to the Second Amendment to "how we protect other constitutional rights" including the First Amendment).

Moreover, for evaluating standing, it is insignificant that the Metro Carry Ban may turn out to be constitutional (it is not). That is because "[f]or standing purposes," the Court "must accept as valid the merits of [Plaintiffs'] claims." *Cruz*, 142 S.Ct. at 1648. *See also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (explaining that "standing in no way depends on the merits of [Plaintiffs'] contention that particular conduct is illegal"). The Court "must assume" the Metro Carry Ban "unconstitutionally burdens" the Second Amendment rights of Plaintiffs. *Id.*

### B. *Plaintiffs' injuries are actual or imminent.*

The unconstitutional deprivation of Plaintiffs' Second Amendment rights has created injuries that are both actual and imminent for purposes of standing. For one, Plaintiffs have suffered the loss of their Second Amendment rights when, by virtue of the threatened enforcement of the Metro Carry Ban, they disarmed before riding in the past. *See Ezell*, 651 F.3d at 695. *See also Lewis v. Casey*, 518 U.S. 343, 349 (1996) (explaining "actual harm" stems from "official interference" with a claimed constitutional right). For another, there is the ongoing, "continuous harm to [Plaintiffs'] claimed right to" carry firearms for self-defense on public transportation going forward as they continue to disarm each time they ride (or decline to ride so as to not give up their

Second Amendment rights). *Amer. Booksellers Ass'n*, 484 U.S. at 393 ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."); *Ezell*, 651 F. 3d at 695. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief"—as Plaintiffs do here—"to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion,* 141 S. Ct. at 2210 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).

For standing purposes, it is irrelevant that Plaintiffs are law-abiding and have not promised to break the law, i.e., actually violate the Metro Carry Ban. As the Supreme Court reaffirmed this year, a break-the-law threshold for standing "finds no support in our standing jurisprudence." *Cruz*, 142 S. Ct. at 1648. Instead, "[w]hen an individual is subject to" "threatened enforcement of a law," then "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158. Indeed, it is not even necessary for an individual to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). *See also MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–129 (2007).

Thus, in *Steffel*, the plaintiff had standing to challenge a criminal trespass statute that had caused him to refrain from engaging in certain handbilling activities: he "alleged . . . that . . . he had not done so because of his concern that he . . . would be arrested for violation of" the challenged law. 415 U.S. at 456. As the Seventh Circuit has previously explained, "[i]t is well-established that 'pre-enforcement challenges are within Article III.'" *Ezell,* 651 F.3d 695 (citing *Brandt v. Vill. of Winnetka, Ill*., 612 F.3d 647, 649 (7th Cir. 2010) (cleaned up)). This makes sense because the promulgation of a criminal statute is itself a credible threat of prosecution that is sufficient to chill constitutionally protected conduct. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading*

*Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) ("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will not enforce the statute."). "The existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for purpose of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). As the 10th Circuit explained,

> [T]he Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court found a justiciable controversy between doctors subject to prosecution under criminal abortion statutes and the state attorney general, "despite the fact that the record does not disclose that any one of [the doctors] has been prosecuted, or threatened with prosecution." *Id.* at 188, 93 S.Ct. at 745. Recently, in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Court stated that "[t]he conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Id.* 106 S.Ct. at 1704. [476 US at 64].

*Wilson v. Stocker*, 819 F.2d 943, 946-47 (10th Cir. 1987). *Babbitt*, 442 U.S. at 302 sets the test of a "credible threat of prosecution" as "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative…." *See Amer. Booksellers Ass'n, Amer. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.")

Although it is true there is "some element of chance" in any pre-enforcement challenge—for instance because there is no guarantee a police officer would actually catch Plaintiffs were they to violate the Metro Carry Ban—nevertheless, "[i]njury" stemming from actual prosecution "need not be certain." *Brandt*, 612 F.3d at 649.[5]  Instead, "[c]ourts frequently engage in pre-enforcement

---

[5] In fact, if a prosecution were truly temporally imminent, a federal court might well abstain on comity grounds." *See Younger v. Harris*, 401 U.S. 37, 91 (1971). The Supreme Court explicitly

review based on the potential cost that compliance (or bearing a penalty) creates." *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006). Here the cost of compliance (disarmament on public transportation) in the face of a criminal penalty is more than sufficient for standing. *Id*. *See also Doster v. Kendall*, No. 22-3497, 2022 WL 17261374, at *10 (6th Cir. Nov. 29, 2022) ("Parties often allege that they plan to engage in an activity (for example, speech protected by the First Amendment), but that a law bars that activity. In that situation, parties need not first undertake the activity and risk punishment for violating the law before seeking review over whether they have a right to do so." (citations omitted)). "When [a] plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt*, 442 U.S. at 298, quoting *Doe v. Bolton*, 410 U.S. at 188.

Plaintiffs' allegations demonstrate this is the case here. Each would ride the Metro system while carrying a handgun for self-defense. *See* Exhibits 1-4. This is conduct protected by the Second Amendment. It is proscribed by statute. And there exists no evidence Defendants would not enforce the statute. This case is to be contrasted with a case where the government has disclaimed prosecution, or the statute has fallen into dormancy. In that situation there is no "credible threat of prosecution." *Susan B. Anthony List,* 573 U.S. at 159 (2014). *See Graham v. Butterworth,* 5 F.3d 496, 499 (11th Cir. 1993), cert. denied*, 511 U.S. 1128 (1994) (A credible threat of prosecution exists where "at the time the [plaintiffs] filed [the] action ... they intended to engage in arguably protected conduct, which the statute seemed to proscribe"); *N.H. Right to Life Political*

---

provided that courts avoid *Younger* abstention by engaging in pre-enforcement review of state statutes imposing criminal penalties. *See Steffel*, 415 U.S. at 461.

*Action Comm. v. Gardner,* 99 F.3d 8, 15 (1st Cir.1996) ("courts will assume a credible threat of prosecution in the absence of compelling contrary evidence").

> "The mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting." *Poe v. Ullman,* 367 U.S. 497, 507, 81 S.Ct. 1752 1758, 6 L.Ed.2d 989 (1961). "If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory relief . . . is not such an adversary case" as will support Article III jurisdiction. *Id.*

*Delaware Women's Health Organ., Inc. v. Wier*, 441 F. Supp. 497, 501 (D. Del. 1977).

Standing is not defeated, however, where the government fails to disavow prosecution, where the disavowal is equivocal, or where the government merely states its view that the plaintiff's intended conduct is not proscribed by the statute. *See Woodhull Freedom Foundation v. United States,* 948 F.3d 363, 373 (D.C. Cir. 2020) (DOJ did not disavow any intention of invoking criminal penalties against persons who operate web sites like plaintiff's. "And although the Department has maintained in the instant litigation that plaintiffs' intended conduct is not proscribed by § 2421A, 'there is nothing that prevents the [Department] from changing its mind,' *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000)."); *Rhode Island Assoc. of Realtors v. Att'y General*, 199 F.3d 26, 35 (1st Cir. 1999) ("[T]he cautious phrasing of the Attorney General's statements (e.g., 'does not appear') is a far cry from a flat commitment not to prosecute in this particular instance."); *Wilson v. Stocker*, 819 F.2d at 947 & n.3 (finding a credible threat of prosecution notwithstanding the Attorney General's affidavit which stated that "he did not presently believe the [plaintiff's] proposed conduct . . . was prohibited by the statute").

Here Plaintiffs specifically requested the Attorney General and Chiefs Anzallo and Contee to disavow prosecution of Plaintiffs if they carry their firearms on the Metro system, and Defendants declined to respond. Plaintiffs are entitled to the fair inference from this fact that

Defendants intend to arrest and prosecute Plaintiffs for violation of DC Code § 7-2507.09(a)(6). That inference is especially justified since Chief Anzallo states that MTPD has no prosecutorial discretion and is obligated to enforce all DC laws. ECF 41-1 at 7. *See also* Amended Complaint at para. 40 (WTPD is known for a zero-tolerance policy with respect to violations observed by its officers); *Id.* at para. 42 ("On information and belief MPD has a policy to arrest for any violation of the District's firearm regulations." And MPD prioritizes enforcement of firearm regulations) These inferences reinforce the credibility of the threat of enforcement of the Metro carry ban, a matter that Plaintiffs intend to explore in discovery of this action.

### C.  The Navegar line of cases does not rob Plaintiffs of standing to contest the Metro Carry Ban.

The District, however, citing the *Navegar* line of cases[6] asserts that since this case is a non-First Amendment pre-enforcement challenge to a criminal statute, Plaintiffs must show they face a credible and imminent threat of prosecution, such as being singled out for prosecution or being uniquely targeted by the government for prosecution. ECF-44-1 at 10-11.

The court must reject that argument because the most recent standing decision from the Supreme Court in a non-First Amendment pre-enforcement challenge found standing in a context factually indistinguishable from the *Navegar* line of cases. *Whole Woman's Health v. Jackson*, 142 S.Ct. 522 (2021) involved a pre-enforcement challenge to a Texas statute that provided a private civil cause of action against persons providing certain abortions. *Id.* at 530. Plaintiffs, abortion providers, filed suit against various state officials seeking an injunction against the state officials taking any action to enforce the statute. *Id.* Among the state officials sued were four state executive

---

[6] *See Navegar, Inc. v. United States,* 103 F.3d 994; *Seegars v. Gonzales,* 396 F.3d 1248; *Parker v. District of Columbia,* 478 F.3d 370. *Cf. Ord v. District of Columbia,* 587 F.3d 1136, 1140 (D.C. Cir. 2009) (finding standing in light that Ord had been previously arrested for violating the statute).

licensing officers charged with enforcing the Texas Health and Safety Code. *Id.* at 535. The

Supreme Court found that the plaintiffs there had standing to sue these four officials despite the

absence of any explicit threat of enforcement by them and despite that the statute provided it was

not to be enforced by state actors. *Id.* at 536. Nonetheless, the court in an eight to one decision

(Justice Thomas dissenting) found standing based on regulations that imposed a general duty on

the state officials to enforce the state health code. Justice Gorsuch's opinion for the court stated:

> The petitioners have plausibly alleged that [the legislation] has already had a direct
> effect on their day-to-day operations. *See* Complaint ¶¶103, 106–109. And they
> have identified provisions of state law that appear to impose a duty on the licensing-
> official defendants to bring disciplinary actions against them if they violate [that
> law]. In our judgment, this is enough at the motion to dismiss stage to suggest the
> petitioners will be the target of an enforcement action and thus allow this suit to
> proceed.

*Id.* at 536-37.

The duty the court cited in *Whole Woman's Health,* is no different than the general duty

Chief Contee has to enforce DC law and the specific duty Chief Anzallo has to enforce DC law.

*See* ECF 41-1 at 7. Given that *Whole Woman's Health* is flatly inconsistent with the *Navegar* line

of cases that suggests one must be personally threatened or uniquely targeted for enforcement, this

court is required to follow the Supreme Court's view of standing in a pre-enforcement non-First

Amendment case and not the *Navegar* line. *See, e.g., Haynesworth v. Miller,* 820 F.2d 1245, 1260-

61 (D.C. Cir. 1987) (court did not see itself as bound by circuit precedent in light of a subsequent

Supreme Court decision which undermined that prior precedent). *See also Garrett v. Univ. of Ala.*

*at Birmingham Bd. of Trustees,* 344 F.3d 1288, 1292 (11th Cir. 2003) (a subsequent on point

Supreme Court decision overrules circuit precedent).

Additional discussion regarding standing in *Whole Woman's Health* further undermines the

idea that the standard for an injury sufficient to confer standing differs between cases raising First

Amendment challenges and Second Amendment challenges. In considering the issue of chill of constitutionally protected conduct, the *Whole Woman's Health* opinion states clearly "The Court has consistently applied these [standing] requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." 142 S.Ct. at 538. That statement is wholly consistent with *Bruen's* explicit warning that, "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' *McDonald [v. City of Chicago],* 561 U.S. [742,] 780, 130 S.Ct. 3020 [2010] (plurality opinion)." *Bruen,* 142 S.Ct. at 2156. Indeed, the Court in *Bruen* suggested parallels in the treatment of First and Second Amendment rights, stating, the standard it was adopting for analysis of Second Amendment rights "accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms. 554 U.S. at 582, 595, 606, 618, 634-635." *Bruen*, 142 S.Ct. at 2130.

Just as the Second Amendment is not subject to a separate set of rules substantively, it is not subject to a separate set of rules jurisdictionally. The Supreme Court's admonition applies with no less force to unduly restrictive interpretations of Article III standing that operate to keep the courthouse doors closed to meritorious Second Amendment claims.

We continue to believe *New York Rifle & Pistol Ass'n  v. New York,* 140 S.Ct. 1525 (2020) ("*NYSR&P*") also undermines the *Navegar* line of cases. *See* ECF 29 at 14-15. The record in that case contains no evidence the plaintiffs were singled out or otherwise threatened with prosecution beyond the general expectation the city would enforce its law. *See* Joint App'x, Case No. 18-280 at 26-48 (US May 7, 2019) (amended complaint). *See also New York State Rifle & Pistol Ass'n v.*

*City of New York,* 883 F.3d 45 (2d Cir. 2016); *New York State Rifle & Pistol Ass'n v. City of New York,* 86 F. Supp. 3d 249 (S.D.N.Y. 2015).

We note Plaintiffs there sought guidance as to the law's requirements from the police, but that inquiry did not elicit a specific threat. *NYSR&P,* 140 S.Ct. at 130-31 (Alito, J. dissenting). The police essentially responded that Plaintiffs were prohibited from taking their guns out of the city. *Id.* That was not an example of singling out the Plaintiffs for enforcement or uniquely targeting them. *See Seegars,* 396 F.3d at 1255. It was essentially reciting the substance of the law. *See* 86 F. Supp. 3d 249, 256-57 (S.D.N.Y. 2015). Here Plaintiffs duly inquired as to the District's intent to enforce the law against them asking that they not prosecute them for violation of the Carry Ban and were met by silence, no doubt because the obvious answer was that of course the District would prosecute Plaintiffs if they are caught carrying their firearms on the Metro system. The court must take note that the District has defended DC Code § 7-2509.07(a)(6) as a vitally important measure to protect public safety, including school children and government workers. *See generally* ECF-18. It is fantasy to assume anything other than that the District will aggressively prosecute any discovered violation of the Metro Carry Ban. Defendants' silence to Plaintiffs' inquiry is simply designed to support its position on standing in this case and avoid a merits decision which likely would be adverse to their position. Plaintiffs' "access to federal court [should not] depend on the government's litigation strategy." *Ord,* 587 F.3d at 1147 (Brown, J. dissenting).

Although the Court found in *NYSR&P* that plaintiffs' claims had been mooted, the three dissenting Justices, Thomas, Alito and Gorsuch, would have decided the case on the merits in plaintiffs' favor. *See* 140 S.Ct. at 1540-44 (Alito, J. dissenting). None of the dissenting Justices expressed concern with the plaintiffs' standing, including Justice Thomas, whose dissents in *Whole*

*Woman's Health,* 142 S.Ct. at 539 and *Medimmune*, 549 U.S. at 137, indicate he takes a substantially narrower view of the injury component of standing than does the rest of the court.

In denying a preliminary injunction the court herein indicated that "[a]t least two of the three plaintiffs in *NYSR&P* had 'been advised by out-of-state ranges that they were not permitted to engage in target practice or [to] participate in shooting competitions at those ranges because of New York City's enforcement' of the handgun-transportation rule," ECF 32 at 16, citing the District court decision in the case, *N.Y. State Rifle & Pistol Ass'n*, 86 F.Supp.3d at 257, and implying that Plaintiffs may have incurred a cognizable injury resulting from these third parties' refusals to allow access to their ranges in reliance on the New York City ordinance. *Id.* However, the District court gave no citation to the actual record in that case to that effect. The *NYSR&P* dissent, however, tells a different story:

> But after the hosts of that competition alerted [one of the plaintiffs] that his premises license did not allow him to transport his handgun to New Jersey—and after Inspector Andrew Lunetta, the commanding officer of the NYPD License Division, confirmed this—Colantone pulled out of the competition. App. 32, 49–50, 55. Plaintiff Efrain Alvarez has had a firearms license for approximately 30 years, and plaintiff Jose Anthony Irizarry has been licensed for 15 years. Both men would like to take their handguns to ranges and competitions outside the City, but they have not done so because of the same ordinance. See *id.*, at 29, 32–33. After the hosts of the previously noted competition in New Jersey advised them that their New York City premises licenses barred them from taking their handguns outside the City, they both decided not to attend. *Id.*, at 32–33. For the same reason, Alvarez also did not participate in the International Defensive Pistol Association Postal Matches in Simsbury, Connecticut. *Ibid.*

*NYSR&P,* 140 S.Ct. at 1530-31 (Alito, J., dissenting). Thus, the ranges were merely advising the Plaintiffs that New York City law did not allow them to take their guns out of the city. After all, a New York ordinance cannot bind parties' operation of their ranges located outside the city. Accordingly, we reiterate that the Supreme Court's treatment of *NYSR&P* is inconsistent with the

idea that a non-First Amendment pre-enforcement challenge requires that Plaintiffs be personally threatened with prosecution or be uniquely targeted for enforcement.

This case does not involve a generalized grievance, but a specific claim of constitutional injury. Plaintiffs are personally coerced by DC Code § 7-2509.07(a)(6) into not carrying their licensed handguns on the Metro system lest they face arrest and prosecution. There is no suggestion in the record that the District defendants or Chief Anzallo lacks an intention to enforce the law. The right to bear arms is a fundamental individual right which Plaintiffs must forego on the Metro system because of the risk of arrest and prosecution.[7] By alleging that the defendants through the enactment of the Metro Carry Ban and its prospective enforcement have deprived Plaintiffs of a fundamental individual constitutional right that they intend to exercise, and that this deprivation may be remedied by judicial relief of an injunction and declaratory judgement and damages, Plaintiffs have adequately satisfied the Article III standing requirements. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555; *Tennessee Elec. Power Co. v. TVA*, 306 U. S. 118, 137–138 (1939). In other words, they have shown "what's it to" them. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. at 882.

Even before *NYSR&P* and *Whole Woman's Health,* Supreme Court precedent did not support a lesser standing requirement when a First Amendment restriction is under a pre-enforcement challenge. And the Supreme Court has expressly disclaimed that a challenger to a criminal law must violate the law and face criminal prosecution before challenging it. "When an

---

[7] Cases are clear that even the momentary loss of Constitutional rights constitutes irreparable injury for obtaining a preliminary injunction. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (hereinafter "*Elrod*"). *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (hereinafter *"Gordon"*). *See also Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List*, 573 U.S. at 158, citing *Steffel*, 415 U. S. 452 ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"). "Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159, citing *Babbitt*, 442 U. S. at 298. The Court has never suggested this standard applies only to First Amendment cases.

The *Navegar* line of cases is predicated on a narrow view of "imminence" the Supreme Court has never adopted. *See* 103 F.3d at 998. As the Court explained in *MedImmune,* 549 U.S. at 128-29 "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law *eliminates the imminent threat of prosecution*, but nonetheless does not eliminate Article III jurisdiction." (Emphasis supplied.) The Court there discussed various pre-enforcement challenges, including *Terrace* v. *Thompson*, 263 U.S. 197 (1923) (involving a state law which prohibited leasing land to an alien and

> *Steffel* v. *Thompson*, 415 U.S. 452 (1974), [where] we did not require the plaintiff to proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution. *Id.,* at 458–460. As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.,* at 480. *In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do* (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. See *Terrace, supra,* at 215–216; *Steffel, supra,* at 459. The

dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 152 (1967).

549 U.S. at 129 (emphasis supplied).

Nor is it pertinent that Plaintiffs have not been arrested or pointed to other concealed pistol licensees being arrested for carrying firearms on the Metro system. Although violation of the provision is a misdemeanor, it comes with harsh collateral consequences, including loss of District Second Amendment rights. *See* DC Code § 7-2502.03(a)(2). Plaintiffs have alleged their respect for the rule of law and that they will not intentionally violate the law. *See* Exhibits 1-4. The very purpose of the Declaratory Judgement Act is to avoid placing Plaintiffs in the position of having to violate the law in order to vindicate their rights. And, if anything, the absence of known arrests indicates that DC concealed carry license holders, as a group, are exceedingly law abiding, a trait generally shared by Americans holding gun carry licenses. *See, e.g.,* Johnson, *Lawful Gun Carriers (Police And Armed Citizens): License, Escalation, And Race,* 80 Law and Contemporary Problems 209, 219-21 (2017) (showing the incidence of criminal violations among licensed gun owners to be low and in fact lower than police officers). That does not mean that they do not suffer injury from the Metro Carry Ban. Additionally, Plaintiffs are not in a position to know whether arrests have taken place with respect to the Metro Carry Ban.  That is a fact particularly within the knowledge of Defendants and a fair topic for discovery.

Finally, even if *Seegars, Parker* and *Navegar* survive *Whole Woman's Health* and *NYSR&P,* those cases are distinguishable.[8] *Seegars* involved a challenge to the DC handgun ban, stuck down

---

[8] *Seegars* itself is somewhat internally inconsistent. While holding that *Navegar* required the Plaintiffs to be singled out or personally threatened with enforcement, *Seegars* stated:

in *Parker* and affirmed in *Heller*, 554 U.S. 570. Although *Seegars* indicates plaintiffs there would

have had standing if personally threatened with arrest for possessing handguns in DC in violation

of the law, as Chief Judge Ginsburg observed in concurring in the denial of rehearing *en banc*, the

*Seegars'* plaintiffs had a ready means for seeking relief with respect to the DC handgun ban without

awaiting criminal prosecution. *See* 413 F.3d 1 (D.C. Cir. 2005). They could have applied to register

a pistol and then challenged the subsequent denial.[9] *Id.* Thus, a pre-enforcement challenge was not

their "sole means of seeking relief" to challenge the DC handgun ban. *Id.* That distinction between

the *Seegars* plaintiffs and Plaintiffs here is important, as *Babbitt* stressed that plaintiffs "'should

not be required to await and undergo a criminal prosecution as *the sole* means of seeking relief.'"

442 U.S. 289, 298 (emphasis supplied), quoting *Doe v. Bolton*, 410 U.S. 179, 188. *Navegar* itself

stressed that hardship to Plaintiffs is a factor in determining injury for the purpose of standing. *See*

103 F.3d at 998 ("In deciding whether a case is ripe for adjudication, federal courts generally

---

To the extent that this language implied that plaintiffs must be individually or specifically burdened in a way distinct from some broader class of potential prosecutees, it is at variance with Supreme Court precedent. Although injuries that are shared *and* generalized – such as the right to have the government act in accordance with the law – are not sufficient to support standing, see *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), "where a harm is concrete, though widely shared, the Court has found injury in fact." *Fed. Election Comm'n v. Akins,* 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (internal quotation marks omitted); see also *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (plaintiffs had standing to challenge non-disclosure of information even where innumerable other parties might make identical requests for disclosure).

*Seegars*, 396 F.3d at 1253. In any event, as we pointed out previously, the harm Plaintiffs face here is not shared by the general public; it is specific to persons like Plaintiffs who are licensed to carry a concealed handgun in public for self-defense and who operate under detailed regulations concerning when and where they may carry their concealed handguns. *b.,* DC Code § 7-2509.07.

[9] Dick Heller followed this course in overturning the District's unconstitutional handgun ban. *See Parker,* 478 F.3d at 375-76. That makes *Parker* distinguishable as well.

consider the hardship to the parties of withholding court resolution (a factor that overlaps with the 'injury in fact' facet of standing doctrine").

No Supreme Court decision has ever held that relief is unavailable unless either the plaintiff has been prosecuted or has a special, personalized threat of prosecution. That officials will enforce laws is presumed, absent substantial and credible evidence to the contrary. "Thus, in numerous pre-enforcement cases" the Supreme Court "did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but rather the Court "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). Here, Defendants have not disavowed enforcement of the Metro Carry Ban and there is every reason to believe they will enforce it against Plaintiffs if Plaintiffs are discovered to have violated the carry ban.

The District argues Plaintiffs must demonstrate the harm they suffer is imminent; but the test for that inquiry is merely whether there is "a creditable threat of enforcement." *Barke v. Banks*, 25 F.4th 714, 718-19 (9th Cir. 2022). Under that standard, "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Babbitt,* 442 U.S. at 302. *See New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14-15 (1st Cir.1996) ("This standard -- encapsulated in the phrase "credible threat of prosecution" – is quite forgiving."), citing *Babbitt*, 442 U.S. at 302. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 n.5 (9th Cir. 2013) ("we have never held that a specific threat is necessary to demonstrate standing").

We also point out as is evident from many of the cases cited herein, that the *Navegar* line of cases is inconsistent not only with Supreme Court precedent but with the treatment of standing by the other circuits, a point admittedly to be addressed with the D.C. Circuit, if necessary.[10]

Under the District's view of *Navegar* and *Seegers*, a constitutional violation by the District, say resegregation of lunch counters, enforced by a zero-tolerance policy and severe sanctions would be unassailable in a pre-enforcement challenge where the District simply declines to state its intention to enforce the law. That is obviously not a correct statement of the law of standing as interpreted by the Supreme Court. Here Plaintiffs' sole remedy, other than breaking the law, risking arrest, prosecution and collateral loss of Second Amendment rights, is a pre-enforcement challenge

---

[10] We note no other circuit requires a person pursuing a pre-enforcement challenge in a non-First Amendment context to be singled out or personally threatened to have standing to challenge the constitutionality of statute. *See, e.g., Bach v. Pataki,* 408 F.3d 75 (2d Cir. 2005); *Mobil Oil Corp. v. Attorney Gen. of Va.,* 940 F.2d 73, 75 (4th Cir. 1991); *Peoples Rights Organization, Inc. v. Columbus,* 152 F.3d 522 (6th Cir. 1998); *Gillespie v. City of Indianapolis,* 185 F.3d 693 (7th Cir. 1999); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014); *Hejira Corp. v. MacFarlane,* 660 F.2d 1356 (10th Cir. 1981). The District, however, cites the denial of standing to individual plaintiffs in *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 293-94 (6th Cir. 1997), but omits the salient point that the court explained that "Plaintiffs [did] not allege that the law 'chills' because it forces them to forego constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Id.* at 294 & n.15. Plaintiffs there simply alleged they wanted to acquire the banned arms. *Id.*

In *Antonyuk v. Hochul*, Case No. 22-cv-00986, Doc 27 (N.D.N.Y. Oct. 6, 2022), appeal pending (2d Cir.), the court temporarily restrained New York's recently enacted public transportation carry ban. The court's order fails to indicate plaintiffs there were singled out or directly threatened with arrest. Rather the court pointed to the local sheriff saying he would be enforcing the provision, albeit conservatively, while noting that carrying a firearm into any sensitive area is a felony. *Id.* at 15. *See also Hardaway v. Nigrelli*, No. 22-cv-771, Doc 35 at 7-9 (W.D.N.Y. Oct. 20, 2022) appeal pending (2nd Cir.) (court found plaintiff had standing to contest New York's recently enacted ban on gun carry in churches, stating that in light of the recency of the law and lack of any indication that it will be repealed the court will presume the government will enforce it).

The District court of New Jersey in two pending "sensitive places" cases has specifically rejected a requirement that plaintiffs must be singled out or uniquely targeted. *See Koons v. Reynolds,* 22-CV-07464, ECF 34 at 26 n.10, 2023 WL 128882 (D.N.J. Jan. 9, 2023); *Siegel v. Platkin*, 22-CV-07464, ECF 51 (D.N.J. Jan. 30, 2023).

to DC Code § 7-2509.07(a)(6). They seek, inter alia, a declaratory judgement that the Metro Carry Ban is unconstitutional. This is not a generalized grievance. Plaintiffs hold licenses to carry handguns in public for self-defense. They have registered their guns with MPD. A specific statute governs when and where they may carry their firearms. They are regular users of the Metro system. The ramifications of violating the Metro Carry Ban are substantial: fines, imprisonment and the loss forever in the District of their Second Amendment right to possess firearms. *See* DC Code § 7-2502.03(a)(2) (disqualifying persons from registering a firearm if ever convicted of a weapons offense). An actual case and controversy exists here conferring Article III jurisdiction. DC vigorously enforces its gun laws and has not disclaimed the intention to enforce the ban. Plaintiffs have altered their daily routines in reasonable fear of enforcement of the statute. Plaintiffs have shown "what's it to them." Standing plainly exists here.

Finally, as noted above, Plaintiffs should be entitled to discovery as to DC's intent to enforce the ban and they in fact intend to explore Defendants' intent to enforce the ban in discovery.

### D.  Plaintiffs suffer economic injury from the Metro Carry Ban.

Beyond the injury caused by the violation of Plaintiffs' Second Amendment rights by the prospective enforcement of the Metro Carry Ban, is the economic injury the Metro Carry Ban places on Plaintiffs who must use more expensive means of transportation to exercise their Second Amendment rights. Each Plaintiff avers that he has foregone use of the Metro system in favor of more expensive alternatives in order to comply with the Metro Carry Ban while exercising their Second Amendment right to carry. *See* Exhibits 1-4. This economic injury is a cognizable injury for standing purposes. *See, e.g., Abbott Laboratories,* 387 U.S. at 152.

The District claims Plaintiffs' economic injuries cannot confer standing because they are risk mitigation expenses incurred in response to a speculative threat, and thus "self-inflicted." ECF

44-1 at 9, citing *Attias v. Carefirst, Inc.,* 865 F.3d 620, 629 (D.C. Cir. 2017) (quoting *Clapper,* 568 U.S. 398, 416-17 (2013)). To begin with as Judge Wald observed, all injuries are in some sense self-inflicted, so this doctrine "should be read quite narrowly" for standing purposes." *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 935 (D.C.Cir.1989) (Wald, J. dissenting). But Plaintiffs' expenditures are not risk-mitigation expenses incurred based on a speculative threat, they are expenses incurred specifically to comply with the Metro Carry Ban, while exercising their Constitutional right to carry their handguns in public. *See Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia,* Case No 22-7014, slip op. at 6 (D.C. Cir. March 14, 2023) (contractor "can bring this action in its own right based on its allegations that it incurs increased administrative costs to comply with the statute's hiring and reporting requirements, which constitutes injury in fact that would be redressed by a favorable decision."). *Clapper* did not involve expenditures necessary to comply with a statutory ban directly affecting Plaintiffs, as is the situation here.

Here, Plaintiffs' increased expenditures are incurred for travel within the District so they may continue to exercise their Second Amendment rights. Plaintiffs are not required to forego their Second Amendment rights in order to transport themselves around the District. And the District is certainly not suggesting Plaintiffs should simply ignore the law and carry their concealed firearms on Metro in violation of the law. Plaintiffs' expenditures have nothing to do with fear of arrest if they carry on the Metro in violation of the law because Plaintiffs simply will not violate that law. The expenditures are the necessary and wholly predicable expenses of coerced compliance with the Metro Carry Ban.

This is to be contrasted with the District's cited cases on "self-harm." For example, the Plaintiff's theory of standing in *Clapper*, relied "on a highly attenuated chain of possibilities," that

did "not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568

U.S. at 410, and the expenditures it cited were predicated on that highly attenuated chain of

possibilities. *Id.* at 416-17.   *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)

cited by the District at note 1 is inapposite for the same reasons. As the court made clear, the

Plaintiffs in that case were not directly affected by the regulation at issue. *Id.* at 914. The

expenditures they said they would make were directed to the costs of purchasing chickens not

subject to the NPIS inspection routine because they were concerned about increased risk of food

borne illness; the court, however, found as in *Clapper* that their concern was speculative as

"Plaintiffs have not plausibly alleged that they face a substantial increase in the risk of harm from

NPIS-produced poultry." *Id.* at 919.[11]

In *Cruz*, Chief Justice Roberts writing for the Court rejected a similar "self-inflicted" harm

argument the government advanced:

> [T]he Government argues that appellees lack standing because their injuries were
> "self-inflicted." Brief for Appellant 20. Because appellees knowingly triggered the
> application of the loan-repayment limitation, the Government says, any resulting
> injury is in essence traceable to *them*, not the Government. The predicate for this
> argument is appellees' stipulation in the District Court that "the sole and exclusive
> motivation behind Senator Cruz's actions in making the 2018 loan[s] and the
> [C]ommittee's actions in waiting to repay them was to establish the factual basis

---

[11] Other cases cited at note 1 by the District are even more far afield. In *Nat'l Family Planning and Reproductive Health Ass'n v. Gonzales,* 468 F.3d 826, 831 (D.C. Cir. 2006), the self-inflicted injury was the Plaintiff's failure to ask the agency for clarification of what it perceived to be a vague Congressional enactment. It did not involve an allegation of increased costs to comply with a statute. *Id.* Likewise *Heuer v. Smithsonian Inst.,* 17-CV-0147 (D.D.C. August 1, 2022), did not involve any expenditure of funds in mitigation of risk regarding a receipt that violated the Fair Credit Reporting Act. As the court said, "Plaintiff [did] not allege that he treated the Smithsonian receipt any differently than any other receipt, or that he spent any additional time safeguarding it. Without more, Plaintiff has not adequately pled that he suffered a concrete injury in fact." *Id. slip op.* at 12. And in *In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig*ation, 45 F.Supp.3d 14, 26 (D. D.C. 2014) the alleged harm that Plaintiffs claimed required risk mitigation was speculative because of the lack of proof that anyone had accessed the personal data contained on the tapes that had been stolen.

for this challenge." App. 325. At bottom, the Government asks us to recognize an exception to traceability for injuries that a party purposely incurs.

We have never recognized a rule of this kind under Article III. To the contrary, we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred. See *Evers v. Dwyer,* 358 U.S. 202, 204, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958) (*per curiam*) (that the plaintiff subjected himself to discrimination "for the purpose of instituting th[e] litigation" did not defeat his standing); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 374, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (a "tester" plaintiff posing as a renter for purposes of housing-discrimination litigation still suffered an injury under Article III).

*Cruz*, 142 S.Ct. at 1647. The Court went on to distinguish *Clapper,* pointing out that in that case "the plaintiffs attempted to manufacture standing by voluntarily taking costly and burdensome measures that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge. [568 U.S.] at 402, 133 S.Ct. 1138. Their problem, however, was that they could not show that they had been or were likely to be subjected to that policy in any event. *Id.*, at 416, 133 S.Ct. 1138." *Cruz,* 142 S.Ct. at 1647. Here it is plainly evident that the Metro Carry Ban applies to Plaintiffs who have DC carry licenses.

### 2. Plaintiffs' injuries are fairly traceable to Defendants and are redressable by this Court.

The last two factors are easily met for purposes of the standing inquiry. The second factor is met because Defendants Contee, Anzallo and Schwalb are principal enforcement officers that can seek criminal penalties for the violation of the Metro Carry Ban. *See* Complaint at ¶¶ 33, 40, 42-43. With both a still-in-effect penalty and enforcement officials with the duty to seek that penalty, Plaintiffs' injuries are "fairly traceable" to Defendants. *California v. Texas*, 141 S.Ct. 2104, 2114 (2021). And this Court must presume that the Metro Carry Ban will be enforced notwithstanding any hypothetical possibility of prosecutorial discretion, particularly at the pleadings stage, when "all reasonable inferences must be made in favor of [Plaintiffs]." *Silha*, 807

F.3d at 173. *See Williams v. Lew,* 819 F.3d 466, 472 (D.C. Cir. 2016)*; See also New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d at 15 ("courts will assume a credible threat of prosecution in the absence of compelling contrary evidence")). This is especially the case given that Chief Anzallo has told the court that he has no discretion with respect to enforcement of DC law, which of course includes DC Code § 7-2509.07(a)(6). ECF 41-1 at 7.

DC disputes that Plaintiffs' claimed economic injury is fairly traceable to the Metro Carry Ban. The court should reject that claim which flows from the District's self-inflicted harm argument. But for the Metro Ban, Plaintiffs would not incur the claimed costs.  The claimed costs are Plaintiffs costs of compliance with the Metro Carry Ban necessary if they are to continue to enjoy their Second Amendment right to carry firearms for their personal protection. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 177 (D.C. Cir. 2012) cited by the District is inapposite. In that case EPA issued waivers that allowed fuel manufacturers the option to introduce a new fuel. Manufacturers complained of the added cost of doing so. The court rejected their claim of causation because the regulation did not require them to produce the new fuel. The court explained, "To the extent the petroleum group's members implement that option voluntarily, any injury they incur as a result is a 'self-inflicted harm' not fairly traceable to the challenged government conduct." *Id.* The situation is different here. Here Plaintiffs are put in the quandary that to exercise their constitutional right to carry for self-defense when they travel around the District, they must either break the law – which as law abiding citizens they find repulsive – with a greater than zero chance of being arrested, or choose alternative higher cost transportation. That is not self-inflicted harm, that is harm inflicted by the District of Columbia in outlawing carry on the Metro. *Ellis v. Comm'r, IRS,* 67 F. Supp. 3d 325, 337 (D.D.C. 2014) is even less on point as there the taxpayer

voluntarily chose not to file tax returns and complained of the IRS's response. There is not a shred of similarity to this case.

Finally, this Court can redress Plaintiffs' injuries in fact with a declaration that the Metro Carry Ban is unconstitutional and an injunction barring Defendants from enforcing it prospectively. Enjoining specific parties from specific action is "an acceptable Article III remedy" that redresses Plaintiffs' "cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

For the foregoing reasons, the Court should find that Plaintiffs have standing to challenge the Metro Carry Ban at this stage of the proceeding.

## IV.     Plaintiffs agree that the individual defendants are immune from damages.

Defendants move to dismiss damage remedies with respect to the individual defendants Anzallo, Contee and Schwalb on various immunity theories. We agree that damage remedies do not lie with respect to the individual defendants. However, injunctive relief does lie with respect to each of the individual defendants pursuant to 42 U.S.C § 1983. *See, e.g., Maine v. Thiboutot,* 448 U.S. 1, 100 (1980); *Samuels v. District of Columbia,* 770 F.2d 184, 194-95 (D.C. Cir. 1985).

The District does not contest municipal liability for violation of Plaintiffs' Second Amendment rights, and municipal liability plainly lies in this case. *See, e.g., Allen v. District of Columbia,* Case No. 20-cv-2453, slip op. at 21-26 (March 31, 2023).

## V.     Conclusion.

Plaintiffs have sufficiently demonstrated their standing to contest the Metro Carry Ban. Accordingly, the motions to dismiss should be denied as to that claim.  With respect to damage remedies against the individual defendants, Plaintiffs agree they are immune from damages, but not from injunctive relief.

Respectfully submitted,

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By:  /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys PLLC
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  April 24, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I served all counsel of record in this proceeding this day through the court's ECF system.

George L. Lyon, Jr., DC Bar 388678