## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREGORY T. ANGELO, *et al.*,<br><br>           *Plaintiffs*,<br><br>      v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>           *Defendants*. | Civil Action No. 22-1878 (RDM) |

## <u>MEMORANDUM OPINION</u>

District of Columbia law prohibits the carrying of firearms on public transportation, *see* D.C. Code § 7-2509.07(a)(6), unless the firearm is unloaded and secured in a locked container, *see* D.C. Code §§ 22-4504.01, 22-4504.02.  Plaintiffs, four D.C.-area residents who hold concealed-carry licenses and use public transportation in the District of Columbia, bring this action challenging the constitutionality of § 7 2509.07(a)(6) under the Second Amendment and the Fifth Amendment's Due Process Clause.  They allege, in short, that they have a constitutional right to carry concealed firearms for personal protection within the District of Columbia and that, but for § 7-2509.07(a)(6), they would do so while riding the Washington Metropolitan Area Transit Authority ("WMATA") owned and operated Metrorail and Metrobus system (collectively, "Metro system").  They further allege that they have on occasion opted to use other, more expensive modes of transportation, rather than risk riding the Metro system unarmed.  They seek injunctive relief, declaratory relief, and compensatory damages.

Because Plaintiffs have failed to allege facts sufficient to support their standing to bring this preenforcement suit, the Court will **DISMISS** the amended complaint, without prejudice, for lack of Article III jurisdiction.

# I. BACKGROUND

The Court has previously described the background of this case in detail, *see Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 119–21 (D.D.C. 2022) ("*Angelo I*"), and, thus, for present purposes will highlight only those aspects of the background that bear on the pending motions to dismiss.  At this early stage of the proceeding, the Court "accept[s] as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiffs Gregory T. Angelo, Tyler Yzaguirre, and Cameron M. Erickson are residents of the District of Columbia.  Dkt. 34 at 2, 4, 8 (Am. Compl. ¶¶ 2, 9, 26).  Plaintiff Robert M. Miller is a resident of Virginia.  *Id.* at 5 (Am. Compl. ¶ 15).  All four Plaintiffs "hold[] a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department" and are "regular rider[s] of the" Metro system.  Dkt. 34 at 2–4, 6, 8 (Am. Compl. ¶¶ 3, 10, 16, 27).  All four Plaintiffs also are "loath to break the law," *id.* at 2, 4, 5, 8 (Am. Compl. ¶¶ 2, 9, 15, 26), and so they do not carry concealed firearms on D.C. public transport even though it would make them feel "more comfortable" or "better protected" to do so, *id.* at 3, 5, 7, 8–9 (Am. Compl. ¶¶ 6, 12, 20, 29).[1]  And all four have, on occasion, opted not to use "the Metro system out of fear of [their] personal safety because [they] could not within the law carry [their] concealed firearm[s] for personal protection," and have, instead, used more expensive modes of transportation.  *Id.* at 3 (Am. Compl. ¶ 6); *see also id*. at 5, 7–9 (Am. Compl. ¶¶ 12, 20, 29).

Plaintiffs acknowledge that because D.C. law permits a licensed owner to transport an unloaded firearm in a locked container that is separate from any ammunition, *see* D.C. Code

---

[1] Plaintiff Yzaguirre, in a different lawsuit against the District of Columbia, has alleged that he was "denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation" of the District's ban on large-capacity magazines.  *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 8 (D.D.C. 2023).

§§ 22-4504.01, 22-4504.02, it is "technically possible to transport a handgun on the Metro," *id.*
at 35 (Am. Compl. ¶ 94).  But they allege that these restrictions have the "practical effect" of
disarming them "for the entirety of their journey." *Id.*  While on the Metro system, Plaintiffs
cannot access their firearms, and because D.C. law requires that firearms remain concealed while
in public, D.C. Code § 7-2509.07(e), Plaintiffs would need to find a private place to remove their
firearms from the locked contained and to holster them in a concealed manner, *id.* at 35–36 (Am.
Compl. ¶ 95).  They further allege that this "unnecessary handling of a firearm [would] create[]
the risk of an accidental or negligent discharge." *Id.* at 36 (Am. Compl. ¶ 96).

This litigation commenced on June 30, 2022, when Plaintiffs brought suit against the
District of Columbia and Robert J. Contee III, the Chief of the D.C. Metropolitan Police
Department ("MPD"), alleging that D.C. Code § 7-2509.07(a)(6) violated their Second and Fifth
Amendment rights by prohibiting them from carrying concealed firearms on public
transportation vehicles. *See* Dkt. 1 at 33–34 (Compl. ¶¶ 81–83).  At that time, Plaintiffs sought
injunctive and declaratory relief, but mentioned damages "only in passing" and without any
supporting factual allegations. *Angelo I*, 648 F. Supp. 3d at 121 n.2.  Two weeks after filing suit,
Plaintiffs moved for a preliminary injunction, requesting that this Court enjoin Defendants from
enforcing § 7-2509.07(a)(6) during the pendency of this action.  Dkt. 6.  At that time, Plaintiffs
also asked that the Court "merge" the preliminary injunction proceeding with the ultimate merits
and issue a permanent injunction barring Defendants from enforcing § 7-2509.07(a)(6).  Dkt. 6-1
at 50–51.  On December 28, 2022, the Court declined to merge the preliminary injunction
proceeding with the ultimate merits, *Angelo I*, 648 F. Supp. 3d at 121 n.3, and denied Plaintiffs'
motion for preliminary injunctive relief, holding that Plaintiffs lacked standing to bring a
preenforcement challenge to § 7-2509.07(a)(6), *id.* at 132.

On February 1, 2023, Plaintiffs filed an amended complaint.  Dkt. 34.  In Count One, Plaintiffs allege that § 7-2509.07(a)(6), violates the Second Amendment, both "facially and as applied" to their circumstances.  Dkt. 34 at 47–48 (Am. Compl. ¶¶ 130–32).  In Count Two, they allege that § 7-2509.07(a)(6) is "arbitrary and irrational and thus violates the due process clause of the Fifth Amendment."  *Id.* at 48 (Am. Compl. ¶ 133).  The amended complaint adds as defendants Brian Schwalb, the Attorney General of the District of Columbia, and Michael Anzallo, the Chief of Police of WMATA's Metro Transit Police Department ("MTPD" or "WMATA MTPD").  Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40); *see also* Dkt. 42-1 at 2, 7 n.2.  Attorney General Schwalb and MTPD Chief Anzallo are each named in both their official and individual capacities.  Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40).  The amended complaint also adds factual allegations relating to Plaintiffs' claim for compensatory relief.  *See id.* at 48 (Am. Compl. ¶ 132); *see also Angelo I*, 648 F. Supp. 3d. at 121 n.2 (observing that it was "unclear whether the complaint in fact s[ought] damages" because it contained "no allegation[s] relating to any monetary loss").  Other than those additions, however, the amended complaint largely tracks its predecessor.

In response, Defendants the District of Columbia, Attorney General Schwalb, and MPD Chief Contee (collectively "the District Defendants") and Defendant MTPD Chief Anzallo have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. 42 (Anzallo); Dkt. 44 (District Defendants).  For the reasons explained below, the Court will **GRANT** both motions to dismiss.

## II.  LEGAL STANDARD

Two legal standards govern the Court's consideration of the pending motions to dismiss.

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to adjudicate the claim and may take the form of either a "facial" or "factual" challenge.  A facial challenge asks whether the plaintiff has pleaded facts sufficient to establish the Court's jurisdiction, while a factual challenge asks the Court to "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  In other words, a facial challenge is confined to the four corners of the complaint, while a factual challenge permits the court to look beyond the complaint to satisfy itself that it has jurisdiction to hear the suit.  Whether the motion to dismiss is facial or factual, the plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Considered against that background, Defendants' respective challenges to the Court's jurisdiction are best viewed as facial in nature.  When considering a facial challenge to its jurisdiction, the Court must accept the allegations of the complaint as true and must construe "the complaint in the light most favorable to the non-moving party."  *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  In that sense, the Court resolves the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept the factual allegations of the complaint as true and may not rely on evidence or factual material beyond those allegations.  A defendant can therefore prevail on a Rule 12(b)(6) motion only by demonstrating that the facts, as alleged in the complaint, do not warrant relief as

a matter of law.  In resolving a 12(b)(6) motion, the Court need not accept legal conclusions as true.  *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006).  Rather, the question for the Court is whether the factual allegations "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### III.  ANALYSIS

In significant part, the question now before the Court is a familiar one, since the Court previously held that Plaintiffs (1) had failed to allege facts sufficient to establish standing to bring a preenforcement challenge to § 7-2509.07(a)(6) under the standard set forth in two binding decisions from the D.C. Circuit and (2) had failed to show that those "precedents are no longer good law or do not control in this case."  *Angelo I*, 648 F. Supp. 3d at 132.  The Court must now decide whether Plaintiffs' amended complaint has cured the defects that the Court previously identified, whether any intervening law has now abrogated those precedents, or whether the Court's prior analysis was mistaken.

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), the Court must assess Plaintiffs' standing with respect to "each claim" asserted and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  This, in turn, requires the Court to determine whether Plaintiffs have alleged facts sufficient to satisfy the constitutional minimum for establishing Article III standing for each claim and for each form of relief sought—that is (1) that they are suffering or will likely suffer an "injury in fact" that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted); (2) that their injury is "'fairly traceable to the challenged action of the defendant[s],'" *Ord v. District of Columbia*, 587 F.3d

1136, 1140 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 560); and (3) that their injury is "likely to be 'redressed by a favorable decision,'" *id.* (quoting *Lujan*, 504 U.S. at 561).

The Court first addresses Plaintiffs' claims for injunctive and declaratory relief and then turns to their claims for damages.

## A.      Injunctive and Declaratory Relief

### 1.      *The District of Columbia*

Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint seeks a declaration that D.C. Code § 7-2509.07(a)(6) is unconstitutional, and they seek an injunction prohibiting Defendants from the enforcing the law against them.  As in *Angelo I*, moreover, Plaintiffs bring a preenforcement challenge.  None of the Plaintiffs has been arrested, prosecuted, or subject to civil penalties for violating § 7-2509.07(a)(6).  None has been threatened with arrest or prosecution or with the imposition of a civil penalty.  And none has identified a credible, imminent threat of arrest, prosecution, or fine.  Instead, each asserts standing to seek declaratory and injunction relief based on his commitment to abide by the law and corresponding submission that, but for § 7-2509.07(a)(6), he would exercise his constitutional right to carry a concealed firearm while using the Metro system.

To bring a preenforcement challenge to the constitutionality of a statute, a plaintiff may "establish Article III standing by (1) 'alleging an intention to engage in the proscribed conduct,'" provided that the conduct is "arguably affected with a constitutional interest, . . . and (2) demonstrating that 'there exists a credible threat of prosecution.'"  *Ord*, 587 F.3d at 1140 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).  In the D.C. Circuit, moreover, when a plaintiff presents a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings," *Seegars v. Gonzales*,

396 F.3d 1248, 1254 (D.C. Cir. 2005), the plaintiff "must establish that the threat of prosecution is not only 'credible,' but also 'imminent,'" *Angelo I*, 648 F. Supp. 3d at 124 (quoting *Ord*, 587 F.3d at 1140).

Here, for reasons explained in *Angelo I*, Plaintiffs easily satisfy the first of the preenforcement standing requirements.  *See Angelo I*, 648 F. Supp. 3d at 123.  They have alleged a present intention to carry concealed firearms while using the Metro system, and they have alleged that the only thing that is keeping them from doing so is the law that they challenge. Because "[t]he D.C. Circuit has disavowed any requirement that plaintiffs asserting preenforcement challenges express an 'unconditional intention to engage in the proscribed behavior, regardless of whether the statute is invalidated,'" *id.* (quoting *Seegars*, 396 F.3d at 1251 (emphasis omitted), those allegations suffice.  So far, so good.

The difficulty that Plaintiffs confronted in *Angelo I*, and that they continue to confront here, is that they have failed allege any facts that, if accepted as true, would show that they face (or would face) a credible and imminent threat of prosecution (were they to violate the law).  *See Angelo I*, 648 F. Supp. 3d at 123–26.  As the Court concluded in *Angelo I*, the Court once again concludes that Plaintiffs have failed to satisfy this requirement for establishing standing to bring a preenforcement, constitutional challenge to a statute.

By way of background, the Court's conclusion in *Angelo I* was dictated by three D.C. Circuit precedents: *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), *cert denied*, 531 U.S. 816 (2000); *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), *cert denied*, 546 U.S. 1157 (2006); and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).  Those cases, *Angelo I* explained, "paint a clear picture: to establish Article III standing, a plaintiff bringing a [non-First Amendment]

preenforcement challenge must do more than show that the government enforces its laws as written." 648 F. Supp. 3d at 126. It is not enough to allege facts demonstrating a "credible" threat of prosecution; the plaintiff bringing a non-First Amendment preenforcement challenge to a criminal statute must also allege facts sufficient to permit a plausible inference that the threat of criminal or civil enforcement is "imminent." *Id.* at 124. As the D.C. Circuit reaffirmed in *Parker*, *Navegar* and *Seegars* require courts "to look for an allegation that [the plaintiffs] have been singled out or uniquely targeted by the D.C. government for prosecution." 478 F.3d at 375.

Applying this test in *Angelo I*, the Court concluded that Plaintiffs' complaint lacked the allegations necessary to satisfy this test. *See Angelo I*, 648 F. Supp. 3d at 126. As the Court explained, as alleged in their original complaint, "Plaintiffs rest[ed] their entire standing argument on the facial contention that '[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense' and that they 'do not do so now because [they] fear arrest and prosecution.'" *Id.* To be sure, as the Court further explained, the *Seegars* court noted, in describing the "imminence requirement, that 'clarity prevails only at the poles.'" *Id.* (quoting *Seegars*, 396 F.3d at 1252). But that line-drawing problem is of little consequence when, as in *Angelo I*, a plaintiff alleges nothing more than a generalized and entirely speculative concern that he or she might face prosecution or a civil penalty proceeding, were he or she to violate the law. Thus, *Angelo I* concluded as follows:

> Notably, . . . nowhere do Plaintiffs allege . . . that they "have been singled out or uniquely targeted by the D.C. government for prosecution," *Parker*, 478 F.3d at 375, and they point to no "prior threats against them" and to no "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255. The Court, accordingly, finds no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all.

*Id.*

9

The conclusion that the Court reached in *Angelo I* applies with equal force to the present motion.  *Navegar*, *Seegars*, and *Parker* remain binding precedent, and Plaintiffs have yet to identify any reason to believe they have been, or will be, "singled out or uniquely targeted by the D.C. government for prosecution" or civil penalty proceedings.  *Parker*, 478 F.3d at 375. Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint alleges that, but-for the challenged statute, they would carry concealed firearms on and within the metro system for purposes of self-defense.  *See* Dkt. 34 at 1, 4–5, 7–9 (Am. Compl. ¶¶ 2, 7, 9, 13, 15, 21, 26, 30). As in their original complaint, they allege, in conclusory terms, that the District's gun laws are enforced "actively and vigorously," *id.* at 9 (Am. Compl. ¶ 33); *see also id.* at 12 (Am. Compl. ¶ 42), and that the District "has not disclaimed prosecution for violation of the law at issue in this proceeding," *id.* at 9 (Am. Compl. ¶ 33); *Angelo I*, 647 F. Supp. 3d at 126 ("Plaintiffs argue that '[t]he District has never disclaimed an intent to enforce the Metro carry ban.'").

These allegations were insufficient in *Angelo I*, and they remain insufficient for present purposes.  This Court remains bound by the D.C. Circuit's admonitions that "the District's general threat to prosecute violations of its gun laws d[oes] not constitute an Article III injury," *Parker*, 478 F.3d at 374, and that a "plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written," *Angelo I*, 648 F. Supp. 3d at 126. As before, Plaintiffs have alleged "no prior threats against them or any characteristics indicating an especially high probability of enforcement against them."  *Seegars*, 396 F.3d at 1255.  And they have failed to allege any facts suggesting that they have been, or are likely to be, singled out for prosecution.  *Parker*, 478 F.3d at 375.

Plaintiffs' efforts to cure the jurisdictional deficiencies in their original complaint, moreover, are unavailing.  They now allege, for example, that their counsel emailed the Attorney

General of the District of Columbia in January 2023 requesting that he "waive enforcement" of D.C. Code § 7-2509.07(a)(6) "as to [his] clients," Dkt. 34 at 11 (Am. Compl. ¶ 38), and, almost two weeks later, sent a letter to the Chief of the WMATA Police Department requesting a similar waiver and also requesting that he "'enter into a non-prosecution agreement'" with the Plaintiffs, *id.* (Am. Compl. ¶ 41).  They allege that neither official has responded to this correspondence. *Id.* (Am. Compl. ¶¶ 39, 41).  This silence does not, however, suggest that Plaintiffs face an imminent threat of prosecution—or that they would face such a threat, were they to violate § 7-2509.07(a)(6).  All the more so when considered against the backdrop of *Navegar* and its progeny.  In *Navegar*, for example, the D.C. Circuit held that the plaintiffs had failed to show that they faced an imminent threat of enforcement, even though "case agents of the Bureau of Alcohol, Tobacco and Firearms had visited the plaintiff gun manufacturers, alerted them to the prohibitions in question, and conducted inventories of their firearms stocks, including those of the weapons about to be barred."  *Seegars*, 396 F.3d at 1255 (citing *Navegar*, 103 F.3d at 997).  Still, the *Navegar* court concluded that, "although the government ha[d] demonstrated its interest in enforcing the Act generally," there was no indication that the plaintiffs faced a jurisdictionally sufficient threat of enforcement.  103 F.3d at 1001; *see also Ord*, 587 F.3d at 1141 (noting that there was no imminence in *Parker* where "the District of Columbia had declared its intention to prosecute all violators").

Plaintiffs also now allege that Miller is "aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating" § 7-2509.07(a)(6).  Dkt. 34 at 6 (Am. Compl. ¶ 18); *cf. Angelo I*, 648 F. Supp. 3d at 126 (noting that at oral argument, Plaintiffs could not identify a single person with a concealed carry permit who had ever been arrested for carrying a handgun on public transportation in the District while not

engaged in another crime).  After the close of briefing, moreover, Plaintiffs filed "the result of an information request directed to Metro by Plaintiff Dr. Miller on January 13, 2023."  Dkt. 51 at 3. According to that filing, Miller "asked Metro to advise him of the number of arrests occurring on the Metro system in the District for the unlawful carrying of firearms in years 2018 through 2022."  *Id.*  Miller reports that, in response, he was informed that a total of "71 arrests for possession/carrying firearms on the Metro system" occurred during this five-year period.  *Id.* at 4.  Although Plaintiffs contend that their filing "plainly shows [that] there is a credible threat of enforcement of DC Code Section 7-2509.07(a)(6)," *id.* at 4, the Court is unpersuaded for at least two reasons.[2]

First, there is no evidence that any of these arrests were for violating § 7-2509.07(a)(6), rather than other criminal laws, or that they involved efforts to enforce § 7-2509.07(a)(6).  There are, of course, multiple laws—federal and D.C.—that preclude individuals from carrying firearms under specified circumstances.  It is unlawful, for example, "for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to possess a firearm that has traveled in interstate commerce.  18 U.S.C. § 922(g)(1).  It is also unlawful for a person who engages in a violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, to carry a firearm in furtherance of that offense.  18 U.S.C. § 924(g)(2). And it is unlawful for anyone to carry a firearm in the District of Columbia without a registration certificate.  D.C. Code § 7-2502.01.  Yet, Plaintiffs' statistics fail to indicate whether any of the 71 arrests were for violating § 7-2509.07(a)(6).  Moreover, even in case where a defendant might

---

[2] When assessing whether it has jurisdiction, the Court may consider any record materials that bear on that question.  *See Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021).

have been charged with violating § 7-2509.07(a)(6), Plaintiffs fail to indicate whether the arrest at issue was prompted by a violation of § 7-2509.07(a)(6) or whether a § 7-2509.07(a)(6) charge was added only after an arrest was made.  Consider, for example, an individual who starts a fist fight on the Metro while carrying a concealed firearm.  One can easily imagine that the individual might face arrest for assault, *see* D.C. Code § 22-404, and that the police or prosecutors might only add a § 7-2509.07(a)(6) charge after a gun is found in course of making the arrest.  In any event, Plaintiffs offer no allegations—or facts—suggesting that the WMATA police department has engaged in any coordinated efforts to enforce § 7-2509.07(a)(6) against any licensed firearm owners who have carried concealed weapons on the Metro system.

Second, even if all 71 of the arrests over the five-year period were the product of a concerted effort by the WMATA police department to enforce § 7-2509.07(a)(6), that would not show that *Plaintiffs* have been or will be targeted for enforcement.  That laws are generally enforced is presumed.  *See Angelo I*, 648 F. Supp. 3d at 126; *Seegars*, 396 F.3d at 1255 (explaining that, absent "prior threats" or "characteristics indicating an especially high probability of enforcement," it was not enough to show that the District "enforces its guns laws, prosecuting all violators of the statute under normal prosecutorial standards" (internal quotation marks and citation omitted)).  But an average of 14.2 arrests per year (71/5), throughout the entire portion of the Metro system located in the District of Columbia, hardly suggests that Plaintiffs face a credible threat of arrest or prosecution.  In short, there is "no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all."  *Angelo I*, 648 F. Supp. 3d at 126.

13

To be sure, the question in *Angelo I* was whether Plaintiffs could make a "'clear showing,'" *id.* at 121 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), that they were "likely" to establish standing, *id.* at 119.  Here, the standard is different, since the Court must assume the truth of Plaintiffs' factual allegations and must construe the amended complaint in the light most favorable to Plaintiffs.  But the Court's decision in *Angelo I* did not rest on the heightened preliminary injunction standard; it rested on the fact that Plaintiffs had failed to allege facts sufficient to sustain their standing.  As the Court wrote: "Nowhere do Plaintiffs allege (much less show a likelihood of establishing) that they 'have been singled out or uniquely targeted by the D.C. government for prosecution,' and they point to no 'prior threats against them' and to no 'characteristics indicating an especially high probability of enforcement against them.'"  *Angelo I*, 648 F. Supp. 3d at 126 (first quoting *Parker*, 478 F.3d at 375; and then quoting *Seegars*, 396 F.3d at 1255).  Accordingly, notwithstanding the different procedural posture, the Court's analysis and conclusions in *Angelo I* apply here with equal force.

Plaintiffs resist this conclusion with two arguments.

The first is a familiar one.  Plaintiffs once again argue that *Navegar* and its progeny are inconsistent with the Supreme Court's standing precedents.  Dkt. 46 at 33–34 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Plaintiffs made the same argument, nearly verbatim, in *Angelo I*.  *Compare id.*, *with* Dkt. 29 at 17–18.  Notably, Plaintiffs nowhere address (or even acknowledge) the Court's rejection of these identical arguments in *Angelo I*.  648 F. Supp. 3d at 126–32.  But the blunt force of repetition cannot render the binding decisions in *Navegar*, *Seegars*, and *Parker* dead letter—or any less applicable.

As this Court explained in *Angelo I*, "'[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court,' and it is the province of the D.C.

Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions should be overruled." *Id.* at 129 (quoting *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979)).  That principle, moreover, applies with "particular force" here because the D.C. Circuit has itself "reckoned with the tension between *Navegar* and the Supreme Court's First-Amendment precedents" and because "[m]ultiple judges on the D.C. Circuit have . . . called for reconsideration of *Navegar* en banc—some of them precisely on the grounds that the decision is at odds with" Supreme Court precedent. *Id.* at 130.  Because the D.C. Circuit has, at least to date, declined that invitation, "[w]hatever the merits of Plaintiffs' doctrinal critiques," this Court "must, just like the D.C. Circuit, remain faithful" to the *Navegar* line of cases. *Id.*; *see also Parker*, 478 F.3d at 375 ("Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.").

Plaintiffs' attempt to adorn an old argument with an additional Supreme Court precedent—*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), *see* Dkt. 46 at 28–30—is unavailing.  That case, which was decided before *Angelo I*, held that the doctrine of sovereign immunity barred petitioners' preenforcement challenge to Texas Senate Bill 8 as brought against state court judges, state court clerks, and the Texas attorney general, but not against four executive licensing officials. *Whole Woman's Health*, 595 U.S. at 37–43, 51.  Although not the focus of the Court's inquiry, each of the Court's opinions touches on standing as well.  But Plaintiffs overstate the holding of the Court and its application to the present circumstances.  For one thing, the paragraph that Plaintiffs quote from Justice Gorsuch's opinion, comes from a portion of the opinion, Part II-C, that failed to command a majority. *See* 595 U.S. at 34, 45–48.

Even more importantly, as explained in Chief Justice Roberts and Justice Sotomayor's separate opinions—which provided Justice Gorsuch with a majority on the question of standing—the present circumstances are readily distinguishable from what was at issue in *Whole Woman's Health*. *See id.* at 59–61 (Roberts, C.J., concurring in the judgment in part and dissenting in part); *id.* at 62–63 (Sotomayor, J., concurring in the judgment in part and dissenting in part). As explained in those opinions, the law at issue was "structured to thwart [judicial] review," *id.* at 67 (Sotomayor, J.), and to "nullify th[e] [Supreme] Court's rulings" while evading review, *id.* at 61 (Roberts, C.J.). Moreover, even assuming that *Whole Woman's Health* is in some tension with the *Navegar* line of cases, Plaintiffs cannot plausibly maintain that the decisions are so irreconcilable that this Court may—and should—conclude that *Navegar* and its progeny are no longer binding precedent. If that precedent is to be discarded, it is for the D.C. Circuit or the Supreme Court, and not this Court, to do so. *See Angelo I*, 648 F. Supp. 3d at 129.

Taking a slightly different tack, Plaintiffs also cite a passage from *Whole Woman's Health* in support of their separate contention that the D.C. Circuit's distinction between First Amendment and all other constitutional challenges does not hold water. That passage, which appears in a portion of Justice Gorsuch's opinion that did garner a majority, observes as follows:

> [T]he "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. Instead, this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice. The Court has consistently applied these requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right. The petitioners are not entitled to a special exemption.

595 U.S. at 50 (internal citations omitted). Plaintiffs imply a tension between the penultimate sentence, equating "the free exercise of religion, the freedom of speech, [and] the right to bear arms," and the D.C. Circuit's treatment of non-First Amendment preenforcement challenges.

Dkt. 46 at 30.  But this is the same tension that the Court addressed in *Angelo I*.  *See* 648 F. Supp. 3d at 129–30 & n.5.  And it is the same tension that the D.C. Circuit grappled with in *Seegars*.  *See* 396 F.3d at 1254; *see also id.* at 1257 (Sentelle, J., dissenting) ("I know of no hierarchy of Bill of Rights protections that dictates different standing analysis.").  As this Court previously explained: "Notwithstanding that tension, '[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court.'"  *Angelo I*, 648 F. Supp. 3d at 129 (quoting *Brewster*, 607 F.2d at 1373).

Finally, Plaintiffs assert that they "continue to believe that *New York Rifle & Pistol Ass'n v. New York*," 590 U.S. 336 (2020) (per curiam), "undermines the *Navegar* line of cases."  Dkt. 46 at 30–33.  *Angelo I* addressed and rejected this argument.  *See* 648 F. Supp. 3d at 126–28.

Plaintiffs' second argument—that *Seegars* and *Navegar* are distinguishable, and, relatedly, that the absence of an administrative remedy requires the availability of preenforcement review, Dkt. 46 at 36; Dkt. 61 at 5 n.1—was addressed and rejected in *Angelo I*.  As the Court explained, "that argument is squarely foreclosed by the D.C. Circuit's decision in *Seegars*, which made clear that 'the lack of an administrative remedy, while it increases the hardship resulting from denial of preenforcement review, still does not enable [the plaintiff] to meet the *Navegar* test.'"  *Angelo I*, 648 F. Supp. 3d at 130–31 (second alteration in original) (quoting *Seegars*, 396 F.3d at 1256).

    2.    *Individual Defendants*

In addition to seeking injunctive and declaratory relief against the District of Columbia, Plaintiffs seek similar relief with respect to three government officials, who Plaintiffs sue in both their individual and official capacities: Attorney General Schwalb, MPD Chief Contee, and WMATA MPTD Chief Anzallo.  These claims fail for all of the reasons explained above—

Plaintiffs have not "demonstrated a threat of prosecution sufficiently imminent under circuit law," *Seegars*, 396 F.3d at 1256, and, therefore, lack standing to pursue prospective relief, *see id.* at 1248, 1256 (claims against D.C. mayor and U.S. attorney general); *Parker*, 478 F.3d at 370, 375 (claims against the District and its mayor).[3]

A final note:  Since the close of briefing, Plaintiffs have filed eight separate notices of supplemental authority bringing to the Court's attention various standing decisions in allegedly similar cases.[4]  But those decisions are of little persuasive value here—none is from this Circuit, none analyzed standing under the *Navegar* standard that governs here, and none addresses whether this Court is free to depart from that standard.

## B.    Damages

Plaintiffs also seek compensatory relief, alleging that D.C. Code § 7-2509.07(a)(6) has caused them economic injuries in the form of increased transportation costs.  As explained above, Plaintiffs added these allegations to their amended complaint in an effort to establish

---

[3] Plaintiffs' claims against MTPD Chief Anzallo in his official capacity fail for the further reason that he is not subject to suit in his official capacity under § 1983.  Section 1983 provides a private cause of action against any "person" who, under color of state or District of Columbia law, deprives another individual of a federal constitutional or statutory right.  But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  And "there is no question that, as an interstate compact agency created by Maryland, Virginia, and the District of Columbia, WMATA is an arm of its signatory states for Section 1983 purposes and, as a result, cannot be sued under that statute." *Tapp v. WMATA*, 306 F. Supp. 3d 383, 394 (D.D.C. 2016).  Nor is there question that MTPD is "a department within WMATA and not a separate entity." *White v. WMATA*, 303 F. Supp. 3d 5, 9 (D.D.C. 2018); *see also Hawkins v. WMATA*, 311 F. Supp. 3d 94, 108 (D.D.C. 2018) (dismissing § 1983 suit against MTPD officer in his official capacity).

[4] Dkt. 48 (District of Southern Illinois); Dkt. 51 (District of Eastern Virginia); Dkt. 55 (Ninth Circuit and the District of Colorado); Dkt. 56 (District of Maryland); Dkt. 58 (Second Circuit and the District of New Mexico); Dkt. 59 (Central District of California); Dkt. 60 (Southern District of California); Dkt. 61 (Second Circuit).

standing to bring a preenforcement challenge to § 7-2509.07(a)(6). And, as explained below, the Court concludes that the additional allegations fail fix the problem.

1. *The District of Columbia*

In their amended complaint, Plaintiffs allege that they have incurred increased transportation costs because they are fearful of riding the Metro system unarmed. Dkt. 34 at 3, 5, 7–8 (Am. Compl. ¶¶ 4–5, 11–12, 17, 28). Each Plaintiff avers that he has, on occasion, declined to use the Metro system "out of fear of his personal safety" because he could not lawfully "carry his concealed firearm for personal protection."[5] Dkt. 34 at 3, 5, 7–8 (Am. Compl. ¶¶ 6, 12, 20, 29). Plaintiffs emphasize that their avoidance of the Metro system has "nothing to do" with a "fear of arrest" or prosecution. Dkt. 46 at 40. Instead, Plaintiffs rely on a slightly less direct chain of events, which takes the following form: (1) § 7-2509.07(a)(6) prohibits Plaintiffs from carrying their firearms on the Metro system in an accessible manner; (2) Plaintiffs are law abiding and, accordingly, will not carry their firearms on the Metro system absent injunctive or declaratory relief; (3) although Plaintiffs often ride the Metro system, they have, on occasion, declined to do so based on a concern for their personal safety; (4) had they been allowed to carry their firearms, they would have felt safe enough to ride the Metro system on these occasions; and (5) when they have declined to ride the Metro system based on a concern for their personal safety, they have used alternative forms of transportation (*e.g.*, taxis or Uber), which were more costly than riding the Metro system. For purposes of resolving the pending motions to dismiss, the Court accepts these allegations as true.[6]

---

[5] Plaintiffs do not allege how frequently they have foregone riding the Metro system.

[6] The Court notes, however, that Uber "prohibits everyone from carrying firearms of any kind while using the app, to the extent permitted by applicable law." Firearms Policy, Uber,

The District Defendants argue that Plaintiffs have failed to establish causation because the additional costs that they have incurred using alternative modes of transportation are not "fairly traceable" to § 7-2509.07(a)(6). Dkt. 44-1 at 15. In their view, these additional costs are self-inflicted, risk-mitigation expenses, and Plaintiffs "cannot establish standing by incurring costs that 'are simply the product of their fear[.]'" *Id.* at 14 n.1 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)). The District Defendants, accordingly, urge the Court to hold that the costs at issue are a form of "self-inflicted harm [that is] not fairly traceable to the challenged government conduct." *Id.* at 15 (quoting *Passut v. Cardona*, 540 F. Supp. 3d 27, 41 (D.D.C. 2021)).

Plaintiffs respond that these costs were not self-inflicted, but rather constitute "wholly predicable expenses" of "coerced compliance" with § 7-2509.07(a)(6). Dkt. 46 at 40. In their view, the additional costs that they have incurred are akin to increased administrative costs that a regulated party might incur in order to comply with an allegedly unconstitutional statute. *See* Dkt. 46 at 40 (citing *Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (holding that contractor had standing to challenge statute's hiring and reporting requirement based on increased administrative costs of compliance)). Plaintiffs contend that the cost of using a taxi, Uber, or personal vehicle is therefore directly traceable to D.C. Code § 7-2509.07(a)(6). *See* Dkt. 46 at 43.

Although the costs at issue here differ in material respects from the costs incurred by a regulated party in complying with a challenged law, the Court need not decide whether Plaintiffs' additional transportation costs were "self-inflicted" or "voluntarily" incurred because

---

https://help.uber.com/riders/article/firearms-policy?nodeId=e642d54a-dbfb-4e9d-922f-69aea2dd1e67 (last visited August 9, 2024).

Plaintiffs' claims for monetary relief fail for the same reasons that their claims for injunctive and declaratory relief fail.   The form of relief sought does not alter the fact that this is a preenforcement challenge to a criminal statute; that *Navegar* and its progeny require a showing that Plaintiffs face a "credible" and "imminent" of prosecution; and that Plaintiffs have failed to make the requisite showing.   *Angelo I*, 648 F. Supp. 3d at 124.

The Court need look no farther than *Navegar* itself to conclude that Plaintiffs' alleged monetary losses do not alter the result.   Recall that in *Navegar* two federally licensed firearms manufacturers brought suit challenging the constitutionality of a federal law that "made it unlawful for a person to 'manufacture, transfer, or possess a semiautomatic assault weapon'" or to transfer or possess "any 'large capacity ammunition feeding device.'"   103 F.3d at 997 (citing 18 U.S.C. §§ 922(v)(1), 922(w)(1)).   After they were visited by Bureau of Alcohol, Tobacco, and Firearms inspection agents and informed of these prohibitions, the plaintiffs "ceased the manufacture and transfer of the outlawed weapons . . . and [ ] expressed no intention to violate the Act in the future."   *Id.*   In bringing suit challenging the law, the plaintiffs alleged that they suffered substantial economic losses due to the law, including a prohibition on future sales of important products and the loss of tens of thousands of dollars of existing inventory.   *See*, *e.g.*, Compl. ¶ 19, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.D.C. 1996) (No. 95-550), ECF No. 11.   The district court nonetheless dismissed the action for lack of standing, *Navegar*, 914 F. Supp. at 637, and on appeal the plaintiffs, again, invoked the cost of complying with the statute to support their claim to standing.   As they did in the district court, they argued that they "had to cease manufacture of their products" and had "tens of thousands of dollars worth of inventory" that they could no longer sell.   Brief of Appellant at 20, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.C. Cir. 1996) (No. 96-5088).

Notwithstanding these allegations of economic loss that was both more direct and far more substantial than the economic loss the Plaintiffs invoke here, the D.C. Circuit held that the manufacturers lacked standing to bring a preenforcement challenge to those portions of the law that did not "single[] out the [plaintiffs] as intended targets." *Navegar*, 103 F.3d at 1000. As the D.C. Circuit explained, the plaintiffs lacked standing because they failed to demonstrate that the threat of prosecution was "genuine and imminent," *id.* at 1001–02, and the fact that they had incurred—and would continue to incur—substantial financial losses had no bearing on that question. In a preenforcement challenge, like this one, a plaintiff cannot establish causation by merely invoking risk-avoidance or compliance costs; such costs are fairly traceable to the challenged law only when they are linked to a "credible threat of imminent prosecution." *Seegars*, 396 F.3d at 1254–55. The same conclusion applies here with even greater force.

Ultimately, Plaintiffs' damages claim is "a repackaged version of [Plaintiffs'] first failed theory of standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). In some circumstances, the form of relief that a plaintiff seeks can affect his or her standing to sue. A plaintiff lacks standing, for example, to bring an action seeking injunctive relief, where the alleged wrong occurred in the past and is unlikely to reoccur. *See*, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). But, here, the addition of a claim for damages has no bearing on Plaintiffs' standing because, as in *Navegar*, Plaintiffs contend that they have incurred losses relating to their compliance with a criminal statute but have failed to show that they face a credible and imminent threat of prosecution. If the ongoing financial losses in *Navegar* were insufficient to establish standing in the absence of a "credible" and "imminent" threat of prosecution, then Plaintiffs' asserted losses resulting from their decision, on occasion, to use

taxis or Ubers in the absence of any "credible" and "imminent" threat of prosecution cannot suffice.

Whether the *Navegar* rule is sound and consistent with other precedent is not for this Court to decide.  As noted above, multiple judges on the D.C. Circuit have raised substantial questions about the rule and have called for its reconsideration by the *en banc* court.  But unless and until the Court of Appeals overrules *Navegar* and its progeny, this Court remains bound to follow the rule.  Applying that rule here, the Court concludes, as it did in *Angelo I*, that Plaintiffs have failed to allege facts sufficient to show that they have been, or are likely to be, singled out for prosecution and that, accordingly, Plaintiffs lack standing to bring a preenforcement challenge to § 7-2509.07(a)(6).  That conclusion applies, moreover, regardless of whether Plaintiffs seek injunctive, declaratory, or monetary relief.

2.      *Individual-Capacity Defendants*

Turning to Plaintiffs' damages claim against the individual defendants, Plaintiffs "agree that monetary damage claims against the individual dependents do not lie."  Dkt. 46 at 13; *see id.* at 44 ("Defendants move to dismiss damage remedies with respect to the individual defendants Anzallo, Contee and Schwalb on various immunity theories.  We agree that damage remedies do not lie with respect to the individual defendants.").

Given that Plaintiffs have abandoned these individual-capacity claims, the Court will treat the matter as conceded and will grant Defendants' respective motions to dismiss with respect to the damages claims against the individually named defendants: Attorney General Schwalb, MPD Chief Contee, and MTPD Chief Anzallo.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, Dkt. 42; Dkt. 44, will be granted.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  August 9, 2024